## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GOLDKING HOLDINGS, LLC, et al.,[1] | Case No. 13-12820 (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF EDWARD HEBERT IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, EDWARD HEBERT, do hereby declare (this "Declaration"), under penalty of perjury, that:

1.      I am a member of the Board of Managers (the "GKH Board") and Chief Executive Officer (CEO) of Goldking Holdings, LLC ("GKH"), a Delaware limited liability company, and its above-captioned affiliated debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors"). GKH owns 100% of the membership interests of Debtor Goldking Onshore Operating, LLC ("GKO") and Debtor Goldking Resources, LLC ("GKR"), both of which are Delaware limited liability companies.

2.      I have been employed by the Debtors since October 2011, initially as Chief Financial Officer, and beginning in May 2013, as CEO. My prior work experience includes serving as Vice President of Finance and Chief Accounting Officer of Saratoga Resources, Inc., an oil and gas company that filed for chapter 11 protection in 2009. In my capacity as CEO of the Debtors, I have detailed knowledge of, and experience with, the Debtors' business and financial affairs.

---

[1]  The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Goldking Holdings, LLC (2614); Goldking Onshore Operating, LLC (2653); and Goldking Resources, LLC (2682). The mailing address for the Debtors is 777 Walker Street, Suite 2500, Houston, TX 77002.

3.      As CEO, I am one of the employees responsible for devising and implementing the Debtors' business plans and strategies and overseeing the Debtors' financial, operational and legal affairs.  Accordingly, I have been involved in the Debtors' restructuring process (the "<u>Restructuring</u>"), which includes, but is not limited to:   (i) participating and overseeing the process of pursuing and consummating the sale of all or substantially all of the Debtors' assets; (ii) managing the professionals engaged by the Debtors in connection with the Restructuring; (iii) supervising the preparation of the documentation necessary to implement the Restructuring; (iv) managing and negotiating the Debtors' relations with their creditors and other stakeholders; and (v) consulting with the Debtors' other officers, executives and managers and members of the GKH Board, of which I am member, with respect to the foregoing.

4.      On the date hereof (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions (collectively, the "<u>Petitions</u>") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq</u>. (the "<u>Bankruptcy Code</u>"), in this Bankruptcy Court (the "<u>Court</u>"), in an effort to preserve and maximize the value of their business, assets and chapter 11 estates through the prosecution of these chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>").

5.      The Debtors intend to operate their business and manage their assets and properties as "debtors in possession" under sections 1107(a) and 1108 of the Bankruptcy Code.

6.      I have been advised by counsel that the Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.  In addition, I have been advised by counsel that venue of the Chapter 11 Cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

01:14269918.4

A.      **Overview of the Debtors**

7.      Wayzata Opportunities Fund II, L.P. ("Wayzata") is the majority member of GKH and holds approximately a 94.20% ownership interest.  GKH's minority member is Goldking LT Capital Corp., an entity owned by Leonard C. Tallerine, Jr. ("Mr. Tallerine"),[2] which holds approximately a 5.80% ownership interest.  For the Court's convenience, a corporate organizational chart is attached hereto as Exhibit A.

8.      Along with me, Eugene Davis serves on the GKH Board; he is an experienced turnaround executive, who has served as Chairman and CEO of Pirinate Consulting Group, L.L.C., a consulting firm specializing in crisis and turn-around management and strategic advisory services for public and private business entities, since 1999.  He has served on the board of directors of various companies that have gone through the chapter 11 process, including Emerson Radio Corp., Atari, Bally Total Fitness and Friedman's Jewelers.

9.      GKH was formed on March 1, 2010 and, along with its two wholly-owned subsidiaries, GKO and GKR, was organized for the purpose of acquiring and developing oil and gas properties onshore and in state waters in South Louisiana and the upper Texas Gulf Coast.  The Debtors' oil and gas operations commenced on September 1, 2010, following the acquisition of certain oil and gas assets of White Oak Energy ("White Oak").  The Debtors' business operations are primarily conducted through GKO, while the Debtors' properties are primarily leased or owned through GKR.

10.      The Debtors own certain leasehold interests in certain lands in Louisiana and Texas, which are leased from both government entities and private landowners.  As of the Petition Date, the Debtors' leasehold position totaled approximately 9,000 net acres, with

---

[2]  As set forth more fully below, Mr. Tallerine served as CEO of GKH and GKO from their inception until he was removed in mid-December 2012 for alleged misconduct.  Mr. Tallerine also served on the GKH Board until he was removed therefrom shortly after being removed as CEO.

approximately 34% leased from government entities and the remaining 66% leased from third-parties.  The Debtors currently operate properties located in Iberville, Terrebonne and Vermilion Parishes, Louisiana, and in Aransas, Hardin and Jasper Counties, Texas.  As of the Petition Date, the Debtors' operations include 47 wells (12 in Louisiana and 35 in Texas).

11.    In addition to the foregoing, the Debtors utilize certain types of derivative financial instruments to manage fluctuations in cash flows resulting from changes in crude oil and natural gas commodity prices.  The types of derivative instruments typically entered into by the Debtors include swaps and options.

12.    The Debtors' headquarters is in Houston, Texas, and is leased pursuant to an agreement that expires on December 31, 2015.

**B.    Pre-petition Debt Structure**

13.    On November 5, 2010, GKR, as borrower, and GKH and GKO, as guarantors, entered into a Credit Agreement (as amended, modified or supplemented from time to time prior to the Petition Date, the "Existing Credit Agreement")[3] with Bank of America, N.A. ("BofA"), as administrative agent and lender.  When it was entered into, the Existing Credit Agreement had a Commitment of $200 million, which was subject to a Borrowing Base initially set by BofA at $12 million and, by amendment dated June 15, 2011, was increased to $22 million.  The Debtors' obligations under the Existing Credit Agreement:  (i) are secured by substantially all of their assets; (ii) are evidenced by the Note in the amount of the aggregate outstanding principal amount of each Advance, together with accrued but unpaid interest on the principal amount of each such Advance; and (iii) mature on November 5, 2013 (the "Maturity Date").

---

[3]  Capitalized terms used but not otherwise defined in this Section of this Declaration shall have the meanings ascribed to them in the Existing Credit Agreement.

14.     On January 24, 2013 (the "Assignment Date"), the Debtors, BofA and Wayzata entered into a (i) Resignation, Assignment and Release Agreement, (ii) an Assignment and Acceptance, and (iii) a Release Agreement (as amended, modified or supplemented from time to time, collectively, the "Assignment Documents"), pursuant to which Wayzata took assignment of all of the rights and obligations of BofA under the Existing Credit Agreement.

15.     Prior to the Assignment Date, certain Events of Default (together, the "Existing Events of Default") had occurred as a result of GKR's failure to comply with the Interest Rate Coverage Ratio and the Debt to EBITDA Ratio in sections 6.15 and 6.17, respectively, of the Existing Credit Agreement for the compliance periods ending June 30, 2012 and September 30, 2012.  Additionally, because of the prior actions of Mr. Tallerine, the Debtors were not in a position to make basic representations and warranties regarding their financial condition and financial statements, a problem which also served as a practical bar to an attempt to procure third-party financing.  On account of these Existing Events of Default and attendant circumstances, BofA sought to accelerate the maturity of the Note, at which point Wayzata decided that it was in the best interests of all parties for Wayzata to take assignment of BofA's rights and obligations under the Existing Credit Agreement and provide the Debtors with necessary breathing room to resolve repayment of their secured indebtedness.  As of the Assignment Date, the Borrowing Base under the Existing Credit Agreement was $18 million,[4] the aggregate outstanding principal amount of Advances was approximately $10.291 million, and the outstanding amount of interest was approximately $53,000.  Through the Third Amendment, the Existing Events of Default were waived.

---

[4]  Prior to the execution by the Debtors and Wayzata of a January 24, 2013 amendment to the Existing Credit Agreement (the "Third Amendment"), under the Existing Credit Agreement, the Borrowing Base was generally to be re-determined each May 1 and November 1.  The Third Amendment removed this requirement.

16.     Since the execution of the Assignment Documents, there have been no further Advances under the Existing Credit Agreement, as the Commitment has been terminated and no more Advances are permitted.  Furthermore, since the Assignment Date, the Debtors have not made any payments on account of principal or interest, which accrues as payment-in-kind, as Wayzata and the Debtors both believed that it was best for the Debtors to use their cash to facilitate operations and the potential sale of assets.

17.     As of the Petition Date, with respect to the Existing Credit Agreement, the aggregate outstanding principal amount of Advances is approximately $11.446 million and the outstanding amount of interest is approximately $136,000.  No letters of credit are currently outstanding under the Existing Credit Agreement.

C.     **Events Leading to the Chapter 11 Cases**

18.     A series of unforeseen events, including alleged past mismanagement under Mr. Tallerine, beginning from the formation of the Debtors, and the expense and lost opportunity of unsuccessful exploration and drilling efforts, have placed a significant strain on the Debtors' cash flow.  In turn, this has forced the Debtors to commence the Chapter 11 Cases, in order to obtain much-needed liquidity and to preserve and maximize value through a sale of all or substantially all of their assets.

19.     On August 31, 2010, shortly after their formation, the Debtors acquired certain oil and gas assets in Louisiana owned by White Oak for a purchase price of approximately $39 million (collectively, the "White Oak Properties").  Thereafter, on February 22, 2011, the Debtors' prior management team completed the purchase of certain oil and gas assets in the Nine Mile Point Field in Texas from EOG Resources, Inc., for a purchase price of approximately $19 million (collectively, the "Nine Mile Properties").

01:14269918.4

6

20.     Unfortunately, the Debtors' exploration and drilling efforts in connection with the White Oak Properties and the Nine Mile Properties failed to bear fruit.  In late 2010, the Debtors incurred significant exploratory and drilling costs in drilling three wells on the White Oak Properties that did not generate a meaningful return.  The Debtors believe that the failure to generate a meaningful return was largely attributable to the failure of the Debtors' then-management team to take the necessary steps to study and understand the White Oak Properties and, as a consequence, making flawed decisions on where to drill those properties.  Eventually, in the first quarter of 2011, the Debtors drilled a fourth well outside of the White Oak Properties and the Nine Mile Properties, but they were only mildly successful and did not realize a significant return.

21.     Rather than focusing the Debtors' efforts on studying and better understanding the Debtors' current properties and unlocking their inherent value, the Debtors' former management team essentially abandoned the White Oak Properties and the Nine Mile Properties, and spent the majority of their time looking to acquire new properties.  Meanwhile, the Debtors quickly found themselves operating at a deficit.  In total, the Debtors invested approximately $70 million in the acquisition of the White Oak Properties and the Nine Mile Properties and their unsuccessful exploratory and drilling efforts in connection with the White Oak Properties, leaving a significant strain on the Debtors' liquidity since the commencement of their operations.

22.     In November 2012, in response to an anonymous tip, Wayzata and their professionals investigated Mr. Tallerine, and based on the findings of that investigation, terminated Mr. Tallerine's employment in December 2012.  Michael Strain from Wayzata replaced Mr. Tallerine as CEO of GKH and GKO, and the Debtors' new management team,

including me, immediately began to focus on trimming the Debtors' excessive overhead costs, in an effort to stabilize what had been a volatile business under prior management.

23.     On February 13, 2013, GKH and GKO commenced litigation (the "Litigation") against, among others, Mr. Tallerine and certain entities that he owns (collectively, the "Defendants") in the District Court of Harris County (the "District Court") for, among other things, theft, conversion, fraud, unjust enrichment, and breach of contract and breach of fiduciary duty, all as set forth more fully in the Original Petition filed with the District Court, a copy of which is attached hereto as Exhibit B.

24.     Subsequently, on March 26, 2013, the Defendants filed an Original Answer and Counterclaim (the "Original Counterclaim"), complaining of wrongful conduct of, among others, GKH, GKO, Wayzata, and me.  The Original Counterclaim asserted nineteen (19) claims against various combinations of the counterclaim defendants, including, among others: (i) claims against Wayzata for breach of fiduciary duty, shareholder oppression, breach of the duty of good faith and fair dealing, fraud, tortuous interference with contract, failure to pay consulting fee, and theft of plane services; (ii) claims against GKH and GKO for breach of contract, indemnification and advancement of expenses, and failure to pay plane expenses; (iii) claims against all counterclaim defendants for aiding and abetting breach of fiduciary duty, civil conspiracy, trespass to real property, invasion of property, and conversion of personal property; and (iv) derivative claims (on behalf of GKH) for breach of fiduciary duty, waste, breach of the duty of good faith and fair dealing, and civil conspiracy.

25.     On May 13, 2013, the District Court ordered that many of the Defendants' counterclaims were subject to the arbitration clause in GKH's LLC Agreement.  To date, the Defendants have not initiated an arbitration proceeding to properly assert these claims.

01:14269918.4

26.     On September 26, 2013, the Defendants filed a First Amended Answer and Counterclaim (the "First Amended Counterclaim"), which excludes the claims compelled to arbitration.  The First Amended Counterclaim asserts claims against:  (i) Wayzata for fraud, failure to pay consulting fee, and theft of plane services; (ii) GKH and GKO for indemnification and advancement of expenses and failure to pay plane expenses; and (iii) all counterclaim defendants for trespass to real property, invasion of property and conversion of personal property.  The Litigation is currently in the discovery phase.

27.     In May 2013, I became CEO of the Debtors, and continued the process of trimming the Debtors' overhead, right-sizing their cost structure, and stabilizing their operations. In addition, I focused the Debtors' efforts on studying and better understanding their portfolio of properties, which was a much-needed step to maximize the value of their assets.  Within days of becoming CEO, I reconfigured the Debtors' operational and technological teams, certain members of which had previously underperformed, and instructed them to carefully evaluate the Debtors' properties.  In doing so, the Debtors found significant value in these properties going forward, value which had not previously been discovered due to the failure of prior management to appropriately study and understand these properties.

28.     Around this time, it also became apparent to the Debtors that they lacked sufficient liquidity to continue to operate their business on a long-term basis, and that in order to maximize value, it was in their best interests to commence a sale process for all or substantially all of their assets.  The process of preparing the Debtors for an asset sale has taken longer than anticipated, and additional liquidity is now required to bridge the Debtors through a sale process. However, while Wayzata was willing to fund a sale process, it indicated that it would not do so

01:14269918.4

outside of chapter 11 due to the pending Litigation and Mr. Tallerine's threats to interfere with a sale process.

29.     Accordingly, faced with their liquidity strain and the impending Maturity Date, the Debtors commenced the Chapter 11 Cases on the Petition Date in order to implement an orderly sale process.

**D.    Anticipated Chapter 11 Process**

30.     The Debtors have diligently evaluated a number of options to address their liquidity needs.  Based on their evaluation, they have concluded that a sale of all or substantially all of their assets is the best way to maximize value.  The Debtors believe that the commencement of the Chapter 11 Cases and the implementation of an orderly sale process, under the supervision of the Court, will permit the Debtors to consummate a sale of all or substantially all of their assets and maximize the value of their estates, for the benefit of all interested parties.

31.     As a result, the Debtors, with the assistance of Lantana Oil & Gas Partners ("Lantana"), recently began the process of commencing a robust and aggressive marketing effort for the Debtors' assets.  In furtherance of these efforts and to facilitate an organized and efficient diligence process for the Debtors' assets, the Debtors, with the assistance of Lantana, a divestment and advisory firm focused on oil and gas asset packages, assembled diligence information in an electronic data room and prepared written business presentations for interested purchasers.  This marketing process formally commenced on October 17, 2013, and the data room went "live" on October 21st.

32.     Subsequent to the Petition Date and in accordance with the milestones provided for in the Debtors' proposed post-petition financing facility, the Debtors anticipate

01:14269918.4

10

filing a motion with the Court to establish procedures for a bidding and auction process for their assets.

**F.**     **First Day Pleadings**

33.     In my capacity as CEO of the Debtors, I have formed opinions as to:  (i) the urgency and necessity for obtaining the relief sought by the Debtors in their "first day" applications and motions (including the exhibits attached thereto) listed on Exhibit C attached hereto and filed with the Court on the Petition Date (collectively, the "First Day Pleadings"); (ii) the need for the Debtors to continue to effectively operate and, as seamlessly as possible, embark upon the Chapter 11 Cases (and the methodologies to be employed in furtherance thereof); (iii) the deleterious effects upon the Debtors' employees, vendors, creditors and estates if the Debtors do not obtain the relief requested in the First Day Pleadings; and (iv) the immediate and irreparable harm that the Debtors and their estates will be exposed to in the event that the Court does not approve such relief.  My opinions are based upon my first-hand experience as CEO of the Debtors and as the result of my review of various materials and information and discussions with other personnel of the Debtors and the Debtors' professional advisors.

34.     This Declaration is submitted in support of the Debtors' Petitions and the Court's entry of orders approving the relief requested in the First Day Pleadings.

35.     I have reviewed each of the First Day Pleadings, and participated, together with other personnel of the Debtors and the Debtors' professional advisors, in the preparation thereof.  I believe, to the best of my knowledge, information and belief, that the facts and circumstances set forth in the Petitions and the First Day Pleadings are true and correct.  This representation is based upon information and belief and through my review of various materials

01:14269918.4

11

and information, as well as my history and experience with, and knowledge of, the Debtors' operations and financial condition.

36.     Based upon the foregoing, if called to testify before the Court in connection with the Petitions and the First Day Pleadings, I could and would testify competently to the facts set forth in each of the Petitions and the First Day Pleadings.

37.     The relief sought in the First Day Pleadings will minimize the adverse impact of the Chapter 11 Cases on the Debtors, their employees, vendors, and other creditors and interested parties, and will preserve and maximize value for the Debtors' creditors.  I believe that the relief sought in the First Day Pleadings is necessary and essential to enable the Debtors to operate effectively as debtors in possession in the Chapter 11 Cases.

38.     The Debtors, in consultation with their professional advisors, carefully designed the relief requested in the First Day Pleadings to ensure that the Debtors' immediate operational needs are met and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Cases.  As indicated, I participated in the process that led to the development of each of the First Day Pleadings.   The relief requested therein is tailored to address those matters, issues and requirements that need urgent and immediate attention by the Court, in order to sustain the value and viability of the Debtors' assets and business operations.

39.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

01:14269918.4

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed October 30 , 2013.

Edward Hebert
Chief Executive Officer

# **EXHIBIT A**

Corporate Organizational Chart

01:14269918.4



# Goldking Holdings, LLC

(Delaware LLC)
TIN: 27-2052614

**100%**

**100%**

## Goldking Resources, LLC

(Delaware LLC)
TIN: 27-2052682

## Goldking Onshore Operating, LLC

(Delaware LLC)
TIN: 27-2052653

# **EXHIBIT B**

Original Petition filed with the District Court

Filed 13 February 13 P2:44
Chris Daniel - District Clerk
Harris County
ED101J017324583
By: Sharon Carlton

2013-08724 / Court: 061

NO. _____

| | | |
|---|---|---|
| GOLDKING ONSHORE OPERATING, LLC and GOLDKING HOLDINGS, LLC | § § § § | IN THE DISTRICT COURT |
| *Plaintiffs* | § § | |
| vs. | § § | |
| LEONARD C. TALLERINE, JR., GOLDKING ENERGY CORPORATION, GOLDKING ENERGY PARTNERS I, LP, GOLDKING ENERGY PARTNERS II, LLC, GOLDKING CAPITAL MANAGEMENT, LLC, RETA WELLWOOD DBA VERMILLION CONTRACTING CO., DENNA RAMSEY and PAUL CULOTTA | § § § § § § § § § § § | HARRIS COUNTY, TEXAS  \_\_\_\_JUDICIAL DISTRICT |
| *Defendants* | § | **JURY DEMANDED** |

<u>PLAINTIFFS' ORIGINAL PETITION</u>

Goldking Onshore Operating, LLC and Goldking Holdings, LLC (collectively "Plaintiffs") file this Original Petition against Leonard C. Tallerine, Jr., Goldking Energy Corporation, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood dba Vermillion Contracting Co., Denna Ramsey, and Paul Culotta (collectively the "Defendants"), and in support thereof would show the Court the following:

## I. NATURE OF THE ACTION

1.      Leonard C. Tallerine, Jr. ("Tallerine") served as the President and CEO of Plaintiffs Goldking Onshore Operating, LLC ("GOO") and Goldking Holdings, LLC ("GKH") beginning in September of 2010. In blatant disregard of his fiduciary duties and any notion of business ethics, Tallerine—with the help of his trusted subordinates and fellow, hand-picked employees, Denna Ramsey and Paul Culotta—engaged in a calculated, pervasive, and deceptive scheme to embezzle hundreds of thousands of dollars from GOO's operating accounts for his and

his cohorts' personal financial gain and use.  Starting with the very first days of his employment, Tallerine and the other Defendants employed a wide range of deceptive and elaborate acts to drain GOO's cash for Tallerine's personal benefit, including: (i) wiring GOO funds directly to Tallerine's personal bank account or the accounts of entities owned by Tallerine; (ii) directing GOO to pay Tallerine's personal expenses that were unrelated to GOO business; (iii) requesting significant cash advances for business travel without providing a subsequent true-up of actual expenses incurred; (iv) submitting fabricated invoices from fake vendors and doctored invoices from real vendors to GOO for payment to Tallerine and his affiliates; (v) invoicing GOO for employees' work already paid for and performed for another entity Tallerine controlled, which funds Tallerine and his affiliates kept for themselves; (vi) stealing checks payable to GOO and depositing them in accounts of entities owned by Tallerine; (vii) stealing GOO checks made out to GOO vendors and depositing them in accounts of entities owned by Tallerine; and (viii) using GOO employees and assets for other personal business ventures.

2.    Tallerine never revealed this conduct to his fellow members of GKH's Board of Managers or to anyone at Wayzata Opportunities Fund II, LP ("Wayzata"), the majority interest owner of GKH, of which GOO is a wholly-owned subsidiary.  In fact, Tallerine, Culotta and Ramsey endeavored to keep these acts hidden from Wayzata.  These were not isolated events that amounted to simple "mistakes," as Tallerine has suggested.  In reality, Tallerine treated GOO as his personal piggy bank, looting GOO at will to support his personal investments and lavish lifestyle, and to pay people who performed personal work or services for him.  By the time he was caught by GOO accounting staff, Tallerine had stolen or diverted several hundred thousand dollars from GOO's operating account, only a portion of which he acknowledged and paid back (without revealing either the repayment or the initial transfers to other members of the

Board of Managers or Wayzata). The only reason Tallerine paid any of these proceeds back was that accounting staff at GOO confronted Tallerine and insisted upon it.

3.      In the fall of 2012, at a time when GOO was in default on its line of credit with Bank of America, Tallerine once again used GOO funds for a clearly improper purpose: the funding of a deposit for Tallerine's acquisition of a restaurant in New Orleans. Around this time, Wayzata received an anonymous call from a member of the GOO accounting staff suggesting that Wayzata investigate Goldking. Wayzata ultimately retained professionals to investigate the matter and uncovered multiple instances of misconduct by Defendants.

4.      Plaintiffs bring this action against Tallerine and the other Defendants for conversion, violation of the Theft Liability Act, breach of fiduciary duty, fraud, unjust enrichment, business disparagement, aiding and abetting fraud and breach of fiduciary duty, conspiracy, breach of contract, and breach of the covenant of good faith and fair dealing. Plaintiffs seek recovery of actual and exemplary damages and their attorneys' fees.

## II.  DISCOVERY CONTROL PLAN

5.      Plaintiffs intend to conduct discovery in this case under level 3 as specified in Rule 190.4 of the Texas Rules of Civil Procedure.

## III.  PARTIES

6.      Plaintiff Goldking Onshore Operating, LLC is a Delaware Limited Liability Company with its principal place of business at Two Shell Plaza, 777 Walker Street, Suite 2500, Houston, Texas 77002.

7.      Plaintiff Goldking Holdings, LLC is a Delaware Limited Liability Company with its principal place of business at Two Shell Plaza, 777 Walker Street, Suite 2500, Houston, Texas 77002.

3

8.      Defendant Leonard C. Tallerine, Jr. is an individual residing in Houston, Texas. Tallerine is the former President and CEO of Plaintiffs Goldking Onshore Operating, LLC and Goldking Holdings, LLC and was a manager of Goldking Holdings, LLC.  Mr. Tallerine may be served at 3620 Inverness, Houston, Texas  77019.

9.      Defendant Goldking Energy Corporation is a Texas corporation with its principal place of business in Houston, Texas.  Goldking Energy Corporation may be served by serving process on its registered agent and President, Leonard C. Tallerine, Jr. at 3620 Inverness, Houston, Texas  77019.

10.      Defendant Goldking Energy Partners I, LP is a Texas limited partnership with its principal place of business in Dallas, Texas.  Goldking Energy Partners I, LP may be served by serving process on its registered agent, Benny D. Duncan at 6116 N. Central Expressway, Suite 1400, Dallas Texas 75206.

11.      Defendant Goldking Energy Partners II, LLC is a Texas Limited Liability Company with its principal place of business in Houston, Texas.  Goldking Energy Partners II, LLC may be served by serving process on its registered agent, President and CEO, Leonard C. Tallerine, Jr. at 3620 Inverness, Houston, Texas  77019.

12.      Defendant Goldking Capital Management, LLC is a Texas limited liability company with its principal place of business in Houston, Texas.  Goldking Capital Management, LLC may be served by serving process on its registered agent, President and CEO, Leonard C. Tallerine, Jr. at 3620 Inverness, Houston, Texas  77019.

13.      Defendant Reta Wellwood dba Vermillion Contracting Co. is an entity doing business in Texas.  Reta Wellwood dba Vermillion Contracting Co. may be served at 803 South Jefferson St., Abbeville, LA 70510.

4

14.     Defendant Denna Ramsey is an individual residing in Houston, Texas.  Ms. Ramsey is the former Assistant Vice President and Assistant Treasurer of Plaintiff Goldking Onshore Operating, LLC.  Ms. Ramsey can be served at 6743 Cindy Lane, Houston, Texas 77008.

15.     Defendant Paul Culotta is an individual residing in Houston, Texas.  Mr. Culotta is the former Senior Vice President Corporate Planning, Budget and Analysis of Plaintiff Goldking Onshore Operating, LLC.  Mr. Culotta can be served at 15203 Rose Cottage Drive, Houston, Texas 77069.

## IV.   JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

17.     Defendants are subject to personal jurisdiction in this Court because they are either residents of Texas and/or have engaged in systematic and continuous contacts with the state of Texas and because this Court's exercise of personal jurisdiction over Defendants is consistent with due process under the United States Constitution.  Defendants have purposefully availed themselves of the benefits and protections of Texas's laws by establishing such contacts in this state.  Defendants are subject to general and specific jurisdiction because they are Texas residents, regularly conduct business in Texas and/or because Plaintiffs' claims arise from and are directly related to Defendants' contacts with Texas.

18.     Venue is proper in this Court because Harris County is the county "in which all or a substantial part of the events . . . giving rise to [this] claim occurred."  TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(1).

## V.  FACTUAL ALLEGATIONS

19.     Plaintiff Goldking Onshore Operating, LLC ("GOO") is an oil and gas exploration company headquartered in Houston, Texas.  GOO's primary focus is oil and gas properties located in Louisiana and Texas, including state waters.  GOO is a wholly owned subsidiary of Plaintiff Goldking Holdings, LLC ("GKH").

20.     Wayzata is the majority member of GKH and holds approximately a 93.75% ownership interest.  The minority member is Goldking LT Capital Corp., an entity owned by Defendant Leonard C. Tallerine, Jr. ("Tallerine"), which holds approximately a 6.25% ownership interest.[1]  In addition to his membership interest in GKH, Tallerine individually served on the Board of Managers of GKH.

21.     Both GKH and GOO were formed in 2010.  Tallerine served as President and CEO of both entities from their inception until he was removed in mid-December 2012 after Wayzata confirmed his misconduct.  As explained in detail below, at every turn, Tallerine treated GOO as his personal slush fund, stealing and diverting at least $700,000 of GOO's cash for his own personal use through a legion of deceptive means.  Tallerine expended GOO's cash and working capital by directing or authorizing its use for non-GOO expenditures, including payments that benefitted himself, his family members, his co-conspirators, and entities that he owns.  Tallerine embezzled GOO funds directly into his own accounts or accounts for other businesses he owns, directed GOO to pay invoices that related to his personal expenses, as opposed to corporate expenses, and created bogus contractors and submitted fraudulent invoices in an attempt to "cover up" GOO's payment of his personal expenses.  Tallerine accomplished this systematic misappropriation of corporate assets with the help of his longtime personal

---

[1] Goldking LT Capital Corp. has failed and refused to make its most recent capital call, and thus its ownership percentage may change.

assistant, former GOO Vice President and Assistant Treasurer Denna Ramsey ("Ramsey"), and his colleague, former GOO Senior Vice President Corporate Planning, Budget and Analysis Paul Culotta ("Culotta").[2]

22.    Tallerine's widespread looting of GOO funds directly harmed GOO's financial condition by causing shortfalls in GOO's operating cash and negative cash balances in its operating bank account.  Plus, Defendants have failed to pay back GOO for some of the money that they wrongfully took.  Despite the damage being done to the company, Tallerine's actions were not disclosed to GKH's Board or Wayzata, GKH's majority member.  Indeed, based on GOO's internal records, Tallerine, Ramsey and Culotta attempted to disguise the breadth and amount of GOO's cash that they had diverted.  When Wayzata discovered and confirmed Tallerine and the other Defendants' illegal conduct in December 2012, GOO and GKH terminated the employment of Defendants Tallerine and Ramsey.  Culotta had been terminated from his position as Senior VP Corporate Planning, Budget and Analysis in December 2011 for other reasons, well before his role in Tallerine's scheme was uncovered.  Even after his termination, Culotta continued to assist Tallerine in continuing to cover up his wrongful scheme from Wayzata and the other members of the Board of Managers by making certain that the 2011 audit did not reveal any of these transactions to Wayzata or other members of the Board of Managers.

23.    Plaintiffs' initial investigation has revealed this was not Tallerine's first foray into corporate embezzlement and that he used some of the same deceptive tactics with entities that he had been previously trusted to oversee.

---

[2] GOO and Culotta entered into a Separation Agreement, which included mutual general releases, dated December 31, 2011.  Plaintiffs' claims against Culotta in this action relate only to actions taken after the date of the release.

24.     Because of the nature and scale of Tallerine's scheme to defraud GKH and GOO, Plaintiffs' investigation into Defendants' wrongdoing is still ongoing.   Indeed, Plaintiffs anticipate that the true scope of Defendants' schemes will be larger, and include other bogus vendors and improper transfers to third parties.   Plaintiffs will amend as additional wrongful conduct is discovered.

A.   **Tallerine's Diversion of GOO's Cash to Pay Personal Expenses or Support Personal Investments**

25.     Tallerine, with the assistance of Ramsey, diverted GOO's cash into his personal accounts and directed that GOO's cash be used to pay his personal expenses or support his personal investments.  For example:

(a)     On June 17, 2011, Tallerine and/or Ramsey caused $43,000 to be wired from GOO's bank account to Tallerine's personal bank account, with no explanation or documentation supporting such a transfer of funds;

(b)     On April 14, 2011, Tallerine and/or Ramsey caused $100,000 to be wired from GOO's operating account to the account of Defendant Goldking Energy Corporation, an entity owned by Tallerine, again with no explanation or documentation supporting such a transfer of funds;

(c)     In June 2011, Tallerine and/or Ramsey caused $101,000 of GOO's cash to be used to pay two vendors for the construction and design of a blow-dry bar owned by Tallerine's daughter, with indisputable knowledge aforethought that such expenses had nothing to do with GOO's business;

(d)     In April 2011, Tallerine and/or Ramsey directed $8,065 to be paid out of GOO's operating account for the demolition of a house in the Heights in Houston that, upon information and belief, is (or was at the time) owned by Tallerine or one of his affiliates;

(e)     In October 2011, Tallerine and/or Ramsey directed a $3,000 payment be made by GOO for the repair of a boat ramp on a residential house in Jamaica Beach, Galveston.  Upon information and belief, the house is titled in Ramsey's name;

(f)     In the fall of 2012, well after Tallerine attempted to explain away to GOO accounting staff that all of his misconduct was simply accounting "mistakes," Tallerine directed that a $32,000 wire be made from GOO's operating account to a law firm in Louisiana, which later was discovered to have been for the purpose

of funding an escrow account for Tallerine's personal acquisition of a restaurant in New Orleans; and

(g)    Tallerine and/or Ramsey ordered a $24,967.90 wire from GOO's operating account to Gulfstream Aerospace on June 16, 2011.  Upon information and belief, this payment relates to an aircraft owned by Tallerine through his entity Defendant Goldking Energy Corporation.

**B.    Tallerine's Intentional Misrepresentations and Falsifying of Invoices to Obtain Wrongful Reimbursement from GOO.**

26.    From his very first days working for GOO and GKH, Tallerine also submitted false requests for reimbursement of "transition costs" to GOO on behalf of Defendant Goldking Energy Corporation for alleged services that were not actually provided to GOO.  For example, in late 2010/early 2011, Tallerine requested reimbursement on behalf of Goldking Energy Corporation for an invoice from Cawley Gillespie, a reservoir engineering company that he represented had performed GOO-related work, which he claimed that he had paid from his personal funds at Goldking Energy Corporation.   Based on these representations, GOO reimbursed Goldking Energy Corporation for the $18,092 allegedly paid to Cawley Gillespie. This invoice, as it turns out, was doctored and had nothing to do with GOO.  Defrauding GOO once was not good enough.  After being paid once on this fraudulent invoice, Tallerine once again sought payment of this fraudulent invoice.  In September of 2011, Tallerine, with Ramsey's assistance, requested reimbursement and caused GOO to pay Cawley Gillespie $18,092—the exact same amount Tallerine had represented he and/or Goldking Energy Corporation had already paid to the vendor.  GOO's investigation of the invoice uncovered that not only had Tallerine not paid Cawley Gillespie as he originally reported, he had also submitted a fake Cawley Gillespie invoice to support his initial reimbursement.  Indeed, Tallerine and/or someone acting at his direction had altered the original Cawley Gillespie invoice to hide that it was for work related to Tallerine's personal investments, not GOO's business.  In short,

Tallerine caused GOO to pay a fraudulent invoice (that had nothing to do with GOO business) two times: once for his own personal benefit and once to the vendor.

27.    Equally as deceptive, shortly after GOO had formed but before its payroll procedures were put in place, Tallerine submitted reimbursement requests—again, on behalf of his entity Goldking Energy Corporation—to GOO for alleged payroll costs of its employees for work allegedly performed on GOO-related business (specifically, the acquisition of a set of oil and gas properties known as the "White Oak Acquisition").  In reality, much of the employees' time was spent working for Walker Street Consulting, another of Tallerine's personal ventures, which managed assets sold by East Cameron Partners ("ECP") to EC Offshore Properties, Inc. But Walker Street Consulting had already paid those employees for their work via its receipt of $127,500 per month from ECP.  GOO paid approximately $200,000 in false salary/wage claims, which were not passed on to the employees, but instead were deposited in Tallerine's Goldking Energy Corporation business accounts for his personal use.

28.    In addition, Tallerine and Ramsey created a bogus vendor, Defendant Vermillion Contracting, and authorized GOO to pay over $24,000 in false invoices to Vermillion Contracting, whose accounts Tallerine and Ramsey controlled.  Vermillion Contracting is the assumed "doing business as" name of Reta Wellwood, one of Tallerine's ex-wives.  But Reta Wellwood was the "owner" of Vermillion Contracting in name only; the entity is operated entirely by Tallerine and Ramsey.  Tallerine and Ramsey submitted false invoices from Vermillion Contracting to GOO for alleged work that was not performed at various oil fields and wells, and when the veracity of Vermillion Contracting' "work" was questioned, Tallerine intimidated a GOO employee into "authorizing" the expenses so that Tallerine could get paid.

Tallerine deliberately concealed, and has never disclosed, his relationship and involvement with Vermillion Contracting to GOO, GKH, GKH's Board or Wayzata.

## C.   Tallerine Steals Checks Payable to GOO and Deposits Them Into His Personal Accounts

29.    Tallerine, with Ramsey's assistance, stole checks payable to GOO and intentionally deposited them into accounts owned by Tallerine's personal, non-GOO related entities.  For example:

(a)    A $35,593.51 check payable to GOO from Pioneer Drilling Services for  an overpayment on a turnkey drilling project was deposited into a non-GOO account belonging to Goldking Energy Partners II, LLC, one of the entities owned and controlled by Tallerine; and

(b)    A $38,124.90 check payable to GOO from Russo Exploration for its share of a cash call on a GOO-operated property was deposited into Defendant Goldking Energy Corporation's (an entity solely owned by Tallerine) bank account.

## D.   Tallerine Deposited GOO Checks Made Payable to Vendors In His Personal Accounts

30.    Tallerine, with Ramsey's assistance, also took GOO checks made payable to GOO vendors, and intentionally deposited them into accounts owned by Tallerine's personal, non-GOO related entities.

31.    Specifically, in late May-early June 2011, GOO prepared three checks totaling $234,767, two of which were payable to Phoenix Exploration and one of which was payable to Pioneer Drilling Services, two of GOO's actual vendors.  At that time, Tallerine approved all GOO disbursement checks prior to mailing, and he had possession of them in his GOO office. Tallerine brought the three checks back to GOO's accounting staff, and informed them that they were not to be paid and that the checks were to be voided.  Shortly thereafter, when GOO's operating account was overdrawn, GOO employees discovered that the three "voided" vendor checks had cleared GOO's account and had been deposited into the account of Defendant

Goldking Energy Partners I, LP, an entity owned and controlled by Tallerine. Tallerine and Ramsey had diverted these funds into Goldking Energy Partners' account by using a check scanning device that allowed them to deposit the funds into the incorrect account without interference by GOO's bank.

32.    In the same timeframe, a $15,811.50 GOO check payable to its vendor Charter Capital was held by Tallerine and then deposited into the account of Defendant Goldking Capital Management, LLC (another entity owned and controlled by Tallerine). As a result of this misappropriation, GOO had to submit a replacement check to Charter Capital.

**E.    Tallerine's Post-Termination Wrongful Conduct and Bad Faith**

33.    As stated above, Tallerine's unlawful scheme was discovered by GOO, GKH, GKH's Board and Wayzata in December 2012. On December 17, Tallerine was terminated as CEO and President of GOO and GKH. Ramsey's employment was terminated two days later. Since his removal, Tallerine has continued his pattern of destructive behavior toward the companies. Specifically, upon information and belief, Tallerine and/or his representatives have contacted GOO's vendors and falsely represented that GOO and GKH are in a dire financial situation and on the verge of declaring bankruptcy. Tallerine made these statements knowing that they were false and with the intent to directly harm GKH and GOO's reputation and relationship with vendors, who are a vital part of the companies' success.

34.    Since being terminated as CEO, Tallerine has also used his position as a member of the Board and GKH to harass GOO employees and fellow Board members with numerous requests for information and access to employees far in excess of what is reasonable for a Board or GKH member. Although Tallerine and his affiliates have removed scores of boxes of records, documents, computers and other affects from GOO premises since his termination, Tallerine

continues to issue improper requests and constantly badgers other Board members (and Wayzata) in an attempt to fabricate a record of being "oppressed" as the minority member of GKH. In short, the scheme continues.

35.    Tallerine's post termination conduct and his use of his status as a member of the GKH Board and a minority member of GKH are just the latest installment in a long story of Tallerine's bad faith.

F.    **Ramsey and Culotta's Participation in Tallerine's Scheme to Defraud**

36.    Ramsey, who was GOO's Vice President and Assistant Treasurer, actively participated in Tallerine's scheme to embezzle from and defraud GOO and GKH. Ramsey, among other things, (i) diverted GOO funds to Tallerine's personal bank account and accounts of entities owned by Tallerine; (ii) directed GOO to pay personal expenses on behalf of herself and Tallerine; (iii) falsified vendor invoices submitted to GOO for payment; (iv) submitted invoices to GOO for payment to bogus vendors for services not rendered; (v) deposited checks payable to GOO in accounts of entities owned by Tallerine; and (vi) deposited GOO checks made payable to GOO vendors in accounts of entities owned by Tallerine. Ramsey also participated in the attempt to "cover up" Tallerine's fleecing of the company by doctoring invoices and altering the company's books and records.

37.    Culotta was GOO's and GKH's Senior Vice President Corporate Planning, Budget and Analysis during the events described herein. Because the embezzlement scheme was pervasive and material amounts of cash were routinely stolen from GOO, Culotta either knew, or at the very least should have known, of Tallerine and Ramsey's illegal conduct. Culotta did nothing to stop their wrongdoing or disclose its existence to GOO, GKH or GKH's Board. Moreover, once Culotta became aware of Tallerine and Ramsey's gross misappropriation of

GOO's money, he did not disclose that information to GOO, GKH or GKH's Board.  Culotta continued to be involved in this scheme after his termination, when he worked actively to conceal the pattern of fraud and stolen funds in GOO's 2011 audit so Wayzata and GKH's Board of Managers did not learn of the wrongdoing.

## VI. CAUSES OF ACTION

**Count I:  Conversion Against Tallerine, Goldking Energy Corporation, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood and Ramsey**

38.    All prior allegations are incorporated herein by reference.

39.    GOO owned, possessed, or had the right to immediate possession of funds contained in its bank accounts, and of incoming checks or other instruments made payable to GOO that were received by GOO representatives.

40.    The funds contained in GOO's bank accounts, and checks or other instruments made payable to GOO, were personal property, identifiable as separate chattels, intended to be kept segregated, constituted an intact fund, and were not subject to a title claim by Defendants.

41.    Defendants wrongfully diverted or withdrew funds from GOO's bank accounts, and wrongfully diverted checks or other instruments made payable to GOO, for Defendants' benefit without GOO's knowledge or consent.  Defendants exercised dominion and control over the wrongfully diverted or withdrawn funds and the wrongfully diverted instruments in a manner inconsistent with GOO's rights.

42.    Defendants also used GOO assets and personnel for business and personal activities not related to GOO business activities.

14

43.    Defendants either participated directly in converting GOO's account funds and incoming payments, or received GOO's account funds and incoming payments with the knowledge that the funds had been wrongfully acquired by another.

44.    Defendants' conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

45.    Defendants' conversion has caused GOO substantial injury.

46.    Defendants acted with malice.  GOO is therefore entitled to recover exemplary damages.

**Count 2:  Violations of the Texas Theft Liability Act (Texas Civil Practice & Remedies Code Chapter 134) Against Tallerine, Goldking Energy Corporation, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood and Ramsey**

47.    All prior allegations are incorporated herein by reference.

48.    GOO had a possessory right to the funds contained in its bank accounts, and of incoming checks or other instruments made payable to GOO that were received by GOO representatives.

49.    Defendants unlawfully appropriated GOO's bank-account funds and incoming payments by diverting or withdrawing these funds and instruments without GOO's effective consent, in violation of Texas Penal Code § 31.03.

50.    Defendants appropriated GOO's property with the intent to deprive GOO of the property.

51.    Defendants' conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

52.    GOO has sustained injury as a result of Defendants' theft.

15

53.     Defendants acted with malice.  GOO is therefore entitled to recovery exemplary damages.

54.     GOO is entitled to recover its court costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice & Remedies Code § 134.005(b).

**Count 3: Common Law Fraud Against Tallerine and Ramsey**

55.     All prior allegations are incorporated herein by reference.

56.     As explained above, Tallerine and Ramsey made a series of representations to GOO that were material and false, including representations that expenses and invoices submitted to GOO for payment were for expenses incurred in connection with GOO's business.

57.     When Tallerine and Ramsey made these misrepresentations, they knew they were false and/or made the representations recklessly, as positive assertions, and without knowledge of their truth.

58.     Tallerine and Ramsey made these misrepresentations with the intent that GOO would rely and act on them, which it did, to its detriment.

59.     Tallerine and Ramsey's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

60.     Tallerine and Ramsey's fraudulent conduct caused injury to GOO.

61.     Tallerine and Ramsey committed fraud with malice; therefore GOO is entitled to recover exemplary damages.

**Count 4: Breach of Fiduciary Duty against Tallerine and Ramsey**

62.     All prior allegations are incorporated herein by reference.

63.     As the President and CEO of GKH and GOO, as well as a member and manager of GKH, Tallerine owed GKH and GOO a fiduciary duty of loyalty, care, good faith and fair

dealing, and candor.  Ramsey owed GOO a fiduciary duty of loyalty, care, good faith and fair dealing and candor because she was the Vice President and Assistant Treasurer of GOO.

64.     Tallerine and Ramsey breached their fiduciary duties to GKH and GOO in numerous respects, by, among other things, (i) embezzling corporate funds for their own benefit; (ii) diverting corporate funds into Tallerine's personal bank account or accounts of entities owned by Tallerine; (iii) causing GOO to pay Tallerine and Ramsey's personal expenses; (iv) fabricating vendors and invoices and submitting them to GOO for payment; (v) causing GOO to pay false and improper expenses; (vi) stealing checks payable to GOO and depositing them in accounts of entities owned by Tallerine; (vii) stealing GOO checks payable to GOO vendors and depositing them in bank accounts of entities owned by Tallerine; (viii) entering into self dealing transactions with GOO without disclosure or approval; (ix) altering invoices and corporate books and records to disguise their illegal conduct; (x) using GOO assets and personnel for business not related to GOO and for the personal benefit of Tallerine and his affiliated entities; and (xi) failing to disclose their knowledge of wrongful and illegal conduct to GOO, GKH or GKH's Board.

65.     Tallerine and Ramsey's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

66.     Tallerine and Ramsey's breaches of fiduciary duty have caused injury to Plaintiffs.

67.     Tallerine and Ramsey's breaches of fiduciary duty were intentional; therefore Plaintiffs are entitled to exemplary damages.

**Count 5:  Unjust Enrichment Against Tallerine, Goldking Energy Corporation, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood and Ramsey**

68.     All prior allegations are incorporated herein by reference.

69.     Defendants have been unjustly enriched by retaining funds that were illegally and wrongfully taken from GOO by Defendants.  It is unjust for Defendants to retain these funds for which they have no claim or right.

70.     Defendants' unjust enrichment has caused injury to Plaintiffs.

### Count 6:  Business Disparagement Against Tallerine

71.     All prior allegations are incorporated herein by reference.

72.     Tallerine made disparaging comments to Plaintiffs' vendors about Plaintiffs' economic interests, including comments that Plaintiffs are on the verge of filing for bankruptcy.

73.     When Tallerine made these comments to third parties they were false, and Tallerine knew they were false or made them recklessly without regard for their truth.

74.     Tallerine made these comments with malice and without privilege.

75.     Tallerine's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

76.     Tallerine's actions have caused special damages to Plaintiffs.

### Count 7:  Breach of Contract Against Tallerine

77.     All prior allegations are incorporated herein by reference.

78.     On or about October 16, 2010, Tallerine entered into an employment agreement with GOO and the parties entered into an addendum on or about April 5, 2011 (the agreement and addendum collectively the "Tallerine Employment Agreement").    The Tallerine Employment Agreement required Tallerine to "devote substantially all of [his] business time, attention and best efforts to the affairs of Goldking."   The Tallerine Employment Agreement also specifically listed the limited expense items for which Tallerine would be entitled to reimbursement from GOO.

18

79.     Tallerine breached the Tallerine Employment Agreement by, among other things, not devoting substantially all of his time, attention and best efforts to GOO and GKH business and approving and accepting reimbursement for unauthorized expenses.

80.     GOO fulfilled all of its duties and obligations under the Tallerine Employment Agreement.

81.     Tallerine's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

82.     Tallerine's breaches of the Tallerine Employment Agreement have caused substantial damage to GOO.

### Count 8:  Breach of Contract Against Ramsey

83.     All prior allegations are incorporated herein by reference.

84.     On or about October 16, 2010, Ramsey entered into an employment agreement with GOO (the "Ramsey Employment Agreement").  The Ramsey Employment Agreement required Ramsey to "devote substantially all of [her] business time, attention and best efforts to the affairs of Goldking."  The Ramsey Employment Agreement also stated that she would be reimbursed for "ordinary and necessary business expenses related to directly to [her] employment."

85.     Ramsey breached the Ramsey Employment Agreement by, among other things, not devoting substantially all of her time, attention and best efforts to GOO and GKH business and approving and accepting reimbursement for unauthorized expenses.

86.     GOO fulfilled all of its duties and obligations under the Ramsey Employment Agreement.

87.     Ramsey's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

88.     Ramsey's breaches of the Ramsey Employment Agreement have caused substantial damage to GOO.

**Count 9:  Breach of the Duty of Good Faith and Fair Dealing Against Tallerine**

89.     All prior allegations and incorporated herein by reference.

90.     Tallerine, as a Manager who signed the GKH Limited Liability Agreement, owed GKH a duty of good faith and fair dealing.

91.     Tallerine breached his duty of good faith and fair dealing to GKH in numerous respects, by, among other things, (i) embezzling corporate funds for their own benefit; (ii) diverting corporate funds into Tallerine's personal bank account or accounts of entities owned by Tallerine: (iii) causing GOO to pay Tallerine and Ramsey's personal expenses; (iv) fabricating vendors and invoices and submitting them to GOO for payment; (v) causing GOO to pay false and improper expenses; (vi) stealing checks payable to GOO and depositing them in accounts of entities owned by Tallerine; (vii) stealing GOO checks payable to GOO vendors and depositing them in bank accounts of entities owned by Tallerine; (viii) entering into self dealing transactions with GOO without disclosure or approval; (ix) altering invoices and corporate books and records to disguise their illegal conduct; (x) using GOO assets and personnel for business not related to GOO and for the personal benefit of Tallerine and his affiliated entities; and (xi) failing to disclose their knowledge of wrongful and illegal conduct to GOO, GKH or GKH's Board.

92.     Tallerine's conduct was willful, constituted bad faith, and was not in the best interests of GKH.

93.     Tallerine's breaches of the duty of good faith and fair dealing have caused injury to GKH.

### Count 10:  Aiding and Abetting Breach of Fiduciary Duty and Fraud Against Ramsey and Culotta

94.     All prior allegations are incorporated herein by reference.

95.     Ramsey and Culotta aided and abetted Tallerine's breaches of fiduciary duty and fraud.

96.     As set forth above, Tallerine breached his fiduciary duties to Plaintiffs and committed fraud against Plaintiffs.  Ramsey and Culotta had knowledge that Tallerine's conduct was tortious.  Ramsey and Culotta had the intent to assist Tallerine in his tortious conduct. Ramsey and Culotta gave Tallerine assistance or encouragement in his tortious conduct, and their conduct was a substantial factor in causing Tallerine's breaches of fiduciary duty and fraud.

97.     In addition, Ramsey and Culotta provided substantial assistance to Tallerine in accomplishing his breaches of fiduciary duty and fraud against Plaintiffs.  Ramsey and Culotta's own conduct was a breach of a duty they owed to Plaintiffs, and their participation as a substantial factor in causing Tallerine's breaches of fiduciary duty and fraud.

98.     Ramsey and Culotta's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

99.     Ramsey and Culotta's actions in aiding and abetting Tallerine's tortious conduct have caused Plaintiffs substantial injury.

### Count 11:  Conspiracy Against All Defendants

100.    All prior allegations are incorporated herein by reference.

101.    Defendants engaged in a civil conspiracy to convert substantial amounts of money from GOO and to otherwise defraud Plaintiffs.

102.    Each of the Defendants had knowledge of, agreed to, had a meeting of the minds, and intended to convert GOO's funds and to defraud Plaintiffs.

103.    As set forth above, Defendants committed unlawful, overt acts to further their course of action.

104.    Defendants' conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

105.    The civil conspiracy among Defendants has caused Plaintiffs substantial injury.

106.    The conspiracy was the result of malice.   Plaintiffs are therefore entitled to recover exemplary damages.

### Count 12:  Attorneys' Fees

107.    All prior allegations are incorporated herein by reference.

108.    Plaintiffs are entitled to recover costs and reasonable and necessary attorneys' fees from Tallerine and Ramsey pursuant to Section 38.001(8) of the Texas Civil Practice & Remedies Code.

109.    In addition, as a consequence of Defendants' theft, Plaintiffs have found it necessary to employ the undersigned attorneys to pursue this lawsuit.  Accordingly, pursuant to Texas Civil Practices & Remedies Code § 134.005(b), Plaintiffs are entitled to recover from Defendants their court costs and reasonable and necessary attorneys' fees incurred in pursuing this matter.

### VII.  CONDITIONS PRECEDENT

110.    All conditions precedent to Plaintiffs' causes of action have been performed or have occurred.

## VIII.  JURY DEMAND

111.    Plaintiffs hereby demand a jury trial.

## IX.  REQUEST FOR DISCLOSURE

112.    Pursuant to Texas Rule of Civil Procedure 194, all Defendants are requested to disclose, within 50 days of service of this request, the information or material described in Rule 194.2.

## X.  PRAYER

113.    Wherefore, Plaintiffs respectfully request that Defendants be served with process to appear and answer herein, and upon trial or other final hearing of this matter, that the Court award Plaintiffs the following relief:

(a)  recovery of Plaintiffs' actual damages;

(b)  disgorgement of any benefits or funds improperly received by Defendants;

(c)  recovery of exemplary and punitive damages;

(d)  recovery of Plaintiffs' reasonable and necessary attorneys' fees;

(e)  recovery of Plaintiffs' costs of court;

(f)  recovery of prejudgment and post-judgment interest; and

(g)  any further relief to which Plaintiffs show themselves justly entitled.

Respectfully submitted,

**GIBBS & BRUNS, LLP**


By     */s/ Barrett H. Reasoner*
         Barrett H. Reasoner
         State Bar No. 16641980
         Mark A. Giugliano
         State Bar No. 24012702
         Laura J. Kissel
         State Bar No. 24046223
         1100 Louisiana, Suite 5300
         Houston, Texas 77002
         Tel:  713-650-8805
         Fax:  713-750-0903

**ATTORNEYS FOR PLAINTIFFS**

Unofficial Copy Office of Chris Daniel, District Clerk

## **EXHIBIT C**

First Day Pleadings

1.      Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases

2.      Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Epiq Bankruptcy Solutions, LLC as Clams and Noticing Agent, *Nunc Pro Tunc* to the Petition Date

3.      Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto

4.      Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations and (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers

5.      Debtors' Motion for an Order, Pursuant To Sections 105(a) and 363(b) of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Obligations On Account of Royalties, Overriding Royalty Interests, and Working Interest Owner Payments, and (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers

6.      Debtors' Motion for an Order, Pursuant to Sections 105(a), 363, 364, 503(b), 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Obligations of Critical Vendors and (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers

7.      Debtors' Motion for an Order, Pursuant to Sections 105(a) and 345(a) of the Bankruptcy Code, Bankruptcy Rule 2015 and Local Rule 2015-2, (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of Section 345(b) on an Interim Basis and (IV) Granting Certain Related Relief

8.      Debtors' Motion for an Order, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions and (B) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers

9.      Debtors' Motion for Interim and Final Orders, Pursuant To Sections 105, 361, 362, 363, 364 and 507 of The Bankruptcy Code, (1) Approving Post-Petition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority

Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, (6) Scheduling a Final Hearing, and (7) Granting Certain Related Relief With Respect To the Debtors' Hedging Obligations

01:14269918.4