## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GOLDKING HOLDINGS, LLC, et al.,[1] | Case No. 13-12820 (___) |
| Debtors. | Joint Administration Requested |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE, (1) APPROVING POST-PETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY, (6) SCHEDULING A FINAL HEARING, AND (7) GRANTING CERTAIN RELATED RELIEF WITH RESPECT TO THE DEBTORS' HEDGING OBLIGATIONS**

Goldking Holdings, LLC and its above-captioned affiliated debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors") hereby submit this motion (this "Motion") for the entry of interim and final orders, pursuant to sections 105, 361, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"): (i) authorizing the Debtors to obtain postpetition financing; (ii) authorizing the use of Cash Collateral;[2] (iii) granting liens and superpriority claims; (iv) granting adequate protection to the Lender; (v) modifying the automatic stay; (vi) scheduling a final hearing on this Motion to incur such financing on a permanent basis pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (vii) authorizing, but not directing, the Debtors, in their discretion, to satisfy the Hedging Obligations. The facts and circumstances supporting this Motion are set forth in the concurrently filed Declaration of Edward Hebert in

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Goldking Holdings, LLC (2614); Goldking Onshore Operating, LLC (2653); and Goldking Resources, LLC (2682). The mailing address for the Debtors is 777 Walker Street, Suite 2500, Houston, TX 77002.

[2] Capitalized terms used but not yet defined herein shall have the meanings ascribed to them below.

Support of Chapter 11 Petitions and First Day Pleadings (the "<u>First Day Declaration</u>").  In further support of this Motion, the Debtors respectfully state as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "<u>Amended Standing Order</u>").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rule 4001(b) and (c) and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure (the "<u>Local Rules</u>").

<u>**BACKGROUND**</u>

**A.      General**

2.      On the date hereof (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Concurrently with this Motion, the Debtors have also filed certain other motions and applications seeking certain "first day" relief.

3.      The Debtors have continued in possession of their properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request has been made for the appointment of a trustee or examiner and no official committee has been established in these chapter 11 cases.

2

5.      Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

**B.      Pre-petition Debt Structure**

6.      On November 5, 2010, Goldking Resources, LLC ("GKR" or the "Borrower"), as borrower, and GKH and Goldking Onshore Operating ("GKO," and together, with GKH, each, a "Guarantor" and collectively, the "Guarantors"), as guarantors, entered into a Credit Agreement (as amended, modified or supplemented from time to time prior to the Petition Date, the "Existing Credit Agreement," a copy of which is attached hereto as Exhibit A)[3] with Bank of America, N.A. ("BofA"), as administrative agent and lender.   When it was entered into, the Existing Credit Agreement had a Commitment of $200 million, which was subject to a Borrowing Base initially set by BofA at $12 million and, by amendment dated June 15, 2011, was increased to $22 million.  The Debtors' obligations under the Existing Credit Agreement:  (i) are secured by substantially all of their assets; (ii) are evidenced by the Note in the amount of the aggregate outstanding principal amount of each Advance, together with accrued but unpaid interest on the principal amount of each such Advance; and (iii) mature on November 5, 2013 (the "Maturity Date").

7.      On January 24, 2013 (the "Assignment Date"), the Debtors, BofA and Wayzata Opportunities Fund II, L.P. ("Wayzata," the "Lender," or the "Agent") entered into a (i) Resignation, Assignment and Release Agreement, (ii) an Assignment and Acceptance, and (iii) a Release Agreement (as amended, modified or supplemented from time to time, collectively, the "Assignment Documents"), pursuant to which Wayzata took assignment of all of the rights and obligations of BofA under the Existing Credit Agreement.

---

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement and the Interim Order, as applicable.

8.      Prior to the Assignment Date, certain Events of Default (together, the "Existing Events of Default") had occurred as a result of GKR's failure to comply with the Interest Rate Coverage Ratio and the Debt to EBITDA Ratio in sections 6.15 and 6.17, respectively, of the Existing Credit Agreement for the compliance periods ending June 30, 2012 and September 30, 2012.  Additionally, because of the prior actions of Mr. Tallerine (as defined in the First Day Declaration), the Debtors were not in a position to make basic representations and warranties regarding their financial condition and financial statements, a problem which also served as a practical bar to an attempt to procure third-party financing.  On account of these Existing Events of Default and attendant circumstances, BofA sought to accelerate the maturity of the Note, at which point Wayzata decided that it was in the best interests of all parties for Wayzata to take assignment of BofA's rights and obligations under the Existing Credit Agreement and provide the Debtors with necessary breathing room to resolve repayment of their secured indebtedness. As of the Assignment Date, the Borrowing Base under the Existing Credit Agreement was $18 million,[4] the aggregate outstanding principal amount of Advances was approximately $10.291 million, and the outstanding amount of interest was approximately $53,000.00.  Through the Third Amendment, the Existing Events of Default were waived.

9.      Since the execution of the Assignment Documents, there have been no further Advances under the Existing Credit Agreement, as the Commitment has been terminated and no more Advances are permitted.  Furthermore, since the Assignment Date, the Debtors have not made any payments on account of principal or interest, which accrues as payment-in-kind, as Wayzata and the Debtors both believed that it was best for the Debtors to use their cash to facilitate operations and the potential sale of assets.

---

[4]   Prior to the execution by the Debtors and Wayzata of a January 24, 2013 amendment to the Existing Credit Agreement (the "Third Amendment"), under the Existing Credit Agreement, the Borrowing Base was generally to be re-determined each May 1 and November 1.  The Third Amendment removed this requirement.

4

10.     As of the Petition Date, with respect to the Existing Credit Agreement, the aggregate outstanding principal amount of Advances is approximately $11.446 million and the outstanding amount of interest is approximately $136,000.00.  No letters of credit are currently outstanding under the Existing Credit Agreement.

11.     By virtue of the issuance of the establishment of the Existing Credit Agreement, each of the Debtors is primarily or secondarily liable and obligated for the repayment of all of the Pre-Petition Obligations and substantially all of their respective assets constitute collateral therefor.

**C.     Debtors' Need For Postpetition Financing and Use of the Cash Collateral**

12.     During the ordinary course of their business operations, the Debtors generate certain Cash Collateral as their operations generate revenue from the other Pre-Petition Collateral.  The Debtors need to use the Cash Collateral in the normal course of their business in order to, among other things, make essential payments on account of employee wages and benefits, taxes, utilities, to satisfy obligations related to their oil and gas leases and wells, including, without limitation, royalties, overriding royalty interests and working interest owner payments, and on account of the Debtors' hedging arrangements (collectively, the "Hedging Obligations"),[5] and to otherwise obtain services that are necessary to the continued postpetition operation of the Debtors' business.

13.     As set forth above, the Pre-Petition Obligations are secured by prepetition liens on substantially all of the Debtors' assets, including the Cash Collateral, and as set forth more fully in the First Day Declaration, it has became apparent to the Debtors that they lack sufficient liquidity to continue to operate their business on a long-term basis, and that in order to maximize

---

[5]  As set forth in the First Day Declaration, the Debtors utilize certain types of derivative financial instruments to manage fluctuations in cash flows resulting from changes in crude oil and natural gas commodity prices.  The types of derivative instruments typically entered into by the Debtors include swaps and options.

value, it is in their best interests to commence a sale process for all or substantially all of their assets. However, while Wayzata is willing to fund a sale process, it indicated that it would not do so outside of chapter 11 (due to the pending Litigation[6] and Mr. Tallerine's threats to interfere with a sale process) or on terms other than those set forth in this Motion and the Credit Documents, and no other sources of liquidity were readily available. Accordingly, faced with their liquidity strain and the impending Maturity Date, the Debtors commenced these chapter 11 cases on the Petition Date in order to implement an orderly sale process.

14.    Even the use of the Cash Collateral, however, would be insufficient to satisfy the Debtors' ongoing funding requirements for the operation of their business in an orderly manner. The Debtors need to supplement their use of the Cash Collateral with the modest amount of financing proposed to be provided under the secured debtor-in-possession financing facility (the "DIP Facility") that would be established pursuant to the terms and conditions of: (i) the proposed interim order for this Motion attached hereto as Exhibit C (the "Interim Order"); (ii) the Existing Credit Agreement, as ratified and amended by a certain Ratification, Amendment and Security Agreement (the "Ratification Agreement," a copy of which is attached hereto as Exhibit B) by and among GKR, as borrower, GKH and GKO, as guarantors, and Wayzata, as administrative agent and lender; and (iii) the other Existing Credit Documents (as defined in the Ratification Agreement), as ratified and amended by the Ratification Agreement.[7]

15.    The Debtors' use of the Cash Collateral and the proceeds of the DIP Facility will be used to fund the Debtors' operations and the expenditures permitted under the Interim Order, the Credit Documents, and the budget attached hereto as Exhibit D and, upon entry of an order granting the relief requested in this Motion on a final basis (a "Final Order"), to pay the Lender

---

[6] As defined in the First Day Declaration.

in respect of all Pre-Petition Obligations in accordance with the Credit Documents and the Interim Order (the "Roll-Up").

16.    To obtain the use of the Cash Collateral and the financing available under the DIP Facility, and to avoid immediate and irreparable harm to the Debtors' operations and their estates, the Debtors seek entry of the Interim Order.

**D.    The DIP Facility**

17.    Pursuant to Bankruptcy Rule 4001, the Debtors set forth the significant elements of the DIP Facility, as follows:[8]

| | |
|---|---|
| ***Entities with an Interest in the Cash Collateral*** | Wayzata, as administrative agent and lender under the Existing Credit Documents |
| ***Amount of DIP Facility***<br><br>**See Ratification Agreement, § 7.2(b)** | Interim maximum amount of $1,500,000.00; and final maximum amount of $16,100,000.00 |
| ***DIP Facility Fee***<br><br>**See Ratification Agreement, § 6** | The Borrower shall pay to the Agent, for the account of the Lender, a debtor-in-possession financing facility fee, in the amount of $161,000.00 (the "DIP Facility Fee"), on account of the financing provided by the Agent and the Lender to the Borrower. The DIP Facility Fee will be refunded to the Borrower upon (1) the occurrence of the seventy-sixth (76th) day following the entry of the Interim Order with no Objections having been filed with the Court, or if Objections have been filed, all such Objections have been denied by a final, non-appealable order of the Court, and (2) the entry by the Court of a Final Order and such order is final and non-appealable. |
| ***Use of Proceeds; Roll-Up***<br><br>**See Ratification Agreement, § 5.2;** | For (i) cost, expenses and fees in connection with the Credit Agreement and the transactions contemplated thereby and (ii) other proper corporate purposes, in each case, in accordance with the Budget pursuant to Section 5.3 of the Ratification Agreement |

---

[7]  The Existing Credit Agreement as ratified and amended by the Ratification Agreement is referred to herein as the "Credit Agreement". The Interim Order, the Credit Agreement, and the other Existing Credit Documents (as ratified and amended by the Ratification Agreement) are referred to herein, collectively, as the "Credit Documents".

[8]  The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Facility, reference should be made to the Credit Documents, including the Interim Order. The summary herein is qualified in its entirety by reference to such documents and such order. Interested parties are strongly encouraged to read the Credit Documents. In the event there is a conflict or inconsistency between this Motion and the Credit Documents, the Credit Documents shall control in all respects.

| | |
|---|---|
| **Interim Order, ¶ 1.2** | (including <u>Schedule 5.2</u> thereto identifying certain pre-petition claims that the Borrower intends to pay to the extent approved by the Court); provided, that, no portion of the administrative expenses, priority claims or any other pre-petition claims in the chapter 11 cases, other than those directly attributable to the post-petition operation of the business of the Borrower as the Agent may determine or to which the Agent has specifically agreed, shall be funded with the proceeds of the Advances or the Letters of Credit.   All collections from the Collateral and any other payments received in respect of the obligations owing by the Borrower to the Agent and the Lender shall be deemed to be applied by the Agent and Lender first to all pre-petition obligations owing to the Agent and the Lender and thereafter to all post-petition obligations.   Notwithstanding the foregoing, proceeds shall not be used by the Borrower to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of the Agent's and the Lender's pre-petition and/or post-petition liens, claims and rights or any other actions not expressly authorized by the Interim Order and a Final Order. |
| ***Interest Rate***<br><br>**See Fourth Amendment to Credit Agreement, § 2(c); Ratification Agreement, § 7.1** | All accrued and unpaid interest on any Advances shall be paid in kind and capitalized, with the effective rate of interest being a fixed rate of 15% per annum. |
| ***Post-Petition Lien Granting; Avoidance Actions***<br><br>**See Interim Order, ¶ 2.1** | Pursuant to the Interim Order, to secure the prompt payment and performance of any and all Post-Petition Obligations (and upon entry of a Final Order providing for such relief any and all Obligations, including, without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of the Debtors to the Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the Lender shall have and is granted, effective as of the Petition Date, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' estates may have (but subject to certain claims entitled to priority, including the Permitted Liens and Claims, as and to the extent expressly provided in Paragraph 2.1.2 of the Interim Order), in and upon all of the Pre-Petition Collateral and the Post-Petition Collateral.<br><br>The Lender's liens on and security interests in avoidance actions brought under sections 542, 545, 547, 548, 549 or 550 of the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>") shall secure the |

01:14273785.2

| | |
|---|---|
| | Obligations upon the entry of a Final Order providing for such relief. |
| *Superpriority Claim*<br><br>**See Interim Order, ¶ 2.2** | Pursuant to the Interim Order, for all Post-Petition Obligations (and, upon entry of a Final Order, for all Obligations, including, without limitation, all Pre-Petition Obligations and all Post-Petition Obligations) now existing or hereafter arising pursuant to the Interim Order, the Credit Documents or otherwise, the Lender is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, the Superpriority Claim shall be subject only to the Permitted Liens and Claims as and to the extent expressly set forth in the Interim Order.<br><br>The Superpriority Claim will attach to proceeds of Avoidance Actions upon the entry of a Final Order providing for such relief. |
| *Maturity Date*<br>*(Term of DIP Facility)*<br><br>**See Ratification Agreement, § 7.2** | Pursuant to the Ratification Agreement, the "Maturity Date" is the earlier of: (a) June 1, 2014; (b) the termination in whole of the Commitments in accordance with the terms of the Credit Documents; (c) the date of confirmation of a plan of reorganization or liquidation for the Borrower and the Guarantors in the chapter 11 cases; (d) the consummation of the sale or sales of all of the Borrower's and each Guarantor's (if applicable) assets and properties or of all equity interests in the Borrower and each Guarantor (if applicable); or (e) the last termination date set forth in the Interim Order, unless a Final Order has been entered prior to such date, and in such event, then the last termination date set forth in such Final Order. |
| *Carve-Out Expenses*<br><br>**See Interim Order, ¶ 2.3.1** | Pursuant to the Interim Order, upon the declaration by the Lender of the occurrence of an Event of Default, which is not waived or cured, the Lender's liens, claims and security interests in the Collateral and the Superpriority Claim shall be subject only to the right of payment of the following expenses (collectively, the "Carve-Out Expenses"):<br><br>1. statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);<br><br>2. fees payable to the Clerk of the Court; and<br><br>3. subject to the terms and conditions of the Interim Order, the unpaid, budgeted and outstanding reasonable fees and expenses actually incurred on or after the Petition Date through the occurrence of an Event of Default, and approved or permitted by an order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), by attorneys, accountants and other professionals retained by the Debtors |

9

| | |
|---|---|
| | (collectively, the "<u>Debtors' Professionals</u>"), plus an aggregate sum not to exceed $150,000.00 subsequent to the occurrence of an Event of Default (the "<u>Professional Fee Carve Out</u>"). The Professional Fee Carve Out shall also apply to the professionals employed any Committee. |
| ***Conditions Precedent***<br><br>**See Ratification Agreement, § 10** | Section 10 of the Ratification Agreements contains various conditions precedent, many or all of which are customary for debtor-in-possession credit facilities of this nature and some of which are customized to the facts and circumstances of these chapter 11 cases.<br><br>Among other things, pursuant to Section 10.12 of the Ratification Agreement, on or before the expiration of the Interim Order and in no event later than thirty (30) days after the entry of the Interim Order, the Court shall have entered a Final Order. |
| ***Covenants***<br><br>**See Ratification Agreement, § 5** | Section 5 of the Ratification Agreements contains various affirmative and negative covenants, many or all of which are customary for debtor-in-possession credit facilities of this nature and some of which are customized to the facts and circumstances of these chapter 11 cases.<br><br>As set forth more fully therein, Section 5 of the Ratification Agreement requires compliance with the Budget and the Debtors' retention of Lantana Oil & Gas Partners or another investment banker acceptable to the Agent. |
| ***Events of Default***<br><br>**See Ratification Agreement, § 7.3; Credit Agreement, § 7.1; Interim Order, ¶ 3.1** | Section 7.3 of the Ratification Agreement and Section 7.1 of the Credit Agreement contain various "Events of Default," many or all of which are customary for debtor-in-possession credit facilities of this nature.<br><br>They include, without limitation:<br><br>1. any act, condition or event occurring after the Petition Pate that has a Material Adverse Change upon the assets of the Borrower or either Guarantor, or the Collateral or the rights and remedies of the Agent and the Lender under the Credit Agreement or any other Credit Documents or the Interim Order or any Final Order;<br><br>2. conversion of these chapter 11 cases to chapter 7 under the Bankruptcy Code or dismissal of these chapter 11 cases;<br><br>3. the Interim Order or any Final Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Court without the prior written consent of the Agent (and no such consent shall be implied from any other authorization or acquiescence by the Agent or the Lender), which consent shall not be unreasonably withheld;<br><br>4. the appointment of a trustee pursuant to sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;<br><br>5. the appointment of an examiner with special powers pursuant to |

|  | section 1104(c) of the Bankruptcy Code; |
|  | 6.    the filing of a plan of reorganization or liquidation by the Borrower or either Guarantor, to which the Agent has not consented in writing, or which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; and |
|  | 7.  the confirmation of any plan of reorganization or liquidation in these chapter 11 cases, to which the Agent has not consented to in writing, or which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein. |
|  | In addition, Paragraph 3.1 of the Interim Order provides that the Debtors' failure to comply with the terms, conditions, or provisions of the Interim Order shall constitute an "Event of Default" under the Interim Order, and any "Event of Default" under the Credit Agreement or any of the Credit Documents shall also constitute an "Event of Default" under the Interim Order. |
| *Section 506(c) waiver; marshalling waiver*<br><br>**See Interim Order, ¶¶ 4.3 and 5.9** | Pursuant to the Interim Order, upon entry of a Final Order providing for such relief:  (i) no costs or expenses of administration which have or may be incurred in these chapter 11 cases shall be charged against the Lender, their respective claims or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction or acquiescence by the Lender; and (ii) in no event shall the Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral. |
| *Modification of Automatic Stay*<br><br>**See Interim Order, ¶ 3.4** | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are modified and vacated without further notice, application or order of the Court to the extent necessary to permit the Lender to perform any act authorized or permitted under or by virtue of the Interim Order or the Credit Documents, including, without limitation, upon the occurrence of an Event of Default and after providing five (5) business days prior written notice to counsel for the Debtors, counsel for any Official Committee of Unsecured Creditors (a "<u>Committee</u>"), and the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), to take any action and exercise all rights and remedies provided to it by the Interim Order, the Credit Documents or applicable law as the Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of the Debtors' estates upon which the Lender has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Obligations. |

01:14273785.2

| | |
|---|---|
| ***Adequate Protection for the Benefit of the Lender***<br><br>**See Interim Order, ¶¶ 2.6.2-2.6.4** | Pursuant to the Interim Order, as adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including the Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including the Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out Expenses, the Lender is:<br><br>1.  granted pursuant to sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "<u>Replacement Lien</u>").  The Replacement Lien shall be junior and subordinate only to the Permitted Liens and Claims and the liens and security interests granted to the Lender in the Collateral securing the Post-Petition Obligations and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral; and<br><br>2.  granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of these chapter 11 cases and any conversion thereof to a case under chapter 7 to the extent of such diminution in value (the "<u>Adequate Protection Superpriority Claim</u>"), that shall be junior only to the Carve-Out Expenses and shall otherwise have priority over all administrative expense claims under sections 503(b), 506(c) (upon entry of a Final Order providing for such relief, as set forth in Paragraph 4.3 of the Interim Order), and 507(b) and unsecured claims against the Debtors and their estates now existing or hereafter arising, and will attach to proceeds of Avoidance Actions upon the entry of a Final Order providing for such relief.<br><br>In addition, the Debtors are authorized to provide adequate protection to the Lender in the form of:  (i) payment of interest, fees and other amounts due under the Existing Credit Documents, at the times specified therein, to the Lender; and (ii) ongoing payment of the fees, costs and expenses, including, without limitation, reasonable legal and other professionals' fees and expenses, of the Lender as required under the Existing Credit Documents. |
| ***Releases***<br><br>**See Ratification Agreement, § 9; Interim Order, ¶ 4.5** | Pursuant to the Ratification Agreement and the Interim Order, upon entry of a Final Order providing for such relief, and subject to Paragraph 4.1 of the Interim Order, in consideration of the Lender making post-petition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Credit Documents and the Interim Order, the Debtors, on behalf of themselves and their successors, assigns and other legal representatives (collectively, the "<u>Releasors</u>"), absolutely, unconditionally and irrevocably release, remise and forever discharge the Lender and its respective successors and assigns, and each of its present and former participants, agents, officers, directors, shareholders, affiliates, subsidiaries, divisions, employees, attorneys, professionals and other representatives (collectively, the "<u>Releasees</u>") |

| | |
|---|---|
| | of and from any and all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever, of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which the Releasors may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of the Ratification including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, or actions or inactions of the Lender in the Lender's capacity as equity owner of the Debtors, provided that such release does not apply in cases of fraud, gross negligence or willful misconduct of any Releasee. |
| | In addition, upon the indefeasible repayment of all Obligations owed to the Lender by the Debtors and termination of the rights and obligations arising under the Credit Documents and either a Final Order or the Interim Order, as the case may be (which payment and termination shall be on terms and conditions acceptable to the Lender), the Lender shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Credit Documents or the applicable order (including, without limitation, any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out Expenses), on terms and conditions acceptable to the Lender. |
| ***Post-financing Milestones***<br><br>**See Ratification Agreement, § 11; Interim Order, ¶ 1.7** | Pursuant to Section 11 of the Ratification Agreement and Paragraph 1.7 of the Interim Order:<br><br>1.  Not later than ninety (90) days after the Petition Date, an order in form and substance satisfactory to the Lender (the "Bidding Procedures Order") shall have been entered by the Court authorizing and approving an auction and auction procedures for the selection of a liquidator and/or a going concern purchaser in connection with any potential sale of the business and assets of the Debtors in any liquidation and/or going concern sales, as applicable, to the highest and best bidder, on terms and conditions reasonably acceptable to the Lender (a "<u>Sale</u>").<br><br>2.  Not later than sixty (60) days after the date the Court enters the Bidding Procedures Order, an order in form and substance reasonably satisfactory to the Lender shall have been entered by the Court approving a Sale.<br><br>3.   Any Sale shall:  (i) be consummated, not later than the one hundred fiftieth day (150th) day following the Petition Date; (ii) be in cash; and  (iii) otherwise be on terms and conditions reasonably |

|  | acceptable to the Lender. |
|--|--------------------------|
|  | 4.  Not later than one hundred ten (110) days after the Petition Date, the Debtors shall have filed with the Court a disclosure statement and a plan of reorganization or liquidation (as applicable), and motion and proposed form order (in form and substance satisfactory to the Lender) seeking approval of the Court, on terms and conditions acceptable to the Lender or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein. |
|  | 5.  Not later than one hundred fifty (150) days after the Petition Date, the Court shall have approved the disclosure statement on terms and conditions acceptable to the Lender or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein. |
|  | 6.  Not later than one hundred eighty (180) days after the Petition Date, the Court shall have confirmed the plan of reorganization or liquidation (as applicable) on terms and conditions acceptable to the Lender or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein. |

## <u>LOCAL RULE 4001-2(a)(i) DISCLOSURES</u>

18.   **Lien Investigation**: Rule 4001-2(a)(i) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") requires the disclosure of certain provisions that are contained in post-petition financing motions and proposed orders or in the loan documents underlying those pleadings (collectively, "<u>Financing Motions</u>").  Local Rule 4001-2(a)(i)(B) requires the disclosure of findings of fact in Financing Motions that are intended to bind the estate with respect to the validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation as to those facts or claims.

19.   The Interim Order contains findings of fact agreed to by the Debtors, but Paragraph 4.1 of the Interim Order provides that any Committee shall have sixty (60) calendar days from the date of appointment of such Committee by the U.S. Trustee, and any party in interest with requisite standing (including a chapter 7 trustee) shall have seventy-five (75)

calendar days from the date of the entry of the Interim Order, to file with the Court any action, claim or defense (an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or otherwise, (i) the existence, validity or amount of the Pre-Petition Obligations, (ii) the extent, legality, validity, perfection or enforceability of the Lender's pre-petition liens and security interests in the Pre-Petition Collateral, (iii) the Lender's right to apply proceeds of the Post-Petition Collateral against the Post-Petition Obligations in satisfaction of the Lender's post-petition liens as provided for in the Interim Order, (iv) upon entry of a Final Order, the Lender's right to apply proceeds of the Post-Petition Collateral against the Pre-Petition Obligations in satisfaction of the Lender's pre-petition liens as provided for in the Interim Order (provided, however, that the only grounds for such Objection is that the Pre-Petition Obligations were not fully secured by the Pre-Petition Collateral as of the Petition Date and such application unduly advantaged the Lenders), or (e) the Debtors' stipulations set forth in the Interim Order, including the release of all claims against the Lender.  See Interim Order, ¶ 4.1.

20.    **506(c) Waiver**:  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions in Financing Motions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The proposed waiver of the rights of the Debtors and their estates under section 506(c) of the Bankruptcy Code (the "506(c) Waiver") will be effective only after notice to parties in interest and entry of a Final Order granting such relief.  See Interim Order, ¶ 4.3.

21.    **Avoidance Action Lien**:  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions in Financing Motions that grant the prepetition secured creditor liens on Avoidance Actions.  Although the Credit Agreement provides that the Post-Petition Collateral includes Avoidance Actions, pursuant to the Interim Order, the Lender's liens on and security interests in

15

Avoidance Actions (the "<u>Avoidance Action Lien</u>") shall secure the Obligations only upon the entry of a Final Order providing for such relief.  <u>See</u> Interim Order, ¶ 2.1.1.

22.    **<u>Roll-Up</u>**:    Local Rule 4001-2(a)(i)(E) requires disclosure of provisions in Financing Motions whereby postpetition loans will be used to repay prepetition debt.  As noted above, the Credit Documents provide for the Roll-Up.  <u>See</u> Ratification Agreement, § 5.2; Interim Order, ¶ 1.4.

23.    **<u>Professional Fee Carve Out</u>**:    Local Rule 4001-2(a)(i)(F) requires disclosure of provisions in Financing Motions that, with respect to professional fee carve-outs, provide disparate treatment to professionals retained by any Committee from professionals retained by the Debtors.  The Professional Fee Carve Out provided for in Paragraph 2.3.1 of the Interim Order applies to the Debtors' Professionals, as well as any professionals employed by any Committee.  <u>See</u> Interim Order ¶ 2.3.1

24.    Paragraph 2.3.2 of the Interim Order also provides that neither the Professional Fee Carve Out nor the proceeds of any Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any professional in connection with any of the following:  (i) an assertion or joinder in or any investigation into any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief:  (a) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or the Lender's liens on and security interests in the Collateral, (b) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Lender's liens on and security interests in the Collateral, or (c) preventing, hindering or delaying the Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the Interim Order, (ii) a request to use the Cash Collateral without the prior written consent of the

16

Lender in accordance with the terms and conditions of the Interim Order, (iii) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to sections 364(c) or 364(d) of the Bankruptcy Code, other than from the Lender, without the prior written consent of the Lender, (iv) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Lender under chapter 5 of the Bankruptcy Code, or (v) any act which results in the occurrence of an Event of Default, which is not waived or cured, under the Credit Documents or the Interim Order; provided, however, that any Committee may use up to $10,000.00 to investigate the liens of, or claims again, the Lender.  See Interim Order ¶ 2.3.2

25.    **Priming Liens**:  Finally, Local Rule 4001-2(a)(i)(G) requires disclosure of provisions in Financing Motions that prime any secured liens without the consent of the lienholder.  As discussed herein, the Lender is consenting to the priming of its liens.

26.    The provisions of the Credit Documents requiring disclosure pursuant to Local Rule 4001-2(a)(i) are justified under the circumstances of these chapter 11 cases.  First and foremost, without the inclusion of such terms, the Lender would not agree to make the DIP Facility available to the Debtors and would not agree to the Debtors' use of the Cash Collateral or the priming of its liens.  In light of the unavailability of adequate financing alternatives and for the reasons set forth more fully below, the Debtors determined, in the exercise of their sound business judgment, that agreeing to the terms of the DIP Facility, including the Roll-Up, is appropriate under the circumstances of these chapter cases.

27.    Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that require disclosure under the Local Rules.

01:14273785.2

## AUTHORIZATION TO USE THE CASH COLLATERAL

28.     During the ordinary course of operations, the Debtors generate the Cash Collateral.  The Debtors need to use the Cash Collateral in the normal course of their business in order to, among other things, make essential payments on account of employee wages and benefits, taxes, utilities, to satisfy obligations related to their oil and gas leases and wells, including, without limitation, royalties, overriding royalty interests and working interest owner payments, and their Hedging Obligations, and to otherwise obtain services that are necessary to the continued postpetition operation of the Debtors' business.

29.     However, the Cash Collateral is insufficient to satisfy the Debtors' ongoing funding requirements for the operation of their business in an orderly manner.  Thus, the Debtors need to supplement their use of the Cash Collateral with the funds being provided by the DIP Facility.  Nevertheless, as the Debtors' usage of the Cash Collateral is a key component of the DIP Facility, it is imperative that the Debtors obtain authority to use the Cash Collateral, subject to the terms described in this Motion and provided for in the Interim Order.  Accordingly, to obtain the necessary financing and to avoid immediate and irreparable harm to their operations and estates, the Debtors have an immediate need for authority to use the Cash Collateral.

## THE LENDER'S ADEQUATE PROTECTION

30.     To the extent that its interests in the Prepetition Collateral constitute valid and perfected security interests and liens as of the Petition Date, the Lender is entitled to adequate protection of its interest, including the Cash Collateral, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code.  Accordingly, the Debtors have agreed, subject to the Court's entry of the Interim Order, to provide the Lender with certain adequate protection (as set for the more fully in the Interim Order, the "Adequate Protection") on account of the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral), the imposition of the automatic stay and

18

the subordination to the Carve-Out Expenses, and in return for the Lender's agreement to permit

the priming of its pre-petition liens by the post-petition liens described herein.

31.    The Adequate Protection consists of, among other things, the following:

A.    the Lender is granted the Replacement Lien, which shall be junior and subordinate only to the Permitted Liens and Claims and the liens and security interests granted to the Lender in the Collateral securing the Post-Petition Obligations and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral;

B.    the Lender is granted the Adequate Protection Superpriority Claim, that (i) shall be junior only to the Carve-Out Expenses and shall otherwise have priority over all administrative expense claims under sections 503(b), 506(c) (upon entry of a Final Order providing for such relief, as set forth in Paragraph 4.3 of the Interim Order), and 507(b) of the Bankruptcy Code and unsecured claims against the Debtors and their estates now existing or hereafter arising, and (ii) will attach to proceeds of Avoidance Actions upon the entry of a Final Order providing for such relief; and

C.    the Debtors are authorized to provide adequate protection to the Lender in the form of (i) payment of interest, fees and other amounts due under the Existing Credit Documents, at the times specified therein, to the Lender, and (ii) ongoing payment of the fees, costs and expenses, including, without limitation, reasonable legal and other professionals' fees and expenses, of the Lender as required under the Existing Credit Documents.

## **RELIEF REQUESTED**

32.    By this Motion, the Debtors request entry of the Interim Order and a Final Order

authorizing:

A.    in the case of the Interim Order, the Debtors to borrow up to an aggregate principal amount of $1.5 million or, in the case of a Final Order, the Debtors to borrow the full amount of the DIP Facility up to an aggregate principal amount of $16.1 million;

B.    the Debtors to execute and enter into the Ratification Agreement and to perform such other and further acts as may be required by the Credit Documents in connection therewith;

C.    effective as of the Petition Date, the granting to the Lender of continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors'

estates may have, as and to the extent expressly provided in Paragraph 2.1.2 of the Interim Order, in and upon all of the Collateral, to secure the prompt payment and performance of any and all Post-Petition Obligations (and upon entry of a Final Order providing for such relief any and all Obligations, including, without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of the Debtors to the Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code (provided, however, the Lender's liens on and security interests (i) in the Collateral shall be subject to certain claims entitled to priority, including the Permitted Liens and Claims, and (ii) in Avoidance Actions shall secure the Obligations only upon the entry of a Final Order providing for such relief);

D.      the granting of the Superpriority Claim in favor of the Lender for all Post-Petition Obligations (and, upon entry of a Final Order, for all Obligations, including, without limitation, all Pre-Petition Obligations and all Post-Petition Obligations) now existing or hereafter arising pursuant to the Interim Order, the Credit Documents or otherwise (provided, however, the Superpriority Claim (i) shall be subject to the Permitted Liens and Claims as and to the extent expressly set forth in the Interim Order, and (ii) will attach to proceeds of Avoidance Actions only upon the entry of a Final Order providing for such relief);

E.      the Debtors, pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code, to use the Collateral, including the Cash Collateral;

F.      the Debtors to provide the Adequate Protection in favor of the Lender, as adequate protection for the diminution in value of the Lender's interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral, the imposition of the automatic stay and the subordination to the Carve-Out Expenses;

G.      pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") to be held on this Motion to consider entry of the Interim Order;

H.      the scheduling of a final hearing (the "Final Hearing") to be held on this Motion to consider entry of a Final Order; and

I.      in the case of a Final Order, the Roll-Up, the 506(c) Waiver, and the Avoidance Action Lien.

## BASIS FOR RELIEF REQUESTED

33.     For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for the use of the Cash Collateral and for the Court's approval of the DIP Facility and entry of the Interim Order and a Final Order.

**A.      The Debtors Should Be Authorized to Use the Cash Collateral**

34.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[9]  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section ... 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

35.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.   Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

36.     In this case, the Lender has consented to the use of the Cash Collateral in exchange for the Adequate Protection.   Therefore, the Debtors are authorized to use Cash

---

[9]   Pursuant to section 1107 of the Bankruptcy Code, a debtor-in-possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code.

Collateral pursuant to section 363(c)(2) of the Bankruptcy Code.  Moreover, the Debtors submit

that the Adequate Protection to be provided to the Prepetition Lender is appropriate.  Section

363(e) of the Bankruptcy Code provides as follows:

> Notwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used ... by the
> [debtor-in-possession], the court, with or without a hearing, shall
> prohibit or condition such use ... as is necessary to provide
> adequate protection of such interest.

See 11 U.S.C. § 363(e).

37.     The concept of adequate protection finds its basis in the Fifth Amendment's

protection of property interests. H.R. Rep. No. 595, 95th Cong., 1st Sess. 338-40 (1977), reprinted

in U.S. Code Cong & Admin. News 1978, pp. 5963.  Adequate protection is also grounded in the

belief that secured creditors should not be deprived of the benefit of their bargain. Id.  The

Bankruptcy Code does not define adequate protection, but section 361 of the Bankruptcy Code

does list three non-exclusive examples of adequate protection.  First, making a cash payment or

periodic cash payments to the extent necessary to compensate for any decrease in value of an

entity's interest in property may constitute adequate protection.  See 11 U.S.C. §361(1).  Second,

providing additional or replacement liens to the extent necessary to compensate for any decrease

in value of an entity's interest in property may suffice.  See 11 U.S.C. §361(2).  Third, "granting

such other relief … as will result in the realization by such entity of the indubitable equivalent of

such entity's interest in such property" may also suffice.  See 11 U.S.C. §361(3).

38.     As adequate protection under sections 363(e) and 361(1)-(3) of the Bankruptcy

Code, the Debtors have agreed to provide the Lender with the Adequate Protection, which

includes the Replacement Lien and the Adequate Protection Superpriority Claim.  Additionally,

as noted above, the Debtors receiving authority from the Court to use the Cash Collateral is a

critical component of the DIP Facility.  Hence, absent such authority, the Debtors would not

have access to sufficient liquidity, which would imperil their ability to successfully prosecute these chapter 11 cases.

39.    Therefore, the Debtors request that the Court authorize them to use the Cash Collateral.

**B.    The Debtors Should Be Authorized to Enter into the DIP Facility**

40.    The Debtors propose to obtain post-petition financing under the DIP Facility by providing security interests and other liens, as described herein and provided for in the Credit Documents, pursuant to sections 364(c) and (d) of the Bankruptcy Code.    The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).

41.    Indeed, section 364(c) financing is appropriate when the debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re YL West 87th Holdings I LLC, 423 BR 421, 441 (Bankr. Court, S.D.N.Y. January 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); In re Ames Dep't Stores. Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Banks. E.D. Pa. 1987) (secured credit under Section 364(e)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

42.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

 a.    the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

 b.    the credit transaction is necessary to preserve the assets of the estate; and

  c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; In re General Growth Properties, Inc., 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) that the debtors needed postpetition financing "to preserve [their] assets and continue their operations"; and (c) that the terms and conditions of the DIP Documents had been negotiated in good faith).

43. Prior to the Petition Date, the Debtors endeavored to identify potential sources of post-petition financing.  Based on the outcome, the Debtors have determined that adequate post-petition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Obligations is not available.  Without post-petition financing, the Debtors would be unable to operate their business and consummate an orderly sale of all or substantially all of their assets, which would significantly impair the value of the Debtors' assets, to the detriment of all creditor constituencies.  Furthermore, by obtaining the financing proposed herein, the Debtors will be in a position to preserve the value of their assets for the benefit of all creditors.  Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

## C. The Court Should Approve the Priming Liens and the Adequate Protection

44. If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize a debtor to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien, only if:

> (A)    the trustee is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d); In re Levitt & Sons, LLC, 384 B.R. 630, 640-41 (Bankr. S.D.Fla. Feb. 13, 2008) ("In the event the debtor is unable to obtain credit under the provisions of §364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien.").

45.    A debtor has the burden of establishing that the holder of a lien to be subordinated, or whose cash collateral will be used, has adequate protection.  See In re Swedeland Devel. Co., 16 F.3d 552, 564 (3d Cir. 1994); see also In re Marcys Lee Associates, L.P., Case No. 10-667 (Bankr. E.D. Penn. Jan. 20, 2011) (memo and order, Judge J. William Ditter, Jr.).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Stoney Creek Technologies, LLC, 364 B.R. 882, 890 (Bankr. E.D. Penn. March 19, 2007) (section 364(d)(3) of the Bankruptcy Code serves as a catch-all that allows the bankruptcy court discretion to fashion adequate protection on a case by case basis); see In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  In re Mosello, 195 B.R. at 288 (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

46.    In accordance with section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the Interim Order provides the Lender with the Adequate Protection.  The Lender has consented to the priming of its liens provided that the relief requested herein is granted, including the grant of the Adequate Protection provided for in the Interim Order.

47.     Moreover, a "priming" lien may be granted with the consent of the secured creditors whose lien will be primed.  See In re Sun Healthcare Group, Inc., 245 B.R. 779, 782 n.5 (Bankr. D.Del. 2000) ("Their consent (to the use of their cash collateral and priming of their liens) was given in exchange for . . . adequate protection"); In re El Paso Refinery, L P., 171 F.3d 249, 252 (5th Cir. 1999) (noting that "El Paso gave BBL a priming lien, which by agreement was given a priority over the preexisting first lien of a group of Term Lenders"); In re Outboard Marine Corp., 2002 WL 571661, at *1 (Bankr. N.D.Ill Jan. 9, 2002) ("the DIP Lenders committed to provide certain financing to the Debtors . . . pursuant to which the Pre-petition Lenders consented to the imposition of priming liens upon the Pre-Petition Collateral and in favor of the DIP Lenders"), aff'd, Bank of America, N.A. v. Moglia, 330 F.3d 942 (7th Cir. 2003).

48.     The Lender agreed to the priming of its liens in favor of the DIP Facility. Accordingly, the Court should authorize the Debtors to grant priming liens to the Lender to secure the Debtors' obligations under the DIP Facility.

**D.**     **No Adequate Alternative to the DIP Facility is Currently Available**

49.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code.  In re YL West 87th Holdings I LLC, 423 BR 421, 441 (Bankr. Court, S.D.N.Y. Jan. 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); In re General Growth Properties, Inc., 412 B.R. at 125 (debtor has an obligation to make "reasonable efforts, under the circumstances . . .to obtain [unsecured financing], in the ordinary course of business or otherwise" ); In re Harborwalk, LP, Case No. 10-80043-G3-11 (LZP) (Bankr. S.D. Texas, Jan. 29, 2010) ("Section 364(d)(1) does not require that a debtor seek credit from every possible source, but a debtor must show that it made a

26

reasonable effort to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable.").

50.     Substantially all of the Debtors' assets are subject to the liens asserted by the Lender.  Because of the substantial amount of the Pre-Petition Obligations, obtaining the financing needed by the Debtors as unsecured debt, or debt secured by liens junior to the liens of the Lender, was not a realistic option.  In the days prior to the commencement of these chapter 11 cases, the Debtors pursued alternative post-petition financing.  None of the potential lenders that were solicited were willing to provide an adequate stand-alone debtor-in-possession financing facility on terms more favorable than the DIP Facility.  Therefore, the Debtors determined that the DIP Facility is the best post-petition financing option available to the Debtors and their estates under the circumstances.

51.     Accordingly, the Debtors have satisfied the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**E.     The DIP Facility Terms are Fair, Reasonable and Appropriate Under the Circumstances of the Chapter 11 Cases**

52.     The proposed terms of the Credit Documents are fair, reasonable, and appropriate under the circumstances.  First and foremost, as discussed more fully above, the Debtors made a good-faith effort to obtain credit on the most favorable terms available in the market.  No other lender was willing to provide the funding necessary to pay the Pre-Petition Obligations and fund the continued operation of the Debtors' business and the contemplated sale process on more favorable terms than those provided in the DIP Facility.  Against this backdrop, the Debtors and their proposed bankruptcy counsel carefully evaluated the proposed financing offered by the Lender, and engaged in extensive arms' length negotiations with the Lender and its professionals regarding the proposed terms and conditions of the DIP Facility.  Eventually, the Debtors, in

27

their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs.  Moreover, the terms and conditions of the DIP Facility were negotiated by the parties and their respective professionals in good faith and at arms' length.

53.     To further illustrate that the terms are fair, reasonable and adequate, the proposed DIP Facility and the Interim Order provides that the security interests and administrative expense claims granted to the Lender are subject to the Carve-Out Expenses.  In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40; accord In re General Growth Properties, Inc., 412 B.R. at 125.

54.     Likewise, the DIP Facility Fee provided for under the DIP Facility is customary and approval thereof is appropriate.  Moreover, the DIP Facility Fee will be refunded to the Debtors upon (i) the occurrence of the seventy-sixth (76th) day following the entry of the Interim Order with no Objections having been filed with the Court, or if Objections have been filed, all such Objections have been denied by a final, non-appealable order of the Court, and (ii) the entry by the Court of a Final Order and such order is final and non-appealable.

55.     Accordingly, the terms of the DIP Facility are fair, reasonable and appropriate, and the Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Facility.

**F.     Upon Entry of a Final Order, the Roll-Up of Should Be Approved**

56.     Subject to the Court's entry of a Final Order, the Debtors' agreement to the Roll-Up should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate ….” 11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides

that the Court “may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of [the Bankruptcy Code].” 11 U.S.C. § 105(a).

57.    The proposed use, sale, or lease of property of the estate may be approved under

section 363(b) of the Bankruptcy Code if it is supported by sound business justification.  See In

re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) (“In determining whether to authorize

the use, sale or lease of property of the estate under this section, courts require the debtor to show

that a sound business purpose justifies such actions”); Motorola, Inc. v. Official Comm. of

Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d

452, 466 & n. 21 (2d Cir. 2007); In Re Stingfree Techs., Inc., 2009 Bankr. LEXIS 3023 (Bankr.

E.D. Pa., Feb. 4. 2009); In re Global Crossing Ltd., 295 BR 726, 742 (Bankr. S.D.N.Y. July 24,

2003); In re Del. & Hudson H.R. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991) (explaining that

the Third Circuit has adopted the “sound business purpose” test to evaluate motions brought

pursuant to section 363(b)).  The Debtors believe that entry into the proposed DIP Facility is a

sound exercise of their business judgment, See In re Trans World Airlines, Inc., 163 B.R. 964,

974 (Bankr. D.Del. 1994) (approving interim loan, receivables facility and asset-based facility

based upon the debtor’s prudent business judgment); see also In re General Growth Properties,

Inc., 412 B.R. at 125 (finding that the terms of the borrowings and other financial

accommodations reflected prudent business judgment consistent with the debtors’ fiduciary

duties).  Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive

equitable powers to fashion any order or decree which is in the interest of preserving or

protecting the value of the Debtor’s assets. See, e.g., See In re Fleurantin, Case No. 09-4376

(unpaginated) (3rd Cir. March, 24 2011); see also In re Padilla, 389 BR 409, 429 (Bankr. E.D.

Penn. June 30, 2008); Chinichian v. Campolongo, 784 F.2d 1440, 1443 (9th Cir. 1986).

58.     As noted above, the Roll-Up is supported by sound business judgment, as it will satisfy the Pre-Petition Obligations and was a condition to the DIP Facility.  Also, the Roll-Up will not affect the rights of any Committee or other appropriate parties in interest to assert any challenges to the liens or claims of the Lender during the investigation period provided for in the Interim Order and a Final Order.

**G.     Interim Approval of the DIP Facility Should Be Granted**

59.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  See Fed. R. Bankr. P. 4001(c)(2).

60.     The Debtors request that the Court authorize the Debtors, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an aggregate amount up to $1.5 million.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value, and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  Absent the Court's entry of the Interim Order, the Debtors' businesses would suffer immediate and irreparable harm.  Specifically, the Debtors would have no funds available to, among other things, make essential payments on account of employee wages and benefits, taxes, utilities, to satisfy obligations related to their oil and gas leases and wells, including, without limitation, royalties, overriding royalty interests and working interest owner payments, and the Hedging Obligations, and to otherwise obtain services that are necessary to the continued postpetition operation of the Debtors' business.  The failure to obtain interim (and final) approval of the DIP

30

Facility will also imperil the Debtors' chapter 11 efforts and their ability to maximize the value of their assets in connection with the contemplated sale process.

61.     Therefore, the Debtors seek interim approval of the use of Cash Collateral and interim borrowing under the DIP Facility in the aggregate amount of $1.5 million.

**H.     The Court Should Authorize, But Not Direct, the Debtors, in Their Discretion, to Pay the Hedging Obligations and to Continue their <u>Hedging Arrangements in the Ordinary Course of Business</u>**

62.     As noted above and in the First Day Declaration, the Debtors utilize certain types of derivative financial instruments to manage fluctuations in cash flows resulting from changes in crude oil and natural gas commodity prices (collectively, the "<u>Hedging Arrangements</u>"). Based on historical figures, the Debtors estimate that, as of the Petition Date, they owe approximately $25,000.00 in accrued but unpaid amounts on account of the Hedging Obligations.

63.     The Debtors believe that their payment of the Hedging Obligations in the ordinary course of business is needed to ensure that they have sufficient liquidity under the DIP Facility to operate their business, and that such liquidity is not negatively impacted by any fluctuations in cash flows resulting from price changes.  The Debtors' obligations on account of the Hedging Arrangements are appropriately accounted for in the Budget.  Prior to the Petition Date, the Debtors regularly entered into the Hedging Arrangements to hedge against changes in the price of oil and gas, and the Debtors submit that these types of arrangements are common industry practices.  Therefore, the Debtors believe that they are authorized to continue their Hedging Arrangements in the ordinary course of business without the approval of the Court, pursuant to section 363(c) of the Bankruptcy Code.  Nevertheless, out of an abundance of caution, the Debtors request authority from the Court to continue their Hedging Arrangements post-petition.

64.     Accordingly, the Debtors respectfully submit that entry of the Interim Order is in the best interests of the Debtors, their estates, and creditors as it pertains to the Hedging Obligations and the Hedging Arrangements.

## FINAL HEARING

65.     The Debtors further respectfully request that the Court set a date and time for the Final Hearing to consider the entry of a Final Order approving the relief sought in this Motion no later than thirty (30) days after the date of the Court's entry of the Interim Order (the "Interim Order Date"), because pursuant to the Credit Documents a Final Order must be entered within thirty (30) days after the Interim Order Date.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

66.     Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."   The Debtors believe that, among other things, the continued and uninterrupted operation of their business will depend, in part, on the Debtors' ability to satisfy the Hedging Obligations in the ordinary course.   Thus, if the relief requested herein is not granted, the Debtors' failure to satisfy the Hedging Obligations would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

67.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein with respect to the Hedging Obligations is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

01:14273785.2

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

68.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any delay in paying the Hedging Obligations would be detrimental to the Debtors, their creditors and estates, as the Debtors' ability to manage and run their business operations with as little disruption as possible requires, in significant part, that they remain current with such Hedging Obligations.

69.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Interim Order as it pertains to the Debtors' payment of the Hedging Obligations.

## RESERVATION OF RIGHTS

70.     As it pertains to the Hedging Obligations, nothing in the Interim Order or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code, or (ii) shall impair, prejudice, waive or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates.

## NOTICE

71.     Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors; and (vi) counsel to the Lender.  Notice of this Motion and any order entered

hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**NO PRIOR REQUEST**

72.    The Debtors have not previously sought the relief requested herein from this or any other Court.

**CONCLUSION**

WHEREFORE, the Debtors request entry of the Interim Order and, after the Final Hearing, a Final Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 30, 2013                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

                                    */s/ Edmon L. Morton*_____
                                      Robert S. Brady (No. 2847)
                                      Edmon L. Morton (No. 3856)
                                      Robert F. Poppiti, Jr. (No. 5052)
                                      Ashley E. Markow (No. 5635)
                                      1000 N. King Street, Rodney Square
                                      Wilmington, Delaware 19801
                                      Telephone:  (302) 571-6600
                                      Facsimile:  (302) 571-1253

                                      Proposed Counsel for the Debtors

01:14273785.2

**<u>EXHIBIT A</u>**

Existing Credit Agreement

**Execution Version**

$200,000,000

CREDIT AGREEMENT

among

GOLDKING RESOURCES, LLC

as Borrower,

GOLDKING HOLDINGS, LLC and
GOLDKING ONSHORE OPERATING, LLC

as Guarantors,

THE FINANCIAL INSTITUTIONS
NAMED IN THIS CREDIT AGREEMENT

as Banks,

BANK OF AMERICA, N.A.
as Administrative Agent and Issuing Bank,

BANC OF AMERICA SECURITIES LLC
(which is scheduled to be merged with and into Merrill Lynch, Pierce,
Fenner & Smith Incorporated on or about November 1, 2010)

as Lead Arranger and Book Manager

November 5, 2010

HOU/2408933

ARTICLE I        DEFINITIONS AND ACCOUNTING TERMS ............................................. 1

    Section 1.1.        Certain Defined Terms.......................................................... 1

    Section 1.2.        Computation of Time Periods............................................ 20

    Section 1.3.        Accounting Terms; Changes in GAAP............................... 20

    Section 1.4.        Types of Advances............................................................ 21

    Section 1.5.        Miscellaneous .................................................................. 21

ARTICLE II        CREDIT FACILITIES............................................................................ 21

    Section 2.1.        Commitment for Advances............................................... 21

    Section 2.2.        Borrowing Base ............................................................... 22

    Section 2.3.        Method of Borrowing ...................................................... 23

    Section 2.4.        Prepayment of Advances ................................................. 26

    Section 2.5.        Repayment of Advances ................................................... 28

    Section 2.6.        Letters of Credit .............................................................. 28

    Section 2.7.        Fees ................................................................................. 35

    Section 2.8.        Interest............................................................................. 36

    Section 2.9.        Payments and Computations............................................ 38

    Section 2.10.        Sharing of Payments, Etc ................................................ 38

    Section 2.11.        Breakage Costs................................................................ 39

    Section 2.12.        Increased Costs ............................................................... 39

    Section 2.13.        Taxes ............................................................................... 41

    Section 2.14.        Inability to Determine Rates ........................................... 43

    Section 2.15.        Cash Collateral................................................................ 43

    Section 2.16.        Defaulting Banks ............................................................ 44

ARTICLE III        CONDITIONS OF LENDING ............................................................. 46

    Section 3.1.        Initial Conditions Precedent to Borrowings..................... 46

    Section 3.2.        Conditions Precedent to All Borrowings ......................... 48

ARTICLE IV        REPRESENTATIONS AND WARRANTIES...................................... 49

    Section 4.1.        Corporate Existence; Subsidiaries ................................... 49

    Section 4.2.        Corporate Power; Authorization; No Violation................ 50

    Section 4.3.        Authorization and Approvals........................................... 50

    Section 4.4.        Enforceable Obligations.................................................. 50

    Section 4.5.        Financial Statements ....................................................... 51

    Section 4.6.        True and Complete Disclosure......................................... 51

Section 4.7.        Litigation ................................................................................... 51

Section 4.8.        Use of Proceeds ........................................................................ 51

Section 4.9.        Investment Company Act ......................................................... 52

Section 4.10.       Taxes ......................................................................................... 52

Section 4.11.       ERISA Compliance ................................................................... 52

Section 4.12.       Condition of Property; Casualties ............................................ 53

Section 4.13.       No Burdensome Restrictions; No Defaults ............................... 53

Section 4.14.       Environmental Condition ......................................................... 54

Section 4.15.       Permits, Licenses, Etc.; Compliance with Laws ...................... 54

Section 4.16.       Gas Contracts ........................................................................... 55

Section 4.17.       Title to Properties, Liens, Leases, Etc. .................................... 55

Section 4.18.       Mineral Interests ...................................................................... 55

Section 4.19.       Material Adverse Change ......................................................... 56

ARTICLE V        AFFIRMATIVE COVENANTS ................................................... 56

Section 5.1.        Compliance with Laws, Etc ..................................................... 56

Section 5.2.        Maintenance of Insurance ........................................................ 56

Section 5.3.        Preservation of Corporate Existence, Etc ............................... 58

Section 5.4.        Payment of Taxes, Claims, Etc ............................................... 58

Section 5.5.        Visitation Rights ....................................................................... 58

Section 5.6.        Reporting Requirements ........................................................... 58

Section 5.7.        Maintenance of Property .......................................................... 62

Section 5.8.        New Subsidiaries ...................................................................... 62

Section 5.9.        Maintenance of Books and Records ......................................... 62

Section 5.10.       Use of Proceeds ........................................................................ 63

Section 5.11.       Agreement to Mortgage; Further Assurances .......................... 63

Section 5.12.       Title Information and Cure ....................................................... 64

Section 5.13.       Accounts ................................................................................... 65

ARTICLE VI        NEGATIVE COVENANTS ........................................................ 65

Section 6.1.        Liens .......................................................................................... 65

Section 6.2.        Debt ........................................................................................... 67

Section 6.3.        Agreements Restricting Liens and Distributions ..................... 68

Section 6.4.        Merger or Consolidation; Asset Sales; Farm-Outs .................. 68

Section 6.5.        Restricted Payments ................................................................. 69

Section 6.6.        Investments ........................................................................................ 69

Section 6.7.        Limitation on Hedging ........................................................................ 69

Section 6.8.        Affiliate Transactions ......................................................................... 70

Section 6.9.        Compliance with ERISA ..................................................................... 70

Section 6.10.       Maintenance of Ownership of Subsidiaries ....................................... 70

Section 6.11.       Sale-and-Leaseback ........................................................................... 70

Section 6.12.       Change of Business ............................................................................ 70

Section 6.13.       Subordinated Debt ............................................................................. 70

Section 6.14.       Accounts. ........................................................................................... 71

Section 6.15.       Interest Coverage Ratio ...................................................................... 71

Section 6.16.       Current Ratio ...................................................................................... 71

Section 6.17.       Debt to EBITDA Ratio ....................................................................... 71

ARTICLE VII       EVENTS OF DEFAULT AND REMEDIES ............................................... 71

Section 7.1.        Events of Default ............................................................................... 71

Section 7.2.        Optional Acceleration of Maturity ..................................................... 74

Section 7.3.        Automatic Acceleration of Maturity .................................................. 74

Section 7.4.        Right of Setoff .................................................................................... 75

Section 7.5.        Actions Under Credit Documents ...................................................... 75

Section 7.6.        Non-exclusivity of Remedies ............................................................. 76

Section 7.7.        Application of Funds ........................................................................... 76

ARTICLE VIII      THE AGENT AND THE ISSUING BANK ............................................... 77

Section 8.1.        Appointment and Authorization of Agent ......................................... 77

Section 8.2.        Rights as a Bank ................................................................................. 77

Section 8.3.        Exculpatory Provisions ...................................................................... 77

Section 8.4.        Reliance by Agent .............................................................................. 78

Section 8.5.        Delegation of Duties .......................................................................... 78

Section 8.6.        Resignation of Agent ......................................................................... 79

Section 8.7.        Non-Reliance on Agent and Other Banks .......................................... 79

Section 8.8.        No Other Duties, Etc. ......................................................................... 80

Section 8.9.        Agent May File Proofs of Claim ........................................................ 80

Section 8.10.       Collateral and Guaranty Matters ....................................................... 80

Section 8.11.       Indemnification of Agent ................................................................... 81

ARTICLE IX        MISCELLANEOUS ................................................................................... 82

Section 9.1.        Amendments, Etc ............................................................... 82

Section 9.2.        Notices, Etc ...................................................................... 83

Section 9.3.        No Waiver; Remedies ........................................................ 85

Section 9.4.        Costs and Expenses ........................................................... 85

Section 9.5.        Binding Effect ................................................................... 85

Section 9.6.        Bank Assignments and Participations ................................ 85

Section 9.7.        Indemnification ................................................................ 90

Section 9.8.        USA Patriot Act Notice .................................................... 91

Section 9.9.        No Advisory or Fiduciary Responsibility ........................... 91

Section 9.10.       Execution in Counterparts ................................................ 92

Section 9.11.       Survival of Representations, Etc ........................................ 92

Section 9.12.       Severability ...................................................................... 92

Section 9.13.       Business Loans; Interest Rate Limitation ........................... 92

Section 9.14.       Governing Law ................................................................. 93

Section 9.15.       Waiver of Punitive Damages, Jury Trial, Etc ..................... 93

Section 9.16.       Treatment of Certain Information; Confidentiality ............. 94

Annex 1       -       Commitments; Borrower, Agent, and Bank Notice Information; Lending Offices

**SCHEDULES:**

Schedule 4.1       -       Subsidiaries
Schedule 4.7       -       Litigation
Schedule 6.1       -       Permitted Existing Liens
Schedule 6.2       -       Permitted Existing Debt

**EXHIBITS:**

Exhibit A       -       Form of Assignment and Acceptance
Exhibit B       -       Form of Compliance Certificate
Exhibit C       -       Form of Note
Exhibit D       -       Form of Notice of Borrowing
Exhibit E       -       Form of Notice of Conversion or Continuation
Exhibit F       -       Form of Letter of Credit Application
Exhibit G       -       Form of Mortgage Compliance Certificate

# CREDIT AGREEMENT

This Credit Agreement dated as of November 5, 2010 is among Goldking Resources, LLC, a Delaware limited liability company, the Banks (as defined below), and Bank of America, N.A., as administrative agent for the Banks and as Issuing Bank.

The Borrower, the Banks, and the Agent agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (unless otherwise indicated, such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable Security Interest" in any Property means a Lien which (a) exists in favor of the Agent for the benefit of the Agent and the Secured Parties, (b) with respect to Property that is not Borrowing Base Assets, is the only Lien on such Property other than Permitted Liens, and which is superior to all Liens or rights of any other Person in such Property encumbered thereby except for such Permitted Liens, (c) with respect to Borrowing Base Assets, is the only Lien on such Property other than Permitted Borrowing Base Liens, and which is superior to all Liens or rights of any other Person in such Property encumbered thereby except for such Permitted Borrowing Base Liens, (d) secures the Obligations, and (e) is perfected and enforceable.

"Adjusted Base Rate" means, for any day, the fluctuating rate per annum of interest equal to the highest of (a) the Base Rate in effect on such day, (b) the Federal Funds Rate in effect on such day plus 0.50% and (c) the Eurodollar Rate in effect on such day for an Interest Period of one month plus 1.00%; provided that for any Advance maintained as a Base Rate Advance due to the application of Section 2.14(b), the "Adjusted Base Rate" shall be the greater of clauses (a) and (b) above.

"Advance" means any advance by a Bank to the Borrower as part of a Borrowing and refers to a Base Rate Advance or a Eurodollar Rate Advance.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or any Subsidiary of such Person.  The term "control" (including the terms "controlled by" or "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of Voting Securities, by contract, or otherwise.

"Agent" means Bank of America, in its capacity as an administrative agent pursuant to Article VIII, and any successor administrative agent pursuant to Section 8.6.

"Account Control Agreement" has the meaning set forth in Section 3.1(a)(ix).

"Agent-Related Persons" means the Agent, together with its Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Agreement" means this Credit Agreement, as the same may be amended, supplemented, and otherwise modified from time to time.

"Applicable Lending Office" means, with respect to each Bank, such Bank's Domestic Lending Office in the case of a Base Rate Advance and such Bank's Eurodollar Lending Office in the case of a Eurodollar Rate Advance.

"Applicable Margin" means, for any day, the following percentages based upon the ratio of (a) the aggregate outstanding amount of Advances plus the Letter of Credit Exposure to (b) the Borrowing Base as of such day:

| Ratio of (Advances + Letter of Credit Exposure) to (Borrowing Base) | Applicable Margin for Base Rate Advances | Applicable Margin for Eurodollar Rate Advances | Applicable Margin for Commitment Fees |
|---|---|---|---|
| Less than .25 | 1.50% | 2.50% | 0.500% |
| Greater than or equal to .25 but less than .50 | 1.75% | 2.75% | 0.500% |
| Greater than or equal to .50 but less than .75 | 2.00% | 3.00% | 0.500% |
| Greater than or equal to .75 | 2.25% | 3.25% | 0.500% |

"Approved Fund" means any Fund that is administered or managed by (a) a Bank, (b) an Affiliate of a Bank or (c) an entity or an Affiliate of an entity that administers or manages a Bank.

"Arranger" means Banc of America Securities LLC (which is scheduled to be merged with and into Merrill Lynch, Pierce, Fenner & Smith Incorporated on or about November 1, 2010), in its capacity as sole lead arranger and sole book manager.

"Asset Disposition" means any sale, lease, license, transfer, assignment or other consensual disposition by any Credit Party of any asset, but excluding (i) dispositions of inventory or used, obsolete, worn-out, or surplus equipment, all in the ordinary course of business, (ii) sales, transfers and other dispositions of accounts receivable in connection with the compromise, settlement, or collection thereof in the ordinary course of business, and (iii) any disposition of property or assets or issuance of equity interests to Borrower or any domestic Subsidiary by any Credit Party.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Bank and an Eligible Assignee, and accepted by the Agent, in substantially the form of the attached Exhibit A.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Availability" means the excess of (a) the lesser of (i) the Borrowing Base and (ii) the aggregate Commitments over (b) the aggregate outstanding amount of Advances plus the Letter of Credit Exposure.

"Bank of America" means Bank of America, N.A. and its successors.

"Banks" means the lenders listed on the signature pages of this Agreement and each Eligible Assignee that shall become a party to this Agreement pursuant to Section 9.6.

"Base Rate" means a fluctuating interest rate per annum as shall be in effect from time to time equal to the rate of interest publicly announced by Bank of America as its prime rate, whether or not the Borrower has notice thereof.

"Base Rate Advance" means an Advance which bears interest as provided in Section 2.8(a).

"Borrower" means Goldking Resources, LLC, a Delaware limited liability company.

"Borrower Materials" means materials and/or information provided by or on behalf of any Credit Party hereunder.

"Borrowing" means, subject to Sections 2.3(c)(ii) and 2.4(b)(v), a borrowing consisting of simultaneous Advances of the same Type made by each Bank pursuant to Section 2.3(a), continued by each Bank pursuant to Section 2.3(b), or Converted by each Bank to Advances of a different Type pursuant to Section 2.3(b).

"Borrowing Base" means, for any date of its determination by the Majority Banks or all of the Banks, as the case may be, the amount determined in accordance with Section 2.2.

"Borrowing Base Assets" means, at any time, any assets (including any Swap Contracts) that are given value in the most recently determined Borrowing Base.

"Borrowing Base Deficiency" has the meaning given to such term in Section 2.4(b)(i).

"Business Day" means a day of the year on which banks are not required or authorized to close in Dallas, Texas and, if the applicable Business Day relates to any Eurodollar Rate Advances, on which dealings are carried on by banks in the London interbank market.

"Capital Leases" means, as applied to any Person, any lease of any Property by such Person as lessee which would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

"Cash Collateral" has the meaning set forth in the definition of "Cash Collateralize".

"Cash Collateral Account" means a special cash collateral account pledged to the Agent for the ratable benefit of the Banks containing cash deposited pursuant to Sections 2.4(b) or (c), 2.15, 7.2(b), or 7.3(b) to be maintained at the Agent's office in accordance with Section 2.6(g) and bear interest or be invested in the Agent's reasonable discretion.

"Cash Collateralize" means to pledge and deposit with or deliver to the Agent, for the benefit of the Agent or Issuing Bank (as applicable) and the Banks, as collateral for Letter of Credit Exposure or obligations of Banks to fund participations in respect of either thereof (as the context may require), cash or deposit account balances or, if the Issuing Bank shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to (a) the Agent and (b) the Issuing Bank. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), as amended, state and local analogs, and all rules and regulations and requirements thereunder in each case as now or hereafter in effect.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that the adoption and taking effect of the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith shall constitute a "Change in Law".

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"Collateral" has the meaning specified in the Security Documents.

"Commitment" means, for any Bank, the amount set opposite such Bank's name on Annex 1 as its Commitment, or if such Bank has entered into any Assignment and Acceptance, as set forth for such Bank as its Commitment in the Register maintained by the Agent pursuant to Section 9.6(c), as such amount may be reduced or terminated pursuant to Article VII.

"Commodity Hedge Agreements" means any agreement (including each confirmation entered into pursuant to any, Swap Contract, Master Agreement, schedule or other similar agreement governing derivative transactions and hedging agreements) providing for swaps, caps, collars, puts, calls, floors, futures, options, spots, forwards, in respect of Hydrocarbons, or any other similar or related transactions.

4

"Commodity Hedging Obligations" means, with respect to any Person, any Debt, obligation or other liability arising under any Commodity Hedge Agreement.

"Compliance Certificate" means a compliance certificate in the form of the attached Exhibit B signed by a Responsible Officer of the Borrower.

"Consents" means the Consent and Agreements made by the counterparties to the applicable Mortgaged Contracts in favor of the Agent for the benefit of the Secured Parties, including any such Consent and Agreements delivered from time to time in accordance with Section 5.11, in each case, as the same may be amended, supplemented, or otherwise modified from time to time.

"Consolidated EBITDA" means, with respect to any Person and for any period, for such Person and its Subsidiaries on a consolidated basis, an amount equal to consolidated Net Income of such Person for such period plus (a) the following to the extent deducted in calculating such consolidated Net Income: (i) Consolidated Interest Charges for such period, (ii) the provision for Federal, state, local and foreign income taxes payable by the Borrower and its Subsidiaries for such period, (iii) depreciation and amortization expense, (iv) other non-recurring expenses of such Person and its Subsidiaries reducing such consolidated Net Income which do not represent a cash item in such period or any future period, (v) to the extent expensed and recognized in the applicable period, the transaction fees and expenses incurred in connection with the negotiation, execution and closing of the transaction contemplated by the White Oak PSA in an aggregate amount not to exceed $1,100,000, and (vi) unrealized losses on Commodity Hedge Agreements recognized in accordance with SFAS No. 133 and minus (b) the following to the extent included in calculating such consolidated Net Income: (i) Federal, state, local and foreign income tax credits of such Person and its Subsidiaries for such period, (ii) all non-cash items increasing consolidated Net Income for such period, (iii) unrealized gains on Commodity Hedge Agreements recognized in accordance with SFAS No. 133 and (iv) other non-recurring income of such Person and its Subsidiaries.

"Consolidated Interest Charges" means, with respect to any Person and for any period, for such Person and its Subsidiaries on a consolidated basis, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses of such Person and its Subsidiaries in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, and (b) the portion of rent expense of such Person and its Subsidiaries with respect to such period under capital leases that is treated as interest in accordance with GAAP.

"Controlled Group" means all members of a controlled group of corporations and all trades (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414 of the Code.

"Convert," "Conversion," and "Converted" each refers to a conversion of Advances of one Type into Advances of another Type pursuant to Section 2.3(b).

"Credit Documents" means this Agreement, the Notes, the Letter of Credit Documents, the Guaranties, the Security Documents and each other agreement, instrument, or document executed at any time in connection with this Agreement.

"Credit Parties" means the Borrower and each Guarantor.

"Debt," means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business that are not past due for more than 60 days after the date on which such trade account payable was created);

(e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) Capital Leases and Synthetic Lease Obligations of such Person;

(g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Debt of any Person shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Debt is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any Capital Lease as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Debtor Relief Law" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Legal Requirements of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means (a) an Event of Default or (b) any event or condition which with notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Bank" means, subject to Section 2.16(b), any Bank that, as determined by the Agent, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Advances or participations in respect of Letters of Credit, within three Business Days of the date required to be funded by it hereunder, (b) has notified the Borrower, the Agent or any Bank that it does not intend to comply with its funding obligations hereunder or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Agent, to confirm in a manner satisfactory to the Agent that it will comply with its funding obligations, or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Bank shall not be a Defaulting Bank solely by virtue of the ownership or acquisition of any equity interest in that Bank or any direct or indirect parent company thereof by a Governmental Authority.

"Dollar Equivalent" means for all purposes of this Agreement, the equivalent in another currency of an amount in Dollars to be determined by reference to the rate of exchange quoted by Bank of America at 10:00 a.m. (Dallas, Texas time) on the date of determination, for the spot purchase in the foreign exchange market of such amount of Dollars with such other currency.

"Dollars" and "$" means lawful money of the United States of America.

"Domestic Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Domestic Lending Office" opposite its name on Annex 1 or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Agent.

"Effective Date" means the date on which each of the conditions precedent in Section 3.1 have been met or waived.

"Eligible Assignee" means any Person who is (i) a Bank, (ii) an Affiliate of a Bank, or (iii) a commercial bank (domestic or foreign); provided that in the case of (iii), such commercial bank, as applicable, is organized under the laws of any country which is a member of the Organization for Economic Cooperation and Development and having primary capital (or its equivalent) of not less than $1,000,000,000 (or its Dollar Equivalent) and is approved by (a) the Agent in its sole discretion, which approval by the Agent will not be unreasonably withheld or

delayed, and (b) if no Default or Event of Default exists, the Borrower, which approval by the Borrower will not be unreasonably withheld or delayed.

"Environment" or "Environmental" shall have the meanings set forth in 42 U.S.C. § 9601(8) (1988).

"Environmental Claim" means any third party or Governmental Authority action, lawsuit, claim, demand, regulatory action or proceeding, order, decree, consent agreement or notice of potential or actual responsibility or violation (including claims or proceedings under the Occupational Safety and Health Act or similar laws or requirements, to the extent relating to occupational safety or exposure to Hazardous Substances) which seeks to impose liability under any Environmental Law.

"Environmental Law" means all Legal Requirements, including common law, arising from, relating to, or in connection with the Environment or natural resources, including without limitation CERCLA, or relating to (a) pollution, contamination, injury, destruction, loss, protection, cleanup, reclamation or restoration of the air, surface water, groundwater, land surface or subsurface strata, or other natural resources; (b) solid, gaseous or liquid waste generation, treatment, processing, recycling, reclamation, cleanup, storage, disposal or transportation; (c) exposure to pollutants, contaminants, Hazardous Substances, or Hazardous Wastes; (d) the safety or health of employees, to the extent relating to occupational safety or exposure to Hazardous Substances; or (e) the manufacture, processing, handling, transportation, distribution in commerce, use, storage or disposal of Hazardous Substances or Hazardous Wastes.

"Environmental Permit" means any permit, license, order, approval or other authorization under Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk

8

plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Federal Reserve Board (or any successor), as in effect from time to time.

"Eurodollar Lending Office" means, with respect to any Bank, the office of such Bank specified as its "Eurodollar Lending Office" opposite its name on Annex 1 (or, if no such office is specified, its Domestic Lending Office) or such other office of such Bank as such Bank may from time to time specify to the Borrower and the Agent.

"Eurodollar Rate" means:

(a) for any Interest Period with respect to a Eurodollar Rate Advance, the rate per annum equal to (i) the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or such other commercially available source providing quotations of BBA LIBOR as may be designated by the Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or, (ii) if such rate is not available at such time for any reason, the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurodollar Rate Advance being made, continued or converted and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

(b) for any interest calculation with respect to a Base Rate Advance on any date, the rate per annum equal to (i) BBA LIBOR, at approximately 11:00 a.m., London time determined two Business Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Advance being made or maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination.

"Eurodollar Rate Advance" means an Advance which bears interest as provided in Section 2.8(b).

"Eurodollar Rate Reserve Percentage" of any Bank for the Interest Period for any Eurodollar Rate Advance means the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily average of such percentages for those days in such Interest Period during which any such percentage shall be so applicable) under regulations issued from time to time by the Federal Reserve Board for determining the

maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for such Bank with respect to liabilities or assets consisting of or including Eurocurrency Liabilities having a term equal to such Interest Period.

"Event of Default" has the meaning specified in Section 7.1.

"Expiration Date" means, with respect to any Letter of Credit, the date on which such Letter of Credit will expire or terminate in accordance with its terms.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for any such day on such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any of its successors.

"Financial Statements" means the pro forma financial statements of the Credit Parties as of September 1, 2010, including balance sheets, income and cash flow statements, prepared in conformity with GAAP, and giving effect to the White Oak Acquisition.

"Foreign Bank" has the meaning set forth in Section 2.13(d).

"Fronting Exposure" means, with respect to the Issuing Bank, at any time there is a Defaulting Bank, such Defaulting Bank's Pro Rata Share of the outstanding Letter of Credit Exposure other than Letter of Credit Exposure as to which such Defaulting Bank's participation obligation has been reallocated to other Banks or Cash Collateralized in accordance with the terms hereof.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, applied on a basis consistent with the requirements of Section 1.3.

"Governmental Authority" means any foreign governmental authority, the United States of America, any state of the United States of America and any subdivision of any of the foregoing, and any agency, department, commission, board, authority or instrumentality, bureau or court having jurisdiction over any Bank, the Borrower, any other Credit Party or their Subsidiaries or any of their respective Properties.

10

"Guaranties" means each Guaranty in favor of the Agent for the ratable benefit of the Banks in form and substance satisfactory to Agent executed on the date hereof or as required by Section 5.8, as the same may be amended, supplemented, or otherwise modified from time to time.

"Guarantors" means Holdco, Operating, and each Subsidiary of the Borrower, Holdco or Operating which has executed a Guaranty on the date hereof or as required by Section 5.8.

"Hazardous Substance" means the substances identified as such pursuant to CERCLA and those regulated as pollutants or contaminants under any other Environmental Law, including without limitation petroleum or petroleum products, materials exhibiting radioactivity in excess of background concentrations, and medical and infectious waste.

"Hazardous Waste" means the substances regulated as such pursuant to any Environmental Law.

"Holdco" means Goldking Holdings, LLC, a Delaware limited liability company.

"Hydrocarbons" means oil, gas, coal seam gas, casinghead gas, drip gasolines, natural gasoline, condensate, distillate, and all other liquid and gaseous hydrocarbons produced or to be produced in conjunction therewith, and all products, by-products and all other substances derived therefrom or the processing thereof, and all other minerals and substances, including sulphur, lignite, coal, uranium, thorium, iron, geothermal steam, water, carbon dioxide, helium, and any and all other minerals, ores, or substances of value, and the products and proceeds therefrom, including all gas resulting from the in-situ combustion of coal or lignite.

"Indemnified Liabilities" has the meaning set forth in Section 9.7.

"Information" has the meaning set forth in Section 9.16.

"Insurance Certificate" shall mean a "Certificate of Insurance" issued by an insurance broker on the form ACORD-25 (in the case of property or physical damage policies) or ACORD-27 (in the case of liability policies) or its substantial equivalent, and, in the case of each liability policy, shall include an ISO Form CG 2018 confirming that the Agent has been added as an additional insured for such liability policy, in each case in form reasonably satisfactory to Agent.

"Interest Period" means, for each Eurodollar Rate Advance comprising part of the same Borrowing, the period commencing on the date of such Advance or the date of the Conversion of any Base Rate Advance into such an Advance and ending on the last day of the period selected by the Borrower pursuant to the provisions below or by Section 2.3 and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below or by Section 2.3.  The duration of each such Interest Period shall be one, two, three, or six months, or such longer period approved by the Agent and the Banks, in each case as the Borrower may, upon notice received by the Agent not later than 10:00 a.m. (Dallas, Texas time) on, the third Business Day prior to the first day of such Interest Period select; provided, however, that:

11

(a)    the Borrower may not select any Interest Period for any Advance which ends after the Maturity Date;

(b)    Interest Periods commencing on the same date for Advances comprising part of the same Borrowing shall be of the same duration;

(c)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided that if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(d)    any Interest Period which begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month in which it would have ended if there were a numerically corresponding day in such calendar month.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"Issuing Bank" means Bank of America and any successor issuing bank pursuant to Section 8.6.

"Knowledge" or "Known" means the actual knowledge of a Person.

"Knowledge Party" means (a) Mike Strain, Leonard Tallerine, or Blake Carlson, each in his capacity as a member of the board of managers of Holdco, any member of the board of managers or board of directors of any Credit Party, any member of any Credit Party (as such position is described in the Limited Liability Company Act of Delaware, or equivalent statute in the state where such Credit Party is organized), or any of such parties' successors in such capacity, or (b) any president, chief executive officer, or chief financial officer of any Credit Party.

"L/C Advance" means, with respect to each Bank, such Bank's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"Legal Requirement" means any law, statute, ordinance, decree, requirement, order, judgment, rule, regulation (or official interpretation of any of the foregoing) of, and the terms of any license or permit issued by, any Governmental Authority, including, but not limited to, Regulations U and X.

"Letter of Credit" means, individually, any standby letter of credit issued by the Issuing Bank which is subject to this Agreement, and "Letters of Credit" means all such letters of credit collectively.

"Letter of Credit Application" means the Issuing Bank's standard form letter of credit application for either a commercial or standby letter of credit, as the case may be, which has been executed by the Borrower and accepted by the Issuing Bank in connection with the issuance of a Letter of Credit, which form or forms as of the date of this Agreement are in the form of the attached Exhibit F, as the same may be amended, supplemented, and otherwise modified from time to time.

"Letter of Credit Documents" means all Letters of Credit, Letter of Credit Applications, and agreements, documents, and instruments entered into in connection with or relating thereto.

"Letter of Credit Exposure" means, at any time, the sum of (a) the aggregate undrawn maximum face amount of each Letter of Credit at such time, plus (b) the aggregate unpaid amount of all Reimbursement Obligations at such time, plus (c) if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such amount so remaining available to be drawn.

"Letter of Credit Fees" has the meaning given such term in Section 2.7(d)(i).

"Letter of Credit Obligations" means any obligations of the Borrower under this Agreement in connection with the Letters of Credit, including the Reimbursement Obligations.

"Lien" means any mortgage, lien (statutory or other), pledge, hypothecation, charge, collateral assignment, deed of trust, security interest or encumbrance of any kind or nature whatsoever, whether arising by contract, operation of law, or otherwise (including, without limitation, the interest of a vendor or lessor under any conditional sale agreement or other title retention agreement and any Capital Lease having substantially the same economic effect as any of the foregoing).

"Majority Banks" means, at any time and except as provided in the last sentence of this definition, Banks holding at least 66-2/3% of the then aggregate unpaid principal amount of the Notes held by the Banks and the Letter of Credit Exposure of the Banks at such time, but in no event less than two Banks at any time when there are three or more Banks; provided that if no such principal amount or Letter of Credit Exposure is then outstanding, "Majority Banks" shall mean Banks having at least 66-2/3% of the aggregate amount of the Commitments at such time, but in no event less than two Banks at any time when there are three or more Banks; and provided further that the Commitment of, and the portion of the aggregate unpaid principal amount of the Notes and Letter of Credit Exposure held or deemed held by, any Defaulting Bank shall be excluded for purposes of making a determination of Majority Banks.  For any redetermination of the Borrowing Base under Section 2.2 which would increase the Borrowing Base, "66-2/3%" in the foregoing sentence shall be "100%".

"Master Agreement" has the meaning set forth in the definition of "Swap Contract".

"Material Adverse Change" means (a) a material adverse change in the business, financial condition, or results of operations of the Borrower and the other Credit Parties taken as a whole, or (b) the occurrence and continuance of any event or circumstance which could reasonably be expected (i) to have a material adverse effect on the Borrower's or any Guarantor's ability to perform its obligations under this Agreement, any Note, any Guaranty, or any other Credit Document, (ii) to materially impair the rights and remedies of the Agent or any Bank under any Credit Document, or (iii) to have a materially adverse effect upon the legality, validity, or binding effect, or enforceability against the Borrower or any Guarantor of, any Credit Document to which it is party.

"Maturity Date" means the earlier of (a) November 5, 2013 and (b) the earlier termination in whole of the Commitments pursuant to Section 2.1(b) or Article VII.

"Maximum Rate" means the maximum nonusurious interest rate under applicable law.

"Mortgaged Contracts" means the contracts of the Borrower and the Guarantors related to the Mortgaged Properties.

"Mortgaged Properties" means the Oil and Gas Properties of the Borrower and the Guarantors that are subject to the Mortgages.  For the avoidance of doubt, the Mortgaged Properties shall not include any Oil and Gas Properties the record title to which has been acquired by the Borrower or any Guarantor since the most recent Mortgages that would encumber the property where such Oil and Gas Properties are located have been recorded.

"Mortgaged Property Value" means, as of any date of its determination, the aggregate present value of the future net income with respect to the Mortgaged Properties as set forth in the applicable engineering report, discounted at the stated per annum rate utilized in such report.  For the avoidance of doubt, the methodology utilized to calculate the Mortgaged Property Value shall be the same methodology utilized to calculate the Oil and Gas Property Value for all purposes of this Agreement.

"Mortgages" means (i) the Act of Mortgage, Assignment of Production, Security Agreement, Fixture Filing, and Financing Statement dated as of November 5, 2010, made by the Borrower in favor of the Agent for the benefit of the Secured Parties, and governed by Louisiana law, (ii) the Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production dated as of November 5, 2010, made by the Borrower to PRLAP, INC. as trustee for the benefit of Agent and the Secured Parties, and governed by Texas law, and (iii) any other mortgage or deed of trust executed by the Borrower or any Guarantor in favor of the Agent for the benefit of the Secured Parties, in each case, as the same may be amended, supplemented, or otherwise modified from time to time.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means, with respect to any transaction or event, an amount equal to the cash proceeds received by any Credit Party from or in respect of such transaction or event (including proceeds of any non-cash proceeds of such transaction), less (i) any out-of-pocket expenses paid to a Person that are reasonably incurred by such Credit Party in connection therewith and (ii) in the case of an Asset Disposition, the amount of any Debt secured by a Lien on the related asset and discharged from the proceeds of such Asset Disposition and any taxes paid or reasonably estimated by the applicable Credit Party to be payable by such Person in respect of such Asset Disposition (*provided*, that if the actual amount of taxes paid is less than the estimated amount, the difference shall immediately constitute Net Cash Proceeds).

"Net Income" means, for any Person and for any period of its determination, the net income of such Person determined in accordance with GAAP (excluding extraordinary gains and extraordinary losses) for that period.

"Note" means a promissory note of the Borrower payable to the order of any Bank, in substantially the form of the attached Exhibit C, evidencing indebtedness of the Borrower to such Bank resulting from Advances owing to such Bank.

"Notice of Borrowing" means a notice of borrowing in the form of the attached Exhibit D signed by a Responsible Officer of the Borrower.

"Notice of Conversion or Continuation" means a notice of conversion or continuation in the form of the attached Exhibit E signed by a Responsible Officer of the Borrower.

"Obligations" means all (a) principal, interest, fees, reimbursements, indemnifications, and other amounts payable by the Borrower or any Guarantor to the Agent, the Issuing Bank, or the Banks under the Credit Documents and (b) all debts, liabilities, obligations of the Borrower or any Guarantor under any Specified Swap Contract or Specified Cash Management Agreement, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Borrower or any Guarantor of any proceeding under any law relating to bankruptcy, insolvency or reorganization or relief of debtors naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding; provided that any release of Collateral or Guarantors pursuant to this Agreement shall not require the consent of the holders of Obligations under Specified Swap Contracts or Specified Cash Management Agreements.

"Oil and Gas Properties" means fee, leasehold or other interests in or under mineral estates or oil, gas, and other liquid or gaseous hydrocarbon leases with respect to Properties situated in the United States or offshore from any state of the United States, including overriding royalty and royalty interests, leasehold estate interests, net profits interests, production payment interests and mineral fee interests, together with contracts executed in connection therewith and incidental rights belonging thereto, whether now owned or hereafter acquired.

"Oil and Gas Property Value" means, as of any date of its determination, the aggregate present value of the future net income with respect to the Oil and Gas Properties of the Borrower and the Guarantors as set forth in the applicable engineering report, discounted at the stated per annum rate utilized in such report.

"Oil and Gas Reserve Report" means each engineering report covering the Credit Parties' consolidated Oil and Gas Properties provided to the Agent pursuant to Section 5.6(c).

"Operating" means Goldking Onshore Operating, LLC, a Delaware limited liability company.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Participant" has the meaning given to such term in Section 9.6(d).

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Borrower and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Acquisition" means any acquisition, whether by purchase, merger, consolidation or otherwise, if: (a) such acquisition consists of Oil and Gas Properties of, or capital stock in, a Person or division or line of business or other business unit of a Person and relates to the business conducted by the Borrower and its Subsidiaries as of the date hereof; (b) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing or would result therefrom; (c) immediately after giving effect thereto, any acquired or newly formed corporation, partnership or limited liability company shall be a Subsidiary in which the Borrower has at least an 80% ownership interest and all actions required to be taken, if any, with respect to any such acquired or newly formed Subsidiary under Section 5.8 shall have been taken or will be taken within the time periods specified therein; (d) with respect to any such acquisition of Oil and Gas Properties, all actions required under Section 5.6(c), Section 5.11 and Section 5.12 shall have been taken or will be taken within the time periods specified therein and (e) immediately after giving effect thereto, the Borrower and its Subsidiaries shall be in compliance, on a pro forma basis after giving effect to such acquisition, with the covenants contained in Section 6.15, Section 6.16 and Section 6.17, recomputed as of the last day of the most recently ended fiscal quarter of the Borrower as if such acquisition and any related financings or other transactions had occurred on the first day of the period for testing such compliance and the Borrower shall have delivered to the Agent an officers' certificate to such effect, together with all financial information required under Section 5.6(m).

"Permitted Borrowing Base Liens" means Permitted Liens of the type described in clauses (a) through (h) (inclusive), (l) and (n) of Section 6.1.

"Permitted Liens" means the Liens permitted to exist pursuant to Section 6.1.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, limited liability corporation or company, limited liability partnership, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof or any trustee, receiver, custodian or similar official.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Platform" means IntraLinks or another similar electronic system to be used by Agent for posting Borrower Materials in accordance with the terms of this Agreement.

"Pledge Agreement" means the Pledge Agreement dated as of the date of this Agreement and each other Pledge Agreement in favor of the Agent for the ratable benefit of the Secured Parties in the form and substance satisfactory to Agent, and any supplement or joinder thereto, executed on the date hereof or as required by Section 5.8, as the same may be amended, supplemented, or otherwise modified from time to time.

"Property" of any Person means any property or assets (whether real, personal, or mixed, tangible or intangible) of such Person.

"Property Proceeds" means (i) the aggregate insurance proceeds received under any property or physical damage insurance policy in connection with one or more related events or (ii) any award or other compensation with respect to any eminent domain, condemnation of property or similar proceedings (or any transfer or disposition of property in lieu of condemnation).

"Pro Rata Share" means, with respect to any Bank, either (a) the ratio (expressed as a percentage) of such Bank's Commitments at such time to the aggregate Commitments at such time or (b) if the Commitments have been terminated, the ratio (expressed as a percentage) of such Bank's aggregate outstanding Advances and Letter of Credit Exposure at such time to the aggregate outstanding Advances and Letter of Credit Exposure of all the Banks at such time.

"Proved Mineral Interests" means, collectively, proved developed producing reserves, proved developed non-producing reserves, and proved undeveloped reserves.

"Public Bank" means those Banks who may have personnel that do not wish to receive material non-public information with respect to the Credit Parties or their Affiliates, or the respective securities of any of the foregoing and who may be engaged in investment or other market-related activities with respect to such Person's securities.

"Register" has the meaning set forth in paragraph (c) of Section 9.6.

"Regulations U and X" mean Regulations U and X of the Federal Reserve Board, as the same is from time to time in effect, and all official rulings and interpretations thereunder or thereof.

"Reimbursement Obligations" means all of the obligations of the Borrower to reimburse the Issuing Bank for amounts paid by the Issuing Bank under Letters of Credit as established by the Letter of Credit Applications and Section 2.6(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Release" shall have the meaning set forth in CERCLA or under any similar applicable Environmental Law.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Response" shall have the meaning set forth in CERCLA or under any similar applicable Environmental Law.

"Responsible Officer" means, with respect to any Person, such Person's Chief Executive Officer and anyone designated by such Person's Chief Executive Officer and approved by Agent in its sole discretion.

"Restricted Payment" means, with respect to any Person, any dividends or other distributions (in cash, property, or otherwise) on, or any payment for the purchase, redemption, or other acquisition of, any shares of any capital stock of such Person, other than dividends payable in such Person's stock.

"Royalty Disbursement or Suspense Account" means a deposit account holding exclusively (a) funds owned by the owners (other than any Credit Party) of royalty interests in the Oil and Gas Properties of any Credit Party or (b) funds that are required by applicable Legal Requirements to be held in a suspense account (i) because they are unclaimed funds or because of a dispute as to the ownership of such funds, or (ii) upon the recommendation of counsel to any Credit Party due to questions or issues involving the ownership of such funds; provided, in each case, that (x) no funds owned by a Credit Party shall be deposited in any such account and (y) if any funds on deposit in any such account are determined to be owned by a Credit Party, such funds shall be removed from such account and placed in a deposit or securities account that is subject to an Account Control Agreement that creates an Acceptable Security Interest in such account.

"Secured Parties" means the Agent, the Issuing Bank, the Banks, and the holders of Obligations under Specified Swap Contracts and Specified Cash Management Agreements.

"Security Agreement" means the Security Agreement dated as of the date of this Agreement and each other Security Agreement in favor of the Agent for the ratable benefit of the Secured Parties in the form and substance satisfactory to Agent, and any supplement or joinder

thereto, executed on the date hereof or as required by Section 5.8, as the same may be amended, supplemented, or otherwise modified from time to time.

"Security Documents" means the Mortgages, the Security Agreements, the Pledge Agreements, the Consents, any account control agreements, any agreement creating or perfecting rights in Cash Collateral pursuant to the provisions of Section 2.15 of this Agreement, and each of the other agreements, instruments, or documents that creates or purports to create, or to consent to the creation of, a Lien in favor of the Agent for the benefit of the Secured Parties.

"Specified Cash Management Agreement" means any cash management agreement or similar agreement between any Credit Party and any Bank or an Affiliate of any Bank. The status of any cash management agreement as a Specified Cash Management Agreement shall not create in favor of such Bank or Affiliate any rights in connection with the management or release of any Collateral or of the obligations of any Credit Party under any Security Document.

"Specified Swap Contract" means any Swap Contract between any Credit Party and any Bank or Affiliate of any Bank. The status of any Swap Contract as a Specified Swap Contract shall not create in favor of such Bank or Affiliate any rights in connection with the management or release of any Collateral or of the obligations of any Credit Party under any Security Document.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement, in each case, expressly including any such transactions in which a Person hedges the price to be received by it for future production from the Oil and Gas Properties.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Bank or any Affiliate of a Bank).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Type" has the meaning set forth in Section 1.4.

"Voting Securities" means with respect to any corporation, capital stock of the corporation having general voting power under ordinary circumstances to elect directors of such corporation (irrespective of whether at the time stock of any other class or classes shall have or might have special voting power or rights by reason of the happening of any contingency).

"White Oak Acquisition" means the acquisition of oil and gas properties and other interests pursuant to the White Oak PSA.

"White Oak PSA" means the Purchase and Sale Agreement dated as of July 19, 2010 by and between White Oak Energy V, LLC and Holdco, as amended by the First Amendment to Purchase and Sale Agreement dated as of July 29, 2010, as further amended by the Second Amendment to Purchase and Sale Agreement dated as of August 23, 2010, as assigned from Holdco to Borrower pursuant to the Assignment of Purchase and Sale Agreement dated as of August 25, 2010, and as further amended by the Third Amendment to Purchase and Sale Agreement dated as of August 31, 2010.

Section 1.2.    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

Section 1.3.    Accounting Terms; Changes in GAAP.

(a) All accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP applied on a consistent basis with those applied in the preparation of the Financial Statements.

(b) Unless otherwise indicated, all financial statements of the Borrower, all calculations for compliance with covenants in this Agreement and all calculations of any amounts to be calculated under the definitions in Section 1.1 shall be based upon the consolidated accounts of the Credit Parties in accordance with GAAP and consistent with the principles applied in

preparing the Financial Statements. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either the Borrower or the Majority Banks shall so request, the Agent, the Banks and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Majority Banks); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Banks financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.4.    Types of Advances.  Advances are distinguished by "Type." The "Type" of an Advance refers to the determination whether such Advance is a Eurodollar Rate Advance or Base Rate Advance.

Section 1.5.    Miscellaneous.  Article, Section, Schedule, and Exhibit references are to Articles and Sections of and Schedules and Exhibits to this Agreement, unless otherwise specified.

## ARTICLE II

## CREDIT FACILITIES

Section 2.1.    Commitment for Advances.

(a)    Advances.  Each Bank severally agrees, on the terms and conditions set forth in this Agreement, to make Advances to the Borrower from time to time on any Business Day during the period from the date of this Agreement until the Maturity Date in an aggregate outstanding amount up to but not to exceed an amount equal to (i) the lesser of such Bank's Commitment or such Bank's Pro Rata Share of the Borrowing Base less (ii) such Bank's Pro Rata Share of the Letter of Credit Exposure; provided that the sum of the outstanding amount of all Advances made by such Bank and such Bank's Pro Rata Share of the Letter of Credit Exposure shall not exceed such Bank's Commitment.  Each Borrowing shall, in the case of Borrowings consisting of Base Rate Advances, be in an aggregate amount not less than $250,000 and in integral multiples of $50,000 in excess thereof, and in the case of Borrowings consisting of Eurodollar Rate Advances, be in an aggregate amount not less than $250,000 or in integral multiples of $250,000 in excess thereof, and in each case shall consist of Advances of the same Type made on the same day by the Banks ratably according to their respective Commitments. Within the limits of each Bank's Commitment, and subject to the terms of this Agreement, the Borrower may from time to time borrow, prepay, and reborrow Advances.

(b)    Optional Reduction of Commitment.  The Borrower shall have the right, upon at least three Business Days' irrevocable notice to the Agent, to terminate in whole or reduce ratably in part the unused portion of the Commitments; provided that each partial reduction of

the Commitments shall be in the aggregate amount of $250,000 or in integral multiples of $50,000 in excess thereof.  Any reduction or termination of the Commitments pursuant to this Section 2.1(b) shall be permanent, with no obligation of the Banks to reinstate such Commitments, and the commitment fees provided for in Section 2.7(a) shall thereafter be computed on the basis of the Commitments, as so reduced.

(c)     Notes.  The indebtedness of any Borrower to each Bank resulting from the Advances owing to such Bank shall, if such Bank requests, be evidenced by a Note of the Borrower in the maximum principal amount of such Bank's Commitment.

Section 2.2.    Borrowing Base.

(a) The Borrowing Base has been set by the Banks and acknowledged by the Borrower as $12,000,000 as of the date of this Agreement.

(b) From the date hereof through the Maturity Date and subject to the further provisions of this Section 2.2, the Borrowing Base shall be redetermined by the Majority Banks each May 1 and November 1 in accordance with Section 2.2(d) on the basis of information, including the Oil and Gas Reserve Reports required to be delivered before each such date supplied by Borrower in compliance with the provisions of this Agreement, such additional data concerning pricing, quantities of production, purchasers of production, and other information and engineering and geological data with respect thereto as the Agent or any Bank may reasonably request, together with all other information then available to the Agent and the Banks; provided that the first such scheduled redetermination shall occur on May 1, 2011.  Notwithstanding the foregoing, the Majority Banks may, in the exercise of their good faith discretion, require additional redeterminations of the Borrowing Base in accordance with Section 2.2(d) by providing written notice to the Borrower, but only one such request may be made during any calendar year.

(c) The Borrower may request that the Majority Banks redetermine the Borrowing Base by providing a written request to the Agent, but only one such request may be made during any calendar year.  In connection with any such request, the Borrower shall provide the Agent and the Banks with an interim reserve report prepared by the Borrower together with such other information, including additional data concerning pricing, quantities of production, purchasers of production, and other information and engineering and geological data, as the Agent or any Bank may reasonably request. Within 30 days following the receipt of such interim reserve report and other information, the Majority Banks shall make a redetermination of the Borrowing Base in accordance with Section 2.2(d).

(d) In connection with a redetermination of the Borrowing Base, the Agent shall propose a Borrowing Base to the Banks, and the Banks shall vote to approve or disapprove such proposed Borrowing Base.  If the Majority Banks do not approve the proposed Borrowing Base, the Agent shall propose, and

the Banks shall vote to approve or disapprove, another Borrowing Base, until the Majority Banks approve a Borrowing Base proposed by the Agent.  Once the Majority Banks approve the proposed Borrowing Base, the Agent shall notify the Borrower of such redetermination.   Until the Borrower receives such notification from the Agent, the Borrowing Base most recently established shall remain in effect, and thereafter the new Borrowing Base as set forth in such notification shall be in effect.

(e) Upon any sale, lease, transfer, unwinding, termination, novation or other disposition, whether or not in the ordinary course of business, by the Borrower or any other Credit Party of Borrowing Base Assets that (individually or on a cumulative basis with all such dispositions consummated since the determination of the most recently determined Borrowing Base) were given value in the most recently determined Borrowing Base in excess of 5% of the amount of such Borrowing Base, the Borrowing Base shall automatically be reduced by (1) with respect to Swap Contracts, the Net Cash Proceeds received by a Credit Party as a result of unwinding, terminating, or novating such Swap Contracts and (2) with respect to all Borrowing Base Assets other than Swap Contracts, the present value given to such assets in the most recent engineering report delivered pursuant to Section 5.6(c), including the applicable stated discount utilized therein.

(f) The Borrowing Base shall represent the determination by the Majority Banks of the loan value of the Borrower's and the Guarantors' Oil and Gas Properties which are subject to an Acceptable Security Interest, but the Agent and the Majority Banks shall make their determination and vote their approval, respectively, in accordance with the applicable definitions and provisions herein contained, each such Bank's standard policies regarding energy lending, industry lending practices, consultation with the Agent and the other Banks (but without requiring the approval of any such Bank), and consideration for the nature of the facilities established hereunder.   The Borrower acknowledges that the determination of the Borrowing Base contains an equity cushion (market value in excess of loan value), which is acknowledged by Borrower to be essential for the adequate protection of the Agent and the Banks.

(g) The Borrower shall also have the right to reduce the Borrowing Base at any time by providing the Agent 30 days advance written notice of such reduction; provided that any such reduction shall be in a minimum amount of $1,000,000.   The Agent shall promptly send to each Bank a copy of such notice and such reduction shall be effective on the date of the Agent's receipt of such notice.

Section 2.3.    Method of Borrowing.

(a)    Notice.  Each Borrowing shall be made pursuant to a Notice of Borrowing (or by telephone notice promptly confirmed in writing by a Notice of Borrowing), given not later than

10:00 a.m. (Dallas, Texas time) (i) on the third Business Day before the date of the proposed Borrowing, in the case of a Eurodollar Rate Borrowing or (ii) on the Business Day of the proposed Borrowing, in the case of a Base Rate Borrowing, by the Borrower to the Agent, which shall in turn give to each Bank prompt notice of such proposed Borrowing by telecopier or telex. Each Notice of a Borrowing shall be given by telecopier or telex, confirmed immediately in writing specifying the information required therein. In the case of a proposed Borrowing comprised of Eurodollar Rate Advances, the Agent shall promptly notify each Bank of the applicable interest rate under Section 2.8(b). Each Bank shall (A) in the case of a Eurodollar Rate Borrowing, before 12:00 noon (Dallas, Texas time) on the date of such Borrowing and (B) in the case of a Base Rate Borrowing, before 12:00 noon (Dallas, Texas time) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Agent at its address referred to in Section 9.2, or such other location as the Agent may specify by notice to the Banks, in same day funds, such Bank's Pro Rata Share of such Borrowing. After the Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Agent shall make such funds available to the Borrower.

(b)    Conversions and Continuations. The Borrower may elect to Convert or continue any Borrowing under this Section 2.3 by delivering an irrevocable Notice of Conversion or Continuation to the Agent at the Agent's office no later than 10:00 a.m. (Dallas, Texas time) (i) on the date which is at least three Business Days in advance of the proposed Conversion or continuation date in the case of a Conversion to or a continuation of a Borrowing comprised of Eurodollar Rate Advances and (ii) on the Business Day of the proposed conversion date in the case of a Conversion to a Borrowing comprised of Base Rate Advances. Each such Notice of Conversion or Continuation shall be in writing or by telex or telecopier confirmed immediately in writing specifying the information required therein. Promptly after receipt of a Notice of Conversion or Continuation under this Section, the Agent shall provide each Bank with a copy thereof and, in the case of a Conversion to or a Continuation of a Borrowing comprised of Eurodollar Rate Advances, notify each Bank of the applicable interest rate under Section 2.8(b).

(c)    Certain Limitations. Notwithstanding anything in paragraphs (a) and (b) above:

(i)    at no time shall there be more than ten Interest Periods applicable to outstanding Eurodollar Rate Advances;

(ii)    if any Bank shall, at least one Business Day before the date of any requested Borrowing, Conversion, or continuation, notify the Agent that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or that any central bank or other Governmental Authority asserts that it is unlawful, for such Bank or its Eurodollar Lending Office to perform its obligations under this Agreement to make Eurodollar Rate Advances or to fund or maintain Eurodollar Rate Advances, the right of the Borrower to select Eurodollar Rate Advances from such Bank shall be suspended until such Bank shall notify the Agent that the circumstances causing such suspension no longer exist, and the Advance made by such Bank in respect of such Borrowing, Conversion, or continuation shall be a Base Rate Advance;

(iii)    if the Agent is unable to determine the Eurodollar Rate for Eurodollar Rate Advances comprising any requested Borrowing, the right of the Borrower to select

24

Eurodollar Rate Advances for such Borrowing or for any subsequent Borrowing shall be suspended until the Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist, and each Advance comprising such Borrowing shall be a Base Rate Advance;

(iv)    if the Majority Banks shall, at least one Business Day before the date of any requested Borrowing, notify the Agent that the Eurodollar Rate for Eurodollar Rate Advances comprising such Borrowing will not adequately reflect the cost to such Banks of making or funding their respective Eurodollar Rate Advances, as the case may be, for such Borrowing, the right of the Borrower to select Eurodollar Rate Advances for such Borrowing or for any subsequent Borrowing shall be suspended until the Agent shall notify the Borrower and the Banks that the circumstances causing such suspension no longer exist, and each Advance comprising such Borrowing shall be a Base Rate Advance; and

(v)    if the Borrower shall fail to select the duration or continuation of any Interest Period for any Eurodollar Rate Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.1 and paragraph (b) above, the Agent shall forthwith so notify the Borrower and the Banks and such Advances shall be made available to the Borrower on the date of such Borrowing as Base Rate Advances or, if an existing Advance, Convert into Base Rate Advances.

(d)    Notices Irrevocable.  Each Notice of Borrowing and Notice of Conversion or Continuation shall be irrevocable and binding on the Borrower.  In the case of any Borrowing which the related Notice of Borrowing specifies is to be comprised of Eurodollar Rate Advances, the Borrower shall indemnify each Bank against any loss, out-of-pocket cost, or expense incurred by such Bank as a result of any failure by the Borrower to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III including, without limitation, any loss, cost, or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Bank to fund the Advance to be made by such Bank as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(e)    Agent Reliance.  Unless the Agent shall have received notice from a Bank before the date of any Borrowing that such Bank shall not make available to the Agent such Bank's Pro Rata Share of such Borrowing, the Agent may assume that such Bank has made its Pro Rata Share of such Borrowing available to the Agent on the date of such Borrowing in accordance with paragraph (a) of this Section 2.3 and the Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such Bank shall not have so made its Pro Rata Share of such Borrowing available to the Agent, such Bank and the Borrower severally agree to immediately repay to the Agent on demand such corresponding amount, together with interest on such amount, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Agent, at (i) in the case of the Borrower, the interest rate applicable on such day to Advances comprising such Borrowing and (ii) in the case of such Bank, the Federal Funds Rate for such day.  If such Bank shall repay to the Agent such corresponding amount and interest as provided above, such corresponding amount so repaid shall constitute such Bank's Advance as part of such Borrowing

for purposes of this Agreement even though not made on the same day as the other Advances comprising such Borrowing.

(f)    Bank Obligations Several.  The failure of any Bank to make the Advance to be made by it as part of any Borrowing shall not relieve any other Bank of its obligation, if any, to make its Advance on the date of such Borrowing.  No Bank shall be responsible for the failure of any other Bank to make the Advance to be made by such other Bank on the date of any Borrowing.

Section 2.4.    Prepayment of Advances.

(a)    Optional.  The Borrower may prepay Advances, after giving by 10:00 a.m. (Dallas, Texas time) (i) in the case of Eurodollar Rate Advances, at least three Business Days' or (ii) in case of Base Rate Advances, same Business Day's, irrevocable prior written notice to the Agent stating the proposed date and aggregate principal amount of such prepayment.  If any such notice is given, the Borrower shall prepay Advances comprising part of the same Borrowing in whole or ratably in part in an aggregate principal amount equal to the amount specified in such notice; provided, however, that each partial prepayment with respect to:  (A) any Borrowing comprised of Base Rate Advances shall be made in $50,000 multiples and in an aggregate principal amount such that after giving effect thereto such Borrowing shall have a principal amount outstanding of at least $50,000 and (B) any Borrowing comprised of Eurodollar Rate Advances shall be made in $250,000 multiples and in an aggregate principal amount such that after giving effect thereto such Borrowing shall have a principal amount outstanding of at least $250,000.  Full prepayments of any Borrowing are permitted without restriction of amounts.

(b)    Mandatory.

(i)    Borrowing Base Deficiency.  Except as provided in Section 2.4(b)(ii), (iii), (iv), and (v) below, if the aggregate outstanding amount of Advances plus the Letter of Credit Exposure ever exceeds the Borrowing Base (such excess being referred to herein as the "Borrowing Base Deficiency"), the Borrower shall, within ten days after receipt of written notice of such condition from the Agent elect by written notice to the Agent to take one or more of the following actions to remedy such Borrowing Base Deficiency:

(A)    prepay Advances and, if the Advances have been repaid in full, Cash Collateralize the Letter of Credit Exposure, such that the Borrowing Base Deficiency is cured within ten days after the Borrower's written election;

(B)    add additional Oil and Gas Properties acceptable to the Majority Banks to the Borrowing Base (and take such actions as are requested by the Agent to cause such additional Oil and Gas Properties to become subject to Mortgages, to the extent necessary to cause the Mortgaged Property Value to equal or exceed 80% of the Oil and Gas Property Value) such that the Borrowing Base Deficiency is cured within 30 days after the Borrower's written election; or

(C)    pay the deficiency in six equal monthly installments for the prepayment of Advances and, if the Advances have been repaid in full, for the

26

Cash Collateralization of the Letter of Credit Exposure such that the Borrowing Base Deficiency is eliminated in such six-month period.

(ii)    <u>Reduction of Commitments</u>.    On the date of each reduction of the aggregate Commitments pursuant to <u>Section 2.1(b)</u>, the Borrower agrees to make a prepayment in respect of the outstanding amount of the Advances and the Letter of Credit Exposure to the extent, if any, that the aggregate unpaid principal amount of all Advances <u>plus</u> the Letter of Credit Exposure exceeds the Commitments, as so reduced.    Any amount paid under the preceding sentence in respect of Letter of Credit Exposure shall be held as Cash Collateral under <u>Section 2.6(g)</u>.

(iii)    <u>Asset Sales</u>.    If, after giving effect to the sale, transfer or other disposition of any of the Borrower's or any other Credit Party's Borrowing Base Assets, the aggregate outstanding amount of Advances plus the Letter of Credit Exposure exceeds the Borrowing Base, the Borrower shall repay the Advances, and then Cash Collateralize the Letter of Credit Exposure, by an amount equal to the lesser of (A) such Borrowing Base Deficiency and (B) 100% of the Net Cash Proceeds of such sale, transfer, or other disposition, within three Business Days after  receipt of such proceeds.

(iv)    <u>Property, Physical Damage and Other Insurance Proceeds</u>.    If any Credit Party (or Agent as loss payee or assignee) receives any Property Proceeds arising from a single event or related series of events, whether as one payment or a series of payments, (A) during the existence of a Default or Event of Default, then the Borrower shall repay the Advances, and then Cash Collateralize the Letter of Credit Exposure, by an amount equal to 100% of such Property Proceeds, upon receipt of such proceeds, and (B) during the existence of a Borrowing Base Deficiency, then the Borrower shall repay the Advances, and then Cash Collateralize the Letter of Credit Exposure, by an amount equal to the lesser of (1) such Borrowing Base Deficiency and (2) 100% of such Property Proceeds, within three Business Days after receipt of such proceeds.

(v)    <u>Illegality</u>.    If any Bank shall notify the Agent and the Borrower that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or that any central bank or other Governmental Authority asserts that it is unlawful for such Bank or its Eurodollar Lending Office to perform its obligations under this Agreement to maintain or make any Advances whose interest is determined by reference to the Eurodollar Rate hereunder or any Governmental Authority has imposed material restrictions on the authority of such Bank to purchase or sell, or to take deposits of, Dollars in the London interbank market, (i) the Borrower shall, no later than 10:00 a.m. (Dallas, Texas time) (A) if not prohibited by law, on the last day of the Interest Period for each outstanding Eurodollar Rate Advance made by such Bank or (B) if required by such notice, on the second Business Day following its receipt of such notice prepay all of the Eurodollar Rate Advances made by such Bank then outstanding, (ii) such Bank shall simultaneously make a Base Rate Advance (the interest rate on such Base Rate Advance of such Bank shall, if necessary to avoid such illegality, be determined by the Agent without reference to the Eurodollar Rate component of the Base Rate) to the Borrower on such date in an amount equal to the aggregate principal amount of the Eurodollar Rate Advances prepaid to such Bank, and (iii) the right of the Borrower

to select Eurodollar Rate Advances from such Bank for any subsequent Borrowing shall be suspended until such Bank gives notice referred to above shall notify the Agent that the circumstances causing such suspension no longer exist.

(c)    <u>No Additional Right; Ratable Prepayment; Interest and Breakage</u>.  The Borrower shall have no right to prepay any principal amount of any Advance except as provided in this <u>Section 2.4</u>, and all notices given pursuant to this <u>Section 2.4</u> shall be irrevocable and binding upon the Borrower.  Each payment of any Advance pursuant to this <u>Section 2.4</u> shall be made in a manner such that all Advances comprising part of the same Borrowing are paid in whole or ratably in part.  Each prepayment pursuant to this <u>Section 2.4</u> shall be accompanied by accrued interest on the amount prepaid to the date of such prepayment and amounts, if any, required to be paid pursuant to <u>Section 2.11</u> as a result of such prepayment being made on such date.

Section 2.5.    <u>Repayment of Advances</u>.  The Borrower shall repay to the Agent for the ratable benefit of the Banks the outstanding principal amount of each Advance on the Maturity Date.

Section 2.6.    <u>Letters of Credit</u>.

(a)    <u>The Letter of Credit Commitment</u>.

(i)    Subject to the terms and conditions set forth herein, (A) the Issuing Bank agrees, in reliance upon the agreements of the Banks set forth in this <u>Section 2.6</u>, (1) from time to time on any Business Day during the period from the Effective Date until the Maturity Date, to issue Letters of Credit for the account of the Borrower, and to amend Letters of Credit previously issued by it, in accordance with subsection (b) below, and (2) to honor drawings under the Letters of Credit; and (B) the Banks severally agree to participate in Letters of Credit issued for the account of the Borrower and any drawings thereunder; <u>provided</u> that after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the aggregate outstanding amount of Advances <u>plus</u> the Letter of Credit Exposure shall not exceed the aggregate Commitments, (y) the aggregate outstanding amount of the Advances of any Bank, <u>plus</u> such Bank's Pro Rata Share of the outstanding amount of all Letter of Credit Exposure shall not exceed such Bank's Commitment, and (z) the outstanding amount of the Letter of Credit Exposure shall not exceed the $10,000,000.  Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)    The Issuing Bank shall not issue any Letter of Credit, if:

(a) the expiry date of the requested Letter of Credit would occur more than twelve months after the date of issuance, unless the Majority Banks have approved such expiry date; or

(b) the expiry date of the requested Letter of Credit would occur after the Maturity Date, unless all the Banks have approved such expiry date.

(iii)     The Issuing Bank shall not be under any obligation to issue any Letter of Credit if:

(a) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing the Letter of Credit, or any Legal Requirement applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Issuing Bank with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Issuing Bank in good faith deems material to it;

(b) the issuance of the Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally;

(c) except as otherwise agreed by the Agent and the Issuing Bank, the Letter of Credit is in an initial stated amount less than $50,000;

(d) the Letter of Credit is to be denominated in a currency other than Dollars;

(e) any Bank is at that time a Defaulting Bank, unless the Issuing Bank has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the Issuing Bank (in its sole discretion) with the Borrower or such Bank to eliminate the Issuing Bank's actual or potential Fronting Exposure (after giving effect to Section 2.16(a)(iv)) with respect to the Defaulting Bank arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other Letter of Credit Exposure as to which the Issuing Bank has actual or potential Fronting Exposure, as it may elect in its sole discretion; or

(f) the Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder.

(iv)     The Issuing Bank shall not amend any Letter of Credit if the Issuing Bank would not be permitted at such time to issue the Letter of Credit in its amended form under the terms hereof.

(v)     The Issuing Bank shall be under no obligation to amend any Letter of Credit if (A) the Issuing Bank would have no obligation at such time to issue the Letter of

Credit in its amended form under the terms hereof, or (B) the beneficiary of the Letter of Credit does not accept the proposed amendment to the Letter of Credit.

(vi)    The Issuing Bank shall act on behalf of the Banks with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Agent in Article VIII with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Letter of Credit Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article VIII included the Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Issuing Bank.

(b)    Procedures for Issuance and Amendment of Letters of Credit

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the Issuing Bank (with a copy to the Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by the Issuing Bank and the Agent not later than 10:00 a.m. (Dallas time) at least two Business Days (or such later date and time as the Agent and the Issuing Bank may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Issuing Bank: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the Issuing Bank may require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Issuing Bank (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the Issuing Bank may require.  Additionally, the Borrower shall furnish to the Issuing Bank and the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Letter of Credit Documents, as the Issuing Bank or the Agent may require.

(ii)    Promptly after receipt of any Letter of Credit Application, the Issuing Bank will confirm with the Agent (by telephone or in writing) that the Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, the Issuing Bank will provide the Agent with a copy thereof.  Unless the Issuing Bank has received written notice from any Bank, the Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article III shall not then be satisfied, then, subject to the terms and conditions hereof, the Issuing Bank shall, on the requested

date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the Issuing Bank's usual and customary business practices.  Immediately upon the issuance of each Letter of Credit, each Bank shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Issuing Bank a risk participation in such Letter of Credit in an amount equal to the product of such Bank's Pro Rata Share <u>times</u> the amount of such Letter of Credit.

(iii)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the Issuing Bank will also deliver to the Borrower and the Agent a true and complete copy of such Letter of Credit or amendment.

(c)    <u>Drawings and Reimbursements; Funding of Participations.</u>

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Issuing Bank shall notify the Borrower and the Agent thereof.  Not later than 10:00 a.m. (Dallas time) on the date of any payment by the Issuing Bank under a Letter of Credit (each such date, an "<u>Honor Date</u>"), the Borrower shall reimburse the Issuing Bank through the Agent in an amount equal to the amount of such drawing.  If the Borrower fails to so reimburse the Issuing Bank by such time, the Agent shall promptly notify each Bank of the Honor Date, the amount of the unreimbursed drawing (the "<u>Unreimbursed Amount</u>"), and the amount of such Bank's Pro Rata Share thereof.  In such event, the Borrower shall be deemed to have requested a Borrowing of Base Rate Advances to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in <u>Section 2.1</u> for the principal amount of Base Rate Advances, but subject to the amount of the unutilized portion of the aggregate Commitments and the conditions set forth in <u>Section 3.02</u> (other than the delivery of a Notice of Borrowing).  Any notice given by the Issuing Bank or the Agent pursuant to this <u>Section 2.6(c)(i)</u> may be given by telephone if immediately confirmed in writing; <u>provided</u> that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    Each Bank shall upon any notice pursuant to <u>Section 2.6(c)(i)</u> make funds available (and the Agent may apply Cash Collateral provided for this purpose) for the account of the Issuing Bank at the Agent's Applicable Lending Office in an amount equal to its Pro Rata Share of the Unreimbursed Amount not later than 12:00 p.m. (Dallas time) on the Business Day specified in such notice by the Agent, whereupon, subject to the provisions of <u>Section 2.6(c)(iii)</u>, each Bank that so makes funds available shall be deemed to have made a Base Rate Advance to the Borrower in such amount.  The Agent shall remit the funds so received to the Issuing Bank.

(iii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Borrowing of Base Rate Advances because the conditions set forth in <u>Section 3.02</u> cannot be satisfied or for any other reason, the Borrower shall be deemed to have incurred from the Issuing Bank an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on

31

demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Bank's payment to the Agent for the account of the Issuing Bank pursuant to Section 2.6(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Bank in satisfaction of its participation obligation under this Section 2.6.

(iv)    Until each Bank funds its Advance or L/C Advance pursuant to this Section 2.6(c) to reimburse the Issuing Bank for any amount drawn under any Letter of Credit, interest in respect of such Bank's Pro Rata Share of such amount shall be solely for the account of the Issuing Bank.

(v)    Each Bank's obligation to make Advances or L/C Advances to reimburse the Issuing Bank for amounts drawn under Letters of Credit, as contemplated by this Section 2.6(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Bank may have against the Issuing Bank, the Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Bank's obligation to make Advances pursuant to this Section 2.6(c) is subject to the conditions set forth in Section 3.02 (other than delivery by the Borrower of a Notice of Borrowing).  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the Issuing Bank for the amount of any payment made by the Issuing Bank under any Letter of Credit, together with interest as provided herein.

(vi)    If any Bank fails to make available to the Agent for the account of the Issuing Bank any amount required to be paid by such Bank pursuant to the foregoing provisions of this Section 2.6(c) by the time specified in Section 2.6(c)(ii), then, without limiting the other provisions of this Agreement, the Issuing Bank shall be entitled to recover from such Bank (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Issuing Bank at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Issuing Bank in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Issuing Bank in connection with the foregoing.  If such Bank pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Bank's Advance included in the relevant Advance or L/C Advance in respect of the relevant L/C Borrowing, as the case may be.  A certificate of the Issuing Bank submitted to any Bank (through the Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)    Repayment of Participations.

(i)    At any time after the Issuing Bank has made a payment under any Letter of Credit and has received from any Bank such Bank's L/C Advance in respect of such payment in accordance with Section 2.6(c), if the Agent receives for the account of the

Issuing Bank any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Agent), the Agent will distribute to such Bank its Pro Rata Share thereof in the same funds as those received by the Agent.

(ii)    If any payment received by the Agent for the account of the Issuing Bank pursuant to Section 2.6(c)(i) is required to be returned under any of the circumstances described in Section 7.4 (including pursuant to any settlement entered into by the Issuing Bank in its discretion), each Bank shall pay to the Agent for the account of the Issuing Bank its Pro Rata Share thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Bank, at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Banks under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    <u>Obligations Absolute</u>.  The obligation of the Borrower to reimburse the Issuing Bank for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Credit Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that any Credit Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Issuing Bank or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the Issuing Bank under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Issuing Bank under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Laws; or

(v)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Credit Party.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Issuing Bank.  The Borrower shall be conclusively deemed to have waived any such claim against the Issuing Bank and its correspondents unless such notice is given as aforesaid.

(f)    Role of Issuing Bank.  Each Bank and the Borrower agree that, in paying any drawing under a Letter of Credit, the Issuing Bank shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the Issuing Bank, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the Issuing Bank shall be liable to any Bank for (i) any action taken or omitted in connection herewith at the request or with the approval of the Banks or the Majority Banks, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Letter of Credit Document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the Issuing Bank, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the Issuing Bank shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.6(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the Issuing Bank, and the Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by the Issuing Bank's willful misconduct or gross negligence or the Issuing Bank's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the Issuing Bank shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)    Cash Collateral Account.

(i)    If the Borrower is required to deposit funds in the Cash Collateral Account pursuant to Sections 2.4(b) or (c), 2.15, 7.2(b), or 7.3(b), then the Borrower and the Agent shall establish the Cash Collateral Account and the Borrower shall execute any documents and agreements, including the Agent's standard form assignment of deposit accounts, that the Agent requests in connection therewith to establish the Cash Collateral Account and grant the Agent a first priority security interest in such account and the funds therein.  The Borrower hereby pledges to the Agent and grants the Agent a security interest in the Cash Collateral Account, whenever established, all funds held in the Cash

Collateral Account from time to time, and all proceeds thereof as security for the payment of the Obligations.

(ii)    So long as no Event of Default exists, (A) the Agent may apply the funds held in the Cash Collateral Account only to the reimbursement of any Letter of Credit Obligations, and (B) the Agent shall release to the Borrower at the Borrower's written request any funds held in the Cash Collateral Account in an amount up to but not exceeding the excess, if any (immediately prior to the release of any such funds), of the total amount of funds held in the Cash Collateral Account over the Letter of Credit Exposure.  During the existence of any Event of Default, the Agent may apply any funds held in the Cash Collateral Account to the Obligations in any order determined by the Agent, regardless of any Letter of Credit Exposure which may remain outstanding.  The Agent may in its sole discretion at any time release to the Borrower any funds held in the Cash Collateral Account.

(iii)    The Agent shall exercise reasonable care in the custody and preservation of any funds held in the Cash Collateral Account and shall be deemed to have exercised such care if such funds are accorded treatment substantially equivalent to that which the Agent accords its own property, it being understood that the Agent shall not have any responsibility for taking any necessary steps to preserve rights against any parties with respect to any such funds.

Section 2.7.    Fees.

(a)    Commitment Fees.

(i)    Subject to Section 2.16(a)(iii), the Borrower agrees to pay to the Agent for the account of each Bank a commitment fee per annum equal to the Applicable Margin for commitment fees in effect from time to time on the average daily amount by which such Bank's Pro Rata Share of the Borrowing Base exceeds the sum of such Bank's outstanding Advances and such Bank's Pro Rata Share of the Letter of Credit Exposure, from the Effective Date until the Maturity Date.

(ii)    The commitment fees shall be due and payable quarterly in arrears on the last day of each March, June, September, and December during the term of this Agreement and on the Maturity Date.

(b)    Agent and Arranger Fees.  The Borrower agrees to pay to the Agent and the Arranger for their own accounts the fees described in any letter among the Agent, Arranger, and the Borrower.

(c)    Bank Fees.  The Borrower agrees to pay to the Agent for the ratable benefit of the Banks on the Effective Date, the fees agreed to between the Borrower and the Banks and any other fees agreed among the Borrower and the Agent or Arranger.

(d)    Letter of Credit Fees.

(i)     The Borrower agrees to pay (A) to the Agent for the pro rata benefit of the Banks a per annum fee for each Letter of Credit issued hereunder equal to the Applicable Margin for Eurodollar Advances on the face amount of such Letter of Credit, but with a minimum annual fee of $1250 on each Letter of Credit (collectively, the "Letter of Credit Fees"); provided, however, any Letter of Credit Fees otherwise payable for the account of a Defaulting Bank with respect to any Letter of Credit as to which such Defaulting Bank has not provided Cash Collateral satisfactory to the Issuing Bank pursuant to this Section 2.7 shall be payable, to the maximum extent permitted by applicable Legal Requirement, to the other Banks in accordance with the upward adjustments in their respective Pro Rata Share allocable to such Letter of Credit pursuant to Section 2.16(a)(iv), with the balance of such fee, if any, payable to the Issuing Bank for its own account and (B) to the Agent for the benefit of the Issuing Bank a fronting fee for each Letter of Credit equal to 0.25% per annum of the face amount of such Letter of Credit, but with a minimum annual fee of $1250 on each Letter of Credit. Each such fee with respect to a Letter of Credit shall be payable quarterly in arrears for the period such Letter of Credit is outstanding, and on the Maturity Date.

(ii)     The Borrower agrees to pay to the Issuing Bank for its own account the customary issuance, presentation, amendment, and other processing fees, and other standard costs and charges, of the Issuing Bank relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

Section 2.8.    Interest.  The Borrower shall pay interest on the unpaid principal amount of each Advance made by each Bank from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(a)    Base Rate Advances.  If such Advance is a Base Rate Advance, a rate per annum equal at all times to the Adjusted Base Rate in effect from time to time plus the Applicable Margin in effect from time to time, payable in arrears on the last day of March, June, September, and December and on the date such Base Rate Advance shall be paid in full, provided that any amount of principal which is not paid when due (whether at stated maturity, by acceleration, or otherwise) shall bear interest from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the Adjusted Base Rate in effect from time to time plus the Applicable Margin plus 2.00% per annum.

(b)    Eurodollar Rate Advances.  If such Advance is a Eurodollar Rate Advance, a rate per annum equal at all times during the Interest Period for such Advance to the Eurodollar Rate for such Interest Period plus the Applicable Margin in effect from time to time, payable on the last day of such Interest Period, and, in the case of Interest Periods that are longer than three months, every three months and on the last day of such Interest Period, provided that any amount of principal which is not paid when due (whether at stated maturity, by acceleration, or otherwise) shall bear interest from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal to (i) until the end of the relevant Interest Period, the Eurodollar Rate in effect from time to time plus the Applicable Margin plus 2.00% per annum and (ii) thereafter, the Adjusted Base Rate in effect from time to time plus the Applicable Margin plus 2.00% per annum.

(c)    <u>Additional Interest on Eurodollar Rate Advances</u>.  The Borrower shall pay to each Bank, so long as any such Bank shall be required under regulations of the Federal Reserve Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, additional interest on the unpaid principal amount of each Eurodollar Rate Advance of such Bank, from the effective date of such Advance until such principal amount is paid in full, at an interest rate per annum equal at all times to the remainder obtained by subtracting (i) the Eurodollar Rate for the Interest Period for such Advance from (ii) the rate obtained by dividing such Eurodollar Rate by a percentage equal to 100% minus the Eurodollar Rate Reserve Percentage of such Bank for such Interest Period, payable on each date on which interest is payable on such Advance.  Such additional interest payable to any Bank shall be determined by such Bank and notified to the Borrower through the Agent (such notice to include the calculation of such additional interest, which calculation shall be conclusive in the absence of manifest error).

(d)    <u>Usury</u>.

(i)    If, with respect to any Bank, the effective rate of interest contracted for under the Credit Documents, including the stated rates of interest and fees contracted for hereunder and any other amounts contracted for under the Credit Documents which are deemed to be interest, at any time exceeds the Maximum Rate, then the outstanding principal amount of the loans made by such Bank hereunder shall bear interest at a rate which would make the effective rate of interest for such Bank under the Credit Documents equal the Maximum Rate until the difference between the amounts which would have been due at the stated rates and the amounts which were due at the Maximum Rate (the "<u>Lost Interest</u>") has been recaptured by such Bank.

(ii)    If, when the loans made hereunder are repaid in full, the Lost Interest has not been fully recaptured by such Bank pursuant to the preceding paragraph, then, to the extent permitted by law, for the loans made hereunder by such Bank the interest rates charged under <u>Section 2.8</u> hereunder shall be retroactively increased such that the effective rate of interest under the Credit Documents was at the Maximum Rate since the effectiveness of this Agreement to the extent necessary to recapture the Lost Interest not recaptured pursuant to the preceding sentence and, to the extent allowed by law, the Borrower shall pay to such Bank the amount of the Lost Interest remaining to be recaptured by such Bank.

(iii)    In calculating all sums paid or agreed to be paid to any Bank by the Borrower for the use, forbearance, or detention of money under the Credit Documents, such amounts shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread in equal parts throughout the term of the Credit Documents.

(iv)    NOTWITHSTANDING the foregoing or any other term in this Agreement and the Credit Documents to the contrary, it is the intention of each Bank and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Bank contracts for, charges, or receives any consideration which constitutes interest in excess of the Maximum Rate, then (A) the provisions of this <u>Section 2.8</u>, together with the second sentence of <u>Section 9.13</u> shall control, and (B) any such excess shall be canceled

automatically and, if previously paid, shall at such Bank's option be applied to the outstanding amount of the loans made hereunder by such Bank or be refunded to the Borrower.  For purposes of Chapter 303 of the Texas Finance Code, as amended, to the extent applicable, the Borrower agrees that the Maximum Rate shall be the "indicated (weekly) rate ceiling" as defined in said Chapter, provided that such Bank may also rely, to the extent permitted by applicable laws, on alternative maximum rates of interest under other laws applicable to such Bank, if greater.

Section 2.9.    Payments and Computations.

(a)    Payment Procedures.    The Borrower shall make each payment under this Agreement and under the Notes not later than 10:00 a.m. (Dallas, Texas time) on the day when due in Dollars to the Agent at 901 Main Street, 14th Floor, Dallas, Texas 75202 (or such other location as the Agent shall designate in writing to the Borrower), in same day funds.  The Agent shall promptly thereafter cause to be distributed like funds relating to the payment of principal, interest or fees ratably (other than amounts payable solely to the Agent, the Issuing Bank, or a specific Bank pursuant to Section 2.7(b), 2.8(c), 2.11, 2.12, 2.13, 8.7, or 9.7, but after taking into account payments effected pursuant to Section 9.4) to the Banks for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Bank or the Issuing Bank to such Bank for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.

(b)    Computations.  All computations of interest based on the Base Rate shall be made by the Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on the Eurodollar Rate and the Federal Funds Rate and of fees shall be made by the Agent, on the basis of a year of 360 days, in each case for the actual number of days (including the first day, but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Agent of an interest rate or fee shall be conclusive and binding for all purposes, absent manifest error.

(c)    Non-Business Day Payments.  Whenever any payment shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; provided, however, that if such extension would cause payment of interest on or principal of Eurodollar Rate Advances to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(d)    Agent Reliance.  Unless the Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Banks that the Borrower shall not make such payment in full, the Agent may assume that the Borrower has made such payment in full to the Agent on such date and the Agent may, in reliance upon such assumption, cause to be distributed to each Bank on such date an amount equal to the amount then due such Bank.  If and to the extent the Borrower shall not have so made such payment in full to the Agent, each Bank shall repay to the Agent forthwith on demand such amount distributed to such Bank, together with interest, for each day from the date such amount is distributed to such Bank until the date such Bank repays such amount to the Agent, at the Federal Funds Rate for such day.

Section 2.10.  <u>Sharing of Payments, Etc</u>.  If any Bank shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of the Advances or Letter of Credit Obligations made by it in excess of its Pro Rata Share of payments on account of the Advances or Letter of Credit Obligations obtained by all the Banks, such Bank shall notify the Agent and forthwith purchase from the other Banks such participations in the Advances made by them or Letter of Credit Obligations held by them as shall be necessary to cause such purchasing Bank to share the excess payment ratably with each of them; <u>provided</u>, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Bank, such purchase from each Bank shall be rescinded and such Bank shall repay to the purchasing Bank the purchase price to the extent of such Bank's ratable share (according to the proportion of (a) the amount of the participation sold by such Bank to the purchasing Bank as a result of such excess payment to (b) the total amount of such excess payment) of such recovery, together with an amount equal to such Bank's ratable share (according to the proportion of (a) the amount of such Bank's required repayment to the purchasing Bank to (b) the total amount of all such required repayments to the purchasing Bank) of any interest or other amount paid or payable by the purchasing Bank in respect of the total amount so recovered.  The Borrower agrees that any Bank so purchasing a participation from another Bank pursuant to this <u>Section 2.10</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Bank were the direct creditor of the Borrower in the amount of such participation.

Section 2.11.  <u>Breakage Costs</u>.  If (a) any payment of principal of any Eurodollar Rate Advance is made other than on the last day of the Interest Period for such Advance, whether as a result of any payment pursuant to <u>Section 2.4</u>, the acceleration of the maturity of the Notes pursuant to <u>Article VII</u>, or otherwise, or (b) the Borrower fails to make a principal or interest payment with respect to any Eurodollar Rate Advance on the date such payment is due and payable, the Borrower shall, within 10 days of any written demand sent by any Bank to the Borrower through the Agent, pay to the Agent for the account of such Bank any amounts required to compensate such Bank for any additional losses, out-of-pocket costs or expenses which it may reasonably incur as a result of such payment or nonpayment, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Bank to fund or maintain such Advance.  Such right of reimbursement shall be in addition to and not in limitation of the protections set forth above and elsewhere in this Agreement.

Section 2.12.  <u>Increased Costs</u>.

(a)    <u>Increased Costs Generally</u>.   If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Bank (except any reserve requirement contemplated in <u>Section 2.08(c)</u>) or the Issuing Bank;

(ii)    subject any Bank or the Issuing Bank to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Eurodollar Rate Advance made by it, or change the basis of taxation of

payments to such Bank or the Issuing Bank in respect thereof (except for Taxes or Other Taxes covered by <u>Section 2.13</u> and the imposition of, or any change in the rate of, any excluded taxes described in clauses (i) through (iii) of the first sentence of <u>Section 2.13(a)</u> payable by such Bank or the Issuing Bank); or

     (iii)    impose on any Bank or the Issuing Bank or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Advances made by such Bank or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Bank of making or maintaining any Advance the interest on which is determined by reference to the Eurodollar Rate (or of maintaining its obligation to make any such Advance), or to increase the cost to such Bank or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Bank or the Issuing Bank hereunder (whether of principal, interest or any other amount) then, upon request of such Bank or the Issuing Bank, the Borrower will pay to such Bank or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Bank or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

     (b)    <u>Capital Requirements</u>.  If any Bank or the Issuing Bank determines that any Change in Law affecting such Bank or the Issuing Bank or any Applicable Lending Office of such Bank or such Bank's or the Issuing Bank's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Bank's or the Issuing Bank's capital or on the capital of such Bank's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Bank and the Advances made by, or participations in Letters of Credit held by, such Bank, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Bank or the Issuing Bank or such Bank's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Bank's or the Issuing Bank's policies and the policies of such Bank's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Bank or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Bank or the Issuing Bank or such Bank's or the Issuing Bank's holding company for any such reduction suffered.

     (c)    <u>Certificates for Reimbursement</u>.  A certificate as to the amount necessary to compensate such Bank, or Issuing Bank or any Applicable Lending Office of such Bank or the Issuing Bank's holding company, if any, and showing the basis of the computation of such amount submitted by such Person, delivered to Borrower and to Agent shall, absent manifest error, be final, conclusive and binding for all purposes under subsection (a) or (b) of this Section. The Borrower shall pay such Bank or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

     (d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Bank or Issuing Bank to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Bank's or Issuing Bank's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a Bank or Issuing Bank pursuant to the foregoing

provisions of this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Bank or Issuing Bank, as the case may be, notifies the Borrower of the change in law or regulation or the interpretation or application thereof giving rise to such increased costs or reductions and of such Bank's or Issuing Bank's intention to claim compensation therefore (except that, if the change in law or regulation or the interpretation or application thereof giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.13.  Taxes.

(a)    No Deduction for Certain Taxes.  Any and all payments by the Borrower shall be made, in accordance with Section 2.9, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of each Bank, the Issuing Bank, and the Agent, (i) taxes imposed on or measured by its income, and franchise taxes imposed on it, by the United States of America or the jurisdiction (or any political subdivision thereof) under the laws of which such Bank, the Issuing Bank, or the Agent (as the case may be) is organized or in which its principal office is located or, in the case of any Bank or the Issuing Bank, in which its applicable lending office is located, (ii) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (iii) in the case of a Foreign Bank (as defined in subparagraph (d), hereof), any withholding tax that is imposed on amounts payable to such Foreign Bank at the time such Foreign Bank becomes a party to this Agreement or other Credit Document (or designates a new lending office) (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").  If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable to any Bank, the Issuing Bank, or the Agent, (i) the sum payable shall be increased as may be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 2.13), such Bank, the Issuing Bank, or the Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made; provided, however, that if the Borrower's obligation to deduct or withhold Taxes is caused solely by such Bank's, the Issuing Bank's, or the Agent's failure to provide the forms described in paragraph (d) of this Section 2.13 and such Bank, the Issuing Bank, or the Agent could have provided such forms, no such increase shall be required; (ii) the Borrower shall make such deductions; and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    Other Taxes.  In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made or from the execution, delivery or registration of, or otherwise with respect to, this Agreement, the Notes, or the other Credit Documents (hereinafter referred to as "Other Taxes").

(c)    Indemnification.  THE BORROWER INDEMNIFIES EACH BANK, THE ISSUING BANK, AND THE AGENT FOR THE FULL AMOUNT OF TAXES OR OTHER TAXES (INCLUDING, WITHOUT LIMITATION, ANY TAXES OR OTHER TAXES IMPOSED BY ANY JURISDICTION ON AMOUNTS PAYABLE UNDER THIS SECTION

41

2.13) PAID BY SUCH BANK, THE ISSUING BANK, OR THE AGENT (AS THE CASE MAY BE) AND ANY LIABILITY (INCLUDING INTEREST AND EXPENSES) ARISING THEREFROM OR WITH RESPECT THERETO, WHETHER OR NOT SUCH TAXES OR OTHER TAXES WERE CORRECTLY OR LEGALLY ASSERTED.  EACH PAYMENT REQUIRED TO BE MADE BY THE BORROWER IN RESPECT OF THIS INDEMNIFICATION SHALL BE MADE TO THE AGENT FOR THE BENEFIT OF ANY PARTY CLAIMING SUCH INDEMNIFICATION WITHIN 30 DAYS FROM THE DATE THE BORROWER RECEIVES WRITTEN DEMAND THEREFOR FROM THE AGENT ON BEHALF OF ITSELF AS AGENT, THE ISSUING BANK, OR ANY SUCH BANK. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO BANK, THE ISSUING BANK OR THE AGENT SHALL BE INDEMNIFIED FOR ANY TAXES HEREUNDER UNLESS SUCH BANK, ISSUING BANK OR AGENT SHALL MAKE WRITTEN DEMAND ON THE BORROWER FOR REIMBURSEMENT HEREUNDER NO LATER THAN 120 DAYS AFTER THE EARLIER OF (I) THE DATE ON WHICH SUCH BANK, ISSUING BANK OR AGENT MAKES PAYMENT OF SUCH TAXES AND (II) THE DATE ON WHICH THE RELEVANT GOVERNMENT AUTHORITY MAKES WRITTEN DEMAND UPON SUCH BANK, ISSUING BANK OR AGENT FOR PAYMENT OF SUCH TAXES.  IF ANY BANK, THE AGENT, OR THE ISSUING BANK RECEIVES A REFUND IN RESPECT OF ANY TAXES PAID BY THE BORROWER UNDER THIS PARAGRAPH (C), SUCH BANK, THE AGENT, OR THE ISSUING BANK, AS THE CASE MAY BE, SHALL PROMPTLY PAY TO THE BORROWER THE BORROWER'S SHARE OF SUCH REFUND.

(d)    Withholding Exemption.  Each Bank and the Issuing Bank, if requested by the Borrower or the Agent, shall deliver such documentation (including Form W-9) prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Bank or Issuing Bank is subject to backup withholding or information reporting requirements. In addition, each Bank and Issuing Bank that is not incorporated under the laws of the United States of America or a state thereof (a "Foreign Bank") agrees that it will deliver to the Borrower and the Agent on the date of this Agreement or upon the effectiveness of any Assignment and Acceptance and from time to time thereafter if requested in writing by the Borrower, to the extent applicable, (i) Internal Revenue Service Form W-8ECI, W-8BEN, W-8EXP, or W-8IMY as appropriate, or any successor form prescribed by the Internal Revenue Service, certifying that such Bank is entitled to benefits under an income tax treaty to which the United States is a party which exempts such Bank from withholding tax on payments of interest or certifying that the income receivable pursuant to this Agreement or other Credit Document is effectively connected with the conduct of a trade or business in the United States, (ii) in the case of a Foreign Bank claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Bank is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, and (iii) any other form prescribed by applicable law as a basis for claiming an exemption from tax on payments pursuant to this Agreement or any of the other Credit Documents.  If an event (including without limitation any change in treaty, law or regulation) has occurred prior to the date on which any delivery required by the preceding sentence would otherwise be required which renders all such

forms inapplicable or which would prevent any Bank from duly completing and delivering any such letter or form with respect to it and such Bank advises the Borrower and the Agent that it is not capable of receiving payments without any deduction or withholding of United States federal income tax, and, in the case of a Form W-9, establishing an exemption from United States backup withholding tax, such Bank shall not be required to deliver such letter or forms.

Section 2.14.  <u>Inability to Determine Rates</u>.  If the Majority Banks determine that for any reason in connection with any request for Eurodollar Rate Advances or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Advances, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to such proposed Eurodollar Rate Advance or in connection with an existing or proposed Base Rate Advance, or (c) the Eurodollar Rate for any requested Interest Period with respect to such proposed Eurodollar Rate Advance does not adequately and fairly reflect the cost to such Banks of funding such Advance, the Agent will promptly so notify the Borrower and each Bank.  Thereafter, (x) the obligation of the Banks to make Eurodollar Rate Advances, or effect any conversion thereto or continuation thereof, shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the Agent (upon the instruction of the Majority Banks) revokes such notice.  Upon receipt of such notice, the Borrower may revoke, without premium or penalty, any pending request for an Advance of, conversion to or continuation of Eurodollar Rate Advances or, failing that, will be deemed to have converted such request into a request for Advances bearing interest based upon the Base Rate in the amount specified therein.

Section 2.15.  <u>Cash Collateral</u>.

(a)     <u>Certain Credit Support Events</u>.  Upon the request of the Agent or the Issuing Bank (i) if the Issuing Bank has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in a Reimbursement Obligation, or (ii) if, as of the Maturity Date, any Letter of Credit Exposure for any reason remains outstanding, the Borrower shall, in each case, immediately Cash Collateralize the aggregate Letter of Credit Exposure then outstanding. At any time that there shall exist a Defaulting Bank, immediately upon the request of the Agent or the Issuing Bank, the Borrower shall deliver to the Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to <u>Section 2.16(a)(iv)</u> and any Cash Collateral provided by such Defaulting Bank).

(b)     <u>Grant of Security Interest</u>.  All Cash Collateral (other than credit support not constituting funds subject to deposit) shall be maintained in blocked, non-interest bearing deposit accounts at Bank of America.  The Borrower, and to the extent provided by any Bank, such Bank, hereby grants to (and subjects to the control of) the Agent, for the benefit of the Agent, the Issuing Bank and the Banks, and agrees to maintain, a first priority security interest in all such cash, deposit accounts and all balances therein, and all other property so provided as collateral pursuant hereto, and in all proceeds of the foregoing, all as security for the obligations to which such Cash Collateral may be applied pursuant to <u>Section 2.15(c)</u>.  If at any time the Agent determines that Cash Collateral is subject to any right or claim of any Person other than the

Agent as herein provided, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other obligations secured thereby, the Borrower or the relevant Defaulting Bank will, promptly upon demand by the Agent, pay or provide to the Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(c)     Application.     Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this Section 2.15 or Sections 2.4, 2.6, 2.16, 7.2(b) or 7.3(b) in respect of Letters of Credit shall be held and applied to the satisfaction of the specific Letter of Credit Exposure, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Bank, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(d)     Release.     Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Bank status of the applicable Bank (or, as appropriate, its assignee following compliance with Section 9.6(b)(vi))) or (ii) the Agent's good faith determination that there exists excess Cash Collateral; provided, however, (x) that Cash Collateral furnished by or on behalf of a Credit Party shall not be released during the continuance of a Default or Event of Default (and following application as provided in this Section 2.15 may be otherwise applied in accordance with Section 7.7), and (y) the Person providing Cash Collateral and the Issuing Bank, may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

Section 2.16.   Defaulting Banks.

(a)     Adjustments.     Notwithstanding anything to the contrary contained in this Agreement, if any Bank becomes a Defaulting Bank, then, until such time as that Bank is no longer a Defaulting Bank, to the extent permitted by applicable Legal Requirements:

(i)     Waivers and Amendments.     That Defaulting Bank's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.1.

(ii)     Reallocation of Payments.     Any payment of principal, interest, fees or other amounts received by the Agent for the account of that Defaulting Bank (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Agent by that Defaulting Bank pursuant to Section 7.4), shall be applied at such time or times as may be determined by the Agent as follows: first, to the payment of any amounts owing by that Defaulting Bank to the Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by that Defaulting Bank to the Issuing Bank hereunder; third, if so determined by the Agent or requested by the Issuing Bank, to be held as Cash Collateral for future funding obligations of that Defaulting Bank of any participation in any Letter of Credit; fourth, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Advance in respect of which that Defaulting Bank has failed to fund its

portion thereof as required by this Agreement, as determined by the Agent; fifth, if so determined by the Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Bank to fund Advances under this Agreement; sixth, to the payment of any amounts owing to the Banks, the Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Bank or the Issuing Bank against that Defaulting Bank as a result of that Defaulting Bank's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Bank as a result of that Defaulting Bank's breach of its obligations under this Agreement; and eighth, to that Defaulting Bank or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Advances or Reimbursement Obligations in respect of which that Defaulting Bank has not fully funded its appropriate share and (y) such Advances or Reimbursement Obligations were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Advances of, and Reimbursement Obligations owed to, all non-Defaulting Banks on a pro rata basis prior to being applied to the payment of any Advances of, or Reimbursement Obligations owed to, that Defaulting Bank. Any payments, prepayments or other amounts paid or payable to a Defaulting Bank that are applied (or held) to pay amounts owed by a Defaulting Bank or to post Cash Collateral pursuant to this Section 2.16(a)(ii) shall be deemed paid to and redirected by that Defaulting Bank, and each Bank irrevocably consents hereto.

(iii)    Certain Fees.  That Defaulting Bank (x) shall not be entitled to receive any commitment fee pursuant to Section 2.7(a) for any period during which that Bank is a Defaulting Bank (and the Borrower shall not be required to pay any such commitment fee that otherwise would have been required to have been paid to that Defaulting Bank) and (y) shall be limited in its right to receive Letter of Credit Fees as provided in Section 2.7(d).

(iv)    Reallocation of Pro Rata Shares to Reduce Fronting Exposure.  During any period in which there is a Defaulting Bank, for purposes of computing the amount of the obligation of each non-Defaulting Bank to acquire, refinance or fund participations in Letters of Credit pursuant to Section 2.6, the "Pro Rata Share" of each non-Defaulting Bank shall be computed without giving effect to the Commitment of that Defaulting Bank; provided, that, (i) each such reallocation shall be given effect only if, at the date the applicable Bank becomes a Defaulting Bank, no Default or Event of Default exists; and (ii) the aggregate obligation of each non-Defaulting Bank to acquire, refinance or fund participations in Letters of Credit shall not exceed the positive difference, if any, of (1) the Commitment of that non-Defaulting Bank minus (2) such non-Defaulting Bank's (A) aggregate amount of the Advances plus (B) the Pro Rata Share of the Letter of Credit Exposure.

(b)    Defaulting Bank Cure.  If the Borrower, the Agent and the Issuing Bank agree in writing in their sole discretion that a Defaulting Bank should no longer be deemed to be a Defaulting Bank, the Agent will so notify the parties hereto, whereupon as of the effective date

specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Bank will, to the extent applicable, purchase that portion of outstanding Advances of the other Banks or take such other actions as the Agent may determine to be necessary to cause the Advances and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Banks in accordance with their Pro Rata Share (without giving effect to Section 2.16(a)(iv)), whereupon that Bank will cease to be a Defaulting Bank; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Bank was a Defaulting Bank; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Bank to Bank will constitute a waiver or release of any claim of any party hereunder arising from that Bank's having been a Defaulting Bank.

## ARTICLE III

## CONDITIONS OF LENDING

Section 3.1.    <u>Initial Conditions Precedent to Borrowings</u>.  This Agreement shall become effective on the date the following conditions precedent are met:

(a)    <u>Documentation</u>.  On or before the day on which the initial Borrowing is made or the initial Letters of Credit are issued, the Agent shall have received the following duly executed by all the parties thereto, in form and substance satisfactory to the Agent and the Banks, and, where applicable, in sufficient copies for each Bank:

(i)    this Agreement, the Notes, the Security Agreement, the Guaranty, the Pledge Agreement, the Consents, and the Mortgages;

(ii)    proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Agent may deem necessary or desirable in order to perfect the Liens created under the Security Documents;

(iii)    a favorable opinion of Baker and Hostetler LLP, counsel to the Credit Parties, dated as of the Effective Date, covering such matters as any Bank through the Agent may reasonably request;

(iv)    a favorable opinion of Baker and Hostetler LLP, Louisiana counsel to the Credit Parties covering the Louisiana-law Mortgages and such other matters as any Bank through the Agent may reasonably request;

(v)    a certificate or certificates of the Secretary or an Assistant Secretary of the Borrower and each Guarantor certifying (A) certificates of good standing and existence or qualification to do business for each of the Borrower and each Guarantor from its jurisdiction of organization and each jurisdiction where it is required to be qualified to do business, (B) the certificate of incorporation, formation, or partnership of each of the Borrower and each Guarantor, (C) the bylaws, limited liability company agreement, or partnership agreement of each of the Borrower and each Guarantor, (D) the resolutions of the member, board of directors, board of managers or other equivalent governing body of

the Borrower and each Guarantor authorizing this Agreement and related transactions, (E) the incumbency and signatures of the officers of the Borrower and each Guarantor authorized to execute this Agreement and related documents, (F) the White Oak PSA, and (G) the consummation of, and purchase price paid in connection with, the White Oak Acquisition;

(vi)    a certificate of a Responsible Officer of Borrower stating that (A) the representations and warranties contained in this Agreement and the other Credit Documents are true and correct in all material respects, (B) no Default or Event of Default exists, and (C) all conditions set forth in this Section 3.1 and in Section 3.2 have been satisfied (assuming satisfaction by the Agent and the Banks where such satisfaction is specified in such conditions);

(vii)    Insurance Certificates from the Credit Parties' insurance providers setting forth the insurance maintained by the Credit Parties, showing that insurance meeting the requirements of Section 5.2 is in full force and effect and that all premiums due with respect thereto have been paid, showing Agent as loss payee with respect to all such property or physical damage policies and as additional insured with respect to all such liability policies, and stating that such insurer will provide Agent with at least 30 days' advance notice of cancellation of any such policy;

(viii)    such UCC lien search reports as Agent shall require, conducted in such jurisdictions and reflecting such names as Agent shall request;

(ix)    if any deposit, commodities or securities account of any Credit Party is held with a financial institution that is not the Agent, an agreement or agreements creating an Acceptable Security Interest and in form and substance reasonably acceptable to the Agent between the Agent and such other financial institution governing any such deposit accounts, commodities accounts, or securities accounts of such Credit Party (an "Account Control Agreement"); and

(x)    such other documents, governmental certificates, agreements, and lien searches as the Agent or any Bank may reasonably request.

(b)    Payment of Fees.  On the date of this Agreement, the Borrower shall have paid (i) the fees required by Section 2.7(b) and (c), (ii) all costs and expenses which have been invoiced and are payable pursuant to Section 9.4, and (iii) all fees payable to the Arranger and Agent pursuant to any written agreement between Borrower and the Arranger or the Agent.

(c)    Financial Statements.  The Agent shall have reviewed and be satisfied with (i) the Financial Statements, (ii) projections for the fiscal quarter ending December 31, 2010, and (iii) projections for the fiscal years ending December 31, 2011, December 31, 2012, and December 31, 2013, including balance sheets and income and cash flow statements.

(d)    No Material Adverse Change.  There shall not have occurred a material adverse change with respect to the assets to be acquired pursuant to the White Oak PSA.

(e)    <u>No Material Litigation</u>.    The absence of any action, suit, investigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that (i) could reasonably be expected to cause a Material Adverse Change, except as set forth on <u>Schedule 4.7</u> (ii) prevents or purports to prevent the White Oak Acquisition or (iii) purports to adversely affect any transaction contemplated hereby or the ability of the Borrower and the Guarantors to perform their respective obligations under the Credit Documents.

(f)    <u>Engineering Reports</u>.    The Agent shall have received Oil and Gas Reserve Reports for the Oil and Gas Properties included in the Borrowing Base.

(g)    <u>Environmental Condition</u>.    The Agent shall be reasonably satisfied with the environmental condition of the Borrower's and the other Credit Parties' Oil and Gas Properties.

(h)    <u>White Oak Acquisition</u>.

(i)    The White Oak Acquisition shall have been consummated pursuant to the White Oak PSA for an aggregate purchase price not in excess of $37,298,203.00.

(ii)    At least $38,980,822.00 of equity shall have been received in cash from Wayzata Opportunities Fund II, L.P. and Goldking Energy Partners I, LP, collectively.

(iii)    All governmental, shareholder, and third party consents and approvals necessary to consummate the White Oak Acquisition shall have been received.

(iv)    All Liens on the assets acquired as part of the White Oak Acquisition shall have been released, except for Permitted Liens.

(i)    <u>Title</u>.    The Borrower shall have delivered to the Agent title opinions regarding that portion of the Borrowing Base Assets representing not less than 85% of the value of the aggregate oil and gas reserves of the Borrower and the other Credit Parties, and such title opinions shall reflect that the Borrower and the other Credit Parties have good and marketable title to all such Borrowing Base Assets, free and clear of all Liens, except for Permitted Borrowing Base Liens.

(j)    <u>Other Matters</u>.    All matters related to this Agreement, the other Credit Documents, and Borrower or any Guarantor shall be acceptable to Agent and each Bank in their sole discretion, and Borrower shall have delivered to Agent and each Bank such evidence as they shall request to substantiate any matters related to this Agreement, the other Credit Documents, and Borrower or any Guarantor as Agent or any Bank shall request.

Section 3.2.    <u>Conditions Precedent to All Borrowings</u>.    The obligation of each Bank to make an Advance on the occasion of each Borrowing and of the Issuing Bank to issue, increase, or extend any Letter of Credit shall be subject to the further conditions precedent that on the date of such Borrowing or the issuance, increase, or extension of such Letter of Credit:

(a)    the Agent shall have timely received a Notice of Borrowing or Letter of Credit Application, as applicable;

(b)    the following statements shall be true (and each of the giving of the applicable Notice of Borrowing or Letter of Credit Application and the acceptance by the Borrower of the proceeds of such Borrowing or the issuance, increase, or extension of such Letter of Credit shall constitute a representation and warranty by the Borrower that, on the date of such Borrowing, or the issuance, increase, or extension of such Letter of Credit, such statements are true):

(i)    the representations and warranties contained in <u>Article IV</u> and the Guaranties are correct in all respects on and as of the date of such Borrowing or the date of the issuance, increase, or extension of such Letter of Credit, before and after giving effect to such Borrowing or to the issuance, increase, or extension of such Letter of Credit and to the application of the proceeds from such Borrowing, as though made on and as of such date;

(ii)    no Default has occurred and is continuing or would result from such Borrowing or from the application of the proceeds therefrom or from the issuance, increase, or extension of such Letter of Credit; and

(iii)    the funding of such Borrowing or issuance of such Letter of Credit and all other Borrowings to be made or Letters of Credit to be issued on the same day under this Agreement, shall not (A) cause the aggregate outstanding amount of Advances plus the Letter of Credit Exposure to exceed the lesser of (1) the Borrowing Base and (2) the aggregate Commitments, or (B) cause the Letter of Credit Exposure to exceed $10,000,000;

(c)    if the date of such proposed Borrowing or proposed issuance of a Letter of Credit is on or after the first anniversary of the Effective Date, the Borrower shall be in compliance with the requirements of <u>Section 5.12(d)</u>; and

(d)    the Agent shall have received such other approvals, opinions, or documents reasonably deemed necessary or desirable by any Bank as a result of circumstances occurring after the date of this Agreement, as any Bank through the Agent may reasonably request.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Credit Parties represent and warrant as follows:

Section 4.1.    <u>Corporate Existence; Subsidiaries</u>.    The Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware and in good standing and qualified to do business in each jurisdiction where its ownership or lease of property or conduct of its business requires such qualification and where a failure to be qualified could reasonably be expected to cause a Material Adverse Change.    Each Guarantor is a corporation, limited liability company, or limited partnership duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation and in good standing and qualified to do business in each jurisdiction where its ownership or lease of property or conduct of its business requires such qualification and where a failure to be qualified could reasonably be expected to cause a Material Adverse Change.    Each Subsidiary of any Credit Party has executed

a Guaranty and otherwise complied with the requirements of Section 5.8. Schedule 4.1 lists each Subsidiary of each Credit Party, its jurisdiction and type of organization, and the owners of the equity interests in such Subsidiary.

Section 4.2.    Corporate Power; Authorization; No Violation.

(a)    The execution, delivery, and performance by the Borrower of this Agreement, the Notes, and the other Credit Documents to which it is a party and by the Guarantors of the Guaranties and the consummation of the transactions contemplated hereby and thereby (including the White Oak Acquisition) (i) are within the Borrower's and the Guarantors' corporate, limited liability, or limited partnership powers, (ii) have been duly authorized by all necessary corporate, limited liability, or limited partnership action, (iii) do not contravene (A) the Borrower's or any Guarantor's certificate or articles of incorporation or formation or by-laws, limited liability company agreement or other governing documents or (B) any law or any material contractual restriction binding on or affecting the Borrower or any Guarantor, and (iv) will not result in or require (A) the creation or imposition of any Lien prohibited by this Agreement or (B) any preferential right, right of first refusal, consent right, or similar right of a counterparty under any material contract.

(b)    At the time of each Borrowing, such Borrowing and the use of the proceeds of such Borrowing (i) will be within the Borrower's limited liability company powers, (ii) will have been duly authorized by all necessary limited liability company action on the part of the Borrower, (iii) will not contravene (A) the Borrower's certificate of formation or limited liability company agreement or (B) any law or any material contractual restriction binding on or affecting the Borrower, and (iv) will not result in or require the creation or imposition of any Lien prohibited by this Agreement.

Section 4.3.    Authorization and Approvals.    No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or third party is required for the due execution, delivery, and performance by the Borrower of this Agreement, the Notes, or the other Credit Documents to which the Borrower is a party or by each Guarantor of this Agreement, its Guaranty or the other Credit Documents to which it is a party, or the consummation of the transactions contemplated thereby, except for (i) those that have already been obtained or made, (ii) routine consents, authorizations, filings and notices required to be made in the ordinary course of business, (iii) the filing of UCC-1 or UCC-3 financing statements in the appropriate filing offices, and (iv) filings required pursuant to Section 5.8 in connection with new Subsidiaries or Section 5.11 and Section 5.12 in connection with the mortgaging of additional Oil and Gas Properties). At the time of each Borrowing, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or third party will be required for such Borrowing or the use of the proceeds of such Borrowing.

Section 4.4.    Enforceable Obligations.    This Agreement, the Notes, and the other Credit Documents to which the Borrower is a party have been duly executed and delivered by the Borrower, and this Agreement, the Guaranties and the other Credit Documents to which any Guarantor is a party have been duly executed and delivered by such Guarantor. Each Credit Document is the legal, valid, and binding obligation of the Borrower and each Guarantor which is a party to it enforceable against the Borrower and each such Guarantor in accordance with its

50

terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar law affecting creditors' rights generally and by general principles of equity.

Section 4.5.    <u>Financial Statements</u>.    The financial statements most recently delivered pursuant to <u>Sections 5.6(a)</u> or <u>5.6(b)</u>, copies of which have been furnished to each Bank, fairly present in all material respects the consolidated financial condition of the Credit Parties, as at such date and the consolidated results of the operations of the Credit Parties, for the period ended on such date, and such consolidated balance sheets and consolidated statements of operations, cash flow, and stockholders' equity were prepared in accordance with GAAP.

Section 4.6.    <u>True and Complete Disclosure</u>.

(a)    All factual information (excluding estimates, projections and pro forma financial information) heretofore or contemporaneously furnished by or on behalf of the Borrower or any other Credit Party in writing to any Bank or the Agent for purposes of or in connection with this Agreement, any other Credit Document or any transaction contemplated hereby or thereby is true and correct in all material respects on the date as of which such information is dated or certified and does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein not misleading as of the date of this Agreement, in light of the circumstances under which they were made.    All projections, estimates, and pro forma financial information heretofore or contemporaneously furnished by the Borrower or any other Credit Party were prepared in good faith on the basis of assumptions, data, information, tests, or conditions believed to be reasonable at the time such projections, estimates, and pro forma financial information were furnished.

(b)    All factual information (excluding estimates, projections and pro forma financial information) furnished by or on behalf of the Borrower or any other Credit Party in writing to any Bank or the Agent after the Effective Date for purposes of or in connection with this Agreement, any other Credit Document or any transaction contemplated hereby or thereby is true and correct in all material respects on the date as of which such information is dated or certified and does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein not misleading, in light of the circumstances under which they were made.    All projections, estimates, and pro forma financial information furnished by the Borrower or any other Credit Party after the Effective Date were prepared in good faith on the basis of assumptions, data, information, tests, or conditions believed to be reasonable at the time such projections, estimates, and pro forma financial information were furnished.

Section 4.7.    <u>Litigation</u>.    There is no pending or, to the Knowledge of any Knowledge Party, threatened action, proceeding, or investigation affecting the Borrower or any other Credit Party before any court, Governmental Authority or arbitrator, which (a) could reasonably be expected to cause a Material Adverse Change, or (b) purports to affect the legality, validity, binding effect, or enforceability of this Agreement, any Note, or any other Credit Document.

Section 4.8.    <u>Use of Proceeds</u>.    All Advances and Letters of Credit shall be used (a) to partially finance the purchase price for the White Oak Acquisition, (b) to pay costs and expenses

related to the White Oak Acquisition and the credit facility evidenced by this Agreement, and (c) for working capital, capital expenditures, exploration costs and expenses, and general corporate purposes of the Borrower and its Subsidiaries (including without limitation to finance the acquisition of Oil and Gas Properties, equipment, data and other assets reasonably related to the Credit Parties' business). The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U). No proceeds of any Advance will be used to purchase or carry any margin stock in violation of Regulation U or X.

Section 4.9. <u>Investment Company Act</u>. Neither the Borrower nor any other Credit Party is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 4.10. <u>Taxes</u>. Proper and accurate (in all material respects) federal, state, local, and foreign tax returns, reports and statements required to be filed (after giving effect to any extension granted in the time of filing) by or on behalf of the Borrower, any other Credit Party, or any member of the Controlled Group (hereafter collectively called the "<u>Tax Group</u>") have been duly filed on a timely basis or appropriate extensions has been obtained with appropriate governmental agencies in all jurisdictions in which such returns, reports, and statements are required to be filed, except where the failure to so file would not be reasonably expected to cause a Material Adverse Change; and all taxes (which are material in amount) and other impositions due and payable have been timely paid prior to the date on which any fine, penalty, interest, late charge, or loss may be added thereto for non-payment thereof, except where contested in good faith by appropriate proceedings. The reserves for accrued taxes reflected in the financial statements delivered to the Banks under this Agreement are adequate in the aggregate for the payment of all unpaid taxes, whether or not disputed, for the period ended as of the date thereof and for any period prior thereto, and for which the Tax Group may be liable in its own right, as withholding agent or as a transferee of the assets of, or successor to, any Person, except for such taxes or reserves therefor, the failure to pay or provide for which does not and could not cause a Material Adverse Change. Timely payment of all material sales and use taxes required by applicable law has been made by the Borrower and all other members of the Tax Group.

Section 4.11. <u>ERISA Compliance</u>.

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state laws. Each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service. To the Knowledge of any Knowledge Party, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)     There are no pending or, to the Knowledge of any Knowledge Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Change. There has been no

prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Change.

(c)    (i) No ERISA Event has occurred, and neither any Credit Party nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) each Credit Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither any Credit Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; (iv) neither any Credit Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither any Credit Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d)    Neither any Credit Party nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan other than Pension Plans not otherwise prohibited by this Agreement.

Section 4.12.  <u>Condition of Property; Casualties</u>.  The material Properties used or to be used in the continuing operations of the Borrower and each other Credit Party are in all material respects in good repair, working order and condition.  Since the date of the Financial Statements, neither the business nor the material Properties of the Borrower and each other Credit Party, taken as a whole, has experienced a Material Adverse Change or has been materially and adversely affected as a result of any fire, explosion, earthquake, flood, drought, windstorm, accident, strike or other labor disturbance, embargo, requisition or taking of property or cancellation of contracts, permits, or concessions by a Governmental Authority, riot, activities of armed forces, or acts of God or of any public enemy.

Section 4.13.  <u>No Burdensome Restrictions; No Defaults</u>.  Neither the Borrower nor any other Credit Party is a party to any indenture, loan, or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate restriction or provision of applicable law or governmental regulation which could reasonably be expected to cause a Material Adverse Change.  The Borrower and the Guarantors are not in default under or with respect to any contract, agreement, lease, or other instrument to which the Borrower or any Guarantor is a party and which could reasonably be expected to cause a Material Adverse Change.  Neither the Borrower nor any Guarantor has received any notice of default under any material contract, agreement, lease, or other instrument to which the Borrower or such Guarantor is a party.  No Default has occurred and is continuing.

Section 4.14.  <u>Environmental Condition</u>.

(a)    Permits, Etc.    The Borrower and each other Credit Party (i) has obtained all Environmental Permits material to the ownership and operation of its respective Properties and the conduct of its respective businesses; (ii) has been and is in compliance in all material respects with all terms and conditions of such Environmental Permits and with all other applicable Environmental Laws; (iii) has not received written notice of any unresolved violation or alleged violation of any Environmental Law or Environmental Permit; and (iv) is not subject to any actual or contingent Environmental Claim, which could reasonably be expected to cause a Material Adverse Change.

(b)    Certain Liabilities.    None of the present or, to the Knowledge of any Knowledge Party, previously owned or operated Property of the Borrower, any of the other Credit Parties, or any of their respective present or former Subsidiaries, wherever located, (i) has been placed on or proposed to be placed on the National Priorities List, the Comprehensive Environmental Response Compensation Liability Information System list, or their state or local analogs, or have been otherwise investigated, designated, listed, or identified as a potential site for any material removal, remediation, cleanup, closure, restoration, reclamation, or other response activity under any Environmental Laws; (ii) is subject to a Lien, arising under or in connection with any Environmental Laws, that attaches to any revenues or to any Property owned or operated by the Borrower or any other Credit Party, wherever located, which could reasonably be expected to cause a Material Adverse Change; or (iii) has been the site of any Release of Hazardous Substances or Hazardous Wastes from present or past operations which has caused at the site or at any third-party site any condition that has resulted in or could reasonably be expected to result in the imposition of any Response, notice, or investigation obligations on the Borrower or any other Credit Party under applicable Environmental Law that would cause a Material Adverse Change.

(c)    Certain Actions.    Without limiting the foregoing, except for matters that will not result in a Material Adverse Change: (i) all necessary notices have been properly filed, and no further action is required under current Environmental Law as to each Response or other restoration or remedial project undertaken by the Borrower, any other Credit Party, or their present or former Subsidiaries on any of their presently or formerly owned or operated Property and (ii) the present and, to the Knowledge of any Knowledge Party, future liability, if any, of the Borrower and any other Credit Party which could reasonably be expected to arise in connection with requirements under Environmental Laws.

Section 4.15.    Permits, Licenses, Etc.; Compliance with Laws.    Except for Environmental Permits, which are addressed in Section 4.14(a), each of the Borrower and each other Credit Party possesses (a) all permits and licenses which are material to the conduct of its business and (b) except where the failure to possess the same could not reasonably be expected to result in a Material Adverse Change, all patents, patent rights or patent licenses, trademarks, trademark rights, trade names rights and copyrights necessary for the conduct of its business. Each of the Borrower and each other Credit Party manages and operates its business in accordance with all applicable Legal Requirements and good industry practices, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

Section 4.16.    Gas Contracts.    Neither the Borrower nor any other Credit Party, as of the date hereof, (a) is obligated in any material respect by virtue of any prepayment made under any

contract containing a "take-or-pay" or "prepayment" provision or under any similar agreement to deliver hydrocarbons produced from or allocated to any of the Borrower's consolidated Oil and Gas Properties at some future date without receiving full payment therefor at the time of delivery, or (b) has produced gas, in any material amount, subject to, and none of the Borrower's consolidated Oil and Gas Properties is subject to, balancing rights of third parties or subject to balancing duties under governmental requirements, except as to such matters for which the Borrower or such other Credit Party has established monetary reserves adequate in amount in accordance with GAAP to satisfy such obligations.

Section 4.17.    Title to Properties, Liens, Leases, Etc.

(a)    Except as is being cured pursuant to Section 5.12, Borrower and the other Credit Parties (i) have good and marketable title (as is customary in the oil and gas industry) to all Borrowing Base Assets, free and clear of all Liens, except for Permitted Borrowing Base Liens, and (ii) have good and marketable title to all material assets reflected in the financial statements most recently delivered pursuant to Section 5.6(a) or Section 5.6(b), free and clear of all Liens, except for Permitted Liens.

(b)    On the date of this Agreement, (i) with respect to the Mortgages, all governmental actions and all other filings, recordings, registrations, material third party consents and other actions which are necessary as of such date to create and perfect the Liens provided for in the Mortgages will have been made, obtained and taken in all relevant jurisdictions and (ii) with respect to the Security Agreement, (A) all UCC-1 financing statements which are necessary as of such date to create and perfect the Liens provided for in the Security Agreement will have been made, obtained and taken in all relevant jurisdictions and (B) all actions necessary to grant control over the Pledged Securities (as defined in the Security Agreement) have been taken.

(c)    All leases and agreements for the conduct of business of the Credit Parties are valid and subsisting, in full force and effect, and there exists no default or event of default or circumstance which with the giving of notice or lapse of time or both would give rise to a default under any such leases or agreements, in each case which could reasonably be expected to cause a Material Adverse Change.

(d)    No Credit Party is a party to any agreement or arrangement (other than this Agreement, the Security Documents, and the documents evidencing Debt referred to in Section 6.2(c)), or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to secure the Obligations against their respective assets or Properties.

Section 4.18.    Mineral Interests.

(a)    Except for Permitted Borrowing Base Liens, all Borrowing Base Assets are valid, subsisting, and in full force and effect, and all rentals, royalties, and other amounts due and payable in respect thereof have been duly paid.

(b)    Without regard to any consent or non-consent provisions of any joint operating agreement covering Borrower's or any Guarantor's Proved Mineral Interests, and except for Permitted Borrowing Base Liens, Borrower's and each Guarantor's share of (i) the costs for each

Borrowing Base Asset is not greater than the decimal fraction set forth in the most recently delivered Oil and Gas Reserve Report, before and after payout, as the case may be, and described therein by the respective designations "working interests", "WI", "gross working interest", "GWI", or similar terms, and (ii) production from, allocated to, or attributed to each such Borrowing Base Asset is not less than the decimal fraction set forth in such Oil and Gas Reserve Report, before and after payout, as the case may be, and described therein by the designations "net revenue interest," "NRI," or similar terms.

(c)     Each well drilled in respect of proved producing reserves described in the most recently delivered Oil and Gas Reserve Report (i) is capable of, and was, as of the date of such Oil & Gas Reserve Report, producing Hydrocarbons in commercial quantities, and Borrower and each Guarantor (as applicable) is currently receiving payments for its share of production, with no funds in respect of any thereof being presently held in suspense, other than any such funds being held in suspense pending delivery of appropriate division orders, and (ii) to Knowledge of any Knowledge Party, has been drilled, bottomed, completed, and operated in compliance in all material respects with applicable Legal Requirements and no such well which is currently producing Hydrocarbons is subject to any penalty in production by reason of such well having produced in excess of its allowable production.

Section 4.19.   Material Adverse Change.  Since the Effective Date, no Material Adverse Change has occurred.

# ARTICLE V

# AFFIRMATIVE COVENANTS

So long as any Note or any amount under any Credit Document shall remain unpaid, any Letter of Credit shall remain outstanding, or any Bank shall have any Commitment hereunder, the Credit Parties agree to comply with the following covenants.

Section 5.1.   Compliance with Laws, Etc.  Each Credit Party shall comply, with all Legal Requirements except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.  Without limiting the generality and coverage of the foregoing, each Credit Party shall comply with all Environmental Laws and all laws, regulations, or directives with respect to equal employment opportunity and employee safety in all jurisdictions in which such Credit Party does business, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change; provided, however, that this Section 5.1 shall not prevent the any Credit Party from, in good faith and with reasonable diligence, contesting the validity or application of any such laws or regulations by appropriate legal proceedings.

Section 5.2.   Maintenance of Insurance.

(a)     Required Insurance Coverage.  Each Credit Party shall maintain property and physical damage insurance on selected real and personal property on an all risks basis (including the perils of flood and quake on a sub-limited basis), covering the repair and replacement cost of all such selected property.  Each Credit Party shall also maintain commercial general liability

and excess liability insurance and products/completed operations liability coverage.  Each of the policies described in this clause (a) shall be of the kinds and in the amounts customarily carried or maintained by Persons of established reputation engaged in similar businesses and owning similar properties in the same general areas in which such Credit Party operates.  All such insurance shall be provided by insurers having a minimum A.M. Best policyholders rating of A-, VII or better.  No Credit Party shall bring or keep any article on any business location of any Credit Party, or cause or allow any condition to exist, if the presence of such article or the occurrence of such condition would reasonably cause the invalidation of any insurance required by this Section 5.2, or would otherwise be prohibited by the terms thereof.

(b)    Loss Payee; Additional Insured.

(i)    On or prior to the Effective Date, and at all times thereafter, each Credit Party shall cause Agent to be named as (A) an additional insured on each liability policy required to be maintained pursuant to this Section 5.2, and (B) loss payee (which shall include, as applicable, identification as mortgagee) on each property and physical damage policy required to be maintained pursuant to this Section 5.2 for any Property Proceeds in respect of Mortgaged Properties.

(ii)    If (A) Agent receives Property Proceeds in its capacity as loss payee, (B) no Default or Event of Default exists at such time, and (C) such Property Proceeds are not required to be applied as a prepayment under the terms of this Agreement, Agent will remit such Property Proceeds to Borrower within fifteen days after receipt.

(iii)    All loss payee and additional insured endorsements must be in form and substance reasonably acceptable to Agent.

(c)    Evidence of Insurance Coverage.  Borrower shall deliver to Agent on the Effective Date, an Insurance Certificate from Borrower's insurance broker in effect on such date showing the amount of coverage under all such policies as of such date, showing the endorsements required above, and showing waivers of all rights of subrogation against all loss payees and additional insureds.  Each such Insurance Certificate will also indicate that each additional insured and loss payee will be given at least 30 days' written notice of the cancellation, termination, reduction in amount or material change in coverage to any part of any applicable policy.  Annually, on or prior to October 1, Borrower shall provide Insurance Certificates for all of its insurance policies as of September 1 of such year and such additional information as to the applicable policies as is reasonably requested by any Bank.  Borrower will deliver to Agent, (i) within 15 days after receipt of notice from any insurer, a copy of any notice of cancellation or material change in coverage from that existing under the applicable policy immediately prior to such notice, (ii) as soon as possible but no later than September 1 of any year, notice of any cancellation or nonrenewal of any insurance policy by the applicable insurer, if such policy has not been renewed or replaced with a substantially similar policy, effective as of September 1 of such year, and (iii) notice of any cancellation or nonrenewal of any insurance policy by Borrower as soon as possible but no later than September 1 of any year.

Section 5.3.    Preservation of Corporate Existence, Etc.  Each Credit Party shall preserve and maintain, its corporate existence, rights, franchises, and privileges in the jurisdiction of its

incorporation, and qualify and remain qualified as a foreign corporation in each jurisdiction in which qualification is necessary or desirable in view of its business and operations or the ownership of its properties, and, in each case, where failure to qualify or preserve and maintain its rights and franchises could reasonably be expected to cause a Material Adverse Change; provided, however, that nothing herein contained shall prevent any transaction permitted by Section 6.4.

Section 5.4.    Payment of Taxes, Claims, Etc.    Each Credit Party shall pay and discharge, before the same shall become delinquent, (a) all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits or Property that are material in amount, prior to the date on which penalties attach thereto and (b) all lawful claims in excess of $250,000 which, if unpaid, might by law become a Lien upon its Property; provided, however, that neither the Borrower nor any such other Credit Party shall be required to pay or discharge any such tax, assessment, charge, or levy which is being contested in good faith and by appropriate proceedings, and with respect to which reserves required by GAAP have been provided.

Section 5.5.    Visitation Rights.    At any reasonable time and from time to time, upon reasonable notice, each Credit Party shall permit the Agent and any Bank or any of its agents or representatives thereof, to (a) examine and make copies of and abstracts from the records and books of account of, and visit and inspect at its reasonable discretion the properties of, such Credit Party, and (b) discuss the affairs, finances and accounts of such Credit Party with any of its respective officers or directors; provided however, the Agent or the Bank for whose benefit such inspection and visitation is made assumes sole responsibility for the condition of any property of such Credit Party so visited and inspected, the access and egress thereto (including, but not limited to wharves, docks, and helicopter landing areas), and any vice or defect therein or thereon, and assumes all responsibility for and hereby releases and indemnifies the Borrower, its Affiliates, and their officers, directors, employees, and agents, and in the case of a non-operated Property, the operator, the non-operating interest owners, and their officers, directors, employees, and agents, against any claim for damage or injury to or by the Agent or such Bank (or the representatives thereof) or to such Credit Party's property which may be occasioned by such inspection and visitation of such Credit Party's property.

Section 5.6.    Reporting Requirements.    The Borrower shall furnish to the Agent and each Bank:

(a)    Annual Financials.    As soon as available and in any event not later than 120 days after the end of each fiscal year of the Borrower, (i) a copy of the annual audit report for such year for the Credit Parties, including therein the consolidating balance sheets of the Credit Parties as of the end of such fiscal year and consolidating statements of operations, cash flows, and stockholders' equity of the Credit Parties for such fiscal year, in each case certified by Hein and Associates LLP or other independent certified public accountants of national standing and including any management letters delivered by such accountants to the Borrower in connection with such audit, (ii) the capital budget for the Credit Parties established by the Board of Directors of the Borrower for the next fiscal year, in reasonable detail by geographical area and type of expenditure, and (iii) a Compliance Certificate executed by a Responsible Officer of the Borrower;

(b)    <u>Quarterly Financials</u>.  As soon as available and in any event not later than 60 days after the end of each of the four quarters of each fiscal year of the Borrower, (i) the unaudited consolidating balance sheet of the Credit Parties as of the end of such quarter and the consolidating statements of operations and cash flows of the Credit Parties for the period commencing at the end of the previous year and ending with the end of such quarter, all in reasonable detail and duly certified with respect to such consolidating statements (subject to year-end audit adjustments) by a Responsible Officer of the Borrower as having been prepared in accordance with GAAP, and (ii) a Compliance Certificate executed by a Responsible Officer of the Borrower;

(c)    <u>Oil and Gas Reserve Reports</u>.

(i)    As soon as available but in any event on or before March 31 of each year, an engineering report in form and substance acceptable to Agent, certified by a firm or firms of independent consulting petroleum engineers approved by the Agent as fairly setting forth (A) the proved and producing, shut in, behind pipe, and undeveloped oil and gas reserves (separately classified as such) attributable to the Credit Parties' consolidated Oil and Gas Properties as of December 31 of the previous year, (B) the aggregate present value, determined on the basis of pricing assumptions specified by the Agent and the Banks, of the future net income with respect to such Oil and Gas Properties, discounted at a 9% per annum discount rate, and (C) projections of the annual rate of production, gross income, and net income with respect to such Oil and Gas Properties.

(ii)    As soon as available but in any event on or before September 30 of each year, an internal engineering report in form and substance satisfactory to the Agent, certified by a Responsible Officer of the Borrower, to such Responsible Officer's Knowledge and not in such Responsible Officer's individual capacity, as fairly setting forth (A) the proved and producing, shut in, behind pipe, and undeveloped oil and gas reserves (separately classified as such) attributable to the Credit Parties' consolidated Oil and Gas Properties as of June 30 of such year, (B) the aggregate present value, determined on the basis of pricing assumptions specified by the Agent and the Banks, of the future net income with respect to such Oil and Gas Properties, discounted at a 9% per annum discount rate, and (C) projections of the annual rate of production, gross income, and net income with respect to such Oil and Gas Properties.

(iii)    Each engineering report delivered pursuant to clause (i) or (ii) above or clause (iv) below shall be accompanied by a certificate, executed by a Responsible Officer of the Borrower in the form of <u>Exhibit G</u> attached hereto, which (A) sets forth the Mortgaged Property Value, as set forth in such engineering report (which Mortgaged Property Value shall exclude any Oil and Gas Property Value allocated to Oil and Gas Properties, the record title to which has been acquired by the Borrower or any Guarantor since the most recent Mortgages that would encumber the property where such Oil and Gas Properties are located were filed) and (B) either (y) demonstrates and certifies that such Mortgaged Property Value equals 85% of the Oil and Gas Property Value as set forth in such engineering report or (z) demonstrates and certifies the amount by which such Mortgaged Property Value is less than 85% of such Oil and Gas Property Value and

agrees that the Borrower shall take all actions required under Section 5.11 hereof within the period required by such Section.

(iv)    (A) At least 10 days prior to the consummation of any sale, lease, transfer, or other disposition, whether or not in the ordinary course of business, by the Borrower or any Guarantor of any Mortgaged Property for which the value of the future net income attributed thereto in the most recently delivered engineering report (individually or on a cumulative basis with all sales of Mortgaged Properties consummated since the date of such report) comprised in excess of 5% of the Mortgaged Property Value as set forth in such report, (B) at least 10 days prior to the consummation of any acquisition by the Borrower or any Guarantor of any Oil and Gas Property for which the value of the future net income attributed thereto in the engineering reports obtained in connection with such acquisition (individually or on a cumulative basis with all acquisitions of Oil and Gas Properties consummated since the date of such report) comprises in excess of 5% of the Oil and Gas Property Value as set forth in the engineering report most recently delivered under this Agreement, and (C) no later than 10 days following the written request of the Agent (provided that, so long as no Event of Default exists, the Agent shall not make more than one such request in any calendar year), the Borrower shall provide (y) an updated internal engineering report, current as of the end of the month then most recently ended for which production data is available and in form and substance satisfactory to the Agent, setting forth the information required by clause (ii) above for internal engineering reports and (z) a certificate as required by clause (iii) above which, in the case of any disposition of any Mortgaged Property or acquisition of any Oil and Gas Property, shall make the required calculation giving pro forma effect to such transaction (including, in the case of any disposition of any Mortgaged Property, the inclusion of any additional Oil and Gas Properties mortgaged by the Borrower or the Guarantors pursuant to Section 6.2(b)(ii) prior to or concurrently with such disposition).

(d)    Defaults.    As soon as possible and in any event within five days after the occurrence of each Default becomes Known to any Knowledge Party which is continuing on the date of such statement, a statement of a Responsible Officer of the Borrower setting forth the details of such Default and the actions which the Borrower has taken and proposes to take with respect thereto;

(e)    ERISA Events.    As soon as possible and in any event within five days after the occurrence of each ERISA Event becomes Known to any Knowledge Party which is continuing on the date of such statement, a statement of a Responsible Officer of the Borrower setting forth the details of such ERISA Event and the actions which the Borrower has taken and proposes to take with respect thereto;

(f)    Other ERISA Notices.    Promptly and in any event within five Business Days after receipt thereof by the Borrower or any member of the Controlled Group from a Multiemployer Plan sponsor, a copy of each notice received by the Borrower or any member of the Controlled Group concerning the imposition or amount of withdrawal liability pursuant to Section 4202 of ERISA;

(g)    <u>Environmental Notices</u>.  Promptly upon the receipt thereof by the Borrower or any other Credit Party, a copy of any form of notice, investigation, summons or citation received from the EPA, or any other Governmental Authority, concerning (i) violations or alleged violations of Environmental Laws, which seeks to impose liability on the Borrower or any other Credit Party or in relation to their respective Oil and Gas Properties in excess of $250,000, (ii) any action or omission on the part of the Borrower, any other Credit Party or any of their present or former Subsidiaries in connection with Hazardous Waste or a Release of Hazardous Substances which could reasonably result in the imposition of liability on the Borrower or any other Credit Party or in relation to their respective Oil and Gas Properties in excess of $250,000, including without limitation any notice of potential responsibility under CERCLA, or (iii) concerning the filing of a Lien upon, against or in connection with the Borrower, any other Credit Party, or their present or former Subsidiaries, or any of their leased or owned Property, wherever located, pursuant to Environmental Laws;

(h)    <u>Other Governmental Notices</u>.  Promptly and in any event within five Business Days after receipt thereof by any Credit Party, a copy of (i) any notice, summons, citation, or proceeding seeking to modify in any material respect, revoke, or suspend any material contract, license, permit, or agreement with any Governmental Authority (including material Environmental Permits) and (ii) any other material notice from any Governmental Authority;

(i)    <u>Material Changes</u>.  Prompt written notice of any condition or event which becomes Known to any Knowledge Party, which condition or event has resulted or may reasonably be expected to result in a Material Adverse Change or;

(j)    <u>Disputes, Etc</u>.  Prompt written notice of any claims, proceedings, or disputes, or to the Knowledge of any Knowledge Party threatened claims, proceedings or disputes, affecting any Credit Party which could reasonably be expected to cause a Material Adverse Change, or any material labor controversy of which any Knowledge Party has Knowledge resulting in or reasonably considered to be likely to result in a strike against any Credit Party; and

(k)    <u>Other Information</u>.  Such other information respecting the business or Properties, or the condition or operations, financial or otherwise, of any Credit Party, as any Bank through the Agent may from time to time reasonably request.  The Agent agrees to provide the Banks with copies of any material notices and information delivered solely to the Agent pursuant to the terms of this Agreement.

(l)    <u>Notices regarding Oil and Gas Properties</u>.  Prompt, but in any event at least 10 days prior to the consummation thereof, written notice of (i) any sale, lease, transfer, or other disposition, whether or not in the ordinary course of business, by any Credit Party of any Mortgaged Property and (ii) any acquisition by any Credit Party of any Oil and Gas Property for which the value of the future net income attributed thereto in the engineering reports obtained in connection with such acquisition (individually or on a cumulative basis with all acquisitions of Oil and Gas Properties consummated since the date of such report) comprises in excess of 5% of the Oil and Gas Property Value as set forth in the engineering report most recently delivered under this Agreement.

(m)    <u>Financials in Connection with a Permitted Acquisition</u>. Prior to the consummation of a Permitted Acquisition of the capital stock of any Person for consideration of more than $2,000,000, the audited or, if the audited is unavailable, the unaudited balance sheet of the acquired Person (or part thereof) as of the most recently ended calendar quarter for which financial statements are available and related statements of income and cash flows for the most recently ended four calendar quarters for which financial statements are available and, if available, for the calendar months ended in the calendar quarter during which such Permitted Acquisition occurs or, in the event all or some of such financial statements are not available, financial information as reasonably requested by the Agent.

Section 5.7.    <u>Maintenance of Property</u>.  Each Credit Party shall maintain its material Properties used or to be used in the continuing operations of the Credit Parties in all material respects in good repair, working order, and condition; and shall abstain from, and not knowingly or willfully permit the commission of waste or other injury, destruction, or loss of natural resources, or the occurrence of pollution, contamination, or any other condition in, on or about the owned or operated property involving the Environment that could reasonably be expected to result in Response activities the costs of which would result in a Material Adverse Change.

Section 5.8.    <u>New Subsidiaries</u>.  Prior to the creation or acquisition of any Subsidiary after the date of this Agreement, the Credit Parties shall give 10 days prior written notice of such new Subsidiary to the Agent.  Simultaneously with such creation or acquisition, the Credit Parties shall cause (a) such Subsidiary to execute and deliver to the Agent a Guaranty (or joinder to an existing Guaranty) with such changes as the Agent may reasonably request, (b) such Subsidiary to execute and deliver to the Agent a Security Agreement (or joinder to an existing Security Agreement) with such changes as the Agent may reasonably request, (c) if such Subsidiary holds Oil and Gas Properties, and if the Mortgaged Property Value as set forth in the certificate of such value delivered in connection with the most recently delivered engineering report is less than 85% of the Oil and Gas Property Value (after giving effect to such new Subsidiary's Oil and Gas Properties), such Subsidiary to execute and deliver to the Agent a Mortgage or Mortgages granting an Acceptable Security Interest in such Oil and Gas Properties, (d) each equity holder of such Subsidiary to execute and deliver a supplement or joinder to its Security Agreement evidencing its pledge of the equity of such Subsidiary, (e) such Subsidiary and such equity holders to deliver to the Agent evidence of corporate authority to enter into such documentation as the Agent may reasonably request, including, without limitation, if requested by Agent, a legal opinion regarding the enforceability of such documentation, and (f) such Subsidiary and such equity holders to deliver to the Agent such other documentation, or authorize Agent to take such other action, as is reasonably requested by Agent.

Section 5.9.    <u>Maintenance of Books and Records; Fiscal Year</u>.  Each Credit Party shall (a) maintain proper books of record and account, in which full, true, and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Credit Party, and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Credit Party.  Each Credit Party shall cause its fiscal year to begin on January 1 of each year and end on December 31 of such year.

Section 5.10.  Use of Proceeds.  The Borrower shall, and shall cause the other Credit Parties to, use all Advances and Letters of Credit (a) to partially finance the purchase price for the White Oak Acquisition, (b) to pay costs and expenses related to the credit facility evidenced by this Agreement and the White Oak Acquisition, and (c) for working capital, capital expenditures, and general corporate purposes of the Credit Parties (including the issuance of Letters of Credit and capital expenditures).

Section 5.11.  Agreement to Mortgage; Further Assurances.

(a)     If any certificate delivered pursuant to Section 5.6(c)(iii) or (iv) demonstrates that the Mortgaged Property Value as set forth in the related engineering report is less than 85% of the Oil and Gas Property Value as set forth in such report, the Credit Parties shall (i) promptly, but in any event within 60 days of the delivery of such certificate, grant to the Agent an Acceptable Security Interest in (A) additional Oil and Gas Properties of the Borrower or the Guarantors as necessary to cause the Mortgaged Property Value to equal 85% of the Oil and Gas Property Value, together with all related equipment and (B) the Borrower's and the Guarantors' contracts related to such additional Mortgaged Properties (unless the granting of a security interest in any such contract requires the consent of the applicable counterparty, in which case the Borrower or applicable Guarantor shall grant such security interest upon receipt of such consent), and (ii) promptly, but in any event within 90 days of the delivery of such certificate (A) perform such title review, title opinions, and title clean-up as are reasonably requested by the Agent with respect to such additional Mortgaged Properties, (B) use commercially reasonable efforts to obtain consents from contract counterparties with respect to each such additional Mortgaged Contract that is material to (y) the Credit Parties' business or financial condition or (z) the operation and ownership of the additional Mortgaged Property to which it relates (including without limitation production, transportation, and marketing of oil and gas produced therefrom), in each case, to the extent such material Mortgaged Contract prohibits or restricts assignment of the applicable Credit Party's rights thereunder to the Agent, unless otherwise agreed by Agent and the Majority Banks, and (C) take such other actions, approve such other filings, provide such opinions of counsel, and execute and deliver such other documents as are reasonably requested by the Agent in connection with the foregoing.

(b)     The Credit Parties shall from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Credit Documents, or of more fully perfecting or renewing the rights of the Agent and the Banks with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Credit Party which may be part of the Collateral) pursuant hereto or thereto, including without limitation using commercially reasonable efforts to obtain consents from contract counterparties with respect to any future Mortgaged Contract that is material to (i) the Credit Parties' business or financial condition or (ii) the operation and ownership of the Mortgaged Property to which it relates (including without limitation production, transportation, and marketing of oil and gas produced therefrom), in each case, to the extent such material Mortgaged Contract prohibits or restricts assignment of the applicable Credit Party's rights thereunder to the Agent, unless otherwise agreed by Agent and the Majority Banks.  Upon the exercise by the Agent or any Bank of any power, right, privilege or remedy

pursuant to this Agreement or the other Credit Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, each Credit Party will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Agent or such Bank may be required to obtain from the Borrower or any other Credit Party for such governmental consent, approval, recording, qualification or authorization.

Section 5.12.    Title Information and Cure.

(a)    Within 60 days after the delivery to Agent and the Banks of each Oil and Gas Reserve Report required by Section 5.6, the Borrower shall deliver title opinions (or other evidence of title acceptable to Agent) showing title into the Borrower or another Credit Party, in form and substance reasonably acceptable to Agent, covering enough of the Oil and Gas Properties evaluated by such Oil and Gas Reserve Report that were not included in the immediately preceding Oil and Gas Reserve Report, so that Agent shall have received, together with title information previously delivered to Agent, reasonably satisfactory title information on at least 85% of the Oil and Gas Property Value.

(b)    Within 60 days after notice from Agent that title defects or exceptions (including defects or exceptions as to priority, but excluding Permitted Borrowing Base Liens) exist with respect to any Oil and Gas Properties, the Borrower shall either (i) cure any such title defects or exceptions, (ii) substitute acceptable Mortgaged Properties having an equivalent or greater value with no title defects or exceptions other than Permitted Borrowing Base Liens or (iii) deliver title opinions (or other evidence of title acceptable to Agent) showing title into the Borrower or another Credit Party, in form and substance acceptable to Agent, so that Agent shall have received, together with title information previously delivered to Agent, satisfactory title information on at least 85% of the Oil and Gas Property Value.

(c)    If Borrower is unable to cure any title defect requested by Agent to be cured within the 60-day period referred to in subsection (b) above or Borrower does not comply with the requirements to provide acceptable title information covering 85% of the Oil and Gas Property Value in accordance with subsection (b) above, such failure  shall not be an Event of Default, but instead Agent shall have the right to exercise the following remedy in its sole discretion from time to time while such condition persists, and any failure to so exercise this remedy at any such time shall not be a waiver as to future exercise of the remedy by Agent or the Banks. To the extent that Agent is not satisfied with title to any Mortgaged Property after the 60-day period has elapsed, such unacceptable Mortgaged Property shall not count towards the 85% requirement, and Agent may send a notice to Borrower and the Banks that the then outstanding Borrowing Base shall be reduced by 50% of the value given to such unacceptable Mortgaged Property in the most recently delivered Oil and Gas Reserve Report.

(d)    In addition to the foregoing requirements, on or prior to the one-year anniversary of the Effective Date, the Borrower shall deliver title opinions (or other evidence of title acceptable to Agent) showing the chain of title into the Borrower or another Credit Party, in form and substance acceptable to Agent, (i) covering Borrowing Base Assets that represent not less than 85% of the aggregate Oil and Gas Property Value and (ii) reflecting that the Borrower and

the other Credit Parties have good and marketable title to all such Borrowing Base Assets, free and clear of all Liens except Permitted Borrowing Base Liens.

Section 5.13.   <u>Accounts</u>. The Borrower shall promptly deposit, or cause to be deposited, all proceeds of any sales of its assets and collections of its receivables into deposit or concentration accounts that are subject to an Acceptable Security Interest.

## ARTICLE VI

## NEGATIVE COVENANTS

So long as any Note or any amount under any Credit Document shall remain unpaid, any Letter of Credit shall remain outstanding, or any Bank shall have any Commitment, each Credit Party agrees to comply with the following covenants.

Section 6.1.   <u>Liens</u>.   No Credit Party shall create, assume, incur, or suffer to exist, or permit any of its Subsidiaries to create, assume, incur, or suffer to exist, any Lien on or in respect of any of its Property whether now owned or hereafter acquired, or assign any right to receive income, except that the Credit Parties may create, incur, assume, or suffer to exist:

(a)      Liens securing the Obligations;

(b)      Liens specified in the attached <u>Schedule 6.1</u> on the Property owned by the Borrower and the other Credit Parties which is specified therein securing only the obligations disclosed to be secured by such Liens therein and any renewals or extensions thereof, <u>provided</u> that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased, (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is otherwise permitted by the Agreement;

(c)      Liens securing indebtedness permitted under <u>Section 6.2(c)</u>, provided that each such Lien encumbers only the property acquired in connection with the creation of any such purchase money indebtedness and any renewals or extensions thereof, <u>provided</u> that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by <u>Section 6.2(c)</u>, (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by <u>Section 6.2(c)</u>;

(d)      Liens for taxes, assessments, or other governmental charges or levies that (i) are not yet due or (ii) provided foreclosure, distraint, sale, or other similar proceedings shall not have been initiated, are being contested in good faith by appropriate proceedings, and for which such reserve as may be required by GAAP shall have been made;

(e)      inchoate Liens in favor of vendors, purchasers, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, construction, or similar Liens arising by operation of law in the ordinary course of business in respect of obligations that are not yet due

or that are being contested in good faith by appropriate proceedings, provided such reserve as may be required by GAAP shall have been made therefor;

(f)     Liens to operators and non-operators under joint operating agreements arising in the ordinary course of the business of the Borrower or the relevant Credit Party to secure amounts owing, which amounts are not yet due or are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor;

(g)     easements, rights-of-way, restrictions, and other similar encumbrances, and minor defects in the chain of title, none of which interfere with the ordinary conduct of the business of Borrower or the relevant Credit Party or materially detract from the value or use of the Property to which they apply;

(h)     Liens to secure plugging and abandonment obligations;

(i)     Liens to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business, in an aggregate amount not to exceed $1,000,000;

(j)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a depository institution;

(k)     Liens arising from precautionary UCC filings relating to leases or consignments that are not Debt;

(l)     Liens consisting of contractual rights of set-off or netting incurred in the ordinary course of business;

(m)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA; and

(n)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 7.1(f).

For purposes of determining compliance with this Section 6.1, in the event that a Lien meets the criteria for more than one type of Lien described in this Section 6.1, the Credit Party which has created, incurred, assumed or suffered to exist the Lien, in its sole discretion, will classify such Lien and only be required to include the amount and type of such Lien in one of the above clauses of this Section 6.1.

Section 6.2.     Debts.  No Credit Party shall create, assume, suffer to exist, or in any manner become or be liable in respect of, any Debt except:

(a)     Debt of the Borrower and the other Credit Parties under the Credit Documents;

66

(b)      Debt of the Borrower and the other Credit Parties existing on the date hereof and disclosed in the attached <u>Schedule 6.2</u> and any extensions, rearrangements, modifications, renewal, and refinancings thereof which do not increase the principal amount thereof or the interest rate charged thereon above a market rate of interest;

(c)      Debt (including Capital Leases and purchase money obligations) relating to Property or assets acquired by the Borrower after the date of this Agreement not to exceed $1,500,000 at any time outstanding;

(d)      Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations, in each case provided in the ordinary course of business, including those to secure regulatory, health, safety, worker's compensation, environmental, and plugging and abandonment obligations;

(e)      Debt in the form of unsecured indebtedness not to exceed $2,000,000;

(f)      Debt for borrowed money owed by any Credit Party other than the Borrower to the Borrower or to any other Credit Party;

(g)      Debt in the form of obligations for the deferred purchase price of property or services incurred in the ordinary course of business which are not yet due and payable or are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been established;

(h)      Commodity Hedging Obligations not in violation of <u>Section 6.7</u>;

(i)      Debt in the form of trade payables or other similar obligations incurred in the ordinary course of business that are past due more than 60 days and are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been established;

(j)      other Debt not to exceed $25,000; and

(k)      any guarantee of any other Debt permitted to be incurred under clauses (a) through (j) above.

For purposes of determining compliance with this <u>Section 6.2</u>, in the event that an item of Debt meets the criteria for more than one type of Debt described in this <u>Section 6.2</u>, the Credit Party which has created, assumed, suffered to exist, or become liable for the item of Debt, in its sole discretion, will classify such Debt and only be required to include the amount and type of such Debt in one of the above clauses of this <u>Section 6.2</u>.

Section 6.3.      <u>Agreements Restricting Liens and Distributions</u>.  No Credit Party shall enter into any agreement (other than a Credit Document) which (a) except with respect to specific Property encumbered to secure payment of Debt related to such Property, imposes restrictions upon the creation or assumption of any Lien upon its Properties, revenues or assets, whether now owned or hereafter acquired or (b) limits Restricted Payments to or any advance by any of the Credit Parties other than Borrower to the Borrower.

Section 6.4.    <u>Merger or Consolidation; Asset Sales; Farm-Outs</u>.  No Credit Party shall:

(a) merge or consolidate with or into any other Person, except that any Credit Party may merge with any of its wholly owned Subsidiaries, and any such Credit Party's wholly owned Subsidiaries may merge with another of such Credit Party's wholly owned Subsidiaries; <u>provided</u> that, (x) immediately after giving effect to any such proposed transaction no Default would exist, and (y) in the case of any such merger to which the Borrower is a party, the Borrower is the surviving entity;

(b) sell, lease, transfer, or otherwise dispose of any of its Property (including pursuant to a farm-out, participation, or other agreement that would reduce such Credit Party's interest in any Property), except for (i) dispositions of assets that are not Borrowing Base Assets or Mortgaged Properties either (y) in the ordinary course of business or (z) outside of the ordinary course of business in an aggregate amount for any fiscal year not to exceed $1,000,000, and (ii) dispositions, whether or not in the ordinary course of business, of Borrowing Base Assets, including Mortgaged Properties, of which the Borrower has provided the Agent 10 days' advance notice, provided that (y) such proposed dispositions will not cause the aggregate outstanding amount of the Advances plus the Letter of Credit Exposure to exceed the Borrowing Base, after giving effect to any reduction of the Borrowing Base that would be required under <u>Section 2.2(e)</u> in connection with such sale, and (z) in the case of any disposition of a Mortgaged Property, at the time of such disposition the Mortgaged Property Value is not less than 85% of the Oil and Gas Property Value, as set forth in the engineering report most recently delivered pursuant to <u>Section 5.6(c)</u>, after giving effect to (1) any reduction of such present value (which shall be the present value given to such assets in such most recent engineering report, including the applicable stated discount utilized therein, in connection with such disposition) on a cumulative basis with all sales of Mortgaged Properties since the date of such report and (2) the aggregate present value, as set forth in such report or otherwise reasonably determined by the Agent and discounted at the applicable rate stated in such report, of any additional Oil and Gas Properties mortgaged by the Borrower or the Guarantors in accordance with the requirements of <u>Section 5.11</u> prior to or concurrently with such disposition (on a cumulative basis with all mortgages of additional Oil and Gas Properties since the date of such report); or

(c) enter into any contract that would obligate any Credit Party to sell, lease, transfer, or otherwise dispose of any interest in any of its Property pursuant to a farm-out, participation, or other similar agreement, unless such sale, lease, transfer, or other disposal would be permitted by <u>Section 6.4(b)</u> above.

Section 6.5.    <u>Restricted Payments</u>.  No Credit Party shall make or pay any Restricted Payment or make any prepayment, redemption, or defeasance of Debt (other than Debt under the Credit Documents) other than Restricted Payments from a Subsidiary of a Credit Party to a Credit Party; provided however, that any Credit Party may make a Restricted Payment if (a) no

Event of Default has occurred and is continuing or would result from such Restricted Payment and (b) the Majority Banks consent to such Restricted Payment, such consent not to be unreasonably withheld.

Section 6.6.    <u>Investments</u>.    No Credit Party shall make or permit to exist any loans, advances, or capital contributions to, or make any investment in, or purchase or commit to purchase any stock or other securities or evidences of indebtedness of or equity interests in any Person, except:

(a) Investments held by a Credit Party in the form of cash equivalents;

(b) Intercompany indebtedness among Credit Parties;

(c) trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and are payable in accordance with customary trade terms;

(d) ordinary course of business contributions, loans, or advances to, or investments in, (i) a directly or indirectly wholly owned Subsidiary of the Borrower, or (ii) the Borrower;

(e) oil and gas farm-ins, oil and gas development joint ventures and limited partnerships, and similar transactions, in each case, entered into in the ordinary course of business;

(f) investments funded entirely through equity contributions by the members of Holdco, provided that at the time of any such investment, no Event of Default exists;

(g) Permitted Acquisitions; and

(h) other investments in an aggregate outstanding amount not to exceed $1,000,000.

Section 6.7.    <u>Limitation on Hedging</u>.

(a) <u>Speculative Purposes</u>. No Credit Party shall purchase, assume, or hold a speculative position in any commodities market or futures market or enter into any Swap Contract for speculative purposes, as determined at the time such Swap Contract is entered into.

(b) <u>Additional Limitations</u>. The Borrower will not, nor will Borrower permit any other Credit Party to, enter into any Swap Contract which would cause the volume of Hydrocarbons with respect to which a settlement payment is calculated to exceed seventy-five percent (75%) of Borrower's anticipated monthly production during the period from the commencement of such Swap Contracts to such settlement date.

Section 6.8.    Affiliate Transactions.  Except as expressly permitted elsewhere in this Agreement, no Credit Party shall, make, directly or indirectly:  (a) any investment in any Affiliate (other than a Credit Party); (b) any transfer, sale, lease, assignment, or other disposal of any assets to any such Affiliate or any purchase or acquisition of assets from any such Affiliate (other than a Credit Party); or (c) any arrangement or other transaction directly or indirectly with or for the benefit of any such Affiliate (other than a Credit Party) (including without limitation guaranties and assumptions of obligations of an Affiliate); provided that each Credit Party may enter into any arrangement or other transaction with any such Affiliate providing for the leasing of property, the rendering or receipt of services or the purchase or sale of inventory and other assets in the ordinary course of business if the monetary or business consideration arising therefrom would be substantially as advantageous to such Credit Party as the monetary or business consideration which it would obtain in a comparable arm's length transaction with a Person not such an Affiliate.

Section 6.9.    Compliance with ERISA.  No Credit Party shall (a) terminate, or permit any member of its Controlled Group to terminate, any Plan so as to result in any material (in the opinion of the Majority Banks) liability of any Credit Party or of any of member of its Controlled Group to the PBGC or (b) permit to exist any occurrence of any Reportable Event (as defined in Title IV of ERISA), or any other event or condition, which presents a material (in the opinion of the Majority Banks) risk of such a termination by the PBGC of any Plan.

Section 6.10.    Maintenance of Ownership of Subsidiaries.  Except as permitted by Section 6.4, no Credit Party shall sell or otherwise dispose of any shares of capital stock of any of its Subsidiaries or permit any Subsidiary to issue, sell, or otherwise dispose of any shares of its capital stock or the capital stock of any of its Subsidiaries.

Section 6.11.    Sale-and-Leaseback.  No Credit  Party shall sell or transfer to a Person (other than a Credit Party) any property, whether now owned or hereafter acquired, if at the time or thereafter any Credit Party shall lease as lessee such property or any part thereof or other property which any Credit Party intends to use for substantially the same purpose as the property sold or transferred.

Section 6.12.    Change of Business.  No Credit Party shall materially change the character of its business as presently and normally conducted or engage in any type of business not related to their business as presently and normally conducted.

Section 6.13.    Subordinated Debt.    The credit parties (a) shall not violate the subordination terms governing any Debt which is by its terms subordinated to the Obligations and (b) shall not amend the subordination terms governing any such Debt without prior written consent of the Majority Banks.

Section 6.14.    Accounts.  The Credit Parties shall not deposit or maintain aggregate balances greater than $1,000 in any deposit, security or commodities accounts, that are not subject to Account Control Agreements that create an Acceptable Security Interest in such accounts; provided that this Section 6.14 shall not apply to any Royalty Disbursement or Suspense Account, or any deposit account exclusively used for payroll, payroll taxes and other

employee wage and benefit payments to or for the benefit of any Credit Party's salaried employees.

Section 6.15.  <u>Interest Coverage Ratio</u>.  The Credit Parties shall not permit the ratio, as of the last day of any fiscal quarter of Credit Parties, of (a) their Consolidated EBITDA for the four fiscal quarters most recently ended to (b) their Consolidated Interest Charges for the four fiscal quarters most recently ended, to be less than 3.00 to 1.00.

Section 6.16.  <u>Current Ratio</u>.  The Credit Parties shall not permit the ratio of, as of the last day of each fiscal quarter of the Credit Parties, beginning with the fiscal quarter ending September 30, 2010, (a) their consolidated current assets to (b) their consolidated current liabilities, to be less than 1.00 to 1.00. For purposes of this calculation (i) "current assets" shall include, as of the date of calculation, the Availability, (ii) "current assets" shall exclude, as of the date of calculation, (A) any cash deposited with or at the request of a counterparty to any Swap Contract or any other similar hedge arrangement and (B) any asset representing a valuation account arising from the application of SFAS 133 or 143, and (iii) "current liabilities" shall exclude, as of the date of calculation, the current portion of long term Debt existing under this Agreement and any liabilities representing a valuation account arising from the application of SFAS 133 and 143.

Section 6.17.  <u>Debt to EBITDA Ratio</u>.  The Credit Parties shall not permit the ratio, as of the last day of any fiscal quarter of the Credit Parties, of (a) the Credit Parties' consolidated Debt on such date to (b) the Credit Parties' Consolidated EBITDA for the four fiscal quarters most recently ended, to be greater than 3.00 to 1.00; ***provided however*** that, for the fiscal quarters ending December 31, 2010 and March 31, 2011, the Credit Parties' Consolidated EBITDA shall be calculated as follows:

| Fiscal Quarter Ending | Consolidated EBITDA |
|---|---|
| December 31, 2010 | Consolidated EBITDA for the eight months ending December 31, 2010 multiplied by 1.5. |
| March 31, 2011 | Consolidated EBITDA for the 11 months ending March 31, 2011 multiplied by 1.091. |

## ARTICLE VII

## EVENTS OF DEFAULT AND REMEDIES

Section 7.1.  <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an "Event of Default" under any Credit Document:

(a)  <u>Payment</u>.  The Borrower shall fail to pay (i) any principal of any Advance or any reimbursement obligation in respect of any Letter of Credit Obligation when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, or (ii) any interest on any Advance, fee or any other amount (other than an amount referred to in clause (i) above) payable under any Credit Document within three Business

Days after such fee or other amount becomes due and payable under this Agreement or any of the other Credit Documents;

(b)    <u>Representation and Warranties</u>.  Any representation or warranty made or deemed to be made by any Credit Party (or any of its officers) in or in connection with this Agreement or any other Credit Document shall prove to have been incorrect in any material respect when made or deemed to be made.

(c)    <u>Covenant Breaches</u>.

(i)    Any Credit Party shall fail to perform or observe any covenant contained in <u>Section 5.2</u>, <u>5.3</u>, <u>5.5</u>, <u>5.6</u>, <u>5.8</u>, <u>5.12</u>, <u>5.13</u> or <u>5.14</u> or <u>Article VI</u> of this Agreement,

(ii)    any Guarantor shall fail to perform or observe any covenant contained in its Guaranty, or

(iii)    any Credit Party shall fail to perform or observe any other term or covenant set forth in this Agreement or in any other Credit Document which is not covered by clause (i) or (ii) above, or any other provision of this <u>Section 7.1</u>, if such failure shall remain unremedied for 30 days after the earlier of (i) written notice of such default shall have been given to such Person by the Agent or any Bank or (ii) such default becomes Known to any Knowledge Party;

(d)    <u>Cross-Defaults</u>.  (i) Any Credit Party shall fail to pay any principal of or premium or interest on its Debt or pay any net hedging obligation which is outstanding in a principal amount of at least $250,000 individually or when aggregated with all such Debt or net hedging obligations of the Credit Parties so in default (but excluding Debt evidenced by the Notes) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt or such hedging obligations; (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to Debt which is outstanding in a principal amount of at least $250,000 individually or when aggregated with all such Debt of the Credit Parties so in default, and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt; or (iii) any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or (iv) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract, if applicable), or such Swap Contract is otherwise terminated prior to the scheduled term of the applicable transaction, in each case, resulting from (A) any event of default under such Swap Contract as to which the Borrower or any Credit Party is the defaulting party or (B) any "Termination Event" (as defined in such Swap Contract, if applicable, or the equivalent defined term) under such Swap Contract as to which any Credit Party is an Affected Party (as defined in such Swap Contract, if applicable, or the equivalent defined term) and, in either event, the net hedging obligation owed by any Credit Party as a result thereof is greater than $250,000;

(e)    <u>Insolvency</u>.  Any Credit Party shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against any Credit Party seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against any Credit Party, either such proceeding shall remain undismissed for a period of 60 days or any of the actions sought in such proceeding shall occur; or any Credit Party shall take any corporate action to authorize any of the actions set forth above in this paragraph (e);

(f)    <u>Judgments</u>.  Any judgment or order for the payment of money in excess of $250,000 (not fully covered by insurance) shall be rendered against any Credit Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(g)    <u>ERISA Events</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Credit Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000, or (ii) any Credit Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000;

(h)    <u>Plan Withdrawals</u>.  Any Credit Party or any member of the Controlled Group as employer under a Multiemployer Plan shall have made a complete or partial withdrawal from such Multiemployer Plan and the plan sponsor of such Multiemployer Plan shall have notified such withdrawing employer that such employer has incurred a withdrawal liability in an annual amount exceeding $250,000;

(i)    <u>Borrowing Base</u>.  Any failure to cure any Borrowing Base deficiency in accordance with <u>Section 2.4</u>, including any failure to make payments to cure the Borrowing Base deficiency within the time period specified by and in accordance with <u>Section 2.4(b)</u>;

(j)    <u>Credit Documents; Security Interests</u>.  Any provision of any Credit Document shall for any reason cease to be valid and binding on the applicable Credit Parties or any such Credit Party.  Any Security Document shall for any reason (other than as permitted pursuant to the terms thereof or hereof) cease to create a valid and perfected lien on and security interest in any material portion of the Collateral or any Credit Party shall so state in writing;

(k)    <u>Change of Control</u>.  (i) The Borrower ceases to be a direct, wholly-owned Subsidiary of Holdco, or (ii) Wayzata Opportunities Fund II, LP and its affiliates shall cease to own at least 50% of the voting equity interests of Holdco; or

(l)    <u>Key Man</u>.  Leonard C. Tallerine, Jr. and Mike Strain shall both cease to be involved principally in the management, administration and control of the Borrower.

Section 7.2.    <u>Optional Acceleration of Maturity</u>.  If any Event of Default (other than an Event of Default pursuant to paragraph (e) of <u>Section 7.1</u>) shall have occurred and be continuing, then, and in any such event,

> (a) the Agent (i) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare the obligation of each Bank and the Issuing Bank to make extensions of credit hereunder, including making Advances and issuing Letters of Credit, to be terminated, whereupon the same shall forthwith terminate, and (ii) shall at the request, or may with the consent, of the Majority Banks, by notice to the Borrower, declare all principal, interest, fees, reimbursements, indemnifications, and all other amounts payable under this Agreement, the Notes, and the other Credit Documents to be forthwith due and payable, whereupon all such amounts shall become and be forthwith due and payable in full, without notice of intent to demand, demand, presentment for payment, notice of nonpayment, protest, notice of protest, grace, notice of dishonor, notice of intent to accelerate, notice of acceleration, and all other notices, all of which are hereby expressly waived by the Borrower;

> (b) the Borrower shall, on demand of the Agent at the request or with the consent of the Majority Banks, deposit with the Agent into the Cash Collateral Account an amount of cash equal to the Letter of Credit Exposure as security for the Obligations; and

> (c) the Agent shall at the request of, or may with the consent of, the Majority Banks proceed to enforce its rights and remedies under the Guaranties and any other Credit Document for the ratable benefit of the Banks by appropriate proceedings.

Section 7.3.    <u>Automatic Acceleration of Maturity</u>.  If any Event of Default pursuant to paragraph (e) of <u>Section 7.1</u> shall occur,

> (a) (i) the obligation of each Bank and the Issuing Bank to make extensions of credit hereunder, including making Advances and issuing Letters of Credit, shall terminate, and (ii) all principal, interest, fees, reimbursements, indemnifications, and all other amounts payable under this Agreement, the Notes, and the other Credit Documents shall become and be forthwith due and payable in full, without notice of intent to demand, demand, presentment for payment, notice of nonpayment, protest, notice of protest, grace, notice of dishonor, notice of intent to accelerate, notice of acceleration, and all other notices, all of which are hereby expressly waived by the Borrower;

(b) the Borrower shall deposit with the Agent into the Cash Collateral Account an amount of cash equal to the outstanding Letter of Credit Exposure as security for the Obligations; and

(c) the Agent shall at the request of, or may with the consent of, the Majority Banks proceed to enforce its rights and remedies under the Guaranties and any other Credit Document for the ratable benefit of the Banks by appropriate proceedings.

Section 7.4.    <u>Right of Setoff</u>.  Upon the occurrence and during the continuance of any Event of Default, the Agent, the Issuing Bank, each Bank and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Agent, the Issuing Bank, such Bank or any such Affiliate to or for the credit or the account of any Credit Party against any and all of the obligations of the Borrower or such Credit Party now or hereafter existing under this Agreement, the Notes held by the Agent or such Bank, and the other Credit Documents, irrespective of whether or not the Agent, the Issuing Bank, such Bank or any such Affiliate shall have made any demand under this Agreement, such Notes, or such other Credit Documents, and although such obligations of the Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such Bank or the Issuing Bank different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Bank shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of <u>Section 2.16</u> and, pending such payment, shall be segregated by such Defaulting Bank from its other funds and deemed held in trust for the benefit of the Agent and the Banks, and (y) the Defaulting Bank shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Bank as to which it exercised such right of setoff.  The rights of each Bank, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Bank, the Issuing Bank or their respective Affiliates may have.

The Agent, the Issuing Bank and each Bank agrees to promptly notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Agent, the Issuing Bank and each Bank under this <u>Section 7.4</u> are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which the Agent, the Issuing Bank or such Bank may have.

Section 7.5.    <u>Actions Under Credit Documents</u>.  Following an Event of Default, the Agent shall at the request, or may with the consent, of the Majority Banks, take any and all actions permitted under the other Credit Documents, including enforcing its rights under the Guaranties for the ratable benefit of the Banks.

Section 7.6.    <u>Non-exclusivity of Remedies</u>.  No remedy conferred upon the Agent is intended to be exclusive of any other remedy, and each remedy shall be cumulative of all other remedies existing by contract, at law, in equity, by statute or otherwise.

Section 7.7.    <u>Application of Funds</u>.  After the exercise of remedies provided for above (or after the Advances have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in <u>Section 7.3</u>), any amounts received on account of the Obligations shall, subject to the provisions of <u>Sections 2.15</u> and <u>2.16</u>, be applied by the Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agent) payable to the Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Banks and the Issuing Bank (including fees, charges and disbursements of counsel to the respective Banks and the Issuing Bank and amounts payable under <u>Sections 2.11</u>, <u>2.12</u>, and <u>2.13</u>), ratably among them in proportion to the respective amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Advances and other Obligations, ratably among the Banks and the Issuing Bank in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Advances and Obligations with respect to Specified Swap Contracts and Specified Cash Management Agreements, ratably among the Banks, the Issuing Bank, and the holders of Obligations under Specified Swap Contracts and Specified Cash Management Agreements, in proportion to the respective amounts described in this clause <u>Fourth</u> held by them;

<u>Fifth</u>, to the Agent for the account of the Issuing Bank, to Cash Collateralize that portion of Letter of Credit Obligations comprised of the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to <u>Sections 2.6</u> and <u>2.15</u>; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by applicable law.

Subject to <u>Section 2.6(d)</u> and <u>2.15</u>, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause <u>Fifth</u> above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE VIII

## THE AGENT AND THE ISSUING BANK

Section 8.1.    <u>Appointment and Authorization of Agent</u>.

(a)    Each of the Banks and the Issuing Bank hereby irrevocably appoints Bank of America to act on its behalf as the Agent hereunder and under the other Credit Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent, the Banks and the Issuing Bank, and the Credit Parties shall not have rights as a third party beneficiary of any of such provisions except for the Borrower's consultation rights explicitly set forth in <u>Section 8.6</u>.

(b)    The Issuing Bank shall act on behalf of the Banks with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (i) provided to the Agent in this <u>Article VIII</u> with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and the applications and agreements for letters of credit pertaining to such Letters of Credit as fully as if the term "Agent" as used in this <u>Article VIII</u> and in the definition of "Agent-Related Person" included the Issuing Bank with respect to such acts or omissions, and (ii) as additionally provided herein with respect to the Issuing Bank.

Section 8.2.    <u>Rights as a Bank</u>.  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Bank as any other Bank and may exercise the same as though it were not the Agent and the term "Bank" or "Banks" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any other Credit Party or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Banks.

Section 8.3.    <u>Exculpatory Provisions</u>.    The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Agent is required to exercise as directed in writing by the Majority Banks (or such other number or percentage of the Banks as shall be expressly provided for herein or in the other Credit Documents), <u>provided</u> that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Credit Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, the other Credit Parties or any of their

respective Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Majority Banks (or such other number or percentage of the Banks as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Article VII and Section 9.1) or (ii) in the absence of its own gross negligence or willful misconduct.  The Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Agent by a Credit Party, a Bank or the Issuing Bank.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article III or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

Section 8.4.    Reliance by Agent.  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of an Advance, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Bank or the Issuing Bank, the Agent may presume that such condition is satisfactory to such Bank or the Issuing Bank unless the Agent shall have received notice to the contrary from such Bank or the Issuing Bank prior to the making of such Advance or the issuance of such Letter of Credit.  The Agent may consult with legal counsel (who may be counsel for the Credit Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.5.    Delegation of Duties.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the credit facilities provided for herein as well as activities as Agent.

Section 8.6.    Resignation of Agent.  The Agent may at any time give notice of its resignation to the Banks, the Issuing Bank and the Borrower.  Upon receipt of any such notice of

resignation, the Majority Banks shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Majority Banks and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Banks and the Issuing Bank, appoint a successor Agent meeting the qualifications set forth above; underline(provided) that if the Agent shall notify the Borrower and the Banks that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Agent on behalf of the Banks or the Issuing Bank under any of the Credit Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Bank and the Issuing Bank directly, until such time as the Majority Banks appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Any resignation by Bank of America as Agent pursuant to this Section shall also constitute its resignation as Issuing Bank.  Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (b) the retiring Issuing Bank shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

Section 8.7.    Non-Reliance on Agent and Other Banks.  Each Bank and the Issuing Bank acknowledges that it has, independently and without reliance upon the Agent or any other Bank or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Bank and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Agent or any other Bank or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.8.    No Other Duties, Etc.  Anything herein to the contrary notwithstanding, none of the Book Manager or Lead Arrangers listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Credit Documents, except in its capacity, as applicable, as the Agent, a Bank, or the Issuing Bank hereunder.

Section 8.9.    Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Agent (irrespective of whether the principal of any Advance or Letter of Credit Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on any Credit Party) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Advances, Letter of Credit Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Banks, the Issuing Bank and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Banks, the Issuing Bank and the Agent and their respective agents and counsel and all other amounts due the Banks, the Issuing Bank and the Agent under Sections 2.7 and 9.4) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Bank and the Issuing Bank to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Banks and the Issuing Bank, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.7 and 9.4.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Bank or the Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Bank or the Issuing Bank to authorize the Agent to vote in respect of the claim of any Bank or the Issuing Bank in any such proceeding.

Section 8.10.    Collateral and Guaranty Matters.  The Banks and the Issuing Bank irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Credit Document (i) upon termination of the Commitments and payment in full of all Obligations (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Credit Document, or (iii) subject to Section 9.1, if approved, authorized or ratified in writing by the Majority Banks;

(b)         to release any Lien on any Mortgaged Property granted to or held by the Agent under the Mortgages, so long as (i) after giving effect to such release, the Mortgaged Property Value shall not be less than 85% of the Oil and Gas Property Value as set forth in the most recent Oil and Gas Reserve Report, (ii) the Borrower shall deliver to the Agent a certificate in the form of Exhibit G hereto, which sets forth the calculation of Mortgaged Property Value and demonstrates and certifies that such Mortgaged Property Value equals or exceeds 85% of the Oil and Gas Property Value, after giving effect to such release of Mortgaged Property, and (iii) the Borrower identifies in writing on such certificate the Mortgaged Properties to be released and sets forth the value attributed thereto in the most recent Oil and Gas Reserve Report;

(c)         to subordinate any Lien on any property granted to or held by the Agent under any Credit Document to the holder of any Lien on such property that is permitted by Section 6.2(c); and

(d)         to release any Guarantor from its obligations under any Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Majority Banks will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under any Guaranty pursuant to this Section 8.10.

Section 8.11.   Indemnification of Agent.  WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, THE BANKS SHALL INDEMNIFY UPON DEMAND EACH AGENT-RELATED PERSON (TO THE EXTENT NOT REIMBURSED BY OR ON BEHALF OF ANY CREDIT PARTY AND WITHOUT LIMITING THE OBLIGATION OF ANY CREDIT PARTY TO DO SO), PRO RATA (AS DETERMINED AT THE TIME INDEMNIFICATION IS SOUGHT HEREUNDER), AND HOLD HARMLESS EACH AGENT-RELATED PERSON FROM AND AGAINST ANY AND ALL INDEMNIFIED LIABILITIES INCURRED BY IT; PROVIDED, HOWEVER, THAT NO BANK SHALL BE LIABLE FOR THE PAYMENT TO ANY AGENT-RELATED PERSON OF ANY PORTION OF SUCH INDEMNIFIED LIABILITIES TO THE EXTENT DETERMINED IN A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH AGENT-RELATED PERSON'S OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; PROVIDED, HOWEVER, THAT NO ACTION TAKEN IN ACCORDANCE WITH THE DIRECTIONS OF THE MAJORITY BANKS SHALL BE DEEMED TO CONSTITUTE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT FOR PURPOSES OF THIS SECTION.   WITHOUT LIMITATION OF THE FOREGOING, EACH BANK SHALL REIMBURSE THE AGENT UPON DEMAND FOR ITS RATABLE SHARE (AS DETERMINED AT THE TIME INDEMNIFICATION IS SOUGHT HEREUNDER) OF ANY COSTS OR OUT-OF-POCKET EXPENSES (INCLUDING ALL FEES, EXPENSES, AND DISBURSEMENTS OF ANY LAW FIRM OR OTHER EXTERNAL COUNSEL AND, WITHOUT DUPLICATION, THE ALLOCATED COST OF INTERNAL LEGAL SERVICES AND ALL EXPENSES AND DISBURSEMENTS OF INTERNAL COUNSEL) INCURRED BY THE AGENT IN CONNECTION WITH THE PREPARATION, EXECUTION, DELIVERY, ADMINISTRATION, MODIFICATION, AMENDMENT OR ENFORCEMENT (WHETHER

THROUGH NEGOTIATIONS, LEGAL PROCEEDINGS OR OTHERWISE) OF, OR LEGAL ADVICE IN RESPECT OF RIGHTS OR RESPONSIBILITIES UNDER, THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT, OR ANY DOCUMENT CONTEMPLATED BY OR REFERRED TO HEREIN, TO THE EXTENT THAT THE AGENT IS NOT REIMBURSED FOR SUCH EXPENSES BY OR ON BEHALF OF ANY CREDIT PARTY.  THE UNDERTAKING IN THIS SECTION SHALL SURVIVE TERMINATION OF THE COMMITMENTS, THE PAYMENT OF ALL OTHER OBLIGATIONS, AND THE RESIGNATION OF THE AGENT.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1.    Amendments, Etc.  No amendment or waiver of any provision of this Agreement, the Notes, or any other Credit Document, nor consent to any departure by the Borrower or any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Banks and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver, or consent shall, unless in writing and signed by all the Banks, do any of the following:  (a) waive any of the conditions specified in Section 3.1 or 3.2, (b) extend or increase the Commitment of the Banks, (c) reduce the principal of, or interest on, the Notes or any fees or other amounts payable hereunder or under any other Credit Document, (d) postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable hereunder or extend the Maturity Date, (e) change the percentage of Banks which shall be required for the Banks or any of them to take any action hereunder or under any other Credit Document, (f) amend Section 2.10 or this Section 9.1, (g) amend the definition of "Majority Banks," (h) release any Guarantor from its obligations under any Guaranty (other than as provided in Section 8.10(d) or as otherwise permitted by the Credit Documents), (i) release any Collateral (other than as provided in Section 8.10(a) or (b) or as otherwise permitted by the Credit Documents) in any transaction or series of related transactions, or (j) except with respect to a Defaulting Bank, change any provision which provides for payment to be distributed to the Banks in accordance with their Pro Rata Shares; and provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Agent or the Issuing Bank in addition to the Banks required above to take such action, affect the rights or duties of the Agent or the Issuing Bank, as the case may be, under this Agreement or any other Credit Document.  Notwithstanding anything to the contrary herein, no Defaulting Bank shall have any right to approve or disapprove any amendment, waiver, or consent hereunder, (and any amendment, waiver or consent which by its terms requires the consent of all Banks or each affected Bank may be effected with the consent of the applicable Banks without taking into consideration the Advances, Letter of Credit Exposure, or Commitments of the Defaulting Banks), except that (x) the Commitment of any Defaulting Bank may not be increased or extended without the consent of such Bank and (y) any waiver, amendment or modification requiring the consent of all Banks or each affected Bank that by its terms affects any Defaulting Bank more adversely than other affected Banks shall require the consent of such Defaulting Bank.

Section 9.2.    Notices, Etc.

(a) Except as provided in clause (b) below, all notices and other communications shall be in writing (including, without limitation, telecopy or telex) and mailed by certified mail, return receipt requested, telecopied, telexed, hand delivered, or delivered by a nationally recognized overnight courier, at the address for the appropriate party specified in Annex 1 or at such other address as shall be designated by such party in a written notice to the other parties.  All such notices and communications shall, when so mailed, telecopied, telexed, or hand delivered or delivered by a nationally recognized overnight courier, be effective when received if mailed, when telecopy transmission is completed, when confirmed by telex answer-back, or when delivered by such messenger or courier, respectively, except that (i) notices and communications to the Agent pursuant to Article II or VIII shall not be effective until received by the Agent, and (ii) notices delivered through electronic communications pursuant to clause (b) below shall be effective as provided in such clause (b).

(b) Electronic Communications.  Notices and other communications to the Banks hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Bank pursuant to Article II if such Bank, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c) The Platform.  Each Credit Party hereby acknowledges that Agent may make the Borrower Materials available to the Banks by posting them on the Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY

83

KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY AGENT-RELATED PERSONS IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Agent-Related Persons have any liability to any Credit Party, any Bank or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Credit Party's or the Agent's transmission of Borrower Materials through the internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of Agent; provided, however, that in no event shall any Agent-Related Person have any liability to the Credit Parties, any Bank, the Issuing Bank, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d) Change of Address, Etc. Each of the Credit Parties, the Agent, and the Issuing Bank may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Bank may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent. In addition, each Bank agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Bank. Furthermore, each Public Bank agrees to cause at least one individual at or on behalf of such Public Bank to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Bank or its delegate, in accordance with such Public Bank's compliance procedures and applicable Legal Requirements, including United States federal and state securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Credit Parties or their securities for purposes of United States Federal or state securities laws.

(e) Reliance by Agent, Issuing Bank, and Banks. The Agent, Issuing Bank and the Banks shall be entitled to rely and act upon any notices (including telephonic Notices of Borrowing) purportedly given by or on behalf of any Credit Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Credit Parties shall indemnify the Agent, the Issuing Bank, each Bank and the Related Parties of

each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Credit Party. All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

Section 9.3.    No Waiver; Remedies.    No failure on the part of any Bank, the Agent, or the Issuing Bank to exercise, and no delay in exercising, any right hereunder or under any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.4.    Costs and Expenses.    The Borrower agrees to pay on demand (a) all reasonable out-of-pocket costs and expenses of the Agent in connection with the preparation, execution, delivery, administration, modification, and amendment of this Agreement, the Notes, the Guaranties, the Security Documents, and the other Credit Documents including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Agent with respect to advising the Agent as to its rights and responsibilities under this Agreement, and (b) all out-of-pocket costs and expenses, if any, of the Agent, the Issuing Bank, and each Bank (including, without limitation, counsel fees and expenses of the Agent, the Issuing Bank, and each Bank) in connection with the enforcement (whether through negotiations, legal proceedings, or otherwise) of this Agreement, the Notes, the Guaranties, the Security Documents and the other Credit Documents. The agreements in this Section shall survive the resignation of the Agent, the replacement of any Bank, the termination of the Commitments, and the repayment, satisfaction or discharge of all the other Obligations.

Section 9.5.    Binding Effect.    This Agreement shall become effective when it shall have been executed by the Credit Parties and the Agent, and when the Agent shall have, as to each Bank, either received a counterpart hereof executed by such Bank or been notified by such Bank that such Bank has executed it and thereafter shall be binding upon and inure to the benefit of the Credit Parties, the Agent, the Issuing Bank, and each Bank and their respective successors and assigns, except that the Credit Parties shall not have the right to assign their rights or delegate their duties under this Agreement or any interest in this Agreement without the prior written consent of each Bank.

Section 9.6.    Bank Assignments and Participations.

(a)    Successors and Assigns Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Credit Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Agent and each Bank and no Bank may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer

85

upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent, the Issuing Bank and the Banks) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Banks.   Any Bank may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Advances (including for purposes of this subsection (b), participations in Letter of Credit Obligations) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Bank's Commitment and the Advances at the time owing to it or in the case of an assignment to a Bank, an Affiliate of a Bank or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Advances outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Advances of the assigning Bank subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless each of the Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     Proportionate Amounts.   Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Bank's rights and obligations under this Agreement with respect to the Advances or the Commitment assigned;

(iii)     Required Consents.   No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Bank, an Affiliate of a Bank or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by

written notice to the Agent within five (5) Business Days after having received notice thereof;

(B)      the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Bank, an Affiliate of a Bank or an Approved Fund; and

(C)      the consent of the Issuing Bank (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding).

(iv)      <u>Assignment and Assumption</u>.      The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; <u>provided</u>, <u>however</u>, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Bank, shall deliver to the Agent an administrative questionnaire.

(v)      <u>No Assignment to Credit Parties</u>.  No such assignment shall be made (A) to any Credit Parties or any of the Credit Parties' Affiliates or Subsidiaries, (B) to any Defaulting Bank or any of its Subsidiaries, or any Person who, upon becoming a Bank hereunder, would constitute any of the foregoing Persons described in this clause (B), (C) to a natural person, or (D) to a Person who is not an Eligible Assignee.

(vi)      <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Bank hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Agent, the applicable pro rata share of Advances previously requested but not funded by the Defaulting Bank, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Bank to the Agent or any Bank hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Advances and participations in Letters of Credit in accordance with its Pro Rata Share.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Bank hereunder shall become effective under applicable Legal Requirements without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Bank for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned

by such Assignment and Assumption, have the rights and obligations of a Bank under this Agreement, and the assigning Bank thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Bank's rights and obligations under this Agreement, such Bank shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.11, 2.12, 2.13, 9.4, and 9.7 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Bank.  Any assignment or transfer by a Bank of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Bank of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Banks, and the Commitments of, and principal amounts of the Advances and Letter of Credit Obligations owing to, each Bank pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Credit Parties, the Agent and the Banks may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Bank hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, the Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Bank as a Defaulting Bank.  The Register shall be available for inspection by the Credit Parties and any Bank, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Bank may at any time, without the consent of, or notice to, the Borrower or the Agent, sell participations to any Person (other than a natural person, a Defaulting Bank or a Credit Party or any of the Credit Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Bank's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Advances (including such Bank's participations in Letter of Credit Obligations) owing to it); provided that (i) such Bank's obligations under this Agreement shall remain unchanged, (ii) such Bank shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Credit Parties, the Agent, the Banks and the Issuing Bank shall continue to deal solely and directly with such Bank in connection with such Bank's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Bank sells such a participation shall provide that such Bank shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any  provision of this Agreement; provided that such agreement or instrument may provide that such Bank will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 9.1 that affects such Participant.  Subject to subsection (e) of this Section, each Credit Party agrees that each Participant shall be entitled to the benefits of Sections 2.11, 2.12, and 2.13 to the same extent as if it were a Bank and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 7.4 as though it were a Bank, provided such Participant agrees to be subject to Section 2.10 as though it were a Bank.

(e)      <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Section 2.12</u> or <u>2.13</u> than the applicable Bank would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Bank if it were a Bank shall not be entitled to the benefits of <u>Section 2.13</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 2.13(d)</u> as though it were a Bank.

(f)      <u>Certain Pledges</u>.  Any Bank may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Bank, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Bank from any of its obligations hereunder or substitute any such pledgee or assignee for such Bank as a party hereto.

(g)      <u>Electronic Execution of Assignments</u>.    The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)      <u>Resignation as Issuing Bank after Assignment</u>.  Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitment and Advances pursuant to subsection (b) above, Bank of America may, upon 30 days' notice to the Borrower and the Banks, resign as Issuing Bank.  In the event of any such resignation as Issuing Bank, the Borrower shall be entitled to appoint from among the Banks a successor Issuing Bank hereunder; <u>provided</u>, <u>however</u>, that no failure by the Borrower to appoint any such successor shall affect the resignation of Bank of America as Issuing Bank.  If Bank of America resigns as Issuing Bank, it shall retain all the rights, powers, privileges and duties of the Issuing Bank hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as Issuing Bank and all Letter of Credit Obligations with respect thereto (including the right to require the Banks to make Advances or fund risk participations in unreimbursed amounts pursuant to <u>Section 2.6(d)</u>).  Upon the appointment of a successor Issuing Bank, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, and (b) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

Section 9.7.    <u>Indemnification</u>.    WHETHER OR NOT THE TRANSACTIONS CONTEMPLATED HEREBY ARE CONSUMMATED, THE CREDIT PARTIES SHALL INDEMNIFY AND HOLD HARMLESS EACH AGENT-RELATED PERSON, EACH BANK

AND THEIR RESPECTIVE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, COUNSEL, AGENTS AND ATTORNEYS-IN-FACT (COLLECTIVELY THE "<u>INDEMNITEES</u>") FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES, AND DISBURSEMENTS (INCLUDING ALL FEES, EXPENSES, AND DISBURSEMENTS OF ANY LAW FIRM OR OTHER EXTERNAL COUNSEL AND, WITHOUT DUPLICATION, THE ALLOCATED COST OF INTERNAL LEGAL SERVICES AND ALL EXPENSES AND DISBURSEMENTS OF INTERNAL COUNSEL AND INCLUDING SETTLEMENT COSTS) OF ANY KIND OR NATURE WHATSOEVER, (EXCLUDING, HOWEVER, THE COSTS AND EXPENSES INCURRED BY THE BANKS, OTHER THAN THE AGENT, IN CONNECTION WITH THE PREPARATION, EXECUTION OR DELIVERY OF THIS AGREEMENT) WHICH MAY AT ANY TIME BE IMPOSED ON, INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNITEE IN ANY WAY RELATING TO OR ARISING OUT OF OR IN CONNECTION WITH (A) THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE OR ADMINISTRATION OF ANY CREDIT DOCUMENT OR ANY OTHER AGREEMENT, LETTER, OR INSTRUMENT DELIVERED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED THEREBY OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREBY, (B) ANY COMMITMENT, ADVANCE, OR LETTER OF CREDIT OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM (INCLUDING ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT), OR (C) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS WASTE OR HAZARDOUS SUBSTANCES ON OR FROM ANY PROPERTY CURRENTLY OR FORMERLY OWNED OR OPERATED BY THE BORROWER, ANY OTHER CREDIT PARTY OR ANY OF THEIR SUBSIDIARIES, OR ANY LIABILITY UNDER ENVIRONMENTAL LAW RELATED IN ANY WAY TO THE BORROWER, ANY CREDIT PARTY OR ANY OF THEIR SUBSIDIARIES, OR (D) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY (INCLUDING ANY INVESTIGATION OF, PREPARATION FOR, OR DEFENSE OF ANY PENDING OR THREATENED CLAIM, INVESTIGATION, LITIGATION OR PROCEEDING) AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO (ALL THE FOREGOING, COLLECTIVELY, THE "<u>INDEMNIFIED LIABILITIES</u>"), **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF THE INDEMNITEE;** <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, DEMANDS, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR DISBURSEMENTS ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.  NO INDEMNITEE SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR

OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY INDEMNITEE HAVE ANY LIABILITY FOR ANY INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE EFFECTIVE DATE).  ALL AMOUNTS DUE UNDER THIS <u>SECTION 9.7</u> SHALL BE PAYABLE WITHIN TEN BUSINESS DAYS AFTER DEMAND THEREFOR.  THE AGREEMENTS IN THIS SECTION SHALL SURVIVE THE RESIGNATION OF THE AGENT, THE REPLACEMENT OF ANY BANK, THE TERMINATION OF THE COMMITMENTS, AND THE REPAYMENT, SATISFACTION OR DISCHARGE OF ALL THE OTHER OBLIGATIONS.

Section 9.8.    <u>USA Patriot Act Notice</u>.  Each Bank that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Bank) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Bank or the Agent, as applicable, to identify the Borrower in accordance with the Act.

Section 9.9.    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), each Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agent and the Arranger are arm's-length commercial transactions between the Credit Parties and their Affiliates, on the one hand, and the Agent and Arranger, on the other hand, (B) the Credit Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Credit Parties are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) the Agent and the Arranger each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Credit Parties or any of their Affiliates, or any other Person and (B) neither the Agent nor the Arranger has any obligation to the Credit Parties or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (iii) the Agent and the Arranger and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Credit Parties and their Affiliates, and neither the Agent nor the Arranger has any obligation to disclose any of such interests to the Credit Parties or their Affiliates.  To the fullest extent permitted by law, each Credit Party hereby waives and releases any claims that it may have against the Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.10.    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which

when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 9.11.  <u>Survival of Representations, Etc</u>.   All representations and warranties contained in this Agreement or made in writing by or on behalf of the Credit Parties in connection herewith shall survive the execution and delivery of this Agreement and the Credit Documents, the making of the Advances and any investigation made by or on behalf of the Banks, none of which investigations shall diminish any Bank's right to rely on such representations and warranties.   All obligations of the Credit Parties provided for in <u>Sections 2.11, 2.12, 2.13(c), 9.4</u>, and <u>9.7</u> and all of the obligations of the Banks in <u>Section 8.11</u> shall survive any termination of this Agreement and repayment in full of the Obligations.

Section 9.12.  <u>Severability</u>.   In case one or more provisions of this Agreement or the other Credit Documents shall be invalid, illegal or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Credit Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.   The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.   Without limiting the foregoing provisions of this <u>Section 9.12</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Banks shall be limited by Debtor Relief Laws, as determined in good faith by the Agent or Issuing Bank, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 9.13.  <u>Business Loans; Interest Rate Limitation</u>.   Each Credit Party warrants and represents that the Advances evidenced by the Notes are and shall be for business, commercial, investment, or other similar purposes and not primarily for personal, family, household, or agricultural use, as such terms are used in Section 342.005 of the Texas Finance Code. Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Legal Requirement (the "Maximum Rate").   If the Agent or any Bank shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Advances or, if it exceeds such unpaid principal, refunded to the Borrower.   In determining whether the interest contracted for, charged, or received by the Agent or a Bank exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Legal Requirement, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 9.14.  <u>Governing Law</u>.   This Agreement, the Notes and the other Credit Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas. Without limiting the intent of the parties set forth above, Chapter 346 the Texas Finance Code, as amended, shall not apply to this Agreement, the Notes, or the transactions contemplated hereby.   Unless otherwise expressly agreed by the Issuing Bank and the Borrower when a Letter of Credit is issued, the rules of the ISP shall apply to each standby Letter of Credit.

Section 9.15.    Waiver of Punitive Damages, Jury Trial, Etc.

(a)    SUBMISSION TO JURISDICTION. THE BORROWER AND EACH OTHER CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS SITTING IN HARRIS COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF TEXAS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH TEXAS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT THE AGENT, ANY BANK OR THE ISSUING BANK MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST THE BORROWER OR ANY OTHER CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    WAIVER OF VENUE. THE BORROWER AND EACH OTHER CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY ANY LEGAL REQUIREMENT, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY ANY LEGAL REQUIREMENT.

(d)    WAIVER OF PUNITIVE DAMAGES, ETC. EACH CREDIT PARTY HEREBY (i) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, (A) ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION BASED HEREON, OR DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THE CREDIT DOCUMENTS OR ANY TRANSACTION CONTEMPLATED THEREBY OR ASSOCIATED THEREWITH, ANY "SPECIAL

DAMAGES," AS DEFINED BELOW; AND (B) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); (ii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iii) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION. AS USED IN THIS SECTION, "SPECIAL DAMAGES" INCLUDES ALL SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES (REGARDLESS OF HOW NAMED), BUT DOES NOT INCLUDE ANY PAYMENT OR FUNDS WHICH ANY PARTY HERETO HAS EXPRESSLY PROMISED TO PAY OR DELIVER TO ANY OTHER PARTY HERETO.

(e)    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.16.    <u>Treatment of Certain Information; Confidentiality</u>.

Each of the Agent, the Banks and the Issuing Bank agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of

this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Credit Party and its obligations, (g) with the consent of any Credit Party or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Agent, any Bank, the Issuing Bank, or any of their respective Affiliates on a nonconfidential basis from a source other than a Credit Party.

For purposes of this Section, "Information" means all information received from the Borrower or any other Credit Party relating to the Borrower or any other Credit Party or any of their respective businesses, other than any such information that is available to the Agent, any Bank, or the Issuing Bank on a nonconfidential basis prior to disclosure by the Borrower or any other Credit Party, provided that, in the case of information received from the Borrower or any other Credit Party after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Agent, the Banks, and the Issuing Bank acknowledges that (a) the Information may include material non-public information concerning the Borrower or any other Credit Party, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Legal Requirements, including United States federal and state securities laws.

**THIS WRITTEN AGREEMENT AND THE CREDIT DOCUMENTS, AS DEFINED IN THIS AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

EXECUTED as of the date first above written.

**BORROWER:**

GOLDKING RESOURCES, LLC

By: _____
Name: Leonard C. Tallerine, Jr.
Title:   Chief Executive Officer

**GUARANTORS:**

GOLDKING HOLDINGS, LLC

By: _____
Name: Leonard C. Tallerine, Jr.
Title:   President

GOLDKING ONSHORE OPERATING, LLC

By: _____
Name: Leonard C. Tallerine, Jr.
Title:   President

**[SIGNATURE PAGE TO CREDIT AGREEMENT]**

**AGENT AND ISSUING BANK:**

BANK OF AMERICA, N.A.

By:_____

Name: Sandra M. Serie
Title:   Vice President

**BANKS:**

BANK OF AMERICA, N.A.

By:_____

Name: Sandra M. Serie
Title:   Vice President

Annex 1

**COMMITMENTS;**
**BORROWER, AGENT, AND BANK NOTICE INFORMATION;**
**LENDING OFFICES**

**I.        Commitments**

Bank of America, N.A.                        $200,000,000

Total Commitments                        $200,000,000

**II.        Borrower Notice Information**

    Goldking Resources, LLC
    One Shell Plaza
    910 Louisiana, Ste. 5030
    Houston, TX 77002
    Attn:   Leonard C. Tallerine, Jr.
    Telephone:    (713) 228-5464
    Telecopy:     (713) 230-9590

**III.       Agent Notice Information**

    Bank of America Merrill Lynch
    TX1-492-14-05
    901 Main Street
    Dallas, Texas 75202
    Attn:   Vince Gonzalez
    Telephone:    214-209-1349
    Telecopy:     214-290-9765

    With a copy to:
    Bank of America, N.A.
    MA5-100-09-01
    100 Federal St.
    Boston, MA 02110
    Attn:   Sandra Serie
    Telephone:    617-434-3462
    Telecopy:     804-264-6946

IV.    **Bank Notice Information**

| Credit Contact | Operations Contact |
|---|---|
| **Bank of America, N.A**.<br>Energy Finance Department<br>MA5-100-09-01<br>100 Federal St.<br>Boston, MA 02110<br>Attn:    Sandra Serie<br>Telephone:      617-434-3462<br>Telecopy:      804-264-6946 | **Bank of America, N.A.**<br>TX1-492-14-05<br>901 Main Street<br>Dallas, Texas 75202<br>Attn:    Vince Gonzalez<br>Telephone:      214-209-1349<br>Telecopy:      214-290-9765 |

-

## V.    Lending Offices

| Domestic Lending Office | Eurodollar Lending Office |
|---|---|
| **Bank of America, N.A.**<br>901 Main Street<br>Dallas, Texas 75202-3714 | **Bank of America, N.A.**<br>901 Main Street<br>Dallas, Texas 75202-3714 |

SCHEDULE 4.1

## SUBSIDIARIES

None.

SCHEDULE 4.7

## EXISTING LITIGATION

None.

-

SCHEDULE 6.1

**PERMITTED EXISTING LIENS**

None.

-

SCHEDULE 6.2

**PERMITTED EXISTING DEBT**

Premium finance loan agreement for Operator's Extra Expense insurance between Goldking Energy Corp. and Meridian Credit Services, Inc., assigned on 09/10/2010 by Meridian Credit Services, Inc. to Imperial Credit Corporation.  Goldking Energy Corp. intends for Goldking Onshore Operating, LLC to assume this obligation.

|  |  |
|---|---|
| Cash Price: | $211,889.07 |
| Amount Financed: | $190,700.16 |

EXHIBIT A

**FORM OF**

**ASSIGNMENT AND ACCEPTANCE**

[date]

Reference is made to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement"), among Goldking Resources, LLC ("Borrower"), Goldking Holdings, LLC and Goldking Onshore Operating, LLC as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent").  Capitalized terms used herein but not defined herein shall have the meanings specified by the Credit Agreement.

Pursuant to the terms of the Credit Agreement, [   ] ("Assignor"), wishes to assign and delegate to [   ] ("Assignee"), [     ]%[1] of its rights and obligations under the Credit Agreement. Therefore, Assignor, Assignee, and the Agent agree as follows:

1.    The Assignor hereby sells and assigns and delegates to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, without recourse to the Assignor and without representation or warranty except for the representations and warranties specifically set forth in clauses (i), (ii), and (iii) of Section 2 of this Assignment and Acceptance, a [  ]% interest in and to all of the Assignor's rights and obligations under the Credit Agreement and the other Credit Documents as of the Effective Date (as defined below), including such percentage interest in the Assignor's Commitment, the Advances owing to the Assignor, and the Note held by the Assignor.

2.    The Assignor (i) represents and warrants that, prior to executing this Assignment and Acceptance, its Commitment is $[   ], the aggregate outstanding principal amount of Advances owed by the Borrower to the Assignor is $[  ], and its Pro Rata Share of the Letter of Credit Exposure is $[  ]; (ii) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (iii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties, or representations made in or in connection with the Credit Agreement or any other Credit Document or the execution, legality, validity, enforceability, genuineness, sufficiency, or value of the Credit Agreement or any other Credit Document or any other instrument or document furnished pursuant thereto; (iv) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any Guarantor or the performance or observance by the Borrower or any Guarantor of any of its obligations under the Credit Agreement or any other Credit Document or any other instrument or document furnished pursuant thereto; and (v) attaches the Note referred to in Section 1 above and requests that the Agent exchange such Note for a new Note dated [   ], in the principal

---

[1]    Specify percentage to 4 decimal points.

amount of $[      ] payable to the order of the Assignee and a new Note dated [      ], in the principal amount of $[  ] payable to the order of Assignor.

3.      The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the financial statements referred to in <u>Section 4.5</u> thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Agent, the Assignor, or any other Bank and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement or any other Credit Document; (iii) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and any other Credit Document as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement or any other Credit Document are required to be performed by it as a Bank; (v) specifies as its Domestic Lending Office (and address for notices) and Eurodollar Lending Office the offices set forth beneath its name on the signature pages hereof; (vi) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement and the Note or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty[2], and (vii) represents that it is an Eligible Assignee.

4.      The effective date for this Assignment and Acceptance shall be [_____] ("<u>Effective Date</u>")[3], and following the execution of this Assignment and Acceptance, the Agent will record it in the Register.

5.      Upon such recording, and as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement for all purposes, and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Bank thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights (other than rights against the Borrower pursuant to <u>Sections 9.4</u> and <u>9.7</u> of the Credit Agreement, which shall survive this agreement) and be released from its obligations (other than obligations to the Agent pursuant to <u>Section 8.11</u> of the Credit Agreement, which shall survive this agreement) under the Credit Agreement.

6.      Upon such recording, from and after the Effective Date, the Agent shall make all payments under the Credit Agreement and the Note in respect of the interest assigned hereby (including all payments of principal, interest, and fees) to the Assignee.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the Notes for periods prior to the Effective Date directly between themselves.

---

[2]      If the Assignee is organized under the laws of a jurisdiction outside the United States.

[3]      See Section 9.6.  Such date shall be at least three Business Days after the execution of this Assignment and Acceptance.

7.     **THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.**

**THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

The parties hereto have caused this Assignment and Acceptance to be duly executed as of the date first above written.

[ASSIGNOR]

By:_____

Name:_____

Title:_____

Address:_____

_____

_____

Attention:_____

Telecopy No:_____

[ASSIGNEE]

By:_____

Name:_____

Title:_____

Domestic Lending Office:

Address:_____

_____

_____

Attention:_____

Telecopy No:_____

Eurodollar Lending Office:

Address:_____

_____

_____

Attention:_____

Telecopy No:_____

BANK OF AMERICA, N.A.,
as Agent


By:_____
Name:_____
Title:_____


[CONSENTED TO
this _____ day of _____, _____.][4]


GOLDKING RESOURCES, LLC


By:_____
Name:_____
Title:_____

---

[4]    See Section 9.6 of Credit Agreement.

EXHIBIT B

**FORM OF**

**COMPLIANCE CERTIFICATE**

[date]

Bank of America, N.A., as Agent
MA5-100-09-01
100 Federal St.
Boston, MA 02110

Attention:    Sandra Serie

Ladies and Gentlemen:

I refer to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement"), among Goldking Resources, LLC ("Borrower"), Goldking Holdings, LLC and Goldking Onshore Operating, LLC, as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"), the defined terms of which are used herein unless otherwise defined herein.

I hereby certify that I have no Knowledge of any Defaults under the Credit Agreement which existed as of [_____] or which exist as of the date of this letter.

I also certify that the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial condition of the Borrower as of [_____], and the related results of operations for the period then ended, in conformity with generally accepted accounting principles.

The following sets forth the information and computations to demonstrate compliance with the requirements of Sections 6.15, 6.16 and 6.17 of the Credit Agreement as of [_____]:

    A.    Section 6.15 – Interest Coverage Ratio.

| | | |
|---|---|---|
| 1. | Consolidated EBITDA[1] four quarters ending [_____] | $_____ |
| 2. | Consolidated Interest Charges[2] for such period | $_____ |
| 3. | ratio A.1 ÷ A.2 | ____ to 1.00 |
| 4. | minimum | 3.00 to 1.00 |

    B.    Section 6.16 – Current Ratio

---

[1] "Consolidated EBITDA" is defined in Section 1.1 of the Credit Agreement.
[2] "Consolidated Interest Charges" is defined in Section 1.1 of the Credit Agreement.

|     |                                      |                    |
|-----|--------------------------------------|--------------------|
| 1.  | consolidated current assets[3]       | $_____        |
| 2.  | consolidated current liabilities[4]  | $_____        |
| 3.  | ratio B.1 ÷ B. 2                      | ____ to 1.00       |
| 4.  | minimum                              | 1.00 to 1.00       |

C.  <u>Section 6.17 - Debt to EBITDA Ratio</u>

|     |                                                      |                    |
|-----|------------------------------------------------------|--------------------|
| 1.  | consolidated Debt as of [_____]           | $_____        |
| 2.  | Consolidated EBITDA[5] for four fiscal quarters ending [_____] | $_____ |
| 3.  | ratio C.1 ÷ C.2                                      | ___ to 1.00        |
| 4.  | maximum                                              | 3.00 to 1.00       |

This certificate is given in my capacity as an officer of the Borrower and not in my individual capacity.

Very truly yours,

GOLDKING RESOURCES, LLC

By:_____

Name:_____

Title:_____

---

[3] "current assets" is defined in <u>Section 6.16</u> of the Credit Agreement.

[4] "current liabilities" is defined in <u>Section 6.16</u> of the Credit Agreement.

[5] Consolidated EBITDA shall be calculated in accordance with <u>Section 6.17</u>.

EXHIBIT C

# FORM OF NOTE

$[_____]                                                                    [date]

For value received, the undersigned Goldking Resources, LLC, a Delaware limited liability company ("Borrower"), hereby promises to pay to [                    ] ("Bank") or registered assigns the principal amount of [  ] and [  ]/100 Dollars ($[                    ]) or, if less, the aggregate outstanding principal amount of each Advance (as defined in the Credit Agreement referred to below) made by the Bank to the Borrower, together with accrued but unpaid interest on the principal amount of each such Advance from the date of such Advance until such principal amount is paid in full, at such interest rates, and at such times, as are specified in the Credit Agreement.

This Note ("Note") is one of the Notes referred to in, and is entitled to the benefits of, and is subject to the terms of, the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement"), among the Borrower, Goldking Holdings, LLC and Goldking Onshore Operating, LLC, as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"). Capitalized terms used herein but not defined herein shall have the meanings specified by the Credit Agreement.  The Credit Agreement, among other things, (a) provides for the making of Advances by the Bank to the Borrower from time to time in an aggregate outstanding amount not to exceed the amount of this Note, the indebtedness of the Borrower resulting from each such Advance being evidenced by this Note, and (b) contains provisions for acceleration of the maturity of this Note upon the happening of certain events stated in the Credit Agreement and for prepayments of principal prior to the maturity of this Note upon the terms and conditions specified in the Credit Agreement.

Both principal and interest are payable in lawful money of the United States of America to the Agent as specified in the Credit Agreement.  The Bank shall record all Advances and payments of principal made under this Note, but no failure of the Bank to make such recordings shall affect the Borrower's repayment obligations under this Note.

It is contemplated that because of prepayments there may be times when no indebtedness is owed under this Note.  Notwithstanding such prepayments, this Note shall remain valid and shall be in force as to Advances made pursuant to the Credit Agreement after such prepayments.

It is the intention of the Bank and the Borrower to conform strictly to any applicable usury laws.  Accordingly, the terms of the Credit Agreement relating to the prevention of usury will be strictly followed.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.**

**THIS WRITTEN AGREEMENT AND THE CREDIT DOCUMENTS, AS DEFINED IN THE CREDIT AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

EXECUTED as of the date first above written.

GOLDKING RESOURCES, LLC


By:_____
Name: Leonard C. Tallerine, Jr.
Title: Chief Executive Officer

-

EXHIBIT D

**FORM OF**

**NOTICE OF BORROWING**

[date]

Bank of America, N.A., as Agent
[_____]
[_____]

Attention:      [_____]
Telephone:    [_____]
Telecopy:      [_____]

Ladies and Gentlemen:

The undersigned, Goldking Resources, LLC, a Delaware limited liability company ("Borrower"), refers to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement," the defined terms of which are used in this Notice of Borrowing unless otherwise defined in this Notice of Borrowing) among the Borrower, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"), and hereby gives you irrevocable notice pursuant to Section 2.3(a) of the Credit Agreement that the undersigned hereby requests a Borrowing (the "Proposed Borrowing") on the terms set forth below:

|  |  |
|---|---|
| Date of Borrowing[1] | : |
| Type of Advances[2] | : |
| Aggregate Amount[3] | : |
| Interest Period[4] | : |

---

[1]        The Date of Borrowing must be a Business Day.  The Borrower must give three Business Days' advance notice for Proposed Borrowings comprised of Eurodollar Rate Advances.

[2]        The Type of Advances comprising the Proposed Borrowing may be Base Rate Advances or Eurodollar Rate Advances.

[3]        The aggregate amount of Borrowings must be (a) in a minimum amount of $250,000 and in multiples of $50,000 with respect to Base Rate Advances and (b) in a minimum amount of $250,000 and in multiples of $250,000 with respect to Borrowings comprised of Eurodollar Rate Advances.

[4]        The Interest Period applies only to Eurodollar Rate Advances and may be one, two, three, or six months, or such longer period approved by Agent and Banks.  Insert "N/A" for Base Rate Advances.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(a)    the representations and warranties contained in the Credit Agreement and the Guaranties are correct in all respects, before and after giving effect to the Proposed Borrowing and the application of the proceeds therefrom, as though made on the date of the Proposed Borrowing;

(b)    no Default has occurred and remains uncured, nor would result from the Proposed Borrowing or from the application of the proceeds therefrom; and

(c)    the funding of such Proposed Borrowing and all other Borrowings to be made or Letters of Credit to be issued on the same day as the Proposed Borrowing under the Credit Agreement shall not cause the aggregate outstanding amount of Advances plus the Letter of Credit Exposure to exceed the lesser of (1) the Borrowing Base and (2) the aggregate Commitments.

Very truly yours,

GOLDKING RESOURCES, LLC


By:_____
Name: Leonard C. Tallerine, Jr.
Title: Chief Executive Officer


cc:    Bank of America, N.A.
       MA5-100-09-01
       100 Federal St.
       Boston, MA 02110
       Attention:    Sandra Serie
       Telephone:    617-434-3462
       Telecopy:    804-264-6946

-

EXHIBIT E

**FORM OF**

**NOTICE OF CONVERSION OR CONTINUATION**

[date]

Bank of America, N.A., as Agent
[_____]
[_____]

Attention:        [_____]
Telephone:      [_____]
Telecopy:        [_____]

Ladies and Gentlemen:

The undersigned, Goldking Resources, LLC, a Delaware limited liability company ("Borrower"), refers to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement," the defined terms of which are used in this Notice of Conversion or Continuation unless otherwise defined in this Notice of Conversion or Continuation), among the Borrower, Goldking Holdings, LLC and Goldking Onshore Operating, LLC, as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"), and hereby gives you irrevocable notice pursuant to Section 2.3(b) of the Credit Agreement that the undersigned hereby requests a [conversion][continuation] of an outstanding Borrowing into a new Borrowing (the "Proposed Borrowing") on the terms set forth below:

       Outstanding Borrowing
       Date of Borrowing        :
       Type of Advance         :
       Aggregate Amount      :
       Interest Period           :

       Proposed Borrowing
       Date of Conversion
       or Continuation[1]        :
       Type of Advance[2]      :
       Aggregate Amount[3]    :

---

[1]       The Date of Conversion or Continuation must be a Business Day.  The Borrower must give three Business Days' advance notice for conversions into or continuations of Borrowings comprised of Eurodollar Rate Advances.

[2]       The Type of Advances comprising a Proposed Borrowing may be Base Rate Advances or Eurodollar Rate Advances.

Interest Period[4]                 :

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(a)     the representations and warranties contained in the Credit Agreement and the Guaranties are correct in all respects, before and after giving effect to the Proposed Borrowing and the application of the proceeds therefrom, as though made on the date of the Proposed Borrowing;

(b)     no Default has occurred and remains uncured, nor would result from the Proposed Borrowing or from the application of the proceeds therefrom; and

(c)     the funding of such Proposed Borrowing and all other Borrowings to be made or Letters of Credit to be issued on the same day as the Proposed Borrowing under the Credit Agreement shall not cause the aggregate outstanding amount of Advances plus the Letter of Credit Exposure to exceed the lesser of (1) the Borrowing Base and (2) the aggregate Commitments.


Very truly yours,

GOLDKING RESOURCES, LLC


By:_____
Name: Leonard C. Tallerine, Jr.
Title: Chief Executive Officer


cc:     Bank of America, N.A.
        MA5-100-09-01
        100 Federal St.
        Boston, MA 02110
        Attention:     Sandra Serie
        Telephone:     617-434-3462
        Telecopy:      804-264-6946

---

[3]     The aggregate amount of the Proposed Borrowing[s] must be (a) in the case of Borrowings consisting of Base Rate Advances, in an aggregate amount not less than $250,000 and in integral multiples of $50,000 in excess thereof, and (b) in the case of Borrowings consisting of Eurodollar Rate Advances, in an aggregate amount not less than $250,000 or in integral multiples of $250,000 in excess thereof.

[4]     The Interest Period applies only to Eurodollar Rate Advances and may be one, two, three, or six months, or such longer period approved by Agent and Banks.  Insert "N/A" for Base Rate Advances.

EXHIBIT F

**FORM OF
LETTER OF CREDIT APPLICATION**

See attached.



**Application and Agreement for Standby Letter of Credit**
TO: Bank of America, N.A. ("Bank of America")

**For Bank of America Use Only**

L/C No.

## A. Application.

**1. Applicant Name & Address** requests Bank of America to issue an irrevocable letter of credit (the "Letter of Credit") as follows:

☐ Full text teletransmission    ☐ Airmail    ☐ Courier

**2. In favor of (Beneficiary Name and Address):**

_____    _____

_____    _____

_____    _____

_____    _____

**3. For Account of / Named Applicant on the Letter of Credit**
(Name and address (PO Box is not acceptable), if different from Applicant)**:**

**3a. Is this party legally related to 1. Applicant through ownership?**
☐ Yes    ☐ No
**If yes**, please indicate relationship:
☐ Parent ☐ Subsidiary ☐ Affiliate ☐ Owner

**If No**, provide the following:
**a.** Tax id number/country equivalent:

_____

_____    **b.** If an individual, Date of Birth:

_____    **c.** Brief explanation of why applicant is applying for an Letter of credit for an non-related entity

_____

**4. Advising Bank (If applicable)**

**5. Brief description of underlying transaction:**

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

**6. Amount:** _____  ( _____ )

(in words and figures)

**Currency:** _____

(if left blank, U.S. Dollars)

**Expiration Date.** Drafts to be drawn on and presented at Bank of America's Address set forth in the Letter of Credit on or before: _____

☐    If this box is marked, Applicant authorizes Bank of America to effect payment of any sums due under this Application and Agreement by means of debiting Applicant's account with Bank of America set forth below. This authorization does not effect the obligation of Applicant to pay such sums when due, if there are insufficient funds in such account to make such payment when due, or if Bank of America fails to debit the account, and this authorization does not effect any setoff rights of Bank of America at law or in equity. Applicant's account number with Bank of America _____ .

**7.** **Available by drafts drawn at sight on Bank of America when accompanied by the following documentation**:

   **a.** The original Letter of Credit.
   **b.** The signed statement of the Beneficiary worded as follows (state wording that is to appear in the statement accompanying the draft; specify if such wording must be exact):

**8.    Special Instructions:**

## B. Agreement.

THIS STANDBY LETTER OF CREDIT AGREEMENT (this "Agreement") is issued by the undersigned applicant (the "Applicant") in favor of Bank of America, N. A. (together with its affiliates, the "Bank").

The Applicant hereby requests that the Bank issue the Letter of Credit (as defined below) for the account of the Applicant, pursuant to the application for Letter of Credit attached hereto ("Application", the Application and Agreement shall sometimes be collectively referred to as the "Application and Agreement"). The term "Letter of Credit" shall mean the standby letter of credit issued by the Bank for the account of the Applicant (including if the letter of credit is issued jointly for the account of the Applicant and any other Person, as defined below), in each case as amended or otherwise modified from time to time. "Person" means any natural person, corporation, partnership, trust, limited liability company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity. A standby letter of credit issued by the Bank pursuant to this Application and Agreement shall be the Letter of Credit hereunder even if another Person is named as the "Applicant" or "Account Party" in such Letter of Credit. The Applicant agrees that, except as provided below, the Letter of Credit shall be subject to the terms and provisions of this Agreement, and the Applicant further agrees with and for the benefit of the Bank as follows:

### 1. Letter Of Credit Procedures.

(a) Subject to the terms and conditions of this Agreement, the Bank may, in its sole and complete discretion, issue the Letter of Credit for the account of the Applicant; provided that the terms and provisions of the Letter of Credit and the Application therefor shall be satisfactory to the Bank in its discretion.

(b) Not later than three Banking Days (as defined in UCP 600 and ISP 98 as applicable, which are defined herein below) prior to the date of the proposed issuance of the Letter of Credit (or such later date as the Bank shall agree), the Applicant shall deliver this Application and Agreement for such Letter of Credit to the Bank. The Application may be sent by facsimile, by United States mail, by overnight courier, by electronic transmission using the system provided by the Bank, by personal delivery or by any other means acceptable to the Bank.

(c) The Applicant authorizes the Bank to set forth the terms of the Application in the Letter of Credit (and in any amendment thereto) in such language as the Bank deems appropriate, with such variations from such terms as the Bank may in its discretion determine to be necessary (which determination shall be conclusive) and not materially inconsistent with the Application. The Bank may, but shall not be obligated to, request the Applicant to review the form of the Letter of Credit prior to issuance thereof, in which case the Applicant shall be deemed to have approved the form of such Letter of Credit. Notwithstanding, the Applicant agrees that the Letter of Credit shall be conclusively presumed to be in proper form unless the Applicant notifies the Bank in writing of any inconsistency in the Letter of Credit within three Banking Days of its issuance. Upon receipt of timely notice of any inconsistency in the Letter of Credit, the Bank will endeavor to obtain the consent of the Beneficiary and any confirming bank for an appropriate modification to the Letter of Credit; provided that the Bank shall have no liability or responsibility for its failure to obtain such consent.

(d) The Applicant accepts the risk that the Letter of Credit will be interpreted or applied other than as intended by the Applicant to the extent the Letter of Credit (i) permits presentation at a place other than the place of issuance, (ii) permits application of laws or practice rules with which the Applicant or the Bank is unfamiliar, (iii) includes ambiguous, inconsistent or impossible requirements, (iv) requires termination or reduction against a presentation made by the Applicant rather than the Beneficiary or (v) fails to incorporate or modifies appropriate letter of credit practices rules.

(e) The delivery of this Application and Agreement shall automatically constitute a representation and warranty by the Applicant to the Bank to the effect that on the requested date of issuance or amendment of the Letter of Credit, (i) the representations and warranties of the Applicant set forth in Section 10 shall be true and correct as of such requested date as though made on the date thereof and (ii ) no Deposit Event, as defined in Section 3 below, shall have then occurred and be continuing or will result from the issuance.

(f) The Letter of Credit may be issued by any office of the Bank in its sole discretion within or outside the United States.

### 2. Applicant Payments.

(a) The Applicant hereby agrees to reimburse the Bank forthwith upon demand in an amount equal to any payment or disbursement made by the Bank under the Letter of Credit, together with interest on the amount so paid or disbursed by the Bank from and including the date of payment or disbursement to but not including the date the Bank is reimbursed by the Applicant at the interest rate described in Section 2(g). The obligation of the Applicant to reimburse the Bank under this Section 2 for payments and disbursements made by the Bank under the Letter of Credit shall be absolute and unconditional under any and all circumstances, including, without limitation, the following:

(i)  any failure of any draft, order, instrument, demand or other document drawn or presented, or to be drawn or presented, under the Letter of Credit ("Item" or collectively referred to as "Items") to strictly comply with the terms of the Letter of Credit;

(ii)  the legality, validity, regularity or enforceability of the Letter of Credit or of any Item presented thereunder;

(iii)  any defense based on the identity of the transferee of the Letter of Credit or the sufficiency of the transfer if the Letter of Credit is transferable;

(iv)  the existence of any claim, set-off, defense or other right that the Applicant may have at any time against any Beneficiary or transferee of the Letter of Credit, the Bank or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or any unrelated transaction;

(v)  any Item presented under the Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(vi)  honor of a demand for payment presented electronically even if the Letter of Credit requires that demand be in the form of a draft;

(vii)  waiver by the Bank of any requirement that exists for the Bank's protection and not the protection of the Applicant or any waiver by the Bank which does not in fact materially prejudice the Applicant;

(viii)  any payment made by the Bank in respect of an otherwise complying Item presented after the date specified as the expiration date, or the date by which documents must be received under the Letter of Credit if presentation after such date is authorized by the UCC, ISP98 or the UCP, as applicable; or

(ix)  any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

In the event that the Applicant shall provide written notice to the Bank within five (5) Banking Days of a payment by the Bank, that Applicant disagrees with the Bank's findings and it is determined in a final non-appealable order by a court of competent jurisdiction that any wrongful payment or disbursement made by the Bank under the Letter of Credit was a result of any act or omission constituting gross negligence or willful misconduct on the part of the Bank, the Bank shall refund reimbursement payment paid hereunder by applicant to the Bank without interest or cost.

(b) On each fee payment date, so long as any undrawn amount of the Letter of Credit remains available, Applicant shall pay the Bank the Letter of Credit fee. The fee payment date(s) shall be the date(s) as Applicant and the Bank may agree, or in the absence of such agreement, the fee payment date shall be the date on which the Bank issues the Letter of Credit. The fee shall be at such rate per annum as Applicant and the Bank may agree or, in the absence of such agreement, at the rate customarily charged by the Bank at the time such fee is payable, based upon Applicant's creditworthiness, as determined by the Bank in its sole discretion. The applicable Letter of Credit fee shall be calculated and payable on the undrawn amount of the Letter of Credit as of each fee payment date, and shall be for the period commencing on such fee payment date and ending on the day preceding the next fee payment date (or the expiration date of the Letter of Credit, as the case may be), both dates inclusive. The Letter of Credit fees will be computed on the basis of a 360-day year and actual days elapsed. The Bank shall not be required to refund any portion of the Letter of Credit fees paid

for any period during which (i) the Letter of Credit expires or otherwise terminates or (ii) any undrawn amount of the Letter of Credit is reduced by drawings or by amendment.

(c) Applicant shall pay the Bank, on demand, commissions and fees for amendments to, payments under, extensions of or cancellation of the Letter of Credit, and other services in the amounts Applicant and the Bank may agree or, in the absence of such agreement, in the amounts customarily charged by the Bank on the date of the Bank's demand.

(d) All payments and deposits of any kind by Applicant under this Application and Agreement, including prepayments, shall be made at the banking center or office the Bank may designate from time to time. The Bank shall have no obligation to pay Applicant interest on any such payment, prepayment or deposit made by Applicant under this Application and Agreement.

(e) (i)  All payments and deposits by Applicant under this Application and Agreement shall be in the currency in which the Letter of Credit is payable, except that the Bank may, at its option, require payments and deposits by Applicant under this Application and Agreement to be made in U.S. Dollars if the Letter of Credit is payable in a currency other than U.S. Dollars.

(ii)  the amount of each payment and each deposit by Applicant under this Application and Agreement in U.S. Dollars for the Letter of Credit payable in a currency other than U.S. Dollars shall be determined by converting the relevant amount to U.S. Dollars at the Conversion Rate in effect:

(A) with respect to each payment under Section 1(a) of this Agreement, on the date the payment is made by the Bank under or in respect of the Letter of Credit; and

(B) with respect to each payment not falling under the preceding clause (A) and each deposit, on the date of the Bank's demand for such payment or deposit.

(iii)  If a U.S. Dollar deposit by Applicant under this Application and Agreement for the Letter of Credit payable in a foreign currency becomes less than the U.S. Dollar equivalent of the undrawn amount of the Letter of Credit because of any variation in rates of exchange, Applicant shall deposit with the Bank, on demand, additional amounts in U.S. Dollars so that the total amount deposited by Applicant under this Application and Agreement is not less than the U.S. Dollar equivalent of the undrawn amount of the Letter of Credit, determined by using the Conversion Rate on the date of the Bank's latest demand.

(iv)  "Conversion Rate" means the rate quoted by the Bank for the purchase from the Bank of the relevant currency with U.S. Dollars with U.S. Dollars.

(f) Applicant shall reimburse or compensate the Bank, on demand, for all costs incurred, losses suffered and payments made by the Bank which are applied or allocated by the Bank to the Letter of Credit (as determined by the Bank) by reason of any and all present or future reserve, capital, deposit, assessment or similar requirements against (or against any class of or change in or in the amount of) assets or liabilities of, or commitments or extensions of credit by, the Bank.

(g) Applicant shall pay interest, on demand, on any amount not paid when due under this Application and Agreement from the due date until payment in full at a rate per annum equal to the rate of interest publicly announced from time to time by the Bank as its prime rate (the "Prime Rate"), plus three percentage points (not to exceed the maximum rate permitted by applicable law)or as otherwise agreed by the Bank. The Prime Rate is set by the Bank based on various factors, including the Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some credits. The Bank may price credit at, above or below the Prime Rate. Any change in the Bank's Prime Rate shall take effect at the opening of business on the day specified in the Bank's public announcement of a change in the Bank's Prime Rate. Interest will be computed on the basis of a 360-day year and actual days elapsed.

### 3. Deposit Events.
Upon the occurrence of any of the following events (each a "Deposit Event"), Applicant shall deposit with the Bank, on demand (except that such demand shall not be required in the event of an occurrence described in (b) below) and as cash security for Applicant's obligations to the Bank under this Application and Agreement, an amount equal to the undrawn amount of the Letter of Credit:

(a) Applicant defaults under any provision of this Application and Agreement;

(b) Any bankruptcy or similar proceeding is commenced with respect to Applicant;

(c) Any default occurs under any other agreement involving the borrowing of money or the extension of credit under which Applicant may be obligated as borrower, installment purchaser or guarantor, which default consists of the failure to pay any indebtedness when due or if such default permits or causes the acceleration of any indebtedness or the termination of any commitment to lend or to extend credit;

(d) Applicant or any of its affiliates defaults on any other obligation to the Bank;

(e) In the opinion of the Bank, any material adverse change occurs in Applicant's business, operations, financial condition or ability to perform its obligations under this Application and Agreement;

(f) Any guarantee of Applicant's obligations under this Application and Agreement terminates, is revoked or its validity is contested by the guarantor, or any of the events set forth in (b) through (e) above occur with respect to the guarantor rather than the Applicant; or

(g) Any court order, injunction or other legal process is issued restraining or seeking to restrain drawing or payment under the Letter of Credit.

### 4. Charge to Accounts.
If the Bank is unable to debit the account, if any, specified on the Application, Applicant authorizes the Bank to charge any of Applicant's accounts with the Bank, or any affiliate of the Bank, for all amounts then due and payable to the Bank under this Application and Agreement.

### 5. Indemnities.

(a) Applicant will indemnify and hold the Bank (such term to include for purposes of this Section 4 affiliates of the Bank and its affiliates' officers, directors, employees and agents) harmless from and against (i) all loss or damage arising out of the issuance by the Bank, or any other action taken by any such indemnified party in connection with the Letter of Credit including any loss or damage arising in whole or in part from the negligence of the party seeking indemnification, but excluding any loss or damage resulting from the gross negligence or willful misconduct of the party seeking indemnification, and (ii) all costs and expenses (including reasonable attorneys' fees and allocated costs of in-house counsel and legal expenses) of all claims or legal proceedings arising out of the issuance and all actions arising from or relating to issuance by the Bank of the Letter of Credit or incident to the collection of amounts owed by Applicant hereunder or the enforcement of the rights of the Bank hereunder, including, without limitation, legal proceedings related to any court order, injunction, or other process or decree restraining or seeking to restrain the Bank from paying any amount under the Letter of Credit. Additionally, Applicant will indemnify and hold the Bank harmless from and against all claims, losses, damages, suits, costs or expenses (including reasonable attorneys' fees and allocated costs of in-house counsel, and legal expenses) arising out of Applicant's failure to timely procure licenses or comply with applicable laws, regulations or rules, or any other conduct or failure of Applicant relating to or affecting the Letter of Credit.

(b) If any award, judgment or order is given or made for the payment of any amount due under this Application and Agreement and such award, judgment or order is expressed in a currency other than the currency required under this Application and Agreement, Applicant shall indemnify the Bank against and hold the Bank harmless from all loss and damage incurred by the Bank as a result of any variation in rates of exchange between the date of such award, judgment or order and the date of payment (or, in the case of partial payments, the date of each partial payment thereof) in the required currency.

(c) Without limiting the foregoing, the above indemnities cover all claims and liabilities for which the indemnified party is not responsible to the Applicant under this Agreement, or, if not covered in this Agreement, under applicable law or practice, and the above indemnities cover all claims and liabilities, whether they arise or are settled formally or informally, in which (i) the Beneficiary seeks to enforce the Letter of Credit or any pre-advice of its issuance or amendment, (ii) a third party seeks to enforce the rights of an applicant, Beneficiary, nominated bank, assignee of letter of credit proceeds, or holder of a document, (iii) Applicant seeks to enjoin honor or to attach proceeds from honor or to obtain similar relief against the Bank or (iv) a government agency seeks to investigate or regulate

specifically this Agreement, the Letter of Credit and the Property Pledged under this Application and Agreement or the Letter of Credit.

(d) Each of these indemnities shall constitute an obligation separate and independent from the other obligations contained in this Application and Agreement, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Bank from time to time, and shall continue in full force and effect notwithstanding any award, judgment or order for a liquidated sum in respect of an amount due under this Application and Agreement.

**6. Limitations on the Bank's Liability.**

(a) The Bank shall not be responsible for Applicant for, and the Bank's rights and remedies against Applicant shall not be impaired by:

(i) action or inaction of the Bank required or permitted under any law, order, or practice that is required or permitted to be applied to the Letter of Credit or this Agreement (including the law or any order of a jurisdiction where the Bank or the Beneficiary is located and the practice stated in the International Standby Practices, ICC Publication No. 590 ("ISP98") or the current version, Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce ("ICC") Publication No. 600 ("UCP 600") or current version thereof, as determined at the time the Letter of Credit is issued, , and the decisions, opinions, practice statements, and official commentary of the ICC Banking Commission, the Bankers Association for Finance and Trade – International Financial Services Association (BAFT-IFSA), and the Institute of International Banking Law & Practice whether or not the Letter of Credit chooses such law or practice;

(ii) honor without regard to any non-documentary condition(s) in the Letter of Credit;

(iii) honor or other recognition of a presentation or other demand that includes forged or fraudulent documents or that is otherwise affected by the fraudulent, bad faith, or illegal conduct of the Beneficiary or other person (excluding employees of the Bank and any processing agent engaged by the Bank), whether or not Applicant is innocent and obtains no benefit;

(iv) dishonor of any presentation that does not strictly comply or that is fraudulent, forged, or otherwise not entitled to honor;

(v) dishonor, which is authorized by Applicant, which occurs during the continuance of a Deposit Event, or for which Applicant is unwilling or unable to reimburse the Bank;

(vi) non-notification to Applicant of the Bank's receipt of a presentation or claim for reimbursement under the Letter of Credit or of the Bank's disposition thereof;

(vii) if the Bank in its sole discretion approaches Applicant for a waiver of discrepancies, dishonors regardless of Applicant's waiver of discrepancies or request for honor; or

(viii) retention of Letter of Credit proceeds based on a valid exercise of Bank of America's set off rights or on an apparently applicable attachment order, blocking regulation, or third-party claim notified to the Bank.

(b) Except as may be expressly provided in this Agreement, the Bank shall not be liable to the Applicant in contract, tort or otherwise and under no circumstances shall the Bank be liable to the Applicant or any other person for any special, indirect, consequential, exemplary, or punitive damages.

**7. The Bank's Discretion.**

(a) The Bank may for Applicant's account at any time provide in the Letter of Credit or otherwise agree to do or do any one or more of the following:

(i) send the Letter of Credit or conduct any communication to or from the Beneficiary via the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") message or overnight courier, or any other commercially reasonable means of communicating with a Beneficiary;

(ii) assert or waive or, with any necessary consent from the Beneficiary or other person, amend any provision in the Letter of Credit or applicable practice that primarily concerns issuer operations (including (A) identification of the Letter of Credit in any presentation, (B) marking of the Letter of Credit to reflect a transfer, payment, or other action, (C) specification of banking days and hours, manner, and place for the Bank's receiving a presentation, effecting honor, and giving notice of dishonor under the Letter of Credit, (D) duration of the period(s) for examination, approaching Applicant for a waiver, or sending a notice of refusal, (E) disposition of the Beneficiary's documents after dishonor or while approaching Applicant for a waiver, and (F) replacement of a lost Letter of Credit or recognition of a successor Beneficiary);

(iii) select any branch or office of the Bank or any affiliate of the Bank or another Bank to act as advising, transferring, confirming, and/or nominated bank or person under the law and practice of the place where it acts (if the Letter of Credit permits advice, transfer, confirmation, and/or nomination) or to act as letter of credit processing agent for the Bank in the Bank's issuance of the Letter of Credit or processing of demands or in any other action that the Bank is required or permitted to take under the Letter of Credit;

(iv) honor any presentation that substantially complies with the terms and conditions of the Letter of Credit, whether or not the Letter of Credit requires strict or literal compliance; and

(v) provide for or submit to arbitration, mediation, or the like for the resolution of any dispute between the Bank and Beneficiary.

(b) Unless specifically committed to do so in a writing signed by the Bank, the Bank need not consent to any Letter of Credit amendment. If the Letter of Credit may be extended or terminated by a notice given or other action taken by the Bank (with or without the passage of time) and if Applicant desires that the Bank give a notice of non-extension under the Letter of Credit, Applicant should so notify the Bank in writing more than 15 calendar days in advance of the last day on which a timely notice may be given to Beneficiary. Whether or not requested to do so by Applicant, the Bank shall have the right to give such notice or take such action, to fail or refuse to do so, or to fail to retain proof of doing so. If the Bank gives such notice or takes such action at Applicant's request, then Applicant shall obtain the Beneficiary's acknowledgement thereof and, in the case of Letter of Credit termination, return of the original Letter of Credit. If the Bank fails or refuses to give a notice of non-extension or termination at Applicant's timely written request, then the Bank's Letter of Credit fees shall be calculated as if the Bank had given such notice or taken such action.

(c) If the Beneficiary or another person claims that the Bank has wrongfully repudiated or dishonored, then the Bank shall have the right to defend or settle the claim, with or without joining Applicant in any proceeding or negotiation and without regard to whether the claimant asserts that the Bank is precluded from relying on a valid defense, and Applicant shall have the obligation to mitigate damages and, if the Bank pays or settles, to reimburse, indemnify, account for any benefits, as provided above, and to cooperate with the Bank as subrogee.

(d) The Bank's agreement to use, or its use of, its discretion in one or more instances shall not waive its right, with or without notice to Applicant, to use its discretion differently in other similar instances and shall not establish a course of conduct on which Applicant may rely in any other instances under the same Letter of Credit.

**8. Applicant's Responsibility for Letter of Credit Text and Practice.** Applicant is responsible for preparing or approving the text of the Letter of Credit as submitted to and as issued by the Bank and as received by the Beneficiary. The Bank's recommendation or drafting of text or the Bank's use or non-use or refusal to use text submitted by Applicant shall not affect Applicant's ultimate responsibility for the final text. Applicant is responsible for the Bank's failure to apply, or to observe standard practice as applied to, Letter of Credit terms or conditions that (i) are erroneous, ambiguous, inconsistent, insufficient, ineffective, or illegal, (ii) require the Bank to respond to a demand in fewer than 3 banking days, or (iii) require Applicant to sign, issue, or present a document.

**9. Governing Law and Rules.**

(a) This Agreement will be governed by and interpreted in accordance with (i) U.S. federal law and, (ii) the laws of the state of New York. Unless otherwise specified in the terms of the Letter of Credit, the Letter of Credit will be subject to and governed by and interpreted in accordance with the most current version of the UCP 600 or ISP98, as applicable, in effect on the date the Letter of Credit is issued. In any event, each choice of law shall be without reference to the chosen jurisdiction's provisions regarding conflicts of laws.

(b) Applicant and the Bank agree, to the extent permitted under applicable law, to waive any right to a trial by jury in any action or proceeding with respect to any dispute or

proceeding will be tried before a judge without a jury.

**10. Applicant Status.** The word "Applicant" in this Application and Agreement refers to each signer (other than the Bank) of this Application and Agreement. If this Application and Agreement is signed by more than one Applicant, their obligations under this Application and Agreement shall be joint and several. If there is more than one Applicant, the Letter of Credit will be issued in the name of the Account Party listed on the Application, or if no such party is listed, the first Applicant named on the Application (the "Designated Party"). Applicant further agrees that the Designated Party shall have the exclusive right to issue all instructions relating to the Letter of Credit including (without limitation) instructions as to the disposition of documents and any unutilized funds, waiver of discrepancies, and to agree with the Bank upon any amendments, modifications, extensions, renewals, or increases in the Letter of Credit or the further financing or refinancing of any transaction effected thereunder, irrespective of whether the same may now or hereafter affect its rights or those of its legal representatives, heirs, successors or assigns. The Designated Party shall have specimen signatures on file with the Bank and the Bank may give any notices to the Designated Party without notice to any other person listed as an Applicant on the Application.

**11. Representations and Warranties.** Applicant represents and warrants to the Bank that it has the authority to enter into this Application and Agreement and that such Agreement will not violate or conflict with any of the provisions of its constituent documents or any other agreement or undertaking to which it is a party or to which it is bound.

(b)Applicant represents and warrants to the Bank that Applicant has obtained all licenses and other governmental approvals required for the import, export, shipping, storage of, financing of or payment for goods and the documents described in the Letter of Credit. Applicant also represents and warrants to the Bank that it has paid all applicable levies, duties or other taxes imposed in connection with the Letter of Credit (other than net income taxes payable by the Bank). Without limiting the generality of the foregoing, Applicant further expressly represents and warrants to the Bank that the transactions underlying the Letter of Credit are not prohibited under the Foreign Assets Control Regulations of the United States Treasury Department and any importation covered by the Letter of Credit conforms in every respect with all existing applicable U.S. and state laws.

**12. Miscellaneous.**

(a) No delay, extension of time, renewal, compromise or other indulgence which may occur or be granted by the Bank shall impair the rights and powers of the Bank hereunder. The Bank shall not be deemed to have waived any of its rights hereunder, unless the Bank shall have signed such waiver in writing.

(b) Any notice from the Bank to Applicant shall be deemed given when mailed, postage paid, or when delivered to a courier, fee paid by shipper, addressed to Applicant at the address furnished by Applicant to the Bank pursuant to this Application and Agreement, or when confirmed by electronic confirmation to the Bank as having been delivered via facsimile or other teletransmission. Any notice from Applicant to the Bank shall be sent to the address of the Bank specified by the Bank to Applicant and shall be effective upon receipt by the Bank.

(c) Each provision of this Application and Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Application and Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Application and Agreement.

(d) Any and all payments made to the Bank hereunder shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding income or franchise taxes imposed by the United States and any political subdivisions thereof (such nonexcluded taxes being herein called "Taxes"). If Applicant shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 11(d)), the Bank shall receive an amount equal to the sum the Bank would have received but for such deductions been made, (ii) Applicant shall make such deductions, and (iii) Applicant shall pay the full amount deducted to the relevant authority in accordance with applicable law. Applicant will indemnify the Bank for the full amount of Taxes (including, without limitation, any Taxes imposed by any jurisdiction on amounts payable under this Section 11(d)) paid by the Bank and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date the Bank makes written demand therefor. Within 30 days after the date of any payment of Taxes, Applicant will furnish to the Bank the original or a certified copy of a receipt evidencing payment thereof.

(e) This Application and Agreement shall be binding upon Applicant, its successors and assigns, and shall inure to the benefit of the Bank, its successors, transferees and assigns; provided that any assignment by Applicant of any of its rights or obligations under this Application and Agreement without the prior written consent of the Bank shall be void.

(f) If the Applicant requests the Bank to increase the amount of the Letter of Credit, extend or renew the Letter of Credit, otherwise modify the terms of the Letter of Credit, or finance or refinance any transaction effected under the Letter of Credit, Applicant agrees that this Agreement shall continue to bind it with respect to any action taken by the Bank or any of the Bank's correspondents in accordance with such increase, extension, renewal or other modification and as to any transaction so financed or refinanced.

(g)Applicant shall pay the Bank for reasonable attorneys' fees and allocated costs of in-house counsel, and legal costs paid or incurred by the Bank in connection with this Agreement or the related Letter of Credit (including, without limitation, the defense by the Bank of any proceeding initiated by the Applicant to enjoin or restrain any drawing, payment or negotiation of the Letter of Credit by the Bank, even if the Applicant is awarded such relief, provided only that the Bank has acted in good faith in defending such action).

(h) Unless the Applicant has specified in the Application that the wording of the Letter of Credit must be exact, Applicant understands that the final form of the Letter of Credit may vary from the wording specified in the Application, and Applicant authorizes the Bank to make such changes, not materially inconsistent with the Application, which the Bank deems necessary or appropriate. Applicant understands that the risk to Applicant is greater if Applicant requests a standby letter of credit which requires only a draft, rather than a standby letter of credit which requires supporting documentation.

(i) In the event of any change or modification, with the consent of Applicant, which consent may be given by any means of submission acceptable to the Bank, including, without limitation, computer, facsimile or telex, relative to the Letter of Credit or any instrument called for hereunder, including any waiver made or in good faith believed by the Bank to have been made by Applicant of any term hereof or the noncompliance of any such instruments with the terms of the Letter of Credit, this Application and Agreement shall be binding upon Applicant with regard to the Letter of Credit as so changed or modified, and to any action taken by the Bank or any of its correspondents relative thereto. No term or provision of this Application and Agreement can be changed orally, but only in a writing and signed by Applicant and the Bank. This Application and Agreement may be amended, supplemented or modified from time to time by a rider, amendment or supplement executed by Applicant and accepted by the Bank.

(j) The Bank assumes no liability or responsibility for the consequences arising out of delay and/or loss in transit of any message, letter or documentation, or for delay, mutilation or other error arising in the transmission of any teletransmission. In no event shall the Bank be liable for any special, indirect, consequential or exemplary damages.

(k) If Applicant includes in the Application any language describing events or conditions that would not be possible for the Bank to verify solely from the documents required to be presented under the Letter of Credit, Applicant acknowledges and agrees that the Bank has no obligation to verify compliance with such requirements.

NOTICE OF FINAL AGREEMENT. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

| Name of Applicant | | FOR OFFICE USE ONLY | | | |
|---|---|---|---|---|---|
| | | ☐ Trade Operations          Mail Code# | | | |
| By: | Title | COMMISSION | ☐ Per Standard Fee Schedule<br>☐ Charge Directly | ☐ Other<br>☐ Commissions and Charges only | ☐ Charge Banking Center<br>☐ Drawings, Commissions and Charges |
| Name of Applicant (if any, co-signing with the Applicant above) | | APPROVING OFFICER (Printed Name)                    PHONE # | | | |
| By: | Title | OFFICER TELEPHONE  #                           FAX # | | | |
| (WHERE SPECIMEN SIGNATURES OF THE APPLICANT NAMED ABOVE ARE NOT ON FILE WITH BANK OF AMERICA, THE FOLOWING SIGNATURE VERIFICATION IS REQUIRED.) | | DDA APPLICANT A/C # | | | |
| The above signature of an officer, partner or agent of each Applicant indicated above confirms to that on file with us and such officer, partner or agent is fully authorized to sign this Agreement for such Applicant. | | APPROVING BANK OFFICER SIGNATURE | | | |
| | | OFFICER – INTEROFFICE ADDRESS | | | |
| By: | BANK (Full Name) | (Bank Address) | | | |
| Authorized Signature/Title (Specimen signature of the signer must be on file with Bank of America) | | OFFICER NUMBER AND COST CENTER NUMBER | | | |

Bank of America, N.A.

EXHIBIT G

FORM OF

**MORTGAGE COMPLIANCE CERTIFICATE**

[date]

Bank of America, N.A., as Agent
[_____]
[_____]

Attention:      [_____]

Ladies and Gentlemen:

I refer to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement"), among Goldking Resources, LLC ("Borrower"), Goldking Holdings, LLC and Goldking Onshore Operating, LLC, as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"), the defined terms of which are used herein unless otherwise defined herein.

In connection with the delivery of, and based upon the information set forth in, the Oil and Gas Reserve Report with respect to the Borrower's consolidated Oil and Gas Properties as of [_____], dated as of [_____] (the "Applicable Report"), the following sets forth the information and computations required by Section 5.6(c)(iii) of the Credit Agreement as of [_____]:

| | | |
|---|---|---|
| 1. | Oil and Gas Property Value (as set forth in the Applicable Report) | $_____ |
| 2. | Oil and Gas Property Value allocated to Oil and Gas Properties described in the Mortgages | $_____ |
| 3. | Oil and Gas Property Value (A) allocated to Oil and Gas Properties described in the Mortgages and (B) the record title to which was acquired since the most recent Mortgage was filed | $_____ |
| 4. | Mortgaged Property Value (line 2 *minus* line 3) | $_____ |
| 5. | 85% of line 1 above | $_____ |
| 6. | **[**Amount by which the Mortgaged Property Value is less than 85% of the Oil and Gas Property Value (line 3 *minus* line 1)**]** *[Include the above only if line 1 is less than line 3]* | [$_____] |

I hereby certify that **[**the Mortgaged Property Value (as set forth in the Applicable Report) equals or exceeds 85% of the Oil and Gas Property Value (as set forth in the Applicable Report).**]** **[**the amount by which the Mortgaged Property Value (as set forth in the Applicable Report) is less than 85% of the Oil and Gas Property Value (as set forth in the Applicable Report) is $_____, and the Borrower agrees to take all actions required by <u>Section 5.11</u> of the Credit Agreement with respect to such difference within the time period required by such Section.**]** ***[Select appropriate alternative.]***

This certificate is given in my capacity as an officer of the Borrower and not in my individual capacity.

Very truly yours,

GOLDKING RESOURCES, LLC

By:_____
Name: Leonard C. Tallerine, Jr.
Title: Chief Executive Officer

<b>Execution Version</b>

### AMENDMENT NO. 1 TO CREDIT AGREEMENT

This Amendment No. 1 dated as of April 29, 2011 (this "<u>Agreement</u>") is among Goldking Resources, LLC, a Delaware limited liability company ("<u>Borrower</u>"), Goldking Holdings, LLC, a Delaware limited liability company, and Goldking Onshore Operating, LLC, a Delaware limited liability company (together, the "<u>Guarantors</u>"), the financial institutions party to the Credit Agreement described below as Banks ("<u>Banks</u>"), and Bank of America, N.A., as administrative agent for the Banks ("<u>Agent</u>") and as Issuing Bank ("<u>Issuing Bank</u>").

### INTRODUCTION

A.    The Borrower, the Guarantors, the Banks, the Issuing Bank, and the Agent have entered into the Credit Agreement dated as of November 5, 2010 (the "<u>Credit Agreement</u>").

B.    The Guarantors entered into that certain Guaranty dated as of November 5, 2010 (the "<u>Subsidiary Guaranty</u>").

C.    The parties hereto desire to amend the Credit Agreement to (i) add a Debt to Capital ratio covenant, (ii) delay measuring the Debt to EBITDA ratio until June 30, 2012 and (iii) extend the deadline to deliver the Compliance Certificate and the financial statements for the fiscal year ended December 31, 2010 by 15 days.

D.    Each Guarantor wishes to reaffirm its guarantee of the Obligations as amended by this Agreement.

THEREFORE, in fulfillment of the foregoing, the Borrower, the Guarantors, the Agent, the Issuing Bank, and the Banks hereby agree as follows:

Section 1.    <u>Definitions; References</u>.  Unless otherwise defined in this Agreement, each term used in this Agreement which is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement.

Section 2.    <u>Amendment</u>.  Upon the satisfaction of the conditions specified in <u>Section 6</u> of this Agreement, and, unless otherwise specified, effective as of December 31, 2010, the Credit Agreement is amended as follows:

(a)    Clause (e) of the definition of "Permitted Acquisition" in Section 1.1 of the Credit Agreement is amended to read as follows:

"(e) immediately after giving effect thereto, the Borrower and its Subsidiaries shall be in compliance, on a pro forma basis after giving effect to such acquisition, with the covenants contained in Section 6.15, Section 6.16, Section 6.17 and Section 6.18, recomputed as of the last day of the most recently ended fiscal quarter of the Borrower as if such acquisition and any related financings or other transactions had occurred on the first day of the period for testing such compliance and the Borrower shall have delivered to the Agent an officers'

certificate to such effect, together with all financial information required under Section 5.6(m)."

(b)    A new definition of "Shareholders' Equity is added to <u>Section 1.1</u> of the Credit Agreement to read as follows:

"<u>Consolidated Shareholders' Equity</u>" means, as of any date of determination, consolidated shareholders' equity of the Borrower and its Subsidiaries as of such date determined in accordance with GAAP.

(c)    <u>Section 5.6(a)</u> of the Credit Agreement is amended in its entirety to read as follows:

(a)    <u>Annual Financials</u>.  As soon as available and in any event not later than (x) with respect to the fiscal year of the Borrower ending December 31, 2010, 135 days after the end of such fiscal year and (y) with respect to the fiscal years of the Borrower ending thereafter, 120 days after the end of each fiscal year of the Borrower, (i) a copy of the annual audit report for such year for the Credit Parties, including therein the consolidating balance sheets of the Credit Parties as of the end of such fiscal year and consolidating statements of operations, cash flows, and stockholders' equity of the Credit Parties for such fiscal year, in each case certified by Hein and Associates LLP or other independent certified public accountants of national standing and including any management letters delivered by such accountants to the Borrower in connection with such audit, (ii) the capital budget for the Credit Parties established by the Board of Directors of the Borrower for the next fiscal year, in reasonable detail by geographical area and type of expenditure, and (iii) a Compliance Certificate executed by a Responsible Officer of the Borrower;

(d)    <u>Section 6.17</u> of the Credit Agreement is amended in its entirety to read as follows:

6.17    <u>Debt to EBITDA Ratio</u>.  Beginning with the fiscal quarter ending June 30, 2012, the Credit Parties shall not permit the ratio, as of the last day of any fiscal quarter of the Credit Parties, of (a) the Credit Parties' consolidated Debt on such date to (b) the Credit Parties' Consolidated EBITDA for the four fiscal quarters ended on such date, to be greater than 3.00 to 1.00.

(e)    A new <u>Section 6.18</u> is added to the Credit Agreement to read as follows:

6.18    <u>Debt to Capitalization Ratio</u>.  Beginning with the fiscal quarter ending December 31, 2010 and ending with the fiscal quarter ending March 31, 2012, the Credit Parties shall not permit the ratio, as of the last day of any fiscal quarter of the Credit Parties, of (a) the Credit Parties' consolidated Debt on such date to (b) the sum of the Credit Parties' consolidated Debt on such date plus Consolidated Shareholders' Equity on such date, to be greater than 35%.

(f)     Exhibit B to the Credit Agreement is replaced with Exhibit B attached hereto.

Section 3.     <u>Reaffirmation of Liens</u>.

(a)     Each of the Borrower and each Guarantor (i) is party to certain Security Documents securing and supporting the Borrower's and Guarantors' obligations under the Credit Documents, (ii) represents and warrants that it has no defenses to the enforcement of the Security Documents and that according to their terms the Security Documents will continue in full force and effect to secure the Borrower's and Guarantors' obligations under the Credit Documents, as the same may be amended, supplemented, or otherwise modified, and (iii) acknowledges, represents, and warrants that the liens and security interests created by the Security Documents are valid and subsisting and create an Acceptable Security Interest in the Collateral to secure the Borrower's and Guarantors' obligations under the Credit Documents, as the same may be amended, supplemented, or otherwise modified.

(b)     The delivery of this Agreement does not indicate or establish a requirement that any Guaranty or Security Document requires any Guarantor's approval of amendments to the Credit Agreement.

Section 4.     <u>Representations and Warranties</u>.  The Borrower represents and warrants to the Agent and the Banks that:

(a)     the representations and warranties set forth in the Credit Agreement and in the other Credit Documents are true and correct as of the date of this Agreement (except to the extent such representations and warranties relate to an earlier date, in which case such representations and warranties are true and correct as of such earlier date);

(b)     (i) the execution, delivery, and performance of this Agreement are within the limited liability company power and authority of the Borrower and have been duly authorized by appropriate proceedings and (ii) this Agreement constitutes a legal, valid, and binding obligation of the Borrower and each Guarantor, enforceable against the Borrower and each Guarantor in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors generally and general principles of equity; and

(c)     as of the effectiveness of this Agreement and after giving effect thereto, no Default or Event of Default has occurred and is continuing.

Section 5.     <u>Reaffirmation of Guaranty</u>.  Each Guarantor hereby ratifies, confirms, and acknowledges that its obligations under the Subsidiary Guaranty are in full force and effect and that such Guarantor continues to unconditionally and irrevocably guarantee the full and punctual payment, when due, whether at stated maturity or earlier by acceleration or otherwise, of all of the Obligations (subject to the terms of the Subsidiary Guaranty), as such Obligations may have been amended by this Agreement.  Each Guarantor hereby acknowledges that its execution and delivery of this Agreement do not indicate or establish an approval or consent requirement by any Guarantor under the Subsidiary Guaranty in connection with the execution and delivery of

amendments, modifications or waivers  to the Credit Agreement, the Notes or any of the other Credit Documents.

Section 6.    <u>Effectiveness</u>.  This Agreement shall become effective as of December 31, 2010, and the Credit Agreement shall be amended as provided herein, upon the occurrence of all of the following:  (a) the Majority Banks', the Borrower's, and the Guarantors' duly and validly executing originals of this Agreement and delivery thereof to the Agent, (b) the representations and warranties in this Agreement being true and correct before and after giving effect to this Agreement, and (c) the Borrower's having paid all costs, expenses, and fees which have been invoiced and are payable pursuant to <u>Section 9.4</u> of the Credit Agreement or any other written agreement.

Section 7.    <u>Effect on Credit Documents</u>.    Except as amended herein, the Credit Agreement and the Credit Documents remain in full force and effect as originally executed, and nothing herein shall act as a waiver of any of the Agent's or Banks' rights under the Credit Documents, as amended.    This Agreement is a Credit Document for the purposes of the provisions of the other Credit Documents.    Without limiting the foregoing, any breach of representations, warranties, and covenants under this Agreement may be a Default or Event of Default under other Credit Documents.

Section 8.    <u>Choice of Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

Section 9.    <u>Counterparts</u>.    This Agreement may be signed in any number of counterparts, each of which shall be an original.

*[Signature follows.]*

THIS WRITTEN AGREEMENT AND THE CREDIT DOCUMENTS, AS DEFINED IN THE CREDIT AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED as of the date first set forth above.

BORROWER:

GOLDKING RESOURCES, LLC

By: _____
Name: Leonard C. Tallerine, Jr.
Title: Chief Executive Officer

GUARANTORS:

GOLDKING HOLDINGS, LLC

By: _____
Name: Leonard C. Tallerine, Jr.
Title: President

GOLDKING ONSHORE OPERATING, LLC

By: _____
Name: Leonard C. Tallerine, Jr.
Title: President

**AGENT AND ISSUING BANK:**

BANK OF AMERICA, N.A.

By: _____

Name: Sandra M. Serie
Title:  Vice President

**BANKS:**

BANK OF AMERICA, N.A.

By: _____

Name: Sandra M. Serie
Title:  Vice President

EXHIBIT B

**FORM OF**

**COMPLIANCE CERTIFICATE**

[date]

Bank of America, N.A., as Agent
MA5-100-09-01
100 Federal St.
Boston, MA 02110

Attention:    Sandra Serie

Ladies and Gentlemen:

I refer to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement"), among Goldking Resources, LLC ("Borrower"), Goldking Holdings, LLC and Goldking Onshore Operating, LLC, as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"), the defined terms of which are used herein unless otherwise defined herein.

I hereby certify that I have no Knowledge of any Defaults under the Credit Agreement which existed as of [_____] or which exist as of the date of this letter.

I also certify that the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial condition of the Borrower as of [_____], and the related results of operations for the period then ended, in conformity with generally accepted accounting principles.

The following sets forth the information and computations to demonstrate compliance with the requirements of Sections 6.15, 6.16, 6.17 and 6.18 of the Credit Agreement as of [_____]:

A.    Section 6.15 – Interest Coverage Ratio.

| | | |
|---|---|---|
| 1. | Consolidated EBITDA[1] four quarters ending [_____] | $_____ |
| 2. | Consolidated Interest Charges[2] for such period | $_____ |
| 3. | ratio A.1 ÷ A.2 | ____ to 1.00 |
| 4. | minimum | 3.00 to 1.00 |

B.    Section 6.16 – Current Ratio

| | | |
|---|---|---|
| 1. | consolidated current assets[3] | $_____ |

---

[1] "Consolidated EBITDA" is defined in Section 1.1 of the Credit Agreement.
[2] "Consolidated Interest Charges" is defined in Section 1.1 of the Credit Agreement.

|  |  |  |  |
|---|---|---|---|
| 2. | consolidated current liabilities[4] | | $_____ |
| 3. | ratio B.1 ÷ B. 2 | | ____ to 1.00 |
| 4. | minimum | | 1.00 to 1.00 |

C.    Section 6.17 - Debt to EBITDA Ratio[5]

|  |  |  |
|---|---|---|
| 1. | consolidated Debt as of [_____] | $_____ |
| 2. | Consolidated EBITDA[6] for four fiscal quarters ending [_____] | $_____ |
| 3. | ratio C.1 ÷ C.2 | ___ to 1.00 |
| 4. | maximum | 3.00 to 1.00 |

D.    Section 6.18 - Debt to Capitalization Ratio[7]

|  |  |  |
|---|---|---|
| 1. | consolidated Debt as of [_____] | $_____ |
| 2. | Consolidated Shareholders' Equity | $_____ |
| 3. | Sum of C.1. and C.2. | $_____ |
| 4. | ratio C.1 ÷ C.3 | _____% |
| 5. | maximum | 35% |

This certificate is given in my capacity as an officer of the Borrower and not in my individual capacity.

Very truly yours,


GOLDKING RESOURCES, LLC


By:_____

Name:_____

Title:_____

---

[3] "current assets" is defined in Section 6.16 of the Credit Agreement.
[4] "current liabilities" is defined in Section 6.16 of the Credit Agreement.
[5] Debt to EBITDA Ratio is measured beginning with the fiscal quarter ending June 30, 2012.
[6] Consolidated EBITDA shall be calculated in accordance with Section 6.17.
[7] Debt to Capitalization Ratio is measured beginning with the fiscal quarter ending December 31, 2010 and ending with the fiscal quarter ending March 31, 2012.

Execution Version

## AMENDMENT NO. 2 TO CREDIT AGREEMENT

This Amendment No. 2 dated as of June 15, 2011 (this "Agreement") is among Goldking Resources, LLC, a Delaware limited liability company ("Borrower"), Goldking Holdings, LLC, a Delaware limited liability company, and Goldking Onshore Operating, LLC, a Delaware limited liability company (together, the "Guarantors"), the financial institutions party to the Credit Agreement described below as Banks ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent") and as Issuing Bank ("Issuing Bank").

## INTRODUCTION

A.      The Borrower, the Guarantors, the Banks, the Issuing Bank, and the Agent have entered into the Credit Agreement dated as of November 5, 2010, as amended by the Amendment No. 1 to Credit Agreement dated as of April 29, 2011 (as so amended, the "Credit Agreement").

B.      The Guarantors entered into that certain Guaranty dated as of November 5, 2010 (the "Corporate Guaranty").

C.      The parties hereto desire to amend the Credit Agreement to (i) increase the borrowing base, (ii) delay measuring the Interest Coverage Ratio until the fiscal quarter ending September 30, 2011, (iii) add a minimum Consolidated EBITDA covenant, and (iv) change the date of delivery of the quarterly financials and compliance certificate for the fiscal quarter ended March 31, 2011.

D.      Each Guarantor wishes to reaffirm its guarantee of the Obligations as amended by this Agreement.

THEREFORE, in fulfillment of the foregoing, the Borrower, the Guarantors, the Agent, the Issuing Bank, and the Banks hereby agree as follows:

Section 1.      Definitions; References.  Unless otherwise defined in this Agreement, each term used in this Agreement which is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement.

Section 2.      Amendment.  Upon the satisfaction of the conditions specified in Section 6 of this Agreement, and, unless otherwise specified, effective as of March 31, 2011, the Credit Agreement is amended as follows:

(a)      A new definition of "Amendment No. 2 Effective Date" is added to Section 1.1 of the Credit Agreement to read as follows:

"Amendment No. 2 Effective Date" means June 15, 2011.

(b)      The definition of "Consolidated EBITDA" in Section 1.1 of the Credit Agreement is amended to read in its entirety as follows:

"Consolidated EBITDA" means, with respect to any Person and for any period, for such Person and its Subsidiaries on a consolidated basis, an amount equal to consolidated Net Income of such Person for such period plus (a) the following to the extent deducted in calculating such consolidated Net Income: (i) Consolidated Interest Charges for such period, (ii) the provision for Federal, state, local and foreign income taxes payable by the Borrower and its Subsidiaries for such period, (iii) depreciation and amortization expense, (iv) other non-recurring expenses of such Person and its Subsidiaries reducing such consolidated Net Income which do not represent a cash item in such period or any future period, including exploration expenses in the event such Person and its Subsidiaries use successful efforts accounting, (v) to the extent expensed and recognized in the applicable period, the transaction fees and expenses incurred in connection with the negotiation, execution and closing of the transaction contemplated by the White Oak PSA in an aggregate amount not to exceed $1,100,000, and (vi) unrealized losses on Commodity Hedge Agreements recognized in accordance with SFAS No. 133 and minus (b) the following to the extent included in calculating such consolidated Net Income: (i) Federal, state, local and foreign income tax credits of such Person and its Subsidiaries for such period, (ii) all non-cash items increasing consolidated Net Income for such period, (iii) unrealized gains on Commodity Hedge Agreements recognized in accordance with SFAS No. 133 and (iv) other non-recurring income of such Person and its Subsidiaries.

(c)    Section 2.2(a) of the Credit Agreement is amended to read in its entirety as follows:

"(a) The Borrowing Base has been set by the Banks and acknowledged by the Borrower as $22,000,000 as of the Amendment No. 2 Effective Date."

(d)    Section 5.6(b) is amended to read in its entirety as follows:

"(b) Quarterly Financials. As soon as available and in any event not later than (x) with respect to the fiscal quarter ending March 31, 2011, June 15, 2011 and (y) with respect to all other fiscal quarters of the Borrower, 60 days after the end of each of the four quarters of each fiscal year of the Borrower, (i) the unaudited consolidating balance sheet of the Credit Parties as of the end of such quarter and the consolidating statements of operations and cash flows of the Credit Parties for the period commencing at the end of the previous year and ending with the end of such quarter, all in reasonable detail and duly certified with respect to such consolidating statements (subject to year-end audit adjustments) by a Responsible Officer of the Borrower as having been prepared in accordance with GAAP, and (ii) a Compliance Certificate executed by a Responsible Officer of the Borrower;

(e)    Section 6.15 of the Credit Agreement is amended to read in its entirety as follows:

6.15    Interest Coverage Ratio.    Beginning with the fiscal quarter ending September 30, 2011, the Credit Parties shall not permit the ratio, as of the last day

of any fiscal quarter of Credit Parties, of (a) their Consolidated EBITDA for the four fiscal quarters ended on such date to (b) their Consolidated Interest Charges for the four fiscal quarters ended on such date, to be less than 3.00 to 1.00.

   (f) A new <u>Section 6.19</u> is added to the Credit Agreement to read as follows:

6.19 <u>Minimum Consolidated EBITDA</u>. The Credit Parties shall not permit (a) the Credit Parties' Consolidated EBITDA for the fiscal quarter ending September 30, 2011 to be less than $2,300,000 and (b) the Credit Parties' Consolidated EBITDA for the fiscal quarter ending December 31, 2011 to be less than $4,000,000.

   (g) Exhibit B to the Credit Agreement is replaced with Exhibit B attached hereto.

  Section 3. <u>Reaffirmation of Liens</u>.

   (a) Each of the Borrower and each Guarantor (i) is party to certain Security Documents securing and supporting the Borrower's and Guarantors' obligations under the Credit Documents, (ii) represents and warrants that it has no defenses to the enforcement of the Security Documents and that according to their terms the Security Documents will continue in full force and effect to secure the Borrower's and Guarantors' obligations under the Credit Documents, as the same may be amended, supplemented, or otherwise modified, and (iii) acknowledges, represents, and warrants that the liens and security interests created by the Security Documents are valid and subsisting and create an Acceptable Security Interest in the Collateral to secure the Borrower's and Guarantors' obligations under the Credit Documents, as the same may be amended, supplemented, or otherwise modified.

   (b) The delivery of this Agreement does not indicate or establish a requirement that any Guaranty or Security Document requires any Guarantor's approval of amendments to the Credit Agreement.

  Section 4. <u>Representations and Warranties</u>. The Borrower represents and warrants to the Agent and the Banks that:

   (a) the representations and warranties set forth in the Credit Agreement and in the other Credit Documents are true and correct as of the date of this Agreement (except to the extent such representations and warranties relate to an earlier date, in which case such representations and warranties are true and correct as of such earlier date);

   (b) (i) the execution, delivery, and performance of this Agreement are within the limited liability company power and authority of the Borrower and have been duly authorized by appropriate proceedings and (ii) this Agreement constitutes a legal, valid, and binding obligation of the Borrower and each Guarantor, enforceable against the Borrower and each Guarantor in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the rights of creditors generally and general principles of equity; and

(c)    as of the effectiveness of this Agreement and after giving effect thereto, no Default or Event of Default has occurred and is continuing.

Section 5.    <u>Reaffirmation of Guaranty</u>.  Each Guarantor hereby ratifies, confirms, and acknowledges that its obligations under the Corporate Guaranty are in full force and effect and that such Guarantor continues to unconditionally and irrevocably guarantee the full and punctual payment, when due, whether at stated maturity or earlier by acceleration or otherwise, of all of the Obligations (subject to the terms of the Corporate Guaranty), as such Obligations may have been amended by this Agreement.  Each Guarantor hereby acknowledges that its execution and delivery of this Agreement do not indicate or establish an approval or consent requirement by any Guarantor under the Corporate Guaranty in connection with the execution and delivery of amendments, modifications or waivers  to the Credit Agreement, the Notes or any of the other Credit Documents.

Section 6.    <u>Effectiveness</u>.  This Agreement shall become effective as of March 31, 2011, and the Credit Agreement shall be amended as provided herein, upon the occurrence of all of the following:  (a) the Majority Banks', the Borrower's, and the Guarantors' duly and validly executing originals of this Agreement and delivery thereof to the Agent, (b) the representations and warranties in this Agreement being true and correct before and after giving effect to this Agreement, (c) the Borrower's having paid all costs, expenses, and fees which have been invoiced and are payable pursuant to <u>Section 9.4</u> of the Credit Agreement or any other written agreement, and (d) the Borrower's having paid a borrowing base increase fee acceptable to Agent.

Section 7.    <u>Effect on Credit Documents</u>.  Except as amended herein, the Credit Agreement and the Credit Documents remain in full force and effect as originally executed, and nothing herein shall act as a waiver of any of the Agent's or Banks' rights under the Credit Documents, as amended.  This Agreement is a Credit Document for the purposes of the provisions of the other Credit Documents.  Without limiting the foregoing, any breach of representations, warranties, and covenants under this Agreement may be a Default or Event of Default under other Credit Documents.

Section 8.    <u>Choice of Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

Section 9.    <u>Counterparts</u>.    This Agreement may be signed in any number of counterparts, each of which shall be an original.

*[Signature follows.]*

**THIS WRITTEN AGREEMENT AND THE CREDIT DOCUMENTS, AS DEFINED IN THE CREDIT AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

EXECUTED as of the date first set forth above.

**BORROWER:**

GOLDKING RESOURCES, LLC


By: _____
Name: Leonard C. Tallerine, Jr.
Title:   Chief Executive Officer




**GUARANTORS:**

GOLDKING HOLDINGS, LLC


By: _____
Name: Leonard C. Tallerine, Jr.
Title:   President

GOLDKING ONSHORE OPERATING, LLC


By: _____
Name: Leonard C. Tallerine, Jr.
Title:   President

EXHIBIT B

**FORM OF**

**COMPLIANCE CERTIFICATE**

[date]

Bank of America, N.A., as Agent
MA5-100-09-01
100 Federal St.
Boston, MA 02110

Attention:    Sandra Serie

Ladies and Gentlemen:

I refer to the Credit Agreement dated as of November 5, 2010 (as the same may be modified from time to time, the "Credit Agreement"), among Goldking Resources, LLC ("Borrower"), Goldking Holdings, LLC and Goldking Onshore Operating, LLC, as guarantors, the banks named therein ("Banks"), and Bank of America, N.A., as administrative agent for the Banks ("Agent"), the defined terms of which are used herein unless otherwise defined herein.

I hereby certify that I have no Knowledge of any Defaults under the Credit Agreement which existed as of [_____] or which exist as of the date of this letter.

I also certify that the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial condition of the Borrower as of [_____], and the related results of operations for the period then ended, in conformity with generally accepted accounting principles.

The following sets forth the information and computations to demonstrate compliance with the requirements of Sections 6.15, 6.16, 6.17, 6.18 and 6.19 of the Credit Agreement as of [_____]:

A.    Section 6.15 – Interest Coverage Ratio.[1]

| | | | |
|---|---|---|---|
| 1. | Consolidated EBITDA[2] four quarters ending [_____] | $_____ | |
| 2. | Consolidated Interest Charges[3] for such period | $_____ | |
| 3. | ratio A.1 ÷ A.2 | ____ to 1.00 | |
| 4. | minimum | 3.00 to 1.00 | |

B.    Section 6.16 – Current Ratio

---

[1] The Interest Coverage Ratio is measured beginning with the fiscal quarter ending September 30, 2011.

[2] "Consolidated EBITDA" is defined in Section 1.1 of the Credit Agreement.

[3] "Consolidated Interest Charges" is defined in Section 1.1 of the Credit Agreement.

| | | | |
|---|---|---|---|
| 1. | consolidated current assets[4] | $ | _____ |
| 2. | consolidated current liabilities[5] | $ | _____ |
| 3. | ratio B.1 ÷ B. 2 | | _____ to 1.00 |
| 4. | minimum | | 1.00 to 1.00 |

C.    Section 6.17 - Debt to EBITDA Ratio[6]

| | | | |
|---|---|---|---|
| 1. | consolidated Debt as of [_____] | $ | _____ |
| 2. | Consolidated EBITDA[7] for four fiscal quarters ending [_____] | $ | _____ |
| 3. | ratio C.1 ÷ C.2 | | _____ to 1.00 |
| 4. | maximum | | 3.00 to 1.00 |

D.    Section 6.18 - Debt to Capitalization Ratio[8]

| | | | |
|---|---|---|---|
| 1. | consolidated Debt as of [_____] | $ | _____ |
| 2. | Consolidated Shareholders' Equity | $ | _____ |
| 3. | Sum of C.1. and C.2. | $ | _____ |
| 4. | ratio C.1 ÷ C.3 | | _____ % |
| 5. | maximum | | 35% |

E.    Section 6.19 – Minimum Consolidated EBITDA[9]

| | | | |
|---|---|---|---|
| 1. | Consolidated EBITDA for fiscal quarter ending: [September 30, 2011] [December 31, 2011] | $ | _____ |
| 2. | Minimum | | |
| | Fiscal Quarter ended September 30, 2011 | | $2,300,000 |
| | Fiscal Quarter ended December 31, 2011 | | $4,000,000 |

*[Signature follows.]*

---

[4] "current assets" is defined in <u>Section 6.16</u> of the Credit Agreement.

[5] "current liabilities" is defined in <u>Section 6.16</u> of the Credit Agreement.

[6] Debt to EBITDA Ratio is measured beginning with the fiscal quarter ending June 30, 2012.

[7] Consolidated EBITDA shall be calculated in accordance with <u>Section 6.17</u>.

[8] Debt to Capitalization Ratio is measured beginning with the fiscal quarter ending December 31, 2010 and ending with the fiscal quarter ending March 31, 2012.

[9] Minimum Consolidated EBITDA is measured for fiscal quarter ending September 30, 2011 and December 31, 2011.

This certificate is given in my capacity as an officer of the Borrower and not in my individual capacity.

Very truly yours,

GOLDKING RESOURCES, LLC

By:_____

Name:_____

Title:_____

**AGENT AND ISSUING BANK:**

BANK OF AMERICA, N.A.

By: _____
Name: Sandra M. Serie
Title:   Vice President

**BANKS:**

BANK OF AMERICA, N.A.

By: _____
Name: Sandra M. Serie
Title:   Vice President

## AMENDMENT NO. 3 TO CREDIT AGREEMENT AND WAIVER

**THIS AMENDMENT NO. 3 TO CREDIT AGREEMENT AND WAIVER** (this "Amendment") is made and entered into as of January 24, 2013, by and among **GOLDKING RESOURCES, LLC**, a Delaware limited liability company (the "Borrower"), **GOLDKING HOLDINGS, LLC**, a Delaware limited liability company ("Holdco"), and **GOLDKING ONSHORE OPERATING, LLC**, a Delaware limited liability company ("Operating"), and **WAYZATA OPPORTUNITIES FUND II, L.P.**, as successor administrative agent to Bank of America, N.A., as resigning administrative agent (in such capacity, the "Administrative Agent").

## W I T N E S S E T H:

**WHEREAS**, Bank of America, N.A., as the administrative agent, the Borrower, Holdco, Operating, the Banks party thereto, and Bank of America, N.A., as Issuing Bank, entered into that certain Credit Agreement dated as of November 5, 2010 (as hereby and from time to time amended, restated, supplemented, modified or replaced, the "Credit Agreement"; capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement), pursuant to which the Banks and the Issuing Bank have agreed to make certain advances and provide certain other credit accommodations to the Borrower as described therein;

**WHEREAS**, Bank of America, N.A. (a) assigned all of its Obligations under the Credit Agreement to Wayzata Opportunities Fund II, L.P. pursuant to that certain Assignment and Acceptance dated the date hereof (the "Assignment") and (b) resigned as administrative agent and Issuing Bank under the Credit Agreement and assigned all of its rights, obligations and protections under the Credit Agreement and the other Credit Documents (including, without limitation, the Security Documents) to Wayzata Opportunities Fund II, L.P. pursuant to that certain Resignation, Assignment and Release Agreement dated the date hereof (the "Resignation");

**WHEREAS**, certain Events of Default have occurred as a result of the Borrower's failure to comply with (a) the Interest Coverage Ratio in Section 6.15 of the Credit Agreement for the compliance periods ending June 30, 2012 and September 30, 2012 and (b) the Debt to EBITDA Ratio in Section 6.17 of the Credit Agreement for the compliance periods ending June 30, 2012 and September 30, 2012, and (c) other possible defaults (collectively, the "Existing Events of Default");

**WHEREAS**, the Borrower has requested that certain terms of the Credit Agreement be amended in the manner set forth herein, and that the Agent, the Banks, and the Issuing Bank waive the Existing Events of Default and their rights and remedies with respect to the Existing Events of Default, and the Agent, the Banks and the Issuing Bank, subject to the terms and conditions contained herein, have agreed to such amendment and waiver of the Existing Events of Default, to be effective as of the date hereof;

**WHEREAS**, the Credit Parties, the Agent, the Banks, and the Issuing Bank acknowledge that the terms of this Amendment constitute an amendment and modification of, and not a novation of, the Credit Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants and the fulfillment of the conditions set forth herein, the parties hereby agree as follows:

1.    <u>Definitions</u>.  The term "Credit Agreement" or "Agreement" (as the case may be) as used herein, in the Credit Agreement and in the other loan documents related thereto (collectively, the "<u>Credit Documents</u>") shall mean the Credit Agreement as hereby amended and modified, and as further amended, restated, modified, replaced or supplemented from time to time as permitted thereby.

2.    <u>Amendments to, and Additions and Restatements of, Terms of the Credit Agreement</u>.  Subject to the conditions hereof and upon satisfaction of the terms set forth in <u>Section 9</u>, the Credit Agreement is hereby amended, effective as of the date hereof, as follows:

(a)    <u>General Amendments to and Modifications of Credit Agreement</u>.  The parties hereto hereby agree that the provisions in this Amendment, to the extent inconsistent with the provisions of the Credit Agreement, will be deemed to be an amendment of the provisions of the Credit Agreement and other Credit Documents to the extent set forth herein, and the remaining provisions shall be deemed to supplement the Credit Agreement as stated herein.  Notwithstanding anything to the contrary herein, in the Credit Agreement, in any other Credit Document or otherwise:

(i)    The Borrower shall only pay all accrued and unpaid interest on each Advance on the first day of each month, and the Borrower shall pay outstanding Obligations (including, but not limited to, principal and interest) in full on the Maturity Date (as amended by this Amendment).

(ii)    The Agent shall have no duty to determine or redetermine the Borrowing Base.  Nothing in this <u>Section 2(a)(ii)</u> shall be construed to diminish or eliminate the Borrower's obligations, including, but not limited to providing Oil and Gas Reserve Reports, under <u>Section 2.2</u> of the Credit Agreement.  The Agent shall have no duty to disseminate to any Bank any information that any Credit Party may provide to the Agent with respect to the Borrowing Base whether pursuant to <u>Section 2.2</u> of the Credit Agreement or otherwise.

(iii)    Without the prior written consent of the Agent,

(A)    no Bank shall assign or participate all or any portion of its Commitment or Advances, or increase its Commitment;

(B)    the Banks shall not (1) extend the Maturity Date or postpone any date for payment of principal of, or interest on, the Notes or any fees or other amounts payable under the Credit Documents, (2) release any Collateral or terminate or release any Security Document or financing statement, (3) revise <u>Section 6.5</u> to permit any Restricted Payments, or (4) waive any Default or Event of Default, notwithstanding if the provisions of <u>Section 9.1</u> of the Credit Agreement have been satisfied.

- 2 -

(iv)    The Agent shall have no duty to disseminate to any Bank any information received by the Agent from any Credit Party, except that the Agent will endeavor to provide to the Banks any notice of Default or Event of Default received by the Agent.

(b)    Amendments to and Additions and Restatements of Specific Provisions of the Credit Agreement.

(i)    Section 1.1 of the Credit Agreement is hereby amended to add thereto in alphabetical order the following definitions which shall read in full as follows:

"Amendment No. 3 to Credit Agreement and Waiver and Consent" means that certain Amendment No. 3 to Credit Agreement and Waiver and Consent dated as of January 24, 2013 by and among Borrower, Holdco, Operating, Agent, the Banks party thereto, and Issuing Bank.

"Amendment No. 3 Effective Date" means January 24, 2013.

"Sponsor" means Wayzata Opportunities Fund II, L.P., a Delaware limited partnership.

(c)    Section 1.1 of the Credit Agreement is hereby further amended as follows:

(i)    The definition of "Applicable Margin" is hereby restated to read as follows:

"Applicable Margin" means, for any Type of Advance, a fixed rate of 15% per annum.

(ii)    The definition of "Permitted Acquisition" is hereby amended as follows:

(A)    The word "and" appearing immediately before the beginning of clause (e) of such definition is deleted.

(B)    Clause (e) of such definition is restated to read as follows:

"(e) immediately after giving effect thereto, the Borrower and its Subsidiaries shall be in compliance, on a pro forma basis after giving effect to such acquisition, with the covenants contained in Section 6.20, recomputed as of the last day of the most recently ended fiscal quarter of the Borrower as if such acquisition and any related financings or other transactions had occurred on the first day of the period for testing such compliance and the Borrower shall have delivered to the Agent an officers' certificate to such effect, together with all financial information required under Section 5.6(m); and"

- 3 -

(C)    A new clause (f) is added immediately following clause (e) of such definition to read as follows:

"(f) the consideration for such acquisition is financed from capital contributions into the Borrower from Sponsor and not from cash flow from operations of any Credit Party."

(d)    Section 2.7(a) is hereby restated to read as follows:

"(a)    [Intentionally omitted]."

(e)    Section 5.6(l) is hereby amended by restating clause (ii) thereof to read as follows:

"(ii) any acquisition by any Credit Party of any Oil and Gas Property."

(f)    Section 5.11(a) is hereby amended as follows:

(i)    each instance of "85%" is deleted and "substantially all" is substituted *in lieu* thereof; and

(ii)    the phrase "unless the Agent otherwise agrees in writing" is added immediately before the beginning of clause (i) of such Section.

(g)    Section 6.4(b) is hereby restated to read as follows:

"(b) sell, lease, transfer or otherwise dispose of any of its Property (including pursuant to a farm-out, participation, or other agreement that would reduce such Credit Party's interest in any Property), except for (i) sales of Hydrocarbons produced from the Oil and Gas Properties in the ordinary course of such Credit Party's business, (ii) dispositions of obsolete or worn out personal property of such Credit Party, (iii) dispositions in the ordinary course of business of personal property that is no longer used or useful in the conduct of business of such Credit Party, and (iv) dispositions of interests in Oil and Gas Properties (including in the form of a farmout) identified on Schedule 6.4(b) and/or acquired after the Amendment No. 3 Effective Date for the purposes of mitigating a Credit Party's risk and/or sharing the cost of developing such Oil and Gas Properties in the ordinary course of business of such Credit Party; provided that in the case of each of the foregoing clauses (i), (ii), (iii), and (iv), the consideration received by such Credit Party for such Property shall be at least the fair market value of such Property."

(h)    Section 6.5 is hereby restated to read as follows:

"Section 6.5    Restricted Payments.    No Credit Party shall make or pay any Restricted Payment or make any prepayment, redemption or defeasance of Debt (other than Debt under the Credit Documents) other than Restricted Payments from a Subsidiary of a Credit Party to a Credit Party unless authorized by Sponsor in writing."

- 4 -

(i)    Section 6.15 is hereby restated to read as follows:

"Section 6.15   [Intentionally omitted]."

(j)    Section 6.16 is hereby restated to read as follows:

"Section 6.16   [Intentionally omitted]."

(k)    Section 6.17 is hereby restated to read as follows:

"Section 6.17   [Intentionally omitted]."

(l)    Section 6.18 is hereby restated to read as follows:

"Section 6.18   [Intentionally omitted]."

(m)    Section 6.19 is hereby restated to read as follows:

"Section 6.19 [Intentionally omitted]."

(n)    A new Schedule 6.4(b), attached hereto as Schedule 6.4(b), is hereby added to the Credit Agreement.

3.    Waiver.  Upon the satisfaction of the conditions in this Amendment, the Agent, the Banks, and the Issuing Bank hereby agree to waive the Existing Events of Default and their rights and remedies under the Credit Agreement and the other Credit Documents in connection with the Existing Events of Default. The Agent's, the Banks', and the Issuing Bank's waiver shall be limited solely to the exercise of rights and remedies arising under the Credit Documents as a result of the Existing Events of Default, and the Agent, the Banks, and the Issuing Bank shall not be deemed to have waived any rights or remedies they may have with respect to any other breach or Event of Default (whether now existing or hereafter occurring), or any breach of this Amendment.

4.    Termination of Commitment Fees.  Upon the effectiveness of this Amendment, the commitment fees due and payable under Section 2.7(a) of the Credit Agreement shall be terminated, and the Borrower shall not be obligated to pay commitment fees that would otherwise accrue under said Section.

5.    Agency; Agency Fee.  The parties hereto acknowledge and agree that except as amended, modified or supplemented herein, the provisions of Article VIII are in full force and effect and the Agent shall have all of the rights, remedies and protections contained therein. The Agent agrees to waive the monthly agency fee but reserves the right to charge a monthly agency fee upon future notice.

6.    Consent of the Guarantors.  Each Guarantor hereby consents, acknowledges and agrees to the amendments, the consent and terms of the waiver set forth herein and hereby confirms, reaffirms and ratifies in all respects the Guaranties to which it is a party (including without limitation the continuation of such Guarantor's payment and performance obligations

thereunder upon and after the effectiveness of this Amendment and the amendments contemplated hereby) and the enforceability of such Guaranty against such Guarantor in accordance with its terms.

7.      Full Force and Effect of Agreement.  Except as hereby specifically amended, modified or supplemented, the Borrower hereby acknowledges and agrees that the Credit Agreement and all of the other Credit Documents are hereby confirmed and ratified in all respects and shall remain in full force and effect according to their respective terms.

8.      No Further Borrowings.  As of the date of this Amendment, the Banks shall have no obligation to make any new Advances, and Issuing Bank shall have no obligation to issue further Letters of Credit.  As of the date hereof, the Commitments are hereby terminated (provided such termination shall not constitute early termination with respect to the definition of "Maturity Date" in the Credit Agreement) and the Borrower shall have no further right to request or obtain Advances or Letters of Credit.  Notwithstanding the foregoing, the Banks may make additional Advances in their sole and absolute discretion.

9.      Conditions to Effectiveness.  This Amendment shall not be effective until the following conditions precedent have been satisfied:

(a)     the Agent shall have received counterparts of this Amendment executed by the Borrower, the Agent, the Banks, Wayzata, and the Issuing Bank and ratified by the Guarantors;

(b)     the Agent shall have received such other documents, instruments and certificates as reasonably requested by the Agent;

(c)     no Events of Default (other than the Existing Events of Default) shall exist both before and after giving effect to this Amendment, and all representations and warranties of each Credit Party in each Credit Document shall be true and correct; and

(d)     the Agent shall have received payment or evidence of payment of all reasonable fees and expenses owed by the Borrower to the Agent, the Banks, and the Issuing Bank.

Upon the satisfaction of the conditions set forth in this Section 9, this Amendment shall be effective as of the date hereof.

10.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original (including electronic copies) but all of which together shall constitute one and the same instrument.

11.     Governing Law.  This Amendment shall in all respects be governed by, and construed in accordance with, the laws of the State of Texas.

12.     Enforceability.  Should any one or more of the provisions of this Amendment be determined to be illegal or unenforceable as to one or more of the parties hereto, all other provisions nevertheless shall remain effective and binding on the parties hereto.

13.    No Novation.  This Amendment is given as an amendment and modification of, and not as a payment of, the obligations of each Credit Party under the Credit Agreement and is not intended to constitute a novation of the Credit Agreement.  All of the indebtedness, liabilities and obligations owing by any Credit Party under the Credit Agreement and the other Credit Documents shall continue.

14.    Successors and Assigns.  This Amendment shall be binding upon and inure to the benefit of the Borrower, the Agent, the Banks, the Issuing Bank and their respective successors, assigns and legal representatives; provided, however, that the Borrower, without the prior consent of the Banks, may not assign any rights, powers, duties or obligations hereunder.

15.    Expenses.  Without limiting the provisions of Section 9.4 of the Credit Agreement or Section 13(i) hereof, the Borrower agrees to pay all reasonable out of pocket costs and expenses (including without limitation reasonable fees and expenses of any counsel, financial advisor, industry advisor and agent for the Agent) incurred before or after the date hereof by the Agent and its affiliates in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the Credit Documents.

**[Remainder of Page Intentionally Left Blank.  Signature Pages Follow.]**

5947432v.13 9766/1478

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be duly executed by their duly authorized officers, all as of the day and year first above written.

<u>**BORROWER:**</u>

**GOLDKING RESOURCES, LLC**
By: Goldking Holdings, LLC, its sole member

_____

By: Michael Strain
Its: Chief Executive Officer

**SPONSOR:**

**WAYZATA OPPORTUNITIES FUND II, L.P.**
By: WOF II GP, L.P. its General Partner
By: WOF II GP, LLC its General Partner

By: _____
Name: Mary Burns
Title:   Authorized Signatory

## REAFFIRMATION OF GUARANTIES

By signing below, each Guarantor (a) acknowledges, consents and agrees to the execution, delivery and performance by the Borrower of this Amendment, (b) acknowledges and agrees that its obligations in respect of its Guaranty and any Mortgages to which it is a party are not released, diminished, waived, modified, impaired or affected in any manner by this Amendment or any of the provisions contemplated herein, (c) ratifies and confirms its obligations under its Guaranty and any Mortgages to which it is a party, and (d) acknowledges and agrees that it has no claims or offsets against, or defenses or counterclaims to, its Guaranty.

**GUARANTORS:**

GOLDKING HOLDINGS, LLC

_____

By: Michael Strain
Its: Chief Executive Officer


GOLDKING ONSHORE OPERATING, LLC
By: Goldking Holdings, LLC, its sole member

_____

By: Michael Strain
Its: Chief Executive Officer

**AGENT**:

**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as Agent
By: WOF II GP, L.P. its General Partner
By: WOF II GP, LLC its General Partner

By:_____
Name:   Mary Burns
Title:    Authorized Signatory

**BANK**:

**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as Bank
By: WOF II GP, L.P. its General Partner
By: WOF II GP, LLC its General Partner

By:_____
Name:   Mary Burns
Title:    Authorized Signatory

**ISSUING BANK**:

**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as Issuing Bank
By: WOF II GP, L.P. its General Partner
By: WOF II GP, LLC its General Partner

By:_____
Name:   Mary Burns
Title:    Authorized Signatory

Schedule 6.4(b)

Oil and Gas Properties Eligible for Dispositions

*[Note to Borrower:  Schedule to include properties acquired prior to Amendment No. 3 Effective Date but not included in the Borrowing Base and not subject to a lien in favor of Agent as of such date.]*

Schedule 8(c)

Schedule of all Real Property and Oil and Gas Properties

## AMENDMENT NO. 4 TO CREDIT AGREEMENT AND WAIVER

**THIS AMENDMENT NO. 4 TO CREDIT AGREEMENT AND WAIVER** (this "Amendment") is made and entered into as of January 24, 2013, by and among **GOLDKING RESOURCES, LLC**, a Delaware limited liability company (the "Borrower"), **GOLDKING HOLDINGS, LLC**, a Delaware limited liability company ("Holdco"), and **GOLDKING ONSHORE OPERATING, LLC**, a Delaware limited liability company ("Operating"), and **WAYZATA OPPORTUNITIES FUND II, L.P.**, as successor administrative agent to Bank of America, N.A., as resigning administrative agent (in such capacity, the "Administrative Agent").

### W I T N E S S E T H :

**WHEREAS**, reference is made to that certain Credit Agreement dated as of November 5, 2010 (as hereby and from time to time amended, restated, supplemented, modified or replaced, the "Credit Agreement"; capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement), pursuant to which the Banks and the Issuing Bank have agreed to make certain advances and provide certain other credit accommodations to the Borrower as described therein;

**WHEREAS**, the parties to the Credit Agreement wish to clarify the rate of interest and payment of interest set forth in the Credit Agreement;

**WHEREAS**, the Credit Parties, the Agent, the Banks, and the Issuing Bank acknowledge that the terms of this Amendment constitute an amendment and modification of, and not a novation of, the Credit Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants and the fulfillment of the conditions set forth herein, the parties hereby agree as follows:

1.     <u>Definitions</u>. The term "Credit Agreement" or "Agreement" (as the case may be) as used herein, in the Credit Agreement and in the other loan documents related thereto (collectively, the "Credit Documents") shall mean the Credit Agreement as hereby amended and modified, and as further amended, restated, modified, replaced or supplemented from time to time as permitted thereby.

2.     <u>Amendments to, and Additions and Restatements of, Terms of the Credit Agreement</u>. Subject to the conditions hereof and upon satisfaction of the terms set forth in <u>Section 9</u>, the Credit Agreement is hereby amended, effective as of the date hereof, as follows:

(a)    General Amendments to and Modifications of Credit Agreement. The parties hereto hereby agree that the provisions in this Amendment, to the extent inconsistent with the provisions of the Credit Agreement, will be deemed to be an amendment of the provisions of the Credit Agreement and other Credit Documents to the extent set forth herein, and the remaining provisions shall be deemed to supplement the Credit Agreement as stated herein. Notwithstanding anything to the contrary herein, in the Credit Agreement, in any other Credit Document or otherwise:

(i)    All accrued and unpaid interest as of the Amendment No. 4 Effective Date shall be paid in kind and capitalized

(ii)    The Borrower shall only pay all accrued and unpaid interest in kind on each Advance on the first day of each quarter by adding the amount equal to such unpaid interest to the principal amount of each Advance, and the Borrower shall pay outstanding Obligations (including, but not limited to, principal and interest) in full on the Maturity Date.

(iii)    All Advances outstanding as of the Amendment No. 4 Effective Date will be treated as Base Rate Advances.

(b)    Amendments to and Additions and Restatements of Specific Provisions of the Credit Agreement.

(i)    Section 1.1 of the Credit Agreement is hereby amended to add thereto in alphabetical order the following definitions which shall read in full as follows:

"Amendment No. 4 to Credit Agreement and Waiver and Consent" means that certain Amendment No. 4 to Credit Agreement and Waiver and Consent dated as of January 24, 2013 by and among Borrower, Holdco, Operating, Agent, the Banks party thereto, and Issuing Bank.

"Amendment No. 4 Effective Date" means January 24, 2013.

(c)    Section 1.1 of the Credit Agreement is hereby further amended as follows:

(i)    The definition of "Applicable Margin" is hereby restated to read as follows:

"Applicable Margin" means, for any Type of Advance, such a margin that results in the effective rate of interest being a fixed rate of 15% per annum.

3.    Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original (including electronic copies) but all of which together shall constitute one and the same instrument.

4.    Governing Law. This Amendment shall in all respects be governed by, and construed in accordance with, the laws of the State of Texas.

5.      Enforceability.  Should any one or more of the provisions of this Amendment be determined to be illegal or unenforceable as to one or more of the parties hereto, all other provisions nevertheless shall remain effective and binding on the parties hereto.

6.      No Novation.  This Amendment is given as an amendment and modification of, and not as a payment of, the obligations of each Credit Party under the Credit Agreement and is not intended to constitute a novation of the Credit Agreement.  All of the indebtedness, liabilities and obligations owing by any Credit Party under the Credit Agreement and the other Credit Documents shall continue.

7.      Successors and Assigns.  This Amendment shall be binding upon and inure to the benefit of the Borrower, the Agent, the Banks, the Issuing Bank and their respective successors, assigns and legal representatives; provided, however, that the Borrower, without the prior consent of the Banks, may not assign any rights, powers, duties or obligations hereunder.

8.      Expenses.  Without limiting the provisions of Section 9.4 of the Credit Agreement or Section 13(i) hereof, the Borrower agrees to pay all reasonable out of pocket costs and expenses (including without limitation reasonable fees and expenses of any counsel, financial advisor, industry advisor and agent for the Agent) incurred before or after the date hereof by the Agent and its affiliates in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the Credit Documents.

**[Remainder of Page Intentionally Left Blank.  Signature Pages Follow.]**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their duly authorized officers, all as of the day and year first above written.

**BORROWER:**

**GOLDKING RESOURCES, LLC**
By:  Goldking Holdings, LLC, its sole member

By:_____
Name: Michael Strain
Title:  Chief Executive Officer

**SPONSOR:**

**WAYZATA OPPORTUNITIES FUND II, L.P.**
By: WOF II GP, L.P., its General Partner
By:  WOF II GP, LLC, its General Partner

By:_____
Name:  Mary Burns
Title:  Authorized Signatory

## REAFFIRMATION OF GUARANTIES

By signing below, each Guarantor (a) acknowledges, consents and agrees to the execution, delivery and performance by the Borrower of this Amendment, (b) acknowledges and agrees that its obligations in respect of its Guaranty and any Mortgages to which it is a party are not released, diminished, waived, modified, impaired or affected in any manner by this Amendment or any of the provisions contemplated herein, (c) ratifies and confirms its obligations under its Guaranty and any Mortgages to which it is a party, and (d) acknowledges and agrees that it has no claims or offsets against, or defenses or counterclaims to, its Guaranty.

### GUARANTORS:

GOLDKING HOLDINGS, LLC

By:_____
Name: Michael Strain
Title:  Chief Executive Officer

GOLDKING ONSHORE OPERATING, LLC
By:  Goldking Holdings, LLC, its sole member

By:_____
Name: Michael Strain
Title:  Chief Executive Officer

**AGENT:**

**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as Agent
By:  WOF II GP, L.P., its General Partner
By:  WOF II GP, LLC, its General Partner

By:_____
Name:   Mary Burns
Title:    Authorized Signatory

**BANK:**

**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as Bank
By:  WOF II GP, L.P., its General Partner
By:  WOF II GP, LLC, its General Partner

By:_____
Name:   Mary Burns
Title:    Authorized Signatory

**ISSUING BANK:**

**WAYZATA OPPORTUNITIES FUND II, L.P.,**
as Issuing Bank
By:  WOF II GP, L.P., its General Partner
By:  WOF II GP, LLC, its General Partner

By:_____
Name:   Mary Burns
Title:    Authorized Signatory

## **EXHIBIT B**

Ratification Agreement

EXECUTION VERSION

## RATIFICATION, AMENDMENT AND SECURITY AGREEMENT

This RATIFICATION, AMENDMENT AND SECURITY AGREEMENT (the "Ratification Agreement"), dated as of October 31, 2013, is by and among WAYZATA OPPORTUNITIES FUND II, L.P., a Delaware limited partnership, in its capacity as administrative agent (in such capacity, "Agent") acting for and on behalf of the Bank and Issuing Bank (each as defined in the Existing Credit Documents (as defined below)) party hereto, as lenders (collectively with Agent, the "Lenders"), GOLDKING RESOURCES, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("Borrower"), GOLDKING HOLDINGS, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("Holdco"), and GOLDKING ONSHORE OPERATING, LLC, a Delaware limited liability company , as Debtor and Debtor-in-Possession ("Operating" and together with Holdco, each, a "Guarantor" and collectively, "Guarantors").

## W I T N E S S E T H:

WHEREAS, on November 5, 2010, Borrower and Guarantors entered into the Existing Credit Documents (as defined below) with, inter alia, Bank of America, N.A., in its capacity as the original Agent (as defined in the Existing Credit Agreement), as original Bank (as defined in the Existing Credit Agreement) and as original Issuing Bank (as defined in the Existing Credit Agreement) (in such capacities, the "Original Lenders"), pursuant to which Original Lenders made loans and advances and provided other financial or credit accommodations to Borrower secured by substantially all assets and properties of Borrower and Guarantors as set forth in the Existing Credit Documents;

WHEREAS, on January 24, 2013, the Original Lenders assigned and delegated to the Lenders, and Lenders purchased and assumed from the Original Lenders, all of the Original Lenders rights and obligations under the Existing Credit Documents, and the Lenders agreed to make loans and advances and provide other financial or credit accommodations to Borrower secured by substantially all assets and properties of Borrower and Guarantors as set forth in the Existing Credit Documents;

WHEREAS, on October 30, 2013, Borrower and Guarantors commenced cases under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, and Borrower and Guarantors have retained possession of their assets and are authorized under the Bankruptcy Code (as defined below) to continue the operation of their businesses as debtors-in-possession;

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrower secured by substantially all the assets and properties of Borrower and Guarantors as set forth in the Financing Order and the Credit Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrower and Guarantors shall execute and deliver this Ratification Agreement;

WHEREAS, Borrower and Guarantors desire to reaffirm their obligations to Agent and Lenders pursuant to the Existing Credit Documents and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Borrower; and

WHEREAS, Borrower and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrower and make certain amendments to the Existing Credit Documents (as defined below), and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders, Borrower and Guarantors mutually covenant, warrant and agree as follows:

1.    <u>DEFINITIONS.</u>

1.1.    <u>Additional Definitions</u>.  As used herein, the following terms shall have the respective meanings given to them below, and the Credit Agreement and the other Credit Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Agent Payment Account" shall mean the Agent's deposit account at JP Morgan Chase Bank N.A. ("JPMorgan"), with the account name "Wayzata Opportunities Fund II, L.P." and an account number ending in 0833.

(b)    "Bankruptcy Court" shall mean the United States Bankruptcy Court or the United States District Court for the District of Delaware.

(c)    "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(d)    "Budget" shall mean the initial budget to be delivered to Agent and Lenders in accordance with Section 5.3(a) hereof, in form and substance satisfactory to Agent, setting forth the Projected Information for the periods covered thereby, together with any subsequent or amended budget(s) thereto delivered to Agent and Lenders, in form and substance satisfactory to Agent, in accordance with the terms and conditions hereof.

(e)    "Chapter 11 Cases" shall mean the Chapter 11 cases of Borrower and Guarantors which are being administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

2

(f)     "Copyrights" means all of the following now owned or hereafter acquired by any of the Credit Parties:  (i) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, and (ii) all registrations and applications for registration of any such copyright in the United States or any other country and all extensions and renewals thereof, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office.

(g)     "Copyright Licenses" means any written agreement naming any of the Credit Parties as licensor or licensee, granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

(h)     "Deed of Trust" means the Deed of Trust, Security Agreement, Financing Statement, Fixture Filing, and Assignment of Production, dated as of November 5, 2010, made by Borrower to PRLAP, Inc., as trustee, for the benefit of Bank of America, N.A., in its capacity as the administrative agent for the Banks under the Existing Credit Agreement and for the ratable benefit of the Securities Parties (as defined therein), as heretofore amended, assigned, transferred, modified, supplemented, ratified and/or confirmed, and as in effect immediately prior to the Petition Date.

(i)     "Existing Credit Documents" shall mean the Credit Documents (as defined in the Existing Credit Agreement), including, without limitation, the Existing Security Agreement, the Existing Guaranty, the Deed of Trust, and the Mortgage, in each instance, as in effect immediately prior to the Petition Date.

(j)     "Existing Credit Agreement" shall mean the Credit Agreement, dated as of November 5, 2010, among Borrower, Guarantors, Bank of America, N.A., in its capacity as the original Agent (as defined therein), as original Bank (as defined therein) and as original Issuing Bank (as defined therein), as amended by Amendment No. 1 thereto, dated as of April 29, 2011, among Borrower, Guarantors, the Banks (as defined therein), Bank of America, N.A., as administrative agent for the Banks (as defined therein) and as Issuing Bank (as defined therein), as further amended by Amendment No. 2 thereto, dated as of June 15, 2011, among Borrower, Guarantors, the Banks (as defined therein), Bank of America, N.A., as administrative agent for the Banks (as defined therein) and as Issuing Bank (as defined therein), as further amended by Amendment No. 3 thereto and Waiver, dated as of January 24, 2013, among Borrower, Guarantors and Agent, as successor administrative agent to Bank of America, N.A., as resigning administrative agent, and as further amended by Amendment No. 4 thereto and Waiver, dated as of January 24, 2013, among Borrower, Guarantors and Agent, as successor administrative agent to Bank of America, N.A., as resigning administrative agent, as in effect immediately prior to the Petition Date.

(k)     "Existing Guaranty" shall mean the Guaranty, dated November 5, 2010 made by the Guarantors in favor of the Agent for the benefit of the Agent and the Beneficiaries referred to therein, as heretofore amended, assigned, transferred, modified, supplemented, ratified and/or confirmed, and as in effect immediately prior to the Petition Date.

3

(l)    "Existing Security Agreement" shall mean the Security Agreement, dated as of November 5, 2010, among Borrower, Guarantors, and Agent for the benefit of the Secured Parties (as defined therein), as heretofore amended, assigned, transferred, modified, supplemented, ratified and/or confirmed, and as in effect immediately prior to the Petition Date.

(m)    "Financing Order" shall mean the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrower on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

(n)    "Guarantor Documents" shall mean, collectively, the Guaranty, as further amended and ratified by this Ratification Agreement, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(o)    "Intellectual Property" means all intellectual and similar property of any of the Credit Parties of every kind and nature now owned or hereafter acquired by any of the Credit Parties, including inventions, designs, Patents, Patent Licenses, Trademarks, Trademark Licenses, Copyrights, Copyright Licenses, domain names and domain name registrations, trade secrets, confidential or proprietary technical and business information, know-how or other data or information, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, licenses for any of the foregoing and all license rights, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

(p)    "Interim Financing Order" shall have the meaning set forth in Section 10.11 hereof.

(q)    "Material Budget Deviation" shall have the meaning set forth in Section 5.3(b) hereof.

(r)    "Mortgage" means that Act of Mortgage, Assignment of Production, Security Agreement, Fixture Filing and Financing Statement, dated November 5, 2010, from Borrower to Bank of America, N.A., as administrative agent and Issuing Bank (as defined in the Existing Credit Agreement), as heretofore amended, assigned, transferred, modified, supplemented, ratified and/or confirmed, and as in effect immediately prior to the Petition Date.

(s)    "Patents" means all of the following now owned or hereafter acquired by any of the Credit Parties: (i) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country, and (ii) all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

4

(t)      "Patent License" means all agreements, whether written or oral, providing for the grant by or to any of the Credit Parties of any right to manufacture, use or sell any invention covered in whole or in part by a Patent.

(u)      "Permanent Financing Order" shall have the meaning set forth in Section 10.12 hereof.

(v)      "Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

(w)      "Post-Petition Collateral" shall mean, collectively, all now existing and hereafter acquired real and personal property of each of Borrower's, Holdco's and Operating's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent and Lenders pursuant to the Credit Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i)      all of the Pre-Petition Collateral;

(ii)      all accounts (including health-care-insurance receivables);

(iii)      all chattel paper (whether tangible or electronic);

(iv)      all claims, rights, interests, assets and properties (recovered by or on behalf of Borrower and each Guarantor or any trustee of such Borrower or Guarantor (whether in the Chapter 11 Cases or any subsequent case or cases to which the Chapter 11 Cases are converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code;

(v)      all contracts;

(vi)      all commercial tort claims, including all commercial tort claims described on Schedule 1.1(p);

(vii)      all deposit accounts;

(viii)      all documents;

(ix)      all general intangibles (including payment intangibles);

(x)      all goods (including as-extracted collateral, inventory, equipment, and any accessions thereto);

(xi)      all instruments (including promissory notes);

(xii)      all insurance, insurance claims;

(xiii)      all Intellectual Property;

(xiv)    all investment property;

(xv)    all letter of credit rights (whether the letter of credit is evidenced by writing) and all letters of credit and banker's acceptances;

(xvi)    all money;

(xvii)    all Mortgaged Properties and Fixtures;

(xviii)    all oil and gas and other minerals before extraction;

(xix)    all Realty Collateral, Personalty Collateral and Fixture Collateral (each as defined in the Deed of Trust);

(xx)    all Realty Collateral, Personalty Collateral and Fixture Collateral (each as defined in the Mortgage);

(xxi)    all records;

(xxii)    all supporting obligations;

(xxiii)    any and all additions, accessions and improvements to, all substitutions and replacements for and all products of or derived from the foregoing; and

(xxiv)    all proceeds.

(x)    "Post-Petition Obligations" shall mean all Obligations (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the Security Agreement, the Mortgage, the Deed of Trust, the Guarantor Documents, the other Credit Documents, a Financing Order, by operation of law or otherwise, and whether incurred by Borrower or either Guarantor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest; financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(i)    "Pre-Petition Collateral" shall mean, collectively, (i) all "Collateral" as such term is defined in the Existing Security Agreement as in effect immediately prior to the Petition Date, (ii) all Realty Collateral, Personalty Collateral and Fixture Collateral as such terms are defined in the Deed of Trust as in effect immediately prior to the Petition Date, (iii) all Realty Collateral, Personalty Collateral and Fixture Collateral as such terms are defined in the Mortgage as in effect immediately prior to the Petition Date, and (iv) all other security for the Pre-Petition Obligations as provided in the Existing Credit Documents immediately prior to the Petition Date.

(y)    "Pre-Petition Obligations" shall mean all Obligations (as such term is defined in the Existing Credit Agreement) arising at any time before the Petition Date.

(z)    "Ratification Agreement" shall mean that certain Ratification, Amendment and Security Agreement, dated as of October 31, 2013, by and among Borrower, Guarantors, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(aa)    "Ratification Agreement Effective Date" means October 31, 2013.

(bb)    "Trademarks" means all of the following now owned or hereafter acquired by any of the Credit Parties: all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office, any State of the United States or any similar offices in any other country or any political subdivision thereof, and all extensions or renewals thereof.

(cc)    "Trademark License" means any agreement, whether written or oral, providing for the grant by or to any of the Credit Parties of any right to use any Trademark.

1.2.    Certain Amendments to Definitions.

(a)    Collateral. All references to the term "Collateral" in the Credit Agreement or the other Credit Documents, or any other term referring to the security for the Pre-Petition Obligations, shall he deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(b)    Debtors. All references to Borrower, including, without limitation, to the terms "Borrower" and "Credit Parties" in the Credit Agreement or the other Credit Documents shall be deemed, and each such reference is hereby amended, to mean and include Borrower as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such limited liability company whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such limited liability company). All references to a Guarantor or Guarantors, including, without limitation, to the terms "Guarantor," "Guarantors" and "Credit Parties" in the Credit Agreement or the other Credit Documents shall be deemed, and each such reference is hereby amended, to mean and include each Guarantor as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such limited liability company whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such limited liability company).

(c)    Credit Documents. All references to the term "Credit Documents" in the Credit Agreement or the other Credit Documents shall be deemed, and each such reference

7

is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Credit Documents, as ratified, assumed and adopted by each of the Credit Parties pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(d)      Credit Agreement.  All references to the term "Credit Agreement" in the Credit Agreement or the other Credit Documents shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by each of the Credit Parties pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)      Material Adverse Change.  All references to the term "Material Adverse Change," "material adverse effect" or "material adverse change" in the Credit Agreement, this Ratification Agreement or the other Credit Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof: "provided, that, the commencement of the Chapter 11 Cases and all other matters disclosed to Agent in writing (including in any written report delivered by Borrower to Agent) prior to the Petition Date shall not constitute a material adverse effect".

(f)      Obligations.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement and the other Credit Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

1.3.    Interpretation.

(a)      For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Credit Agreement.

(b)      All references to the term "Agent," "Lender," "Borrower," "Guarantor," "Guarantors," "Credit Parties" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)      All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)      All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of Texas as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

8

2.    <u>ACKNOWLEDGMENT.</u>

2.1.    <u>Pre-Petition Obligations</u>.    Borrower and each Guarantor hereby acknowledges, confirms and agrees that, as of October 31, 2013, Borrower is indebted to Agent and Lenders in respect of all Pre-Petition Obligations in the aggregate amount of not less than $11,582,729.51, consisting of (a) Advances made pursuant to the Existing Credit Documents in the aggregate principal amount of not less than $11,446,314.53, together with accrued but unpaid interest thereon in the amount of $136,414.98, and (b) Letter of Credit Obligations in the amount of not less than $0.00, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) and (c) other charges now or hereafter owed by Borrower to Agent and Lenders, all of which are unconditionally owing by Borrower to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2.    <u>Guaranteed Obligations</u>.    Each Guarantor hereby acknowledges, confirms and agrees that:

(a)    all obligations of Guarantors under the Guarantor Documents are unconditionally owing by each Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatever, and

(b)    the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by each Guarantor pursuant to the Guarantor Documents extends to all Post- Petition Obligations, subject only to the limitations set forth in the Guarantor Documents.

2.3.    <u>Acknowledgment of Security Interests</u>.    Borrower and each Guarantor hereby acknowledges, confirms and agrees that Agent, for the benefit of itself and the other Lenders, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent and Lenders pursuant to the Existing Credit Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of itself and the other Lenders, under the Financing Order or hereunder or under any of the other Credit Documents or otherwise granted to or held by Agent and Lenders, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders.

2.4.    <u>Binding Effect of Documents</u>.    Borrower and each Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Existing Credit Documents to which it is a party was duly executed and delivered to Agent and Lenders by Borrower and/or the applicable Guarantors and each is in full force and effect as of the date hereof, (b) the agreements and obligations of Borrower and/or the applicable Guarantors contained in the Existing Credit Documents constitute the legal, valid and binding obligations of Borrower or such Guarantor enforceable against it in accordance with the terms thereof, and Borrower and each Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c)

9

Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Credit Documents and the Financing Order.

     3.      ADOPTION AND RATIFICATION

Borrower and each Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Credit Documents to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Credit Documents, as amended by this Ratification Agreement, and in accordance with the Financing Order. All of the Existing Credit Documents, except as amended by this Ratification Agreement and the Financing Order, and excluding the provisions set forth in Schedule 3 attached hereto, are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrower and Guarantors, including as Debtors and Debtors-in-Possession, and considered as agreements between Borrowers and Guarantors party thereto, on the one hand, and Agent and Lenders, on the other hand. Borrower and each Guarantor hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Credit Documents, as amended and supplemented pursuant hereto and the Financing Order, and Borrower and each Guarantor agrees to be fully bound, including as Debtors and Debtor-in-Possession, by the terms of the Credit Documents.

     4.      GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Borrower and Guarantors, as Debtors and Debtors-in-Possession, each hereby grants, pledges and assigns to Agent, for the benefit of itself and the other Lenders, and also confirms, reaffirms and restates the prior grant to Agent and Lenders of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

     5.      ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrower and Guarantors to Agent and Lenders, whether pursuant to the Credit Documents or otherwise, and not in limitation thereof, Borrower and each Guarantor hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Advances by Agent and Lenders:

     5.1.    Financing Order.   The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal or stay.

     5.2.    Use of Proceeds.   Notwithstanding anything to the contrary set forth in the Credit Agreement or in any of the other Credit Documents, all Advances and Letter of Credit

Obligations provided by Agent or any Lender to Borrower pursuant to the Financing Order, the Credit Agreement or otherwise, shall be used by Borrower for (i) cost, expenses and fees in connection with the Credit Agreement and the transactions contemplated thereby and (ii) other proper corporate purposes, in each case, in accordance with the Budget pursuant to Section 5.3 of this Ratification Agreement (including Schedule 5.2 hereto identifying certain pre-petition claims that Borrower intends to pay to the extent approved by the Bankruptcy Court); provided, that, no portion of the administrative expenses, priority claims or any other pre-petition claims in the Chapter 11 Cases, other than those directly attributable to the post-petition operation of the business of Borrower as Agent may determine or to which Agent has specifically agreed, shall be funded with the proceeds of Advances or Letters of Credit.  All collections from Collateral and any other payments received in respect of the obligations owing by Borrower to Agent and Lenders shall be deemed to be applied by Agent and Lenders first to all pre-petition obligations owing to Agent and Lenders and thereafter to all post-petition obligations.  Notwithstanding the foregoing, proceeds shall not be used by Borrower to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's and Lenders' pre-petition and/or post-petition liens, claims and rights or any other actions not expressly authorized by the Financing Order.

5.3.    Budget.

(a)    Borrower and Guarantors have prepared and delivered to Agent and Lenders an initial thirteen (13) week Budget.  The initial Budget has been thoroughly reviewed by Borrower and Guarantors and their management and sets forth for the periods covered thereby: (i) projected weekly operating collections for each week commencing with the week ending November 9, 2013, (ii) projected weekly sales, for each week commencing with the week ending November 9, 2013, (iii) projected inventory levels, (iv) projected aggregate principal amount of outstanding Advances and Letter of Credit Obligations for each week commencing with the week ending as of November 9, 2013, and (v) projected weekly amounts of Advances and Letters of Credit available to Borrower under the terms, conditions and formulae of the Credit Agreement for each week commencing with the week ending November 9, 2013 (collectively, the "Projected information").  In addition to the initial Budget, by no later than 5:00 p.m. (Eastern time) on November 27, 2013, and as of the end of each fourth (4th) week thereafter, Borrower and Guarantor shall furnish to Agent and Lenders, in form and substance satisfactory to Agent, an update of the Budget to omit the four (4) weeks just elapsed and add four (4) additional weeks, such that the Budget reflects a thirteen (13) week period on a rolling basis.  Beginning on November 14, 2009 and on each Thursday thereafter, the Borrower shall submit a variance report that sets forth a comparison of the actual cash receipts, cash disbursements, loan balance and loan availability to the Projected Information in the Budget, together with a certification from an officer of the Borrowers that no Material Budget Deviation has occurred.

(b)    Cash expenditures greater than one hundred ten (110%) percent of the projected amounts set forth in the Budget, in the aggregate, for any applicable period (a "Material Budget Deviation") shall be measured each week with respect to the number of weeks of the Budget then elapsed, commencing with the week-ending November 9, 2013, with savings from one period available for use in a later period, in each case consistent with the initial Budget

11

provided to Agent on or before the date hereof as periodically updated in accordance herewith and with the Credit Agreement and the other Credit Documents as amended hereby.

(c)    Borrower and each Guarantor hereby confirms, acknowledges and agrees that (i) a Material Budget Deviation as set forth in Section 5.3(b) hereof shall constitute an Event of Default and (ii) the failure to deliver any Budget or any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(a) hereof shall constitute an Event of Default.  Notwithstanding any approval by Agent or any Lender of the initial Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to, provide any Advances or Letter of Credit Obligations to Borrowers pursuant to the Budget, but shall only provide Advances and Letters of Credit in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Credit Documents and the Financing Order.  Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

5.4.    <u>Retention of Investment Banker.</u>

(a)    Credit Parties will continue to retain, at all times during which the Obligations remain outstanding, Lantana Oil & Gas Partners or such other Person acceptable to Agent as its investment banker (the "Investment Banker"), at the sole cost and expense of Borrower, for purposes acceptable to Agent, including to (i) assist Credit Parties with the marketing and sale of substantially all of the assets of Credit Parties on terms and conditions acceptable to Agent, (ii) identify potential purchasers of substantially all of the assets of Credit Parties, (iii) prepare and/or acquire due diligence and marketing information with respect to Credit Parties' assets and (iv) review and analyze all bids submitted for the purchase of such assets.

(b)    Credit Parties will (i) not later than fourteen (14) days after the date hereof file with the Bankruptcy Court a motion, in form and substance acceptable to Agent, seeking entry of an order of the Bankruptcy Court approving the retention of the Investment Banker during the Chapter 11 Cases on terms and conditions acceptable to Agent and (ii) obtain such order of the Bankruptcy Court in form and substance satisfactory to Agent.

(c)    Credit Parties will assist and cooperate with the Investment Banker in connection with the due diligence of the Investment Banker and other work contemplated by the retention agreement with the Investment Banker and Credit Parties.  Credit Parties will cause the Investment Banker to communicate and fully cooperate with Agent and Lenders and share with Agent and Lenders all information with respect to Credit Parties.  Credit Parties acknowledge and agree that Borrower will cause the Investment Banker to (i) keep Agent and Lenders fully informed of the progress of the potential sale of substantially all of the assets of Credit Parties, (ii) respond fully to any inquiries of Agent and Lenders regarding the business and operations of Credit Parties and the potential sale of substantially all of their assets, and (iii) communicate and fully cooperate with Agent and Lenders and share all information with Agent and Lenders regarding the business and operations of Credit Parties and the potential sale of substantially all of their assets.

(d)    Credit Parties will not amend, modify or terminate the retention agreement with the Investment Banker without the prior written consent of Agent. If the Investment Banker resigns, Credit Parties shall immediately notify Agent in writing and provide Agent with a copy of any notice of resignation immediately upon the sending of such notice by the Investment Banker.  Any replacement or successor Investment Banker shall be acceptable to Agent and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Agent within five (5) Business Days immediately following the notice of resignation of the resigning Investment Banker.  Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

5.5.    Ratification of Account Control Agreement.  To the extent Agent deems it necessary in its discretion and upon Agent's request, Borrower and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the Account Control Agreement (as defined in the Financing Order) and other deposit account, commodities account and securities account arrangements provided for under Section 3.1(a)(ix) of the Credit Agreement have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the Chapter 11 Cases, that Borrower and Guarantors, as Debtors and Debtors-in-Possession, are the successors-in-interest to Borrower and Guarantors, as applicable, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral.

5.6.    ERISA.  Borrower and each Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of Borrower or either Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of Borrower or either Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of Borrower or either Guarantor.

6.    DIP FACILITY FEE.

Borrower shall pay to Agent, for the account of Lenders on a pro rata basis according to their respective Commitments), a debtor-in-possession financing facility fee, in the amount of $161,000.00 (the "DIP Facility Fee"), on account of the financing provided by Agent and Lenders to Borrower in the Chapter 11 Cases, which fee shall be fully earned and due and payable on the date hereof and which may be charged directly to the loan account of Borrower maintained by Agent.  The DIP Facility Fee will be refunded to Borrower upon (1) the occurrence of the seventy-sixth (76th) day following the entry of the Interim Financing Order with no Objections (as defined in Section 4.1 of the Interim Financing Order) having been filed with the Bankruptcy Court, or if Objections (as defined in Section 4.1 of the Interim Financing Order) have been filed with the Bankruptcy Court, all such Objections (as defined in Section 4.1 of the Interim Financing Order) have been denied by an final, non-appealable order of the Bankruptcy Court, and (2) the entry by the Bankruptcy Court of the Permanent Financing Order and Permanent Financing Order is final and non-appealable.

7.    <u>AMENDMENTS.</u>

7.1.    <u>General Amendments to and Modifications of Credit Agreement</u>.    The parties hereto hereby agree that the provisions in this Ratification Agreement, to the extent inconsistent with the provisions of the Credit Agreement, will be deemed to be an amendment of the provisions of the Credit Agreement and other Credit Documents to the extent set forth herein, and the remaining provisions shall be deemed to supplement the Credit Agreement as stated herein.  Notwithstanding anything to the contrary herein, in the Credit Agreement, in any other Credit Document or otherwise:

(a)    All accrued and unpaid interest on any Advances shall be paid in kind and capitalized.

(b)    Borrower shall only pay all accrued and unpaid interest in kind on each Advance on the first day of each quarter by adding the amount equal to such unpaid interest to the principal amount of each Advance, and the Borrower shall pay outstanding Obligations (including, but not limited to, principal and interest) in full on the Maturity Date.

(c)    All Advances outstanding as of the Ratification Agreement Effective Date or made after the Ratification Agreement Effective Date will be treated as Base Rate Advances.

(d)    Any Borrowing made on or after the Ratification Effective Date will be made pursuant to a Notice of Borrowing given not later than 10:00 a.m. (Dallas, Texas time) on the seventh (7th) Business Day before the date of the proposed Borrowing.

(e)    Agent may, in its discretion, apply any payments received by Borrower or either Guarantor first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full.

(f)    Borrower and Guarantors shall not directly or indirectly sell, transfer, lease, encumber, return or otherwise dispose of any portion of the Collateral or any other assets of Borrower or either Guarantor, including, without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise, without the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender) except for sales of Borrower's or either Guarantor's Hydrocarbons produced from the Oil and Gas Properties in the ordinary course of its business.

7.2.    Amendments to and Additions and Restatements of Specific Provisions of the Credit Agreement.

(a)    Reserved.

(b)    <u>Section 1.1</u> of the Credit Agreement is hereby amended as follows:

(i)    The definition of "<u>Commitment</u>" is hereby restated to read as follows:

"Commitment" means, for any Bank, the amount set opposite such Bank's name on Annex 1 as its Commitment, or if such Bank has entered into any Assignment and Acceptance, as set forth for such Bank as its Commitment in the Register maintained by the Agent pursuant to Section 9.6(c), as such amount may be reduced or terminated pursuant to Article VII, provided that in no event will the Commitment of Wayzata Opportunities Fund II, L.P., a Delaware limited partnership, as Bank, exceed $16,100,000.00. "

(ii)     The definition of "Maturity Date" is hereby restated to read as follows:

"Maturity Date" means the earlier of (a) June 1, 2014, (b) the termination in whole of the Commitments pursuant to Section 2.1(b) or Article VII, (c) the date of confirmation of a plan of reorganization or liquidation for Borrower and Guarantors in the Chapter 11 Cases; (d) the consummation of the sale or sales of all of Borrower's and each Guarantor's (if applicable) assets and properties or of all equity interests in Borrower and each Guarantor (if applicable), or (e) the last termination date set forth in the Interim Financing Order, unless the Permanent Financing Order (as hereinafter defined) has been entered prior to such date, and in such event, then the last termination date set forth in the Permanent Financing Order."

7.3.    Events of Default. Section 7.1 of the Credit Agreement is hereby amended as follows:

(a)     Sections 7.1(g) is hereby amended by deleting the word "Any" at the beginning of the first sentence of Section 7.1(g) and replacing it with the following:

"Other than for the Chapter 11 Cases or in connection therewith, any"

(b)     Section 7.1(k) of the Credit Agreement is hereby amended by (i) deleting the reference to the word "or" at the end of Section 7.1(k),

(c)     Section 7.1 is hereby amended to (i) restate 7.1(l) in its entirety to read "(l) reserved;" and (ii) adding the following:

"(m) the occurrence of any condition or event which permits Agent and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order);

(n) failure of Borrower or either Guarantor to comply in all respects with the terms and conditions of the Ratification Agreement;

(o) the termination or non-renewal of the Credit Documents as provided for in the Financing Order;

(p) Borrower or either Guarantor suspends or discontinues or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee, receiver or custodian is appointed for Borrower or either Guarantor, or any of their respective properties;

(q) any act, condition or event occurring after the Petition Pate that has a Material Adverse Change upon the assets of Borrower or either Guarantor, or the Collateral or the rights and remedies of Agent and Lenders under the Credit Agreement or any other Credit Documents or the Financing Order;

(r) conversion of any of the Chapter 11 Cases to a Chapter 7 case under the Bankruptcy Code;

(s) dismissal of any of the Chapter 11 Cases or any subsequent Chapter 7 case either voluntarily or involuntarily;

(t) the grant of a lien on or other interest in any property of Borrower or either Guarantor after the date hereof other than a lien or encumbrance permitted by Article IV hereof or by the Financing Order or an administrative expense claim other than such administrative expense claim permitted by the Financing Order or this Ratification Agreement by the grant of or allowance by the Bankruptcy Court which is superior to or ranks in parity with Agent's and Lenders' security interest in or lien upon the Collateral or their Superpriority Claim (as defined in the Financing Order);

(u) the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender);

(v) the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(w) the appointment of an examiner with special powers pursuant to Section 1104(c) of the Bankruptcy Code;

(x) the filing of a plan of reorganization or liquidation by or on behalf of Borrower or either Guarantor, to which Agent has not consented in writing, or which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein; or

16

(y) the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of Borrower or either Guarantor, to which Agent has not consented to in writing, or which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein."

7.4.    Notices.  Section 9.2(a) of the Credit Agreement is hereby amended by restating the first sentence as follows:

"Except as provided in clause (b) below, all notices and other communications shall be in writing (including, without limitation, telecopy or telex) and mailed by certified mail, return receipt requested, telecopied, telexed, hand delivered, or delivered by a nationally recognized overnight courier, at the address for the appropriate party specified below or at such other address as shall be designated by such party in a written notice to the other parties.

| | |
|---|---|
| If to any of the Credit Parties: | 777 Walker Street<br>Suite 2500<br>Houston, TX 77002<br>Attn: Edward J. Hebert<br>Telephone: (713) 228-5464<br>Telecopy: (713) 230-9590 |
| with a copy to: | Young Conaway Stargatt & Taylor, LLP<br>1000 North King Street<br>Wilmington, DE 19801<br>Attention:  Robert S. Brady, Esq.<br>Telephone No.: 302-571-6690<br>Telecopy No.: 302-576-3283 |
| If to Agent: | Wayzata Opportunities Fund II, LP<br>701 East Lake Street<br> Suite 300<br>Wayzata, MN 55391<br>Attention:  Blake Carlson<br>Telephone No.: 952-345-0700<br>Telecopy No.: 952-345-8901 |
| with a copy to: | Richards, Layton & Finger, P.A.<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone No.: 302-651-7700<br>Facsimile No.: 302-651-7701<br>Attention: John H. Knight, Esq. |

17

Mark A. Kurtz, Esq.

7.5.    <u>Governing Law</u>.  Section 9.14 of the Credit Agreement is hereby amended by adding the following at the end of the first sentence thereof:

"except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing."

7.6.    <u>Submission to Jurisdiction</u>.  Section 9.15(a) of the Credit Agreement is hereby amended by adding the following at the end of the last sentence thereof:

"Notwithstanding the foregoing, Borrower and each Guarantor irrevocably submit, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court."

8.    <u>ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.</u>

8.1.    <u>Reserves</u>.  Notwithstanding any provision of the Credit Agreement or this Ratification Agreement to the contrary, Borrower and each Guarantor hereby agree that Agent shall have the right in its sole discretion to establish reserves in respect of (i) the Professional Fee Carve-Out and other Carve-Out Expenses (each as defined in the Financing Order), (ii) the amount of any senior liens or claims in or against the Collateral that, in Agent's good faith determination, have priority over the liens and claims of Agent and Lenders with respect to Borrower or either Guarantor's assets, and (iii) as otherwise provided in the Financing Order.

8.2.    <u>Field Examinations, etc</u>.  Notwithstanding anything to the contrary set forth in the Credit Agreement (including Section 5.5) or any of the other Credit Documents, Agent may conduct field examinations of the Collateral and of the operations of Borrower or either Guarantor and appraisals of properties (real and personal), in each case as Agent deems reasonable and at the expense of Borrower, and Agent and Lenders will have no liability and no responsibility whatsoever for the condition of the property so inspected or visited, and no indemnification obligations whatsoever to Borrower, Guarantors, their Affiliates, and their officers, directors, employees, agents, operators or non-operating interest owners, and their officers, directors, employees, or agents.

8.3.    Reserved.

9.    <u>RELEASE.</u>

9.1.    <u>Release of Pre-Petition Claims.</u>

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, and subject to the terms of the Financing Orders, in consideration of the agreements of Agent and Lenders contained herein and the making of any Advances by Agent and Lenders, Borrower and each Guarantor, pursuant to the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and

18

other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent, each Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Borrower or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with (i) the Credit Agreement, as amended and supplemented through the date hereof, (ii) the other Credit Documents, and (iii) actions or inactions as an equity owner of any of the Credit Parties, provided, that such release does not apply in cases of fraud, gross negligence or willful misconduct of any Releasee.

        (b)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, and subject to the terms of the Financing Orders, Borrower and each Guarantor, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by Borrower and each Guarantor pursuant to this Section 9.1, provided that such covenant does not apply in cases of fraud, gross negligence or willful misconduct of any Releasee. If Borrower or either Guarantor violates the foregoing covenant, Borrower and Guarantors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

        (c)     Notwithstanding the foregoing, Sections 9.1(a) and (b), above shall be without prejudice to the rights of any Official Committee of Unsecured Creditors established in the Chapter 11 Cases and other parties in interest in the Chapter 11 Cases, other than the Credit Parties, to assert claims, objections or a complaint against the Lenders to challenge the validity, priority, extent or enforceability of the Lenders' claims and/or liens, subject to the terms and restrictions in the Financing Order.

        9.2.    Release of Post-Petition Claims. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Credit Documents, and (b) the termination of the Credit Documents, in consideration of the agreements of Agent and Lenders contained herein and the making of any Advances by Agent and Lenders, Borrower and each Guarantor hereby covenants and agrees to execute and deliver in favor of Agent and Lenders a

19

valid and binding termination and release agreement, in form and substance satisfactory to Agent.  If Borrower or either Guarantor violates such covenant, Borrower and Guarantors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

9.3.    Releases Generally.

(a)    Borrower and each Guarantor understands, acknowledges and agrees that the releases set forth above in Sections 9.1 and 9.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)    Borrower and each Guarantor agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 9.1 hereof and, when made, Section 9.2 hereof.

10.    CONDITIONS PRECEDENT.

In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Advances and other financial accommodations available to Borrower all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Lenders and be applicable to other financial accommodations available to Borrower and Guarantors, the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Credit Agreement:

10.1.    Borrower and Guarantors shall furnish to Agent and Lenders all financial information, projections, budgets, business plans, cash flows and such other information as Agent and Lenders shall reasonably request from time to time, including current perpetual inventory records and/or rollforwards of inventory through the date of this Ratification Agreement, together with supporting documentation, each in form and substance consistent with prior such reports provided to Agent by Borrower and Guarantors and reasonably satisfactory to Agent;

10.2.    as of the Petition Date, the Existing Credit Documents shall not have been terminated;

10.3.    no trustee, examiner or receiver or the like shall have been appointed or designated with respect to Borrower or either Guarantor, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

10.4.    the execution and delivery of this Ratification Agreement and all other Credit Documents to be delivered in connection herewith by Borrower and Guarantors in form and substance satisfactory to Agent;

10.5.    Agent, for the benefit of itself and the other Lenders, shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent and Lenders pursuant to the Existing Credit Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as, upon approval of the Bankruptcy Court, valid, enforceable and perfected first priority and senior security interests and liens upon all Post-Petition Collateral granted to Agent, for the benefit of itself and the other Lenders, under the Financing Order or hereunder or under any of the other Credit Documents or otherwise granted to or held by Agent and Lenders, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders;

10.6.    Borrower and each Guarantor shall continue to maintain, at its expense, the deposit accounts with Comerica Bank & Trust, National Association ("Comerica") and JPMorgan identified on Schedule 10.6 attached hereto (the "Blocked Accounts") into which the Credit Parties shall promptly either cause all amounts received by any of the Credit Parties to be sent as provided in Section 5.13 of the Credit Agreement or shall itself deposit or cause to be deposited all proceeds of Collateral and all amounts payable to Borrower or Guarantors.  At any time a Default or an Event of Default shall exist or have occurred and be continuing, promptly upon Agent's request, Borrower shall deliver, or cause to be delivered, to Agent an Account Control Agreement duly authorized, executed and delivered by such banks where a deposit account, commodities account or securities account is maintained as Agent shall specify. Without limiting any other rights or remedies of Agent or Lenders, Agent may, at its option, instruct the depository banks, commodities intermediaries or securities intermediaries at which the Blocked Accounts are maintained to transfer all available funds received or deposited into the Blocked Accounts to the Agent Payment Account at any time.  In furtherance thereof, the Interim Financing Order or other order(s) of the Bankruptcy Court shall ratify and amend the Blocked Account Agreements and deposit account arrangements of Borrower and Guarantors, to reflect the commencement of the Chapter 11 Cases, and that Borrower and Guarantors, as Debtors and Debtors-in-Possession, are the successor in interest to the Borrower and Guarantors, as applicable, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

10.7.    the execution or delivery to Agent and Lenders of all other Credit Documents, and other agreements, documents and instruments which, in the good faith judgment, of Agent are necessary or appropriate.  The implementation of the terms of this Ratification Agreement and the other Credit Documents, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

10.8.    satisfactory review by counsel for Agent of legal issues attendant to the post-petition financing transactions contemplated hereunder;

10.9.    Agent's completion of its business and legal due diligence, with results satisfactory to Agent, including field examinations of the business and Collateral of Borrower

21

and Guarantors in accordance with Agent's customary procedures and practices and as otherwise required by the nature and circumstances of the businesses of Borrower and each Guarantor;

10.10.  Agent shall be satisfied with all legal, tax, accounting and other matters relating to Borrower and Guarantors;

10.11.  Borrower and Guarantors shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner acceptable to Agent and its counsel, and an Interim Financing Order shall have been entered by the Bankruptcy Court not later than thirty (30) days after the Petition Date (as amended, modified, supplemented or extended from time to time with Agent's consent, the "Interim Financing Order") authorizing the secured financing under the Credit Documents as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the first priority, perfected liens and senior security interest in favor of Agent and Lenders, in each case as described in this Ratification Agreement and in the Financing Order, and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Cases and any future proceeding which may develop out of such case, including liquidation and bankruptcy. The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement for a period not to exceed thirty (30) days from the date of the entry of the Interim Financing Order by the Bankruptcy Court and in the amounts set forth in the Budget with respect to such period, and it shall contain such other terms and provisions as Agent and its counsel shall reasonable require;

10.12.  on or before the expiration of the Interim Financing Order and in no event later than thirty (30) days after the entry of the Interim Financing Order by the Bankruptcy Court, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Agent and Lenders the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Financing Orders), and modifying the automatic stay and other provisions required by Agent and its counsel, including, without limitation, a release of all claims and causes of action upon the full repayment of all obligations of Borrower and Guarantors to Agent and Lenders on terms satisfactory to Agent ("Permanent Financing Order").  Neither Agent nor any Lender shall provide any Advances (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the thirtieth (30th) day following the date of the entry by the Bankruptcy Court of the Interim Financing Order, such Permanent Financing Order shall have been entered, there shall be no appeal or other contest with respect to either of such orders and the time to appeal or contest such orders shall have expired (the "Permanent Financing Order", and together with the Interim Financing Order, collectively, the "Financing Orders");

10.13.  other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Agent's and Lenders' security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent and Lenders to the Petition Date;

10.14. No material misstatements in or omissions from the materials previously furnished to Agent by Borrower or either Guarantor shall have been made and Agent shall be satisfied that any financial statements delivered to it fairly present the business and financial conditions of Borrower and Guarantors;

10.15. No material adverse change in the business, operations, profits, assets or prospects of Borrower or either Guarantor shall have occurred since June 30, 2013 not previously disclosed in writing to the Agent (including as reflected in any report delivered by any Borrower to Agent); provided, that, neither the commencement of the Chapter 11 Cases nor the default under any agreement to which Borrower or either Guarantor is a party resulting solely from the commencement of the Chapter 11 Cases shall be deemed a material adverse change for purposes of this condition precedent, and no material pending or threatened, litigation, proceeding, injunction, order or claims with respect to Borrower or either Guarantor shall exist; and

10.16. no Event of Default shall have occurred or be existing under any of the Existing Credit Documents, as modified pursuant hereto, and assumed by Borrower and Guarantors.

11.    CONDITIONS SUBSEQUENT.

11.1.   Not later than ninety (90) days after the Petition Date, an order in form and substance satisfactory to Agent (the "Bidding Procedures Order") shall have been entered by the Bankruptcy Court authorizing and approving an auction and auction procedures for the selection of a liquidator and/or a going concern purchaser in connection with any potential sale of the business and assets of Borrower and Guarantors (if applicable) in any liquidation and/or going concern sales, as applicable, to the highest and best bidder, on terms and conditions reasonably acceptable to Agent.

11.2.   Not later than sixty (60) days after the date the Bankruptcy Court enters the Bidding Procedures Order, an order in form and substance reasonably satisfactory to Agent (the "Sale Order") shall have been entered by the Bankruptcy Court approving the selection of a liquidator and/or a going concern purchaser and the sale of the business and/or assets of the Borrower and Guarantors (if applicable) to such liquidator and/or going concern purchaser, in each case on terms and conditions reasonably acceptable to Agent.

11.3.   Any liquidation or going concern sales shall be consummated, not later than the one hundred fiftieth day (150th) day following the Petition Date.  Any sale shall be in cash, shall not contain financing contingencies and shall otherwise be on terms and conditions reasonably acceptable to Agent.

11.4.   Not later than one hundred ten (110) days after the Petition Date, Borrower and Guarantors shall have filed with the Bankruptcy Court a disclosure statement and a plan of reorganization or liquidation (as applicable), and motion and proposed form order (in form and substance satisfactory to Agent) seeking approval of Bankruptcy Court, on terms and conditions acceptable to Agent or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein.

23

11.5.   Not later than one hundred fifty (150) days after the Petition Date, the Bankruptcy Court shall have approved the disclosure statement on terms and conditions acceptable to Agent or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein.

11.6.   Not later than one hundred eighty (180) days after the Petition Date, the Bankruptcy Court shall have confirmed the plan of reorganization or liquidation (as applicable) on terms and conditions acceptable to Agent or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein.

12.   <u>MISCELLANEOUS.</u>

12.1.   <u>Amendments and Waivers</u>.   Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally.   Any change, waiver, discharge or termination of this this Ratification Agreement or any other instrument or document referred to herein or therein must be in a written instrument signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

12.2.   <u>Further Assurances</u>: Borrower and each Guarantor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the other Credit Documents, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Credit Documents or the Financing Order.   Upon the request of Agent, at any time and from time to time, Borrower and each Guarantor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office and/or the United States Copyright Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

12.3.   <u>Headings</u>, The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

12.4.   <u>Counterparts</u>.   This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement. In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.   Delivery of an executed counterpart of this Ratification Agreement by

facsimile or electronic mail shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement. Any party delivering an executed counterpart of this Ratification Agreement by facsimile or electronic mail also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

12.5. <u>Additional Events of Default</u>. The parties hereto acknowledge, confirm and agree that the failure of Borrower or either Guarantor to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Borrower or either Guarantor in connection herewith shall constitute an Event of Default under the Credit Documents.

12.6. <u>Costs and Expenses</u>. Borrower shall pay to Agent and Lenders on demand all reasonably costs and expenses that Agent or any Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Credit Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' fees and paralegal fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Credit Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent and Lenders in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of Borrower and Guarantors under the Credit Documents or the Financing Order that Borrower and Guarantors fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and Borrower's operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Borrower's and/or each Guarantor's operations, plus a per diem charge at the rate of $1,000 per person per day for Agent's examiners in the field and office; and (h) costs and expenses (including reasonable attorneys' and paralegals' fees, and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent and Lenders, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Ratification Agreement, the other Credit Documents and the Financing Order, or to defend any claims made or threatened against Agent or any Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). All sums provided for in this Section 12.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Credit Documents. Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to Borrower or either Guarantor.

25

12.7.   <u>Effectiveness</u>.   This Ratification Agreement shall become effective upon the execution hereof by Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

26

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

AGENT

WAYZATA OPPORTUNITIES FUND II, L.P.,
as Agent

By: _____
Name: _____
Title: _____

BANK

WAYZATA OPPORTUNITIES FUND II, L.P.,
as Bank

By: _____
Name: _____
Title: _____

ISSUING BANK

WAYZATA OPPORTUNITIES FUND II, L.P.,
as Issuing Bank

By: _____
Name: _____
Title: _____

BORROWER

GOLDKING RESOURCES, LLC,
as Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

GUARANTORS

GOLDKING RESOURCES, LLC,
as Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

GOLDKING HOLDINGS, LLC,
as Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

[Signature Page to Ratification Agreement]

SCHEDULE 1.1(P)

TO RATIFICATION, AMENDMENT AND SECURITY AGREEMENT

Commercial Tort Claims

All commercial tort claims related to the following legal proceedings:

1.      *Goldking Onshore Operating, LLC, and Goldking Holdings, LLC v. Leonard C. Tallerine, Jr., Goldking Energy Corporation, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, RETA Wellwood d/b/a Vermillion Contracting Co., Denna Ramsey and Paul Culotta*,   In the District Court of Harris County, Texas, 61st Judicial District, Case No. 2013-08724 [filed on February 13, 2013].

SCHEDULE 3

TO RATIFICATION, AMENDMENT AND SECURITY AGREEMENT

The following provisions of the Existing Credit Agreement shall no longer apply or shall not give rise to an Event of Default, as provided below:

NONE.

SCHEDULE 5.2

TO RATIFICATION, AMENDMENT AND SECURITY AGREEMENT

Borrower is permitted to pay the following upon Court Approval and to the extent set forth in the Budget, the following:

The payees identified in the Budget.

SCHEDULE 10.6

TO RATIFICATION, AMENDMENT AND SECURITY AGREEMENT

Blocked Accounts

| BANK | ACCOUNT NUMBER | ACCOUNT HOLDER | ACCOUNT |
|---|---|---|---|
| Comerica | 188137XXXX | Goldking Onshore Operating, LLC | Concentration Account |
| Comerica | 188137XXXX | Goldking Onshore Operating, LLC | Operating Account |
| Comerica | 188138XXXX | Goldking Onshore Operating, LLC | Royalty Account |
| JPMorgan | 89349XXXX | Goldking Holdings, LLC | General Commercial Account |

# **EXHIBIT C**

Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GOLDKING HOLDINGS, LLC, et al.,[1] | Case No. 13-12820 (___) |
| | Jointly Administered |
| Debtors. | **Ref. Docket No. _____** |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) APPROVING POST-PETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY, AND (6) SCHEDULING A FINAL HEARING**

THIS MATTER having come before the Court upon the motion (the "**Motion**") of Goldking Resources, LLC ("**Goldking Resources**" or "**Borrower**"), Goldking Onshore Operating, LLC ("**Goldking Operating**"), and Goldking Holdings, LLC ("**Goldking Holdings**", and together with Goldking Operating, collectively the "**Guarantors**", and the Guarantors together with Goldking Resources, collectively the "**Debtors**") in the above-captioned Chapter 11 cases (the "**Cases**"), pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an Interim Financing Order (the "**Interim Financing Order**") and a Permanent Financing Order (the "**Permanent Financing Order**"), seeking, among other relief:

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Goldking Holdings, LLC (2614); Goldking Onshore Operating, LLC (2653); and Goldking Resources, LLC (2682). The mailing address for the Debtors is 777 Walker Street, Suite 2500, Houston, TX 77002.

(1)      authorization for Debtors to obtain post-petition loans, advances and other financial accommodations on an interim basis for a period through and including the date of the Final Hearing (as defined below) from Wayzata Opportunities Fund II, LP, (the "**Agent**") as successor administrative agent to Bank of America, N.A. ("**BOA**"), in accordance with the terms and conditions set forth in the Existing Credit Agreement (as defined below), as amended and ratified by the Ratification Agreement (as defined below), and in accordance with this Interim Financing Order, secured by security interests in and liens upon all of the Collateral (as defined below) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code;

(2)      authorization for Debtors to enter into the Ratification and Amendment Agreement, dated of even date herewith, by and among the Borrower, the Guarantors, and Lender (the "**Ratification Agreement**", a copy of which is included in the Exhibits to the Motion and is fully incorporated herein), which ratifies, extends, adopts and amends the Existing Credit Agreement and the other Existing Credit Documents (as defined below);

(3)      an order vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the relief requested herein;

(4)      the grant to Agent of superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all Post-Petition Obligations (as defined in the Ratification Agreement); and

(5)      the setting of a final hearing on the Motion (the "**Final Hearing**").

The initial hearing on the Motion having been held by this Court on _____, 2013 (the "**Interim Hearing**"); and the Court having considered the Motion, the Declaration of

2

Edward Hebert in Support of the Chapter 11 Petitions and First Day Pleadings, the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the Interim Hearing; and the Court having found that the notice of the Interim Hearing has been provided in accordance with the Bankruptcy Rules, Local Rules and the Bankruptcy Code, as set forth in Paragraph D; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Petition</u>.    On October 30, 2013 (the "**Petition Date**"), Debtors filed voluntary petitions (the "**Petitions**") under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b) (2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3

C.      <u>Debtors' Stipulations</u>.  After consultation with their attorneys and financial advisors, and subject to Section 4.1 of this Interim Financing Order, each Debtor hereby admits, stipulates, acknowledges and agrees that:

(i)      *Existing Credit Documents*.  Prior to the commencement of the Case, Borrower entered into that certain Credit Agreement, dated November 5, 2010, by and among Borrower, the Guarantors, the financial institutions named therein, as banks, BOA, as administrative agent and issuing bank, and Banc of America Securities LLC, as lead arranger and book manager (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "**Existing Credit Agreement**," a copy of which is attached to the Motion in the Exhibits).[2]  Pursuant to the Assignment and Acceptance (the "**Assignment and Acceptance**"), the Resignation, Assignment and Release Agreement (the "**Resignation**"), and the Release Agreement (the "**Release**", and together with the Assignment and Acceptance and the Resignation, each as amended, modified or supplemented from time to time, collectively the "**Assignment**"), each dated as of January 24, 2013, by and among Borrower, the Guarantors, BOA, and Agent (referred to hereinafter as the "**Lender**"), BOA assigned, sold and delegated all of its rights and obligations under the Existing Credit Agreement to Lender.  The Assignment was a valid, binding and enforceable Assignment of the Existing Credit Agreement's rights and obligations from BOA to Lender. Prior to the Petition Date, Lender made loans, advances and provided other financial accommodations to Borrower pursuant to the terms and conditions set forth in (1) the Existing Credit Agreement,

---

[2]  Capitalized terms used but not otherwise defined in this Order shall have the respective meanings ascribed thereto in the Motion and the Existing Credit Agreement, as amended and ratified by the Ratification Agreement (as defined herein).

4

and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of Lender, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto, as assigned by BOA to Lender pursuant to the Assignment  (all of the foregoing, together with the Existing Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "**Existing Credit Documents**").   Copies of the operative Existing Credit Documents are contained in the Exhibit Supplement.

(ii)     *Pre-Petition Obligations Amount*.   As of the Petition Date, the aggregate amount of all obligations owing by Borrower to Lender under and in connection with the Existing Credit Documents was not less than $11,582,729.51, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, and as such term is more fully defined in the Ratification Agreement, the "**Pre-Petition Obligations**").     The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

(iii)     *Pre-Petition Collateral*.   As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Existing Credit Documents by valid, perfected,

5

enforceable and non-avoidable first priority security interests and liens granted by Debtors to Lender upon all of the Pre-Petition Collateral, subject only to the liens specifically listed on Schedule 6.1 of the Existing Credit Agreement or permitted under Section 6.1 of the Existing Credit Agreement or applicable law to the extent that such security interests, liens or encumbrances are (a) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (b) senior to and have not been or are subject to being subordinated to Lender's liens on and security interests in the Pre-Petition Collateral or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (the "**Permitted Encumbrances**").  The Debtors will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Lender's liens, claims or security interests in the Pre-Petition Collateral.

(iv)    *Proof of Claim*.    Upon entry of a Permanent Financing Order providing for such relief, the Pre-Petition Obligations and the liens, rights, priorities and protections granted to or in favor of Lender as set forth herein and in the Existing Credit Documents shall be deemed a timely filed proof of claim on behalf of Lender in this Case.

D.    Findings Regarding the Post-petition Financing.

(i)    *Post-petition Financing*.    The Debtors have requested from Lender, and Lender is willing to extend, certain loans, advances and other financial accommodations on the terms and conditions set forth, in this Interim Financing Order and the Credit Documents (as defined below).

(ii)    *Need for Post-Petition Financing*.    The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their

6

businesses in the ordinary course of their business without the financing requested under the Motion. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with Lender as set forth in this Interim Financing Order and the Credit Documents is vital to the preservation and maintenance of the going concern values of the Debtors and/or the Debtors' ability to conduct an orderly liquidation and/or sale of its assets to maximize the value thereof. Accordingly, the Debtors have an immediate need to obtain post-petition financing in order to, among other things, permit the orderly continuation of the operation of its businesses, minimize the disruption of its business operations, and preserve and maximize the value of their assets in order to maximize the recovery to all creditors of the Debtors.

(iii)    *No Credit Available on More Favorable Terms*. The Debtors are unable to obtain financing from sources other than Lender on terms more favorable than the Existing Credit Agreement. The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a post-petition basis is not otherwise available without granting the Lender, (1) perfected security interests in and liens on (each as provided herein) all of the Post-Petition

7

Collateral (2) superpriority claims, and (3) the other protections set forth in this Interim Financing Order.

(iv)    *Budget*.    The Debtors have prepared and delivered to Lender an initial Budget (as defined in the Ratification Agreement).    Such Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, the Projected Information for the periods covered thereby.    The Debtors represent that the Budget is achievable in accordance with the terms of the Credit Documents and this Order.    Lender is relying upon the Debtors' compliance with the Budget in accordance with Section 5.3 of the Ratification Agreement, the other Credit Documents and this Order in determining to enter into the post-petition financing arrangements provided for herein.

(v)    *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms of the Credit Documents and this Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the prudent business judgment of the Debtors, consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.    The terms and conditions of the Credit Documents and this Order have been negotiated in good faith and at arms' length by and among Borrower and Guarantors, on one hand, and the Lender, on the other hand, with all parties being represented by counsel.    Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the Lender as that term is used in Section 364(e) of the Bankruptcy Code.

(vi)    *Good Cause*.    The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their respective estates, as its implementation will, among other things, provide the Debtors

8

with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and on-going operations, (b) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

(vii)    *Notice.*    The telephonic, facsimile, overnight mail and/or hand delivery notice of the Interim Hearing, seeking entry of the Interim Financing Order granting the Motion, has been provided to certain parties in interest, including: (i) the U.S. Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors; and (vi) counsel to the Lender.   The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Financing Order, and no other or further notice is or shall be required.

(viii)    *Immediate Entry*.    Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rules 4001(c)(2).   Absent entry of this Interim Financing Order, the Debtors' business, properties and estates will be immediately and irreparably harmed. Accordingly, this Court concludes that entry of this Interim Financing Order is necessary to avoid immediate and irreparable harm to the Debtors, and is in the best interests of the Debtors' estate and creditors.  Any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

(ix)    Based upon the foregoing, and after due consideration and good cause appearing therefor,

9

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

Section 1.    <u>Authorization and Conditions to Financing.</u>

       1.1    <u>Motion Granted</u>.    The Motion is **GRANTED** on an interim basis in accordance with Bankruptcy Rule 4001(c)(2), subject to the terms and conditions set forth herein.

       1.2    <u>Authorization to Borrow and Use Loan Proceeds</u>.    Debtors are hereby authorized and empowered on an interim basis to immediately borrow, obtain and incur indebtedness and obligations owing to Lender pursuant to the terms and conditions of this Interim Financing Order, the Existing Credit Agreement, as ratified and amended by the Ratification Agreement (the "**<u>Credit Agreement</u>**," as such term is more fully defined in the Ratification Agreement), and the other Existing Credit Documents, as ratified and amended by the Ratification Agreement (the "**<u>Credit Documents</u>**," as such term is more fully defined in the Ratification Agreement), during the period commencing on the date of this Interim Financing Order through and including the date of the Final Hearing as set forth in Section 6 of this Interim Financing Order (the "**<u>Interim Financing Period</u>**"), in such amounts as may be made available to Borrower by Lender in accordance with Budget.    Subject to the terms and conditions contained in this Interim Financing Order and the Credit Documents, including Section 5.2 of the Ratification Agreement, Debtors shall use the proceeds of the Loans and any other credit accommodations provided to or for the benefit of Debtors pursuant to this Interim Financing Order, the Credit Agreement or the other Credit Documents for, <u>inter</u> <u>alia</u>, the payment of employee salaries, payroll, taxes, and all other expenses specified in the Budget for other operating and working capital purposes, including, without limitation, the Hedging Obligations (including any amounts for the Hedging Obligations related to the period prior to the Petition

10

Date), in the ordinary course of Debtors' business in accordance with the Credit Documents, including the fees of the U.S. Trustee, the Clerk of this Court and, subject to Section 2.3 of this Interim Financing Order, Allowed Professional Fees (as defined below).

      1.3     Credit Documents

      1.3.1    Authorization.   Debtors are hereby authorized to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the Credit Agreement, the other Credit Documents and all other agreements, documents and instruments executed or delivered in connection with or related to the Credit Agreement, the other Credit Documents or this Interim Financing Order, including, without limitation, the Ratification Agreement, pursuant to which, inter alia, Debtors ratify, reaffirm, extend, assume, adopt, amend, and restate the Existing Credit Agreement and the other Existing Credit Documents to which they are a party, including, any lockbox, blocked depository bank account arrangements or other cash management systems provided under the Credit Agreement (collectively, the "**Account Control Agreement**").

      1.3.2    Approval.  The Credit Documents (including, without limitation, the Credit Agreement) are approved to the extent necessary to implement the terms and provisions of this Interim Financing Order.  All of such terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among Debtors and Lender, and of Debtors' assumption and adoption of all of the terms, conditions, and covenants of the Credit Agreement and the other Credit Documents for all purposes, including, without limitation, to the extent applicable, the payment of all Obligations arising thereunder, including, without limitation, all principal, interest, commissions, letter of credit fees, servicing fees,

unused line fees, DIP Facility Fee, closing fees, early termination fees, and other fees and expenses, including, without limitation, all of Lender's consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the Credit Documents.

        1.3.3   <u>Amendment.</u>   Subject to the terms and conditions of the Credit Agreement and the other Credit Documents, Debtors and Lender may amend, modify, supplement or waive any provision of the Credit Documents (an "**Amendment**") without further approval or order of the Court so long as (i) such Amendment is not material (for purposes hereof, a "material" Amendment shall mean, any Amendment that operates to increase the interest rate other than as currently provided in the Credit Documents, increase the Availability (as defined in the Credit Agreement), add specific new events of default or enlarge the nature and extent of default remedies available to the Lender following an event of default, or otherwise modify any terms and conditions in any Credit Document in a manner materially less favorable to Debtors) and is undertaken in good faith by Lender and Debtors; (ii) the Debtors provide prior written notice of the Amendment (the "**Amendment Notice**") to (a) the U.S. Trustee and (b) counsel to any official committee appointed in the Case under Section 1102 of the Bankruptcy Code (collectively, the "**Committee(s)**"), or in the event no such Committee is appointed at the time of such Amendment, the 30 Largest Unsecured Creditors; (iii) Debtors file the Amendment Notice with the Court; and (iv) no objection to the Amendment is filed with the Court within two (2) business days from the later of the date the Amendment Notice is served or the date the Amendment Notice is filed with the Court in accordance with this Section.   Any material Amendment to the Credit Documents must be approved by the Court to be effective.

        1.4   <u>Payment of Prepetition Debt</u>.   At the Final Hearing, the Debtors will seek entry of a Permanent Financing Order, in form and substance acceptable to Lender, approving

12

the proposed post-petition financing arrangements, seeking, among other relief, authorization of the Debtors to pay Lender in respect of all Pre-Petition Obligations in accordance with the Credit Documents and Sections 1.5 and 1.6 of this Interim Financing Order.  Notice of the Final Hearing and Permanent Financing Order will be provided in accordance with this Interim Financing Order.

            1.5    <u>Payments and Application of Payments</u>.  The Debtors are authorized to make all payments and transfers of estate property to Lender as provided, permitted and/or required under the Credit Agreement and the other Credit Documents, which payments and transfers, subject to Section 4.1 herein, shall not be avoidable or recoverable from Lender under Section 547, 548, 550, 553 or any other Section of the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  All proceeds of the Collateral received by Lender, and any other amounts or payments received by Lender in respect of the Obligations, shall be applied or deemed to be applied by Lender in accordance with the Credit Agreement, the other Credit Documents and this Interim Financing Order first to the Post-Petition Obligations, until such Post-Petition Obligations are indefeasibly paid in full and completely satisfied or the Court enters the Permanent Financing Order authorizing the Debtors to pay Lender in respect of all Pre-Petition Obligations.  Without limiting the generality of the foregoing, the Debtors are authorized, without further order of this Court, provided that copies of the invoices have been delivered to the Office of the U.S. Trustee and counsel to any official committee(s) appointed in this case, to pay or reimburse Lender for all present and future costs and expenses, including, without limitation, the DIP Facility Fee subject to the terms and conditions set forth in the Ratification Agreement, all professional fees, consultant fees and legal fees and expenses paid or incurred by

13

Lender in connection with the financing transactions as provided in this Interim Financing Order and the Credit Documents, all of which shall be and are included as part of the Obligations and secured by the Collateral.

      1.6    <u>Continuation of Pre-petition Procedures</u>.  All pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to Lender and the funding pursuant to the Credit Documents, including the Account Control Agreement, and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Case.

      1.7    <u>Post-financing Milestones</u>.

      1.7.1   Not later than ninety (90) days after the Petition Date, an order in form and substance satisfactory to Lender (the "**Bidding Procedures Order**") shall have been entered by the Court authorizing and approving an auction and auction procedures for the selection of a liquidator and/or a going concern purchaser in connection with any potential sale of the business and assets of Borrower and Guarantors (if applicable) in any liquidation and/or going concern sales, as applicable, to the highest and best bidder, on terms and conditions reasonably acceptable to Lender.

      1.7.2   Not later than sixty (60) days after the date the Court enters the Bidding Procedures Order, an order in form and substance reasonably satisfactory to Lender (the "**Sale Order**") shall have been entered by the Court approving the selection of a liquidator and/or a going concern purchaser and the sale of the business and/or assets of the Borrower and Guarantors (if applicable) to such liquidator and/or going concern purchaser, in each case on terms and conditions reasonably acceptable to Lender.

14

1.7.3   Any liquidation or going concern sales shall be consummated, not later than the one hundred fiftieth day (150th) day following the Petition Date on terms and conditions reasonably acceptable to Lender.

1.7.4   Not later than one hundred ten (110) days after the Petition Date, Borrower and Guarantors shall have filed with the Court a disclosure statement and a plan of reorganization or liquidation (as applicable), and motion and proposed form order (in form and substance satisfactory to Lender) seeking approval of Court, on terms and conditions acceptable to Lender or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein.

1.7.5   Not later than one hundred fifty (150) days after the Petition Date, the Court shall have approved the disclosure statement on terms and conditions acceptable to Lender or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein.

1.7.6   Not later than one hundred eighty (180) days after the Petition Date, the Court shall have confirmed the plan of reorganization or liquidation (as applicable) on terms and conditions acceptable to Lender or which provides for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions therein.

Section 2.      Post-petition Lien and Superpriority Administrative Claim Status.

2.1     Post-Petition Lien.

2.1.1   Post-Petition Lien Granting.   To secure the prompt payment and performance of any and all Post-Petition Obligations (and upon entry of a Permanent Financing Order providing for such relief any and all Obligations, including, without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of Debtors to Lender of whatever kind,

15

nature or description, absolute or contingent, now existing or hereafter arising, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, Lender shall have and is hereby granted, effective as of the Petition Date, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' estates may have (but subject to certain claims entitled to priority, including the Permitted Liens and Claims (as defined below), as and to the extent expressly provided in Section 2.1.2 below), in and upon all of the Pre-Petition Collateral and the Post-Petition Collateral (the Pre-Petition Collateral and the Post-Petition Collateral, together the "**Collateral**").   Notwithstanding the foregoing or anything to the contrary contained in the Credit Agreement, Lender's liens on and security interests in avoidance actions brought under Sections 542, 545, 547, 548, 549 or 550 of the Bankruptcy Code shall secure the Obligations only upon the entry of a Permanent Financing Order providing for such relief.  In accordance with Sections 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of Obligations secured by such Collateral after satisfaction of the Post-Petition Obligations of Debtors to Lender, shall constitute additional security for the repayment of the Pre-Petition Obligations and adequate protection for the use by Debtors, and the diminution in the value, of the Collateral existing on the Petition Date.

2.1.2   Lien Priority.  The pre-petition and post-petition liens and security interests granted by Debtors to Lender under the Credit Documents and this Interim Financing Order in the Collateral shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor

16

of third parties in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law; provided, however, that Lender's liens on and security interests in the Collateral shall be subject only to (i) the Permitted Liens and (ii) the Carve Out Expenses (as defined below) solely to the extent provided for in Sections 2.3, 2.4 and 2.5 of this Interim Financing Order (the foregoing clauses (i) and (ii) are collectively referred to herein as the "**Permitted Liens and Claims**").

> 2.1.3    Post-Petition Lien Perfection.    This Interim Financing Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution that is a party to any agreement related to an Account Control Agreement consisting of Collateral (a "**Perfection Act**").    Notwithstanding the foregoing, if Lender shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, Lender is authorized to perform such act, and the Debtors are authorized to perform such act to the extent necessary or required by Lender, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Financing Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.    Lender may choose to file, record or present a certified copy of this Interim Financing Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept,

17

file or record such certified copy of this Interim Financing Order in accordance with applicable law.  Should Lender so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Financing Order.

2.1.4    <u>Nullifying Pre-Petition Restrictions to Post-Petition Financing.</u> Upon entry of the Permanent Financing Order providing for such relief, notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which Debtors are a party or under which the Debtors are obligated, except as otherwise permitted under the Credit Documents, any provision that restricts, limits or impairs in any way Debtors from granting Lender security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which Debtors are a party) under the Credit Agreement, the other Credit Documents or this Interim Financing Order, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or the Credit Documents shall <u>not</u> (i) be effective and/or enforceable against either Debtors or Lender, or (ii) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted by Debtors to Lender pursuant to this Interim Financing Order or the Credit Documents.

2.2    <u>Superpriority Administrative Expense</u>.  For all Post-Petition Obligations (and, upon entry of a Permanent Financing Order, for all Obligations, including, without limitation, all Pre-Petition Obligations and all Post-Petition Obligations) now existing or hereafter arising pursuant to this Interim Financing Order, the Credit Documents or otherwise,

18

Lender is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Permanent Financing Order), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "**Superpriority Claim**"), provided, however, the Superpriority Claim shall be subject only to the Permitted Liens and Claims as and to the extent expressly set forth in this Interim Financing Order.  The Superpriority Claim will attach to proceeds of avoidance actions brought under Sections 542, 545, 547, 548, 549 or 550 of the Bankruptcy Code only upon the entry of a Permanent Financing Order providing for such relief.

      2.3    <u>Carve Out Expenses</u>.

      2.3.1    <u>Carve Out Expenses</u>.  Upon the declaration by Lender of the occurrence of an Event of Default, which is not waived or cured, Lender's liens, claims and security interests in the Collateral and their Superpriority Claim shall be subject only to the right of payment of the following expenses (collectively, the "**Carve Out Expenses**"):

      a.    statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

      b.    fees payable to the Clerk of this Court; and

      c.    subject to the terms and conditions of this Interim Financing Order, the unpaid, budgeted and outstanding reasonable fees and expenses actually incurred on or after the Petition Date through the occurrence of an Event of Default, and approved or permitted by an order of the Court pursuant to Sections 326,

19

328, 330, or 331 of the Bankruptcy Code (collectively, the "**Allowed Professional Fees**"), by attorneys, accountants and other professionals retained by the Debtors (collectively, the "**Debtors' Professionals**"), plus an aggregate sum not to exceed $150,000.00 subsequent to the occurrence of an Event of Default (the "**Professional Fee Carve Out**").    The Professional Fee Carve Out shall also apply to the professionals employed by any statutory committee, if appointed.

2.3.2    <u>Excluded Professional Fees</u>.    Notwithstanding anything to the contrary in this Interim Financing Order, neither the Professional Fee Carve Out nor the proceeds of any Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in or any investigation into any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or Lender's liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or Lender's liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Financing Order, (b) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of Lender in accordance with the terms and conditions of this Interim Financing Order, (c) a request for authorization to obtain Debtor-in-Possession financing or other financial accommodations pursuant to Section 364(c) or Section 364(d) of the Bankruptcy Code, other than from Lender, without the prior written consent of Lender, (d) the commencement or

20

prosecution of any action or proceeding of any claims, causes of action or defenses against Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which results in the occurrence of an Event of Default, which is not waived or cured, under the Credit Documents or this Interim Financing Order; provided, however, that any statutory committee, if appointed, may use up to $10,000.00 to investigate the liens of, or claims against, the Lender.

2.4     <u>Carve Out Reserve</u>.  At Lender's sole discretion, Lender may, at any time and in any increment up to the aggregate amount of the Professional Fee Carve Out and the other Carve Out Expenses in accordance with the Credit Agreement, establish a Reserve against the amount of all credit accommodations that would otherwise be made available to Debtors pursuant to the lending formulae contained in the Credit Agreement in respect of the Professional Fee Carve Out and the other Carve Out Expenses.

2.5     <u>Payment of Carve Out Expenses</u>.

2.5.1     Prior to the occurrence of an Event of Default, Debtors shall be permitted to pay Allowed Professional Fees of the Professionals in accordance with the Budget and any such amounts paid prior to the occurrence of an Event of Default shall not reduce the $150,000.00 limitation in the Professional Fee Carve-Out.

2.5.2     Any payment or reimbursement made either directly by Lender at any time, or by or on behalf of the Debtors on or after the occurrence of an Event of Default which is not waived or cured, in respect of any Allowed Professional Fees or any other Carve Out Expenses (exclusive of the application of any retainers by any of the Professionals) shall, in either case, permanently reduce the Professional Fee Carve Out on a dollar-for-dollar basis;

21

provided, however that to the extent the $150,000.00 limitation on the Professional Fee Carve-Out is reduced by any amount as a result of payment of such fees and expenses on and after the occurrence of an Event of Default, and such Event of Default is thereafter waived in writing by Lender, then upon the effectiveness of such waiver, the amount of the Professional Fee Carve Out shall be increased by an amount equal to the amount by which it was reduced following such Event of Default (but in no event shall the Professional Fee Carve Out exceed $150,000.00). Lender's obligation to fund or otherwise pay the Professional Fee Carve Out and the other Carve Out Expenses shall be added to and made a part of the Obligations, secured by the Collateral, and entitle Lender to all of the rights, claims, liens, priorities and protections under this Interim Financing Order, the Credit Documents, the Bankruptcy Code or applicable law.  Payment of any Carve Out Expenses, whether by or on behalf of Lender, shall not, and shall not be deemed to, reduce the Obligations, and shall not and shall not be deemed to subordinate any of Lender's liens and security interests in the Collateral or their Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.  Except as otherwise provided herein with respect to the Professional Fee Carve Out and the other Carve Out Expenses, Lender shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Case under any chapter of the Bankruptcy Code, and nothing in Section 2.3, 2.4 or 2.5 of this Interim Financing Order shall be construed to obligate Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

2.6    Use of Cash Collateral; Adequate Protection.

2.6.1    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Financing Order, the Credit Agreement and the other Credit Documents, and in accordance with the Budget, Debtors shall be and are hereby authorized to use, until the expiration of Lender's commitment to lend under the Credit Agreement and the other Credit Documents, the Cash Collateral (as defined in Section 363 of the Bankruptcy Code) subject to the pre-petition liens and security interests granted to the Lender.  Nothing in this Interim Financing Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or Debtors' use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Financing Order, the Credit Agreement, the other Credit Documents and in accordance with the Budget.

2.6.2    Replacement Liens.  As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, the Lender is hereby granted pursuant to Sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Replacement Lien**").  The Replacement Lien shall be junior and subordinate only to the Permitted Liens and Claims and the liens and security interests granted to Lender in the Collateral securing the Post-Petition Obligations and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

2.6.3    Section 507(b) Priority Claim.  As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on

23

account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out-Expenses, the Lender is hereby granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of this Case and any conversion thereof to a case under chapter 7 to the extent of such diminution in value (the "**Adequate Protection Superpriority Claim**").   The Adequate Protection Superpriority Claim shall be junior only to the Carve-Out Expenses and shall otherwise have priority over all administrative expense claims under 11 U.S.C. §§ 503(b), 506(c) (upon entry of a Permanent Financing Order providing for such relief, as set forth in Section 4.3 of this order), and 507(b) and unsecured claims against Debtors and their estates now existing or hereafter arising.   The Adequate Protection Superpriority Claim will attach to proceeds of avoidance actions brought under Sections 542, 545, 547, 548, 549 or 550 of the Bankruptcy Code only upon the entry of a Permanent Financing Order providing for such relief.

2.6.4   <u>Other Adequate Protection</u>.  As further adequate protection, Debtor is hereby authorized to provide adequate protection to Lender in the form of: (a) payment of interest, fees and other amounts due under the Existing Credit Documents, at the times specified therein, to Lender, and (b) ongoing payment of the fees, costs and expenses, including, without limitation, reasonable legal and other professionals' fees and expenses, of Lender as required under the Existing Credit Documents.

Section 3.   <u>Events of Default, Rights and Remedies, and Relief from Stay</u>.

3.1   <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an "**Event of Default**" under this Interim Financing Order:

24

a.    Debtors' failure to comply with the terms, conditions or provisions under this Interim Financing Order; or

b.    An "Event of Default" under the Credit Agreement or any of the other Credit Documents.

3.2    <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of and during the continuance of an Event of Default, which is not waived or cured, (i) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Financing Order, the Credit Agreement and the other Credit Documents, and (ii) Lender shall be entitled to take any act or exercise any right or remedy (subject to Section 3.4 below) as provided in this Interim Financing Order or any Credit Document, including, without limitation, declaring all Obligations immediately due and payable, accelerating the Obligations, ceasing to extend Loans or provide or arrange for Letter of Credit Obligations on behalf of Debtors, setting off any Obligations with Collateral or proceeds in Lender's possession, and enforcing any and all rights with respect to the Collateral.  Lender shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

3.3    <u>Expiration of Commitment</u>.  Upon the expiration of Borrower's authority to borrow and obtain other credit accommodations from Lender pursuant to the terms of this Interim Financing Order and the Credit Documents (except if such authority shall be extended with the prior written consent of Lender, which consent shall not be implied or construed from any action, inaction or acquiescence by Lender), unless an Event of Default set forth in Section

25

3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.4 of this Interim Financing Order, all of the Obligations shall immediately become due and payable and Lender shall be automatically and completely relieved from the effect of any stay under Section 362 of the Bankruptcy Code, any other restriction on the enforcement of its liens upon and security interests in the Collateral or any other rights granted to Lender pursuant to the terms and conditions of the Credit Documents or this Interim Financing Order, and Lender shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Financing Order, the Credit Documents or applicable law which Lender may deem appropriate and to proceed against and realize upon the Collateral or any other property of the Debtors' estates.

   3.4 <u>Relief from Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit Lender to perform any act authorized or permitted under or by virtue of this Interim Financing Order or the Credit Documents, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Financing Order and pursuant to the terms of the Credit Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Obligations, including, without limitation, all interests, fees, costs and expenses permitted under the Credit Documents, and apply such payments to the Obligations pursuant to the Credit Documents and this Interim Financing Order.  In addition, and without limiting the foregoing, upon the occurrence of an Event of Default, which is not waived or cured, and after providing five (5)

26

business days prior written notice (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Committee (if appointed), and the U.S. Trustee, Lender shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Financing Order, the Credit Documents or applicable law as Lender  may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of Debtors' estate upon which Lender has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Obligations.   Nothing contained in this Interim Financing Order (including Section 3 hereof) shall prevent the Debtors or any committee appointed in this case from requesting a hearing to contest or challenge the existence or continuance of an Event of Default.

Section 4.        Representations, Covenants and Waivers.

        4.1        Objections to Pre-Petition Obligations.   Any action, claim or defense (hereinafter, an "**Objection**") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or otherwise, (a) the existence, validity or amount of the Pre-Petition Obligations, (b) the extent, legality, validity, perfection or enforceability of Lender's pre-petition liens and security interests in the Pre-Petition Collateral, (c) Lender's right to apply proceeds of Post-Petition Collateral against Post-Petition Obligations in satisfaction of Lender's post-petition liens as provided for in this Interim Financing Order, (d) upon entry of the Permanent Financing Order, Lender's right to apply proceeds of Post-Petition Collateral against Pre-Petition Obligations in satisfaction of Lender's pre-petition liens as provided for in this Interim Financing Order (provided, however, that the only grounds for such Objection is that the Pre-Petition Obligations were not fully secured by the Pre-Petition Collateral as of the Petition Date and such application unduly

27

advantaged Lenders), or (e) the Debtors' stipulations set forth in this Interim Financing Order, including the release of all claims against the Lender, shall be filed with the Court (x) by any Official Committee of Unsecured Creditors within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) by any party in interest with requisite standing (including a chapter 7 trustee) within seventy-five (75) calendar days from the date of entry of this Interim Financing Order.  If any such Objection is timely filed and successfully pursued, nothing in this Interim Financing Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or Lender's liens on the Pre-Petition Collateral.  If no Objection is timely filed, or if an Objection is timely filed but denied, (a) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Lender's pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Permitted Liens and Claims, and (b) the Debtors' stipulations set forth in this Interim Financing Order shall be binding on all parties, and Lender and each of its respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Existing Credit Documents or any action or inaction of Lender prior to the date hereof, including but not limited to, actions or inactions of Lender in Lender's capacity as equity owner of the Debtors, and shall not be subject to any further objection or challenge by any party at any time. Nothing contained in this Section 4.1 or otherwise shall or shall be deemed or construed to expand, impair, prejudice or waive any rights, claims or protections afforded to Lender in

28

connection with all post-petition financing and credit accommodations provided by Lender to Debtors in reliance on Section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Financing Order and the Credit Documents.

4.2    Debtors' Waivers.  Subject to entry of a Permanent Financing Order, at all times during the Case, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek authority (i) to use Cash Collateral of Lender under Section 363 of the Bankruptcy Code, except as otherwise expressly provided for herein, (ii) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code, other than from Lender or as may be otherwise expressly permitted pursuant to the Credit Agreement, provided, however, that the Lender may consent to the filing of a motion to approve a replacement debtor-in-possession financing which comports with the provisions of Section 5.7 of this Interim Financing Order and indefeasibly pays in full the Obligations in accordance with the terms of the Credit Documents and this Interim Financing Order, (iii) to challenge the application of any payments authorized by this Interim Financing Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, (iv) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the Ratification Agreement, (v) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Lender's pre-petition and post-petition liens and claims (subject to the rights of the Committee under Section 4.1 of this Interim Financing Order), (vi) to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations or (vii) to seek relief under the

29

Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Lender as provided in this Interim Financing Order and the Credit Documents or Lender's exercise of such rights or remedies; provided, however, that Lender may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Lender.

4.3     Section 506(c) Claims.     Upon entry of a Permanent Financing Order providing for such relief, no costs or expenses of administration which have or may be incurred in the Case shall be charged against Lender, their respective claims or the Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction or acquiescence by Lender.

4.4     Collateral Rights.     Until all of the Obligations shall have been indefeasibly paid and satisfied in full:

4.4.1     absent a further order from this Court, no other party shall foreclose or otherwise enforce any junior lien or claim in any Collateral; and

4.4.2     upon and after the occurrence of an Event of Default, and subject to Lender obtaining relief from the automatic stay as provided for herein, in connection with a liquidation of any of the Collateral, Lender (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, subject to applicable non-bankruptcy law and, at the sole cost and expense of Debtors, to (collectively, the "**Access Rights**"): (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses;

30

provided, that, for purposes of this Interim Financing Order, the Lender's exercise of its Access Rights shall be limited to (i) access and use permitted in accordance with applicable state law, (ii) the consent of the applicable landlord, lessor or owner, or (iii) a further order of this Court (which may be obtained on shortened notice) authorizing such access and use, including, without limitation, establishing GOB Sale guidelines.  Lender will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that Lender actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Lender actually occupies or uses such assets or properties).

    4.5 <u>Release</u>.  Upon the entry of a Permanent Financing Order providing for such relief, and subject to Section 4.1 above, in consideration of Lender making post-petition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Credit Documents and this Interim Financing Order, Debtors, on behalf of themselves and their successors, assigns and other legal representatives, (collectively, the "**<u>Releasors</u>**"), absolutely, unconditionally and irrevocably release, remise and forever discharge Lender and its respective successors and assigns, and each of its present and former participants, agents, officers, directors, shareholders, affiliates, subsidiaries, divisions, employees, attorneys, professionals and other representatives (collectively, the "**<u>Releasees</u>**") of and from any and all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever, of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Releasors may now or hereafter own, hold, have or claim to have

31

against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of the Ratification including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, or actions or inactions of Lender in Lender's capacity as equity owner of the Debtors, provided that such release does not apply in cases of fraud, gross negligence or willful misconduct of any Releasee.  In addition, upon the indefeasible repayment of all Obligations owed to Lender by Debtors and termination of the rights and obligations arising under the Credit Documents and either a Permanent Financing Order or Interim Financing Order, as the case may be (which payment and termination shall be on terms and conditions acceptable to Lender), Lender shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Credit Documents or the applicable Financing Order (including, without limitation, any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out Expenses), on terms and conditions acceptable to Lender.

Section 5.    <u>Other Rights and Obligations</u>.

      5.1    <u>No Modification or Stay of This Interim Financing Order</u>. Notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Financing Order, the Credit Documents or any term hereunder or thereunder, (ii) the failure to obtain a Permanent Financing Order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of one or more of the Cases (each, a "**<u>Subject Event</u>**"), (a) the acts taken by Lender in accordance with this Interim Financing Order, and (b) the Post-Petition Obligations incurred or arising prior to Lender's actual receipt of written notice

32

from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Financing Order, and the acts taken by Lender in accordance with this Interim Financing Order, and the liens granted to Lender in the Collateral, and all other rights, remedies, privileges, and benefits in favor of Lender pursuant to this Interim Financing Order and the Credit Documents shall remain valid and in full force and effect.   The foregoing shall not be construed to expand the rights and protections of section 364(e) of the Bankruptcy Code.   Lender is hereby granted all of the rights and protections of section 364(e) with regard to, *inter alia*, the Post-Petition Obligations, the post-petition liens granted in the Collateral, and the priorities granted to such liens and claims pursuant to this Interim Financing Order.

   5.2 <u>Power to Waive Rights and Duties to Third Parties</u>.  Lender shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Financing Order in respect of Lender (the "**<u>Lender Rights</u>**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).   Any waiver by Lender of any Lender Rights shall not be or constitute a continuing waiver.   Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to Lender.

   5.3 <u>Disposition of Collateral</u>.  Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior express written consent of Lender (and such consent shall not be implied in any way from any action, inaction or acquiescence by Lender) and an order of this Court, except for sales of Debtors' Inventory in the

33

ordinary course of business and as otherwise expressly permitted in the Ratification Agreement; provided, however, that the Lender may consent to the filing of a motion to approve replacement debtor-in-possession financing which comports with the provisions of Section 5.7 of this Interim Financing Order and indefeasibly pays in full the Obligations in accordance with the terms of the Credit Documents and this Interim Financing Order. Debtors shall remit to Lender, or cause to be remitted to Lender, all proceeds of the Collateral for application by Lender to the Obligations, in such order and manner as Lender may determine in its discretion, in accordance with the terms of this Interim Financing Order, the Credit Agreement and the other Credit Documents.

5.4     Inventory.  Debtors shall not, without the prior express written consent of Lender, (a) enter into any agreement to return any inventory to any of its creditors for application against any pre-petition indebtedness under any applicable provision of Section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5     Reservation of Rights.   The terms, conditions and provisions of this Interim Financing Order are in addition to and without prejudice to the rights of Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Credit Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Debtors' estates.

5.6    <u>Binding Effect</u>.

5.6.1    The provisions of this Interim Financing Order and the Credit Documents, the Post-Petition Obligations, Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of Lender provided or acknowledged in this Interim Financing Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Financing Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and to the extent permitted by applicable law, shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Case to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

5.6.2    Notwithstanding any subsequent dismissal of these Cases: (a) the Lender's liens on and security interests in the Collateral shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the liens in the Collateral.

5.6.3    In the event this Court modifies any of the provisions of this Interim Financing Order or the Credit Documents following a Final Hearing, (a) such modifications shall not affect the rights or priorities of Lender pursuant to this Interim Financing Order with respect to the Collateral or any portion of the Obligations which arises or is incurred or is advanced prior to such modifications, and (b) this Interim Financing Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

5.6.4    This Interim Financing Order shall be binding upon Debtors, all parties in interest in the Case and their respective successors and assigns, including any trustee or

35

other fiduciary appointed in the Case or any subsequently converted bankruptcy case(s) of Debtors.  This Interim Financing Order shall also inure to the benefit of Lender, Debtors and their respective successors and assigns.

      5.7   <u>Restrictions on Cash Collateral Use, Additional Financing, and Plan Treatment</u>.  All post-petition advances and other financial accommodations under the Credit Agreement and the other Credit Documents are made in reliance on this Interim Financing Order and there shall not at any time be entered in the Case, or in any subsequently converted case under Chapter 7 of the Bankruptcy Code, any order (other than the Permanent Financing Order) which (a) authorizes the use of cash collateral of Debtors in which or Lenders have an interest, or the sale, lease, or other disposition of property of Debtors' estates in which Lender has a lien or security interest, except as expressly permitted hereunder or in the Credit Documents, or (b) authorizes under Section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Lender herein; unless, in each instance (i) Lender shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by Lender, or (ii) such other order requires that all Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the Credit Agreement and the other Credit Documents, including, without limitation, all debts and obligations of Lender which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to Lender.  The security interests and liens granted to or for the benefit of Lender hereunder and the rights of Lender pursuant to this Interim Financing Order and the

36

Credit Documents with respect to the Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors and, if Lender shall expressly consent in writing that the Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

      5.8    <u>No Owner/Operator Liability</u>.  Upon the entry of a Permanent Financing Order providing for such relief, in determining to make any loan under the Credit Agreement, the other Credit Documents or any Financing Order, or in exercising any rights or remedies as and when permitted pursuant to the Credit Documents or any Financing Order, Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

      5.9    <u>Marshalling</u>.  Upon the entry of a Permanent Financing Order providing for such relief, in no event shall Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

      5.10    <u>Term and Termination</u>.  Notwithstanding any provision of this Interim Financing Order to the contrary, the term of the financing arrangements among Debtors and Lender authorized by this Interim Financing Order may be terminated pursuant to the terms of the Credit Agreement.

      5.11    <u>Limited Effect</u>.  Unless the Interim Financing Order specifically provides otherwise, in the event of a conflict between the terms and provisions of any of the Credit

37

Documents and this Interim Financing Order, the terms and provisions of this Interim Financing

Order shall govern, interpreted as most consistent with the terms and provisions of the Credit

Documents.

    5.12 <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to

enforce this Interim Financing Order according to its terms.

    5.13 <u>Objections Overruled</u>. All objections to the entry of this Interim

Financing Order are, to the extent not withdrawn, hereby overruled.

Section 6.  <u>Final Hearing and Response Dates</u>.

    6.1 <u>Final Hearing</u>. The Final Hearing to consider entry of the Permanent

Financing Order and final approval of the Motion is scheduled for November ___, 2013 at

__:__0 __.m. (ET) before the Honorable _____, United States Bankruptcy Judge,

Courtroom __, at the United States Bankruptcy Court for the District of Delaware located at 824

North Market Street, Wilmington, Delaware 19801.

    6.2 <u>Notice of Final Hearing</u>. The Debtors shall serve, by United States mail,

first-class postage prepaid, a copy of the Motion and Interim Financing Order upon: (i) the U.S.

Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the

United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the

Debtors' thirty (30) largest unsecured creditors; (vi) counsel to any Committee; (vii) counsel to

the Lender; and (viii) any party which has filed prior to such date a request for notices under

Bankruptcy Rule 2002 with this Court.

    6.3 <u>Objection Deadline</u>. Objections, if any, to the relief sought in the Motion

shall be in writing, shall set forth with particularity the grounds for such objections or other

statement of position, shall be filed with the clerk of the Bankruptcy Court, and personally

38

served upon (a) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Edmon L. Morton and Robert S. Brady) counsel to the Debtors; (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: John H. Knight, Michael J. Merchant and William A. Romanowicz), counsel to the Lender; (c) the U.S. Trustee; and (d) counsel to any Committee, so that such objections are filed with the Court and actually received by said parties on or before __:___ p.m. (ET) on November ___, 2013 with respect to entry of the Permanent Financing Order.

Dated: _____, 2013
        Wilmington, Delaware

                                       _____
                                       UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT D**

Budget

**GOLDKING HOLDINGS, LLC**
**PROJECTED CASH COLLATERAL BUDGET**

Week Ending

| (Dollars in Thousands) | File Ch. 11 11/01/13 | Forecast 11/08/13 | Forecast 11/15/13 | Forecast 11/22/13 | Forecast 11/29/13 | Forecast 12/06/13 | Forecast 12/13/13 | Forecast 12/20/13 | Forecast 12/31/13 | Forecast 01/03/13 | Forecast 01/10/13 | Forecast 01/17/13 | Forecast 01/24/13 | Forecast 01/31/13 | Forecast 02/07/13 | Forecast 02/14/13 | Forecast 02/21/13 | Exit Ch. 11 02/28/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH INFLOWS - Operating Revenues** | | | | | | | | | | | | | | | | | | |
| Total proceeds from sale of production - oil | - | - | - | 735 | - | - | - | 700 | - | - | - | - | 700 | - | - | - | 700 | - |
| Total proceeds from sale of production - gas/liquids | - | 240 | - | - | 475 | 20 | - | - | 450 | - | - | - | - | 450 | - | - | - | 450 |
| Royalty payment to Texas GLO | - | (25) | (50) | - | - | (25) | (50) | - | - | (25) | (50) | - | - | (525) | - | (25) | (50) | - |
| Royalty and working interest payments | - | - | - | - | (550) | - | - | - | (550) | - | - | - | - | - | - | - | - | (500) |
| **NET OPERATING REVENUES** | $ - | $ 215 | $ (50) | $ 735 | $ (75) | $ (5) | $ (50) | $ 700 | $ (100) | $ (25) | $ (50) | $ - | $ 700 | $ (75) | $ (25) | $ (50) | $ 700 | $ (50) |
| **CASH INFLOWS - Other** | | | | | | | | | | | | | | | | | | |
| Receipts of JIB invoices billed to owners | - | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Receipts of PHA fees | - | - | 9 | - | - | - | 9 | - | - | - | - | - | - | - | - | - | - | - |
| Hedging settlements | - | (25) | - | - | - | (25) | - | - | (25) | - | - | - | - | (25) | - | - | - | - |
| Insurance proceeds | - | - | - | - | - | - | 100 | - | - | - | - | - | - | - | - | - | - | - |
| DIP Draws | - | 1,500 | - | - | - | 1,500 | - | - | 1,500 | - | - | - | - | 600 | - | - | - | - |
| **TOTAL CASH INFLOWS** | $ - | $ 1,705 | $ (26) | $ 750 | $ (60) | $ 1,510 | $ 49 | $ 715 | $ 1,415 | $ (10) | $ (60) | $ 15 | $ 715 | $ (60) | $ 565 | $ (35) | $ 715 | $ (35) |
| **CASH OUTFLOWS - Operating Expenses** | | | | | | | | | | | | | | | | | | |
| Lease operating expenses | - | - | - | 150 | - | 150 | - | 150 | - | - | 150 | - | 150 | - | - | 150 | - | 150 |
| Production (severance) taxes | - | - | 17 | 8 | - | - | 17 | 8 | - | - | 17 | 8 | - | - | - | 17 | 8 | - |
| Ad valorem taxes | - | - | - | - | - | - | - | - | 350 | - | - | - | 200 | - | - | - | - | - |
| Plug and abandonment costs - Kent Bayou | - | - | - | - | 100 | 100 | 200 | - | 200 | - | 200 | - | 200 | - | - | - | - | - |
| Payroll | - | - | 40 | - | 40 | - | 40 | - | 40 | - | - | 40 | - | 40 | - | 40 | - | 40 |
| Contract labor (temporary employees) | - | - | - | 30 | - | - | - | 30 | - | - | - | 30 | - | - | 30 | - | - | - |
| Insurance - employee health/dental/etc | - | - | - | 19 | - | - | - | 19 | - | - | - | 19 | - | - | - | 19 | - | - |
| Insurance - premiums for Jan 14 - Feb 14 coverage | - | - | - | - | - | 50 | - | - | - | - | - | - | - | - | - | - | - | - |
| Office rent | - | - | - | 35 | - | - | - | 35 | - | - | - | - | 35 | - | - | 35 | - | - |
| Pay critical / lien vendors post-petition | - | 1,267 | - | - | - | 233 | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities deposit fund | - | 10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Employee retention agreements | - | - | - | - | - | - | - | - | - | - | 519 | - | - | - | - | - | - | - |
| Other general & administrative expenses | - | - | - | 25 | - | - | - | 25 | - | - | - | - | 25 | - | - | - | 25 | - |
| **TOTAL OPERATING CASH OUTFLOWS** | $ - | $ 1,277 | $ 57 | $ 267 | $ 140 | $ 533 | $ 257 | $ 267 | $ 590 | $ - | $ 886 | $ 48 | $ 659 | $ 40 | $ - | $ 207 | $ 117 | $ 190 |
| **CASH FLOW FROM OPERATIONS** | $ - | $ 428 | $ (83) | $ 483 | $ (200) | $ 977 | $ (208) | $ 448 | $ 825 | $ (10) | $ (946) | $ (33) | $ 56 | $ (100) | $ 565 | $ (242) | $ 598 | $ (225) |
| **CASH OUTFLOWS - Non Operating Expenses** | | | | | | | | | | | | | | | | | | |
| Lease / rental payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Seismic data purchases - Seitel | - | - | - | - | - | 190 | - | - | - | - | - | - | - | - | - | - | - | - |
| Payment to White Oak Energy - consent to assign | - | - | - | - | - | 350 | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP facility fee | - | 150 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional fees - litigation counsel | - | - | - | 100 | - | - | - | 100 | - | - | - | - | 100 | - | - | - | - | 100 |
| Professional fees - bankruptcy counsel | - | - | - | 250 | - | - | - | 250 | - | - | - | - | 250 | - | - | - | - | 250 |
| Professional fees - creditor committee | - | - | - | 15 | - | - | - | 15 | - | - | - | - | 15 | - | - | - | - | 15 |
| Professional fees - bankruptcy support fees | - | - | - | 50 | - | - | - | 35 | - | - | - | - | 30 | - | - | - | - | 25 |
| US Trustee fees | - | - | - | - | - | - | - | 10 | - | - | - | - | 10 | - | - | - | - | 10 |
| **TOTAL NON OPERATING CASH OUTFLOWS** | $ - | $ 150 | $ - | $ - | $ 425 | $ - | $ 540 | $ - | $ 410 | $ - | $ - | $ - | $ - | $ - | $ 405 | $ - | $ - | $ 400 |
| **TOTAL CASH OUTFLOWS** | $ - | $ 1,427 | $ 57 | $ 267 | $ 565 | $ 533 | $ 797 | $ 267 | $ 1,000 | $ - | $ 886 | $ 48 | $ 659 | $ 40 | $ 405 | $ 207 | $ 117 | $ 590 |
| **NET CASH INFLOW (OUTFLOW)** | $ - | $ 278 | $ (83) | $ 483 | $ (625) | $ 977 | $ (748) | $ 448 | $ 415 | $ (10) | $ (946) | $ (33) | $ 56 | $ (100) | $ 160 | $ (242) | $ 598 | $ (625) |
| **CUMULATIVE POST PETITION CASH FLOW** | | $ 278 | $ 195 | $ 678 | $ 53 | $ 1,030 | $ 282 | $ 730 | $ 1,145 | $ 1,135 | $ 189 | $ 156 | $ 212 | $ 112 | $ 272 | $ 30 | $ 628 | $ 3 |

Note: Budget is operating cash flows only and does not take into account projected proceeds from the sale of assets.

Date: 10/29/2013