## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GOLDKING HOLDINGS, LLC, et al.,[1]<br><br><div align="center">Debtors.</div> | Chapter 11<br><br>Case No. 13-12820 (BLS)<br><br>Jointly Administered<br><br>**Re: Docket Nos. 46 & 48** |

### OBJECTION OF WAYZATA OPPORTUNITIES FUND II, L.P. TO MOTION OF LEONARD C. TALLERINE, JR AND GOLDKING LT CAPITAL CORP. TO TRANSFER VENUE OF THESE CASES

Wayzata Opportunities Fund II, L.P. ("**Wayzata**"), owner of approximately 94.6% of the equity of the above-captioned debtors (the "**Debtors**") and the senior secured pre-petition lender and debtor-in-possession lender to the Debtors, by and through its undersigned counsel, hereby objects (the "**Objection**") to (a) the *Motion of Leonard C. Tallerine, Jr and Goldking LT Capital Corp to Transfer Venue of These Cases* [Docket No. 46] (the "**Venue Transfer Motion**") and (b) the *Declaration of Ann C. Cordo in Support of Motion of Leonard C. Tallerine, Jr and Goldking LT Capital Corp to Transfer Venue of These Cases* [Docket No. 48] (the "**Declaration**", and together with the Venue Transfer Motion, the "**Motion**").  In support of the Objection, Wayzata respectfully states as follows:

### Preliminary Statement

The movant is the Debtors' former president and chief executive officer who also holds approximately 6% of the Debtors' equity and is a defendant and counter-claim plaintiff in pre-petition litigation with the Debtors based on his alleged mismanagement and fraud.  While the movant positions his motion to transfer venue as serving the best interests of the Debtors'

---

[1]     The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Goldking Holdings, LLC (2614); Goldking Onshore Operating, LLC (2653); and Goldking Resources, LLC (2682). The mailing address for the Debtors is 777 Walker Street, Suite 2500, Houston, TX 77002.

unsecured creditors, the movant is not representative of any creditor class, and is not in the position to exercise judgment for and on behalf of the Debtors or the constituencies that the Debtors believe are best served by maintaining venue of these cases in Delaware. The Debtors chose a permissible venue that they deem, in their business judgment, best suited for their bankruptcy (and proposed asset sale). The movant's contrary view appears to result more from the movant's apparent agenda to frustrate the Debtors' decision-making, including the Debtors' proposed sale, presumably as a result of his pre-petition termination and pre-petition litigation with the Debtors and/or to establish perceived leverage vis-à-vis the same. Neither convenience nor justice warrant a transfer; instead, they favor venue here. In this case, the Court should afford the Debtors' choice of venue deference and maintain venue in Delaware.

## Background

### A. The Movants' Misconduct and the Events Leading Up to the Commencement of the Chapter 11 Cases.

1. Leonard C. Tallerine ("**Tallerine**") is an indirect owner of roughly 6% of the Debtors' equity, owned through Goldking LT Capital Corp. ("**Goldking LT**, and together with Tallerine, the "**Movants**"). Tallerine is also the former president and chief executive officer of the Debtors, initially employed in September of 2010. His employment was terminated after an internal investigation exposed vast alleged misconduct during his time at the helm of the Debtors.[2]

2. After an anonymous tip in November of 2012 and an initial investigation, Wayzata engaged FTI Consulting ("**FTI**") to conduct an investigation into the activities of Tallerine. As set forth in Exhibit B of the First Day Declaration, FTI's investigation revealed

---

[2]     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of their chapter 11 cases, is set forth in detail in the Declaration of Edward Hebert in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 2] (the "**First Day Declaration**", abbreviated as "**First Day Dec.**") filed with the Court on October 30, 2013.

that Tallerine allegedly embezzled no less than $700,000 of the Debtors' cash for his own personal use since the Debtors' inception. First Day Dec. at Ex. B, ¶ 21. By way of example, Tallerine's laundry-list of alleged fraudulent conduct uncovered by FTI included: (1) false reimbursement requests made in 2010 and early 2011; (2) theft of the Debtors' checks payable to certain of the Debtors' vendors; (3) theft of checks payable to the Debtors; (4) multiple unauthorized wire transfers and payments to Tallerine and his affiliated entities, including an unexplained $100,000 wire transfer from the Debtors' operating account to Tallerine's wholly owned Goldking Energy Corporation on April 14, 2011; (5) payments made to a bogus contractor that was actually a DBA of one of Tallerine's ex-wives; (6) use of the Debtors' funds to pay expenses related to construction of a blow-dry bar in Houston for Tallerine's daughter; (7) a $32,000 wire transfer made in 2012 from the Debtors' operating account to the client trust account of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (a firm that has represented the Debtors in a variety of matters) for the purposes of funding Tallerine's personal endeavor to become a New Orleans restaurateur;[3] and (8) a wire transfer from the Debtors' operating account to Gulfstream Aerospace on June 16, 2011, relating to what the Debtors and Wayzata believe was a payment for a private jet owned by Tallerine's Goldking Energy Corporation. First Day Dec. at Ex. B, ¶¶ 26, 30-32, 29, 25(b), 28, 25(c), 25(f), & 25(g).[4] Not surprisingly, the Debtors terminated Tallerine in December of 2012. First Day Dec. at ¶ 22.[5]

---

[3]     Wayzata reserves its rights to further evaluate the retention of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard ("**Lugenbuhl**"). Upon information and belief, Lugenbuhl was counsel to the Debtors as recently as 2012. At a minimum, Lugenbuhl's use of the Debtors' client trust funds on Tallerine's behalf for a wholly unrelated business venture may be actionable by the Debtors. Accordingly, Lugenbuhl's representation of Tallerine in the Motion, directly adverse to the Debtors' position, appears to be worthy of further Court scrutiny.

[4]     Indeed, although Tallerine disputes how they occurred, he does admit that certain mistakes were made. See *Original Answer and Counterclaim*, a true and correct copy of which is attached hereto as Exhibit A.

[5]     Unfortunately, Tallerine's alleged theft and chronic misuse of funds in a fiduciary capacity is not limited to his tenure with the Debtors. It is also alleged that Tallerine engaged in substantially the same range of misconduct while CEO of another company and while acting as the court appointed chief restructuring officer of the bankruptcy estate of East Cameron Partners, LP, in the Western District of Louisiana. See *Plaintiffs and Third Party*

3.     As set forth in the First Day Declaration, in part as a result of Tallerine's alleged misconduct and during Tallerine's employ, the Debtors were in technical default of their $200M pre-petition senior secured credit facility, entered into by and between Debtor Goldking Resources, LLC, as borrower, Debtors Goldking Holdings, LLC and Goldking Operating, LLC, as guarantors, and Bank of America, N.A. ("**BOA**") on November 5, 2010 (the "**Existing Credit Agreement**", and the loan made pursuant to the Existing Credit Agreement, the "**Pre-Petition Facility**"). First Day Dec. at ¶ 15. Specifically, the Debtors were in default of their Interest Rate Coverage Ratio (as defined in the Existing Credit Agreement, the "**Coverage Ratio Default**") and their EBITDA Ratio (as defined in the Existing Credit Agreement, the "**EBITDA Ratio Default**", and together with the Coverage Ratio Default, the "**Covenant Defaults**") for the compliance periods ended on June 30, 2012, and September 30, 2012. First Day Dec. at ¶ 15. Although in need of liquidity, the Debtors indicate that they were unable to obtain third-party financing because Tallerine's alleged misconduct made it practically impossible to make basic representations and warranties regarding the Debtors' financial statements and condition. First Day Dec. at ¶ 15. As a result of the unresolved Covenant Defaults, BOA intended to accelerate maturity of the Pre-Petition Facility. First Day Dec. at ¶ 15. Wayzata and the Debtors therefore determined that it was necessary to purchase, and for BOA to assign to Wayzata, the Existing Credit Agreement. Accordingly, on January 24, 2013, Wayzata took assignment of the Existing Credit Agreement pursuant to the Assignment and Acceptance (the "**Assignment and Acceptance**"), the Resignation, Assignment and Release Agreement (the "**Resignation**"), and the Release Agreement (the "**Release**", and together with the Assignment and Acceptance and

---

*Defendants' Response to Tallerine's Motion for a Protective Order*, as filed in the pending state court litigation between the parties. A true and correct copy is attached hereto as Exhibit B.

the Resignation, each as amended, modified or supplemented from time to time, the "**Assignment**"), by and among the Debtors and BOA.  First Day Dec. at ¶¶ 14, 15.

4.      Following Tallerine's termination and the Assignment, the Debtors sued the Movants in the District Court of Harris County Texas alleging, among other causes of action, theft, conversion, fraud, unjust enrichment, and breaches of contract and fiduciary duty (the "**Action**").  First Day Dec. at ¶ 23 & Exhibit B.  Currently, the Action is being held in abeyance as a result of these Chapter 11 Cases.

**B. The Commencement of the Debtors' Chapter 11 Cases.**

5.      As set forth in the Debtors' First Day Declaration, these chapter 11 cases commenced on October 30, 2013 (the "**Chapter 11 Cases**") as a result of Tallerine's alleged misconduct and other unforeseen business difficulties.  First Day Dec. at ¶ 18.  In a valid exercise of their business judgment, the Debtors, each a Delaware limited liability company, selected the district of Delaware as their venue for commencing the Chapter 11 Cases as permitted by 28 U.S.C. § 1408(1).  First Day Dec. at ¶ 1.  In light of the pending litigation and threats by Tallerine to "interfere with a sale process", the First Day Declaration reflects that the purpose of these Chapter 11 Cases is to facilitate a sale of substantially all of their assets in a court-monitored process.  First Day Dec. at ¶¶ 28-30.  The Debtors have been marketing their assets for approximately one month.  First Day Dec. at ¶ 31.

6.      In connection with the Chapter 11 Cases, the Debtors sought certain customary first-day relief on October 31, 2013.  Such first-day relief included approval of a debtor-in-possession loan facility (the "**DIP Loan**"), originated through the Ratification, Amendment and Security Agreement, entered into by and between the Debtors and Wayzata (the "**Ratification**"), pursuant to the *Debtors' Motion for Interim and Final Orders, Pursuant to*

5

*Sections 105, 361, 363, 364 and 507 of the Bankruptcy Code, (1) Approving Post-Petition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying the Automatic Stay, (6) Scheduling a Final Hearing, and (7) Granting Certain Related Relief With Respect to the Debtors' Hedging Obligations* [Docket No. 10] (the "**DIP Motion**").  The DIP Loan was approved on an interim basis on October 31, 2013.  The final hearing on approval of the DIP Loan is currently scheduled for November 26, 2013.

**C. The Motion.**

7.      The Movants filed the Motion on November 7, 2013, seeking to transfer venue of the Chapter 11 Cases to either the Bankruptcy Court for the Southern District of Texas (the "**Southern District of Texas**") or the Bankruptcy Court for the Western District of Louisiana (the "**Western District of Louisiana**", and together with the Southern District of Texas, each a "**Transfer Court**" and collectively the "**Transfer Courts**").  Motion at ¶ 23.

<div align="center">

**Objection**

</div>

8.      Put simply, Tallerine's involvement with the Debtors has been cloaked in allegations of fraud and self-interest since the beginning their association.  The Motion and the relief requested therein are no different, seeking to transfer the Debtors' cases to essentially any venue that is not Delaware under the guise that such venues are more convenient, that a transfer is in the interest of justice, and that a transfer is in the best interests of the Debtors' creditors.  But Movants' request to transfer venue "anywhere but here" falls flat in light of the purpose behind the Debtors' Chapter 11 Cases and the deference courts grant to a debtor's choice of venue.  Moreover, Tallerine's feigned concern for the best interest of the creditors in these Chapter 11 Cases is directly contradicted by his conduct to date:  at the first day hearing, Tallerine sought to prevent any payments from being made to creditors, and in fact caused the

<div align="center">6</div>

Debtors to make approximately $500,000 less in payments to creditors.  This is not the conduct

of a party who is a champion of the best interests of creditors.  And, while most of the facts set

forth in the Motion are not in dispute,[6] when the allegations surrounding Tallerine's past

misconduct and self-dealing are coupled with the facts that (a) venue is entirely appropriate in

Delaware under 28 U.S.C. § 1408(1), (b) the factors courts consider in transferring venue are at

worst neutral and at best tip in favor of venue remaining in Delaware, and (c) Wayzata, the

Debtors' largest equity holder and creditor by amount,[7] approves of the Debtors' choice of

venue, the Motion falls considerably short of meeting the Movants' burden placed on parties

seeking to transfer a case away from a debtor's selected venue.  In short, the Motion should be

denied.

## I. The Debtors' Choice of Venue Is Entirely Proper.

9.     Venue in chapter 11 cases is governed by section 1408 of title 28 of the

United States Code.  The statute provides, in relevant part, that venue is permissible in a judicial

district

> (1) in which the domicile, residence, principal place of business in
> the United States, or principal assets in the United States, of the
> person or entity that is the subject of such case have been located
> for the 180 days immediately preceding such commencement . . . .

28 U.S.C. § 1408(1).  Accordingly, section 1408(1) provides four alternative bases for venue:

domicile, residence, principal place of business, and the location of the debtor's principal assets.

---

[6]     At paragraph 15 of the Motion, the Movants state that "[u]nder the Existing Credit Agreement, the
Applicable Margin could be as low as 4.50%  and could never exceed 6.00%."  However, this assertion appears to
ignore default interest, fees and expenses payable under the Existing Credit Agreement arising after the various pre-
petition defaults, all of which are, of course, true costs of financing.  Further, at page 2 of the Motion, the Movants
note that Michael V. Strain is a member of the Debtors' board of managers.  However, prior to the petition date, Mr.
Strain resigned from the board.  Accordingly, his location is irrelevant for purposes of the Motion.  The current
board members are Eugene Davis, who lives in New Jersey, and Edward Hebert, who lives in Texas.
[7]     Wayzata holds approximately 94% of the Debtors' equity.  Additionally, the Debtors have informed
Wayzata that, as of the petition date, it held approximately 73% of the Debtors' aggregate indebtedness.  When
adjusted for those claims that have been paid or will be paid pursuant to certain first-day relief, Wayzata holds
approximately 90% of the Debtors' aggregate indebtedness.

10.     The law is settled that a corporation is domiciled in the state of its incorporation for venue purposes.  In re De. & Hudson Ry. Co., 96 B.R. 467, 469 (Bankr. D. Del. 1988), aff'd, 884 F.2d 1383 (3d Cir. 1989).  And it is equally well established that a domiciliary is entitled to avail itself of access to the courts in its state of formation:

> It is undisputed that American businesses which choose to operate in a corporate form may choose their state of incorporation and, thus, their citizenship . . . .  Certainly many businesses incorporate in states in which they conduct little, if any, business.  With the choice of citizenship comes various rights and responsibilities.  Significantly, a business must subject itself to personal jurisdiction in the courts of its state of incorporation.  Concomitantly, it is a fundamental legal tenet that every citizen of a state is entitled to take advantage of the state and federal judicial process available in that state.

In re PWS Holding Corp., 1998 Bankr. LEXIS 549, at *14 (Bankr. D. Del. Apr. 28, 1998).

11.     The Debtors are each Delaware limited liability companies, formed pursuant to the laws of Delaware.  First Day Dec. at ¶ 1.  Accordingly, venue of the Debtors' Chapter 11 Cases is entirely proper in the District of Delaware.

**II.  The Debtors' Choice of Venue Should Not be Disturbed Because it is Entirely Proper, and the Movants Have Failed to Meet Their Burden to Show Either That the Convenience of the Parties or the Interest of Justice Merits Transferring Venue.**

12.     In this district, it is well established that where, as is the case here, a debtors' choice of venue is proper, that choice should be granted substantial weight and deference.  In re Hayes Lemmerz Int'l Inc., 312 B.R. 44, 46 (Bankr. D. Del. 2004); De. & Hudson Ry. Co., 96 B.R. at 467; In re Ocean Properties of Del., 95 B.R. 304, 305 (Bankr. D. Del. 1988).  Indeed, "there is a presumption in favor of maintaining the debtor's choice of forum", In re Alcorn Corp., 2012 WL 2974889, at *2 (Bankr. E.D. Pa. July 20, 2012), and when a debtor's choice of venue is proper, the court must exercise its power to transfer a case cautiously, In re Enron Corp., 274 B.R. 327, 341 (Bankr. S.D.N.Y. 2002) ("Enron I"), abrogated

8

on other grounds, <u>In re Enron</u>, 317 B.R. 629, 638 n.8 (Bankr. S.D.N.Y. 2004) (explaining that the court incorrectly noted that it "must" transfer venue if the factors warranted a transfer rather than that the court may transfer venue, but indicating that this distinction did not impact the determination of the case). Accordingly, venue should be disturbed only when transfer is heavily favored. <u>In re Onco</u>, 320 B.R. 577, 579 (Bankr. D. Del. Feb. 23, 2005) (explicating transfer of venue in context of transfer of adversary proceeding in chapter 11 case and denying transfer of venue); <u>In re LaGuardia Assocs.</u>, 316 B.R. 832, 837 (Bankr. E.D. Pa. 2004) (explicating that some courts hold that the balance must "strongly" favor a transfer of venue).

13.    The moving party bears the burden of proving, by a preponderance of the evidence, that a transfer of venue is warranted. <u>In re Qualteq, Inc.</u>, 2012 WL 527669, at *5 (Bankr. D. Del. Feb. 16, 2012); <u>Hayes</u>, 312 B.R. at 46. Yet, "[w]hen the weight of the forces supporting and opposing a change of venue are … equal, a § 1412 motion must be denied." <u>In re Strouse Greenberg Properties VI Ltd. P'ship</u>, 1990 WL 19803, at *2 (Bankr. E.D. Pa. Mar. 2, 1990) (denying motion to transfer venue where two factors tipped in favor of transfer, two factors tipped in favor of maintaining case in debtor's chosen venue, and two factors were insignificant). Further, even if the equities lean only slightly in favor of transferring venue, "the [debtor's] choice of forum should not be disturbed." <u>In re Garden Manor Assocs., L.P.</u>, 99 B.R. 551, 555 (Bankr. S.D.N.Y. 1988); <u>Alcorn</u>, 2012 WL 2974889, at *5 (explaining that although the factors may have tipped "somewhat" in favor of transferring venue, they did not do so with sufficient weight to warrant transferring the case).

14.    Pursuant to 28 U.S.C. § 1412, a court may transfer venue if the transfer of venue (a) is for the convenience of the parties or (b) in the interest of justice. <u>Qualteq</u>, 2012 WL 527669, at *5. In this case, the Movants have failed to meet their burden in both instances.

9

## A. The Movants Have Failed to Meet Their Burden of Showing that the Convenience of the Parties Warrants a Transfer of Venue Because the Majority of the Factors Are Either Neutral or Tip in Favor of Maintaining Venue in Delaware.

15.     In determining whether transfer is warranted for the convenience of the parties, courts consider six factors: (1) the location of the debtor's assets; (2) the necessity for ancillary administration in the event of liquidation; (3) the proximity of creditors of every kind to the court; (4) the proximity of the debtors to the court; (5) the proximity of witnesses who are necessary to the administration of the estate; and (6) the economic administration of the estate. Id. at *5 & n.8 (citing Puerto Rico v. Commonwealth Oil Refining Co., 596 F.2d 1239, 1247 (5th Cir. 1979) ("CORCO").[8]  In this case, the first two factors should be given little or no weight. Of the remaining four factors, factors (3) and (4) are at worst neutral, and factors (5) and (6) tip in favor of maintaining venue in this district.  The Movants have therefore failed to meet their burden.

### 1. The Location of the Debtors' Assets.

16.     The location of the Debtors' assets should be afforded little or no weight in this instance.  Accordingly, the Movant has failed to demonstrate that venue should be transferred based on the location of the Debtors' assets.

17.     Where a debtor's assets are located is "by no means a litmus test, for if it were it would essentially eviscerate meaningful evaluation of the question." Alcorn, 2012 WL 2974889, at *3.  And while courts do tend to hold that cases should be heard where real estate is located, the location of a debtor's assets may be less weighty when the case is not a so-called "single asset real estate case." Id. at * 3, 4.  Thus, in Alcorn, like here, the debtor's business

---

[8]     Notably, courts in this district are not limited to the six factor CORCO analysis.  "Recently, a bankruptcy court in the District of Delaware observed that, in addition to the six (6) factors stated above, the court has discretion to consider other private and public interest factors." Alcorn, 2012 WL 2974889, at *2 (citing Qualteq, 2012 WL 527669, at *5).  An additional seven factors were noted, including four factors not already contemplated by CORCO: (1) the relative administrative difficulty resulting from congestion of the courts' docket; (2) the public policies of the fora; (3) the familiarity of the judge with the applicable state law; and (4) the local interest in deciding local controversies. See id.

involved multiple properties and an active business operation rather than a single piece of real estate.  Id. at *4.  In denying a motion to transfer venue, the court distinguished the case from single asset real estate cases, which tend to focus on the location of the property as compelling, and deferred to the debtor's choice of venue.  Id.  So too here.

18.     Further, when a debtor is national in character, the location of assets may offer less weight to the venue transfer analysis.  See PWS, 1998 Bankr. LEXIS 549, at *12-13 (denying transfer of venue and recognizing that "bankruptcy practice and jurisdiction reflect American business" and that "most American businesses (certainly those with assets and liabilities in the hundreds of millions of dollars) are truly interstate in practice, national in character").

19.     Additionally, courts have also afforded the location of a debtor's assets little weight when the case arises under chapter 11 rather than chapter 7.  In re Enron Corp., 284 B.R. 376, 391 (Bankr. S.D.N.Y. 2002) ("Enron II"), abrogated on other grounds, Enron, 317 B.R. at 638 n.8 (explaining that the court incorrectly noted that it "must" transfer venue if the factors warranted a transfer rather than that the court may transfer venue, but indicating that this distinction did not impact the determination of the case).  Thus, in Enron II, as is the case here, a 363 sale of the debtors' assets was contemplated.  Id. at 391-92.  The court noted that, in the context of a chapter 11 proceeding with a 363 sale, the location of the assets was of diminished weight in part because a 363 sale provides safeguards against concerns that some creditors might have about the distance of a court from a debtor's assets − a 363 sale "ensures that evidence will be offered to demonstrate the adequacy of a sale outside the ordinary course of business".  Id. at 391-92.  A court's proximity to the assets is therefore of less importance.

11

20.     In these Chapter 11 Cases, the Debtors were created to maintain oil and gas properties in Louisiana and Texas, both on and off shore.  First Day Dec. at ¶ 9.  The Debtors own thirty-five properties and are engaged in active business operations − like the debtor in Alcorn, they are not a single asset real estate company.  Additionally, similar to PWS, the Debtors are national in scope given their cross-state border real estate and mineral interest holdings and that they have, in the ordinary course of their business, entered into a variety of derivative investments (including swap and option contracts) with counterparties of a national and even international scope.  See generally First Day Dec. at ¶ 11.  Finally, as in Enron II, the Debtors commenced these Chapter 11 Cases to pursue a 363 sale of all or substantially all of their assets.  First Day Dec. at ¶ 28-30.  In the same way as this factor was given diminished weight in Alcorn, PWS, and Enron II, it should also be afforded little or no weight in these Chapter 11 Cases.[9]

**2. The Necessity for Ancillary Administration in the Event of Liquidation.**

21.     Just as this court should give little or no weight to the location of the Debtors' assets, it should not give any weight to the necessity for ancillary administration in the event of chapter 7 liquidation.  The factor is simply not implicated in any way at this point in these Chapter 11 Cases.

22.     Courts have dismissed this factor where liquidation was not implicated at the time of the motion to transfer venue, where no evidence existed indicating liquidation was

---

[9]     The Movants argue that because the Debtors' limited liability company agreements specify that the Debtors' place of business should be "in or around Houston, Texas" and that disputes among members should be adjudicated in Houston, Texas, Motion at ¶ 7.  These alleged facts at most relate solely to Movants in their capacity as equity holders and further evidence that Tallerine is not representative of any class of creditors in these Chapter 11 cases.  Moreover, Movants selectively omitted Delaware venue provisions contained in the limited liability company agreement, which states that "[a]ny Covered Person may apply to any court of competent jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under Section 8.1 or Section 8.2, as the case may be."  Indeed, far from Movants' claims that only Texas is a proper venue for disputes among members of the Debtors, it is quite plain that Delaware venue is specifically contemplated.  In any event, Movants also already have demonstrated that they are fully capable of representing their own interests in Delaware in these Chapter 11 Cases.

intended or likely, and when the consideration took place at the early stages of a chapter 11 case. See Innovative Comm. Co., 358 B.R. 120, 128 n.16 (Bankr. D. Del. 2006) (noting that this factor was not a predominant factor and was not implicated at the time considered); LaGuardia, 316 B.R. at  842 n.5 (noting that "the necessity for ancillary administration if liquidation should result, has not been viewed as of paramount importance in the early stage of a chapter 11 case, particularly where there is no evidence that the debtor's intention is to liquidate, nor evidence which would suggest that liquidation will likely result."); Enron II, 284 B.R. at 387 n.9, 403 (finding it unnecessary to contemplate the failure of the case at the early stage presented because there was no indication that the case would convert to a chapter 7 case, noting that "[t]his factor is often discounted by the courts" and holding that the movant had therefore failed to carry its burden on the factor).

23.     These Chapter 11 Cases are near their inception, and the Debtors intend to carry out a 363 sale process – no chapter 7 liquidation is contemplated.  Moreover, the Debtors engaged an investment banker to conduct an independent valuation of the Debtors' assets prior to the petition date; the concluded range of values indicated a high likelihood of complete recovery to all creditors of the Debtors.  Thus, the risk of these Chapter 11 Cases liquidating under chapter 7 is wholly remote, and there is simply no indication that liquidation is possible, let alone a likely result at this juncture.  Accordingly, this factor is not relevant and should carry no weight in the Court's consideration.

24.     In any event, although anticipating the failure of these Chapter 11 Cases "is an illogical basis upon which to predicate a transfer", Enron II, 284 B.R. at 403 (citing In re Fairfield Puerto Rico, Inc., 333 F. Supp. 1187, 1191 (D. Del. 1971) (denying motions to transfer), assuming arguendo that this factor is considered by the Court, it should weigh in favor

13

of maintaining venue in Delaware.  The Debtors' contemplated 363 sale of their assets as a going concern is largely analogous to a liquidation, and few bankruptcy court hearings will be required. First, the necessity for any ancillary administration during the course of the 363 sale is largely minimal.  Second, assuming, as the Movants note, that "the determination of the necessity for ancillary administration hinges upon the location of the debtors' real estate, assets and business," Motion at ¶ 49, such considerations tip in favor of maintaining venue in Delaware.  Upon the closing of any 363 sale of substantially all of the Debtors' assets, such assets will have changed hands to the new owner of title to such assets.  Consequently, the location of the real estate, assets, and business will be entirely irrelevant to any ancillary administration of the Debtors' estates – they will no longer be the Debtors' real estate, assets, or business.

### 3. The Proximity of the Creditors to the Court.

25.      The Movants have failed to demonstrate that venue should be transferred based on the fact that the Debtors' creditors are nearer in proximity to the Transfer Courts than to Delaware.

26.      Although Wayzata does not contest the Motion's representation that "more than 79% of all of the Debtors' creditors are located in Texas or Louisiana", Motion at ¶ 12, that fact, alone, is insufficient to merit any transfer of venue.  First, the Movants note only that 79% *in number* are nearer to the Transfer Courts.  Yet Wayzata, by far the largest creditor of the Debtors *in amount*, is located nearer to Delaware than to the Transfer Courts.[10]  When *amount* is considered, the Motion says all that needs to be said: "[t]he Texas creditors listed on

---

[10]      As the Movants note in the Motion at ¶ 36, n.13, Wayzata, Minnesota is closer to Wilmington, Delaware in terms of driving mileage (Wayzata to Wilmington is 1,172.47 miles, whereas Wayzata to Houston is 1,186.07 miles) and in terms of air travel time (Wayzata to Philadelphia, Pennsylvania is "about 2 hours, 37 minutes in duration", whereas Wayzata to Houston, Texas is "about 3 hours even in duration.").  At least one court has noted that considering the convenience of venue to a debtor's largest creditor is clearly both fair and appropriate.  LaGuardia, 316 B.R. at 840 (explaining that "[c]learly, it is fair and appropriate" to consider the convenience of the venue to the debtor's largest creditor).  Here, Wayzata is not only physically closer, but also is entirely in favor of the Debtors' choice of Delaware as venue in these Chapter 11 Cases.

the Top 30 List hold nearly 54% of the total unsecured debt listed on the Top 30 List and the Louisiana creditors hold nearly 29% of the unsecured debt listed on the Top 30 List….” Motion at ¶ 11. Thus, this factor cuts against transferring venue. Indeed, if anything, Movants have failed to meet their burden on this factor as to the Western District of Louisiana, and the factor only slightly favors transfer to the Southern District of Texas. Second, if only the aggregate *number* of creditors is considered, this Court has refused to transfer venue from Delaware to a district in which more than 90% of all creditors of a debtor were located. See In re Caribbean Petroleum Corp., Case No. 10-12553 (KG) (Bankr. D. Del. Aug. 19, 2010) [Docket No. 55], at ¶¶ 12, 25 (Puerto Rico treasury department arguing that because less than 10% of the debtor's creditors were not located in Puerto Rico and no creditors were located in Delaware, transfer of venue to Puerto Rico was appropriate); Transcript of Record at 57:11-14, In re Caribbean Petroleum Corp., Case No 10-12553 (KG) [Docket No. 167] (denying the motion to transfer venue). Accordingly, the fact that a large number of creditors are located outside of this district, alone, is insufficient to carry the Movants' burden.

27.     Additionally, to the extent that any creditor wishes to access this Court, the Court can and does provide telephonic appearances to facilitate participation by creditors and/or their counsel. To be sure, as is plainly evidenced by Tallerine's aggressive involvement to date, he is sufficiently capable of participating in these Chapter 11 Cases while venued in Delaware.

28.     This factor then is at worst neutral, and at best favors maintaining venue in Delaware. As such, it cannot lead to a transfer of venue. See Onco, 320 B.R. at 579 (noting that a debtors' choice of venue should be disturbed only when transfer is heavily favored).

**4. The Proximity of the Debtors to the Court.**

29.     The Movant also has failed to demonstrate that the proximity of the Debtors to the Transfer Courts merits transferring venue.

30.     Wayzata does not dispute that the Debtors' physical proximity is nearer to the Transfer Courts than to Delaware.  However, when courts consider the proximity of a debtor in connection with a venue transfer motion, the consideration includes a debtor's employees who must appear in court – not solely, as Movants appear to argue, on the physical address of a debtor.  Enron II, 284 B.R. at 392-93 (noting that the court "must look to those employees of [the debtor] who are intimately familiar with the financial status of the company.").  What is more, "[t]he locale of a business' operation, either financial or business is not essential to the goal of a §363(b)(1) sale."  Id. at 393 (holding that movant failed to meet burden on proximity of debtor factor).  Further, when a business is being actively marketed for sale, like the Debtors are in these Chapter 11 Cases, the proximity of a debtor's operations are relevant only to the extent they relate to the "location of the assets" factor.  Id. at 394.  As noted above, the location of the assets bears little if any weight in this case.

31.     In these Chapter 11 Cases, the Debtors have only eleven employees.  The few that are intimately familiar with the Debtors' financial status have voiced no concerns with the selection of Delaware as venue for the Chapter 11 Cases.  Moreover, notwithstanding the few instances that the Debtors' representatives will need to appear in court, the Debtors' professionals are all located in Delaware.  As practice has demonstrated, it is the debtor's professionals – who, here, are located in Delaware – that are routinely required to appear in court.  See In re Saftey-Kleen Corp., Case No. 00-2303 (PJW), at 48: 11-17 (Bankr. D. Del. July 11, 2000) (noting that "the vast majority of activities in this court involve lawyering and only a very, very limited number of principals have to appear on very, very limited occasions.").

16

RLF1 9578413v.6

32.     Additionally, the Debtors are being actively marketed and anticipate a 363 sale of substantially all of their assets.  Consideration of the proximity of the Debtors' operations to this Court is therefore inessential and of little relevance.  At any rate, the Debtors have selected Delaware as the district most convenient and, in their business judgment, most likely to lead to a successful outcome of their Chapter 11 Cases; this choice should be given substantial weight.

### 5. The Proximity of Witnesses Necessary to the Administration of the Estate.

33.     The witnesses a court must consider are those who are likely to appear in court; *i.e.*, those who are intimately familiar with the financial status of the debtor.  Enron II, 284 B.R. at 392-93.  In this case, the fact that witnesses with intimate familiarity may be located outside of Delaware is at worst neutral and at best tips in favor of maintaining venue in Delaware: "[w]itnesses are presumed to be willing to testify in either forum despite the inconvenience that one of the forums would entail."  Hayes Lemmerz, 312 B.R. at 47.

34.     Of the eleven employees of the Debtors, the few that do maintain intimate familiarity with the Debtors' financial status, including Mr. Edward Hebert,[11] have voiced no concerns with the selection of Delaware as venue for the Chapter 11 Cases.  Nor is there any indication that any necessary witnesses will be unable to testify in Delaware.  Any argument to the contrary is purely guesswork at this point.

---

[11]     Although the Movants accurately note that Mr. Hebert "will be one o (sic) the primary witnesses" in the Chapter 11 Cases and that he is located in Houston, Texas, Motion at ¶¶ 33-34, as CEO of the Debtors and a member of the Debtors' board of managers, Mr. Hebert was party to the selection of Delaware as the venue for the Debtors' Chapter 11 Cases.  As such, the fact that he is located in Houston, Texas bears no weight in this consideration − he favors Delaware, as is evidenced by the Debtors' selection of Delaware.  See, e.g., In re Indus. Pollution Control, Inc., 137 B.R. 176, 181 (Bankr. W.D. Pa. 1992) (denying venue transfer motion after explaining that although a debtor's president resided in Ohio and debtor filed for bankruptcy in Pennsylvania, the president was the only witness of significance and that "he favors this venue, as is evidenced by the decision to file the bankruptcy petition in this district.").

35.     To the extent any such employees are in fact unable to travel to Delaware, "appearances required by the officers (or other management) can be addressed by telephonic and video conference capabilities." Enron II, 284 B.R. at 393; Alcorn, 2012 WL 2974889, at *4 (explaining that even if witnesses in Puerto Rico were necessary, there were "means available for the court to ameliorate the problem, such as through the use of video conferencing technology."). Wayzata, however, anticipates that any such hearings requiring management of the Debtors to appear will be quite limited − perhaps limited only to the 363 sale of the Debtors' assets. Thus, "[t]he limited, and likely infrequent, appearance that may be required of the principals should not cause any inconvenience." Enron II, 284 B.R. at 393.

36.     As with witnesses related to the Chapter 11 Cases, so too is the case with witnesses related to the Action. Movants argue that because the Action is nearer to the Transfer Courts, transfer is appropriate because potential witnesses are therefore closer to the Transfer Courts. Motion at ¶ 36. However, that fact is in no way dispositive and bears little if any relevance: the Action is currently being held in abeyance, and witnesses are *not* currently required. Therefore, their location, at this juncture, is of no moment. What is more, the location of Mr. Michael V. Strain (cited as a factor by the Movants in favor of transfer, Motion at ¶ 36) is also irrelevant because, as noted above, he is no longer a member of the Debtors' board of directors. See supra note 5.

37.     That being said, notwithstanding the few instances that the Debtors' representatives will need to appear in Court, both the Debtors' and Wayzata's sole counsel are located in Delaware. Thus, the Debtors are well positioned, maintaining representation near to the Court. And, the Movants have plainly demonstrated that they are in no way impeded or

prejudiced with these cases in a Delaware forum given that they have been very active participants in the process since the first day of these Chapter 11 Cases.

38.     Finally, the Debtors' books and records are easily accessible via electronic means if the need to access them ever arises.  Enron II, 284 B.R. at 394 (noting that presence of books and records outside of chosen venue was "not major concern" because email and technology could provide easy access).  In the end, this factor is at worst neutral and at best tips in the Debtors' favor because any witnesses, the materials they may need to reference, and the representatives of the parties in interest, can either easily access Delaware or are actually located in Delaware.

### 6. The Economic Administration of the Estate.

39.     The factor most paramount in a court's decision of whether to transfer venue is where the economic administration of a chapter 11 case can best be accomplished. See Qualteq, 2012 WL 527996, at *6; Enron II, 284 B.R. at 395; CORCO, 596 F.2d at 1247.  The primacy of economic and efficient administration of the estate can outweigh the adverse circumstances of proximity in certain circumstances.  See generally In re Windtech, 73 B.R. 448, 451-52 (Bankr. D. Conn. 1987).  Here, this critical factor tips in favor of keeping venue of these Chapter 11 Cases in Delaware.

40.     First, the economic administration of a bankruptcy estate includes the need to obtain post-petition financing, the need to obtain financing to fund reorganization, and the location of the sources of such financing.  Indus. Pollution Control, 137 B.R. at 182; Enron I, 274 B.R. at 348.  Wayzata entered into the DIP Loan and set the sale milestones contained therein based on the Debtors' Chapter 11 Cases and sale process commencing and proceeding in Delaware.  Were venue transferred to any court other than the District of Delaware, Wayzata would need to reassess entering into the Ratification and DIP Loan, and terms set forth therein

19

(including Wayzata's compensation for the attendant risks of these cases pending in a jurisdiction other than Delaware). Thus, the funding of the DIP Loan was predicated on these Chapter 11 Cases proceeding in Delaware, and the economic and efficient administration of the estate would be best served by maintaining venue in Delaware.

41.    Second, maintaining venue in Delaware avoids an unwarranted increase in administrative expenses and costs to the Debtors. See Alcorn, 2012 WL 2974889, at *3 (denying venue transfer motion, explaining that increased administrative expenses frequently harm successful reorganizations and that transferring venue would duplicate administrative expenses already incurred in the district in which the case was pending); LaGuardia, 316 B.R. at 842 (denying motion to transfer venue where it would lead to increased travel expenses for parties' lead counsel). The Debtors' and Wayzata's sole counsel are both located in Delaware. Transferring the cases away from Delaware necessarily involves hiring local counsel and thus adds an additional layer of duplicative professional fees to both the Debtors and Wayzata (which the Debtors are responsible for under the DIP Loan). Further, transferring the cases will also involve travel costs of the Debtors' and Wayzata's respective counsel. Thus, the transfer of these Chapter 11 Cases would necessarily force the professionals in these cases to travel greater distances, making the administration of these Chapter 11 Cases not only more costly, but also less efficient. Tallerine should not be permitted to unilaterally increase the administrative costs of these Chapter 11 Cases given that he was terminated by the Debtors in 2012 and that his actions in part led to the commencement of these Chapter 11 Cases.

42.    Third, and finally, these Chapter 11 Cases contemplate a 363 sale of substantially all of the Debtors' assets. This common, uncontroversial, and relatively straight-forward process is one in which this Court is intimately familiar with and consistently presides

20

over.  Although Wayzata agrees that the Transfer Courts, as well as any other bankruptcy court

in the United States, could preside over a 363 sale, the core question is not whether this case

*could* be presided over in another district, but instead whether transferring venue *would* lead to a

case being "actually easier, faster or less expensive" to administer in another district.  Onco, 320

B.R. at 581.  In these Chapter 11 Cases, the answer is a resounding "no."  This Court has a

unique perspective and ability given that it "is one of the most experienced courts in the nation in

terms of corporate chapter 11 cases…."  Motion at ¶ 44.  As such, the Debtors selected this

Court, in their business judgment, to preside over these Chapter 11 Cases.  Preserving that choice

will lead to the most economic and efficient administration of their estates.

43.     At bottom, the most efficient and economic administration of the Debtors'

estates will occur in Delaware, their original choice of venue.

### 7. Other Private and Public Interest Factors Tip in Favor of Maintaining Venue in Delaware.

44.     As noted above, courts in this district also consider factors beyond the six

set forth in CORCO, including: (1) the public policies of the fora; (2) the local interest in

deciding local controversies; and (3) the familiarity of the judge with the applicable state law.

Alcorn, 2012 WL 2974889, at *2. These factors do not favor transferring venue.

45.     In this case, no special public policy or local interest militates in favor of

transferring venue.  This is not a single asset real estate case, in which a state maintains a special,

localized interest in governing over land in its borders.  See, e.g., LaGuardia, 316 B.R. at 839

(noting that decisions in which transfer is granted generally stress the importance of local

concerns about the administration of a bankruptcy case involving local real estate).  To the

contrary, the Debtors own thirty-five properties across two states, both on and off shore.

21

46.     What is more, this Court is no stranger to applying a variety of state laws. Transcript of Record at 56:12-21, In re Caribbean Petroleum Corp., Case No 10-12553 (KG) [Docket No. 167] (explaining that "the Court is fully able to determine and apply Puerto Rico Law.  As has been indicated, this Court is no stranger to the laws of other jurisdictions.  When a Court's jurisdiction is largely based on the fact that a corporation's domicile here…it's clear that very often this Court is asked to apply foreign law.").   And, to the extent the need to apply Louisiana, Texas, or any other state law arises, the Movants have made no assertion that such laws are either novel or complex.  See, e.g., In re Hechinger Inv. Co., 288 B.R. 398, 403 (Bankr. D. Del. 2003) (denying venue transfer motion, and explaining that although federal law would generally apply, the movant did not assert that issues of state law that could arise were either complex or novel).  Accordingly, the additional factors do not weigh in favor of transferring venue for the convenience of the parties.

47.     All in all, transferring venue for the convenience of the parties is not heavily favored, as required, nor have the Movants met their burden to demonstrate by a preponderance of the evidence that transfer is warranted.  Of the six factors considered, factors one and two (the location of assets and ancillary administration of the estate) should be afforded little or no weight.  Accordingly, the Movants have not met their burden as to these two factors. Of the remaining four factors, factors three and four (proximity of the debtors and proximity of the creditors) are no worse than neutral on balance.  Finally, factors five and six (the critical economic administration of the estate factor and the proximity of any witnesses factor) favor maintaining venue in Delaware.  Such an equal weighting is insufficient to warrant transfer.[12]

---

[12]     In any event, given modern technological advances, courts have noted the diminished importance of the "convenience" factor to the venue transfer analysis.  See PWS, 1998 Bankr. LEXIS 549, at *15 (acknowledging "the reality that technological advances continue to diminish the importance of the convenience factor") (internal quotations omitted).

See, e.g., Strouse Greenberg, 1990 WL 19803, at *2 (denying motion to transfer venue where two factors tipped in favor of transfer, two factors tipped in favor of maintain case in debtor's chosen venue, and two factors were insignificant); Alcorn, 2012 WL 2974889, at *5 (holding that, where factors tipped only somewhat in favor of transfer, transfer of venue was not warranted).

48.     At any rate, even assuming *arguendo* that factors three, four, and five (the proximity of the debtors, proximity of the creditors, and proximity of witnesses) do tip in favor of transfer, the Movants would still be unable to carry their burden because the efficient administration of the estate factor is the most important factor in the analysis, Enron II, 284 B.R. at 395, and a transfer of venue must be heavily favored − not just slightly favored. See Onco, 320 B.R. at 579; LaGuardia, 316 B.R. at 837; Garden Manor, 99 B.R. at 555.   In sum, the Movants have failed to meet their burden, and the Debtors' choice of venue should not be disturbed under the guise of the convenience of the parties.

### B. The Interest of Justice Does Not Weigh in Favor of Transferring the Chapter 11 Cases to Either Transfer Court.

49.     In considering whether to transfer venue in the interest of justice, the standard is both broad and flexible, and is applied on a case-by-case basis.  LaGuardia, 316 B.R. at 837.  "Some courts have combined the interest of justice analysis with the convenience of the parties analysis . . .  since the facts and circumstances which inform one evaluation will almost always bear on the other as well."  Id. at 839 (internal citations and quotations omitted); see also Enron II, 284 B.R. at 403 (noting that "the considerations involved with the interest of justice are intertwined with the economic and efficient administration of the estate.").   Further, "in evaluating the interest of justice, [a court] must consider what will promote the efficient administration of the estate, judicial economy, timeliness and fairness."  Id; Enron I, 274 B.R. at

23

349.  While the Movants do cite the Enron I decision in arguing the proposition that the interest of justice favors transfer, Motion at ¶ 52, that case in fact held that the interest of justice *did not* warrant a transfer of venue.   Enron I, 274 B.R. at 350-51 (noting that the interest of justice is served by retaining venue).  Likewise, in Enron II, the court also denied a transfer of venue.  284 B.R. at 405 (noting that the interest of justice is served by retaining venue and that the movant had "failed to carry its burden" on the interest of justice factor).   Accordingly, the Enron decisions are instructive, and further elaboration on them is helpful in guiding this Court's analysis.

50.    In Enron II, the court evaluated three considerations in denying a transfer of venue under the interest of justice prong, two of which are applicable here:[13]  (1) the delay in administration of the estate and (2) the "learning curve" attendant with any transfer.  Id. at 403.

51.    First, in considering the delay in the administration of the estate, the court held that this factor tipped in favor denying transfer:  the court was entirely confident that there would be a delay in administration because new professionals would need to "be retained and be required to immediately become familiar with the case", id. at 403, as would be necessary in these Chapter 11 Cases.  Indeed, any such delay would undoubtedly lead to the delay of a final hearing on the DIP Motion, currently set for November 26, 2013, and possibly to a delay and interruption in the Debtors' access to funds under the DIP Loan, the sale of the Debtors' assets and, ultimately, the payment of creditor claims.  What is more, the transfer of venue and its inevitable attendant delays is potentially disruptive to the sale process and could harm the Debtors' ability to attain the highest and best price for their assets.  Further, in these Chapter 11

---

[13]    The third factor the court considered was the intertwined nature of a debtor and its parent and/or subsidiary, and their interest in having their cases adjudicated in the same court.  Enron II, 284 B.R. at 403.  Such consideration is not applicable here because in Enron II the debtors commenced their cases at differing times, and the venue transfer motion sought only to transfer venue of one subsidiary of the debtors.  Id. at 385.  Here, the Movants seek to transfer all cases.

24

Cases, the necessity of retaining new professionals and the need for lead counsel to travel to the Transfer Courts would add an additional and significant layer of expenses to the Debtors.

52.    Second, in considering the learning curve, the <u>Enron II</u> court explained that such a consideration involved evaluating the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue.  <u>Id.</u> at 404.  <u>See also</u> <u>Enron I</u>, 274 B.R. at 350 (explaining in context of interest of justice consideration that "[a] transfer at this time would not promote judicial economy as it would only delay pending matters while a transferee court familiarized itself with the intricacies of these cases.").  While here it is true that only one hearing has taken place, it cannot be disputed that at this point in time, the Court has more familiarity with the Debtors' cases than any other court, having heard and considered the background of the Debtors' business, the causes of their Chapter 11 Cases, their "first day" motions for relief, and corresponding objections thereto.[14]  Additionally, this Court has refused to transfer venue in cases in which the motion to transfer venue was brought sooner than the Movants' Motion here.  <u>See, e.g.</u>, Transcript of Record at 57:13-14, <u>In re Caribbean</u> <u>Petroleum Corp.</u>, Case No 10-12553 (KG) [Docket No. 167] (denying venue transfer motion that was brought seven days post-petition).  In summary, the <u>Enron II</u> court noted that the parties most essential to the court were located in New York, that the transaction could be most easily accomplished by utilizing the resources based in New York and that the professionals retained by the Debtors, were all primarily located in New York.  284 B.R. at 405.  Transferring venue would therefore "be inefficient and wasteful, and would be contrary to the interests of judicial economy".  <u>Id.</u>  So too here.  In the Debtors' case, the parties most essential to the Chapter 11

---

[14]    Although the Motion states that "given that the Texas Bankruptcy Court sits in the same city as the Debtors' principal place of business, that court may already have developed a learning curve regarding the Debtors," Motion at ¶ 53, such prognostication should in no way inform this Court's judgment as to whether or not there would be a learning curve associated with a transfer of these cases.

Cases are located in Delaware, the Debtors have selected Delaware as the venue in which their prospective 363 sale can be most easily accomplished, the Debtors' and Wayzata's sole counsel are located in Delaware, and their other professionals can easily access Delaware. Accordingly, the Movants have failed to meet their burden of demonstrating that the interest of justice warrants the transfer of venue of these Chapter 11 Cases.

53.    Justice clearly does not warrant transfer in these cases. The consideration of justice here also weighs against transferring venue as the Movants may have their individual interests in mind, including as a result of allegations of mismanagement, self-dealing and fraud as has been alleged in other fora.[15]    Indeed, Movants simply are not entitled to a veto over the Debtors' fully informed choice of venue. Accordingly, the interest of justice, at a minimum, instructs that this Court not disturb the Debtors' choice of forum.

### C. These Chapter 11 Cases Are Similar to Others in Which this Court Maintained Venue.

54.    This Court has considered and denied motions to transfer venue in circumstances largely analogous to the Debtors' Chapter 11 Cases. See In re Caribbean Petroleum Corp., Case No. 10-12553 (KG) (Bankr. D. Del. Aug. 19, 2010) [Docket Nos. 55 & 167]. In Caribbean Petroleum, like the Debtors' business here, the debtors were an oil company and maintained their operations in Puerto Rico, where substantially all of the debtors' assets were located. Although the debtors were incorporated in Delaware, over 90% of their creditors were located in Puerto Rico. In re Caribbean Petroleum Corp., Case No. 10-12553 (KG) (Bankr. D. Del. Aug. 19, 2010) [Docket No. 55]. Further, like the Debtors here, the debtors had only one creditor located in Delaware. Id. The debtors commenced their cases after certain explosions

---

[15]    As previously noted, Tallerine's past alleged misconduct includes misuse of funds while being a court appointed fiduciary in a chapter 11 case that was venued in the Western District of Louisiana, one of the very districts Movants seek to transfer these Chapter 11 Cases to. See Exhibit B, attached hereto.

occurred in their production facilities, seeking a 363 sale of substantially all of their assets.  Like the Movants' Motion, here, which was filed eight days after the petition date, the Secretary of the Treasury of Puerto Rico filed a motion to transfer venue to Puerto Rico just seven days after the petition was filed.  Id.  The debtors and the debtors' DIP lender, among others, all opposed the motion.

55.     Notwithstanding the facts that substantially all of the debtors' assets were located in Puerto Rico, over 90% of the debtors' creditors were located in Puerto Rico, and only one creditor existed in Delaware − similar to Movants' allegations that substantially all of the Debtors assets are located in the Transfer Court districts, approximately 79% of all creditors are in the Transfer Court districts, and only one creditor exists in Delaware − this Court refused to transfer venue because, among other things: (a) transfer would increase the administrative cost to the debtor because the professionals of the debtor, DIP lender, and the committee were all located in Delaware or New York, and (b) the transfer would potentially delay the sale process. Transcript of Record at 54-57, In re Caribbean Petroleum Corp., Case No 10-12553 (KG) [Docket No. 167] (denying venue transfer motion that was brought seven days post-petition).[16] If denial of the venue transfer motion was appropriate in Caribbean Petroleum, the Movants' Motion should be denied as well.

56.     In these Chapter 11 Cases, the Debtors have chosen, in their business judgment, to pursue their bankruptcy in the United States Bankruptcy Court for the District of Delaware − a choice they were fully entitled to make and a choice that courts grant broad deference to.  The fact that some "convenience of the parties" factors may tend to favor another

---

[16]     The Court also noted that transfer was inappropriate because the official committee of unsecured creditors opposed the motion.  Transcript of Record at 54-57, In re Caribbean Petroleum Corp., Case No 10-12553 (KG) [Docket No. 167].  However, because no committee has been formed in these cases, that consideration is inapplicable.

venue should not and cannot lead this Court to actually effectuate such a transfer.   More is required.   <u>See, e.g.</u>, <u>Alcorn</u>, 2012 WL 2974889, at *5 (explaining that although the factors may have tipped "somewhat" in favor of transferring venue, they did not do so with sufficient weight to warrant transferring the case).   Moreover, the interest of justice warrants maintaining Delaware as the venue of these Chapter 11 Cases.   The Motion should therefore be denied, and venue should remain in Delaware.   The Debtors' choice of venue should not be disturbed.

**WHEREFORE**, Wayzata respectfully requests that, for all of the foregoing reasons, the Court deny the Movants' Motion to transfer venue and grant such other and further relief as may be just and proper.

Dated: November 18, 2013
       Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

*/s/ William A. Romanowicz*
John H. Knight (No. 3848)
Michael J. Merchant (No. 3854)
Marcos A. Ramos (No. 4450)
William A. Romanowicz (No. 5794)
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: knight@rlf.com
       merchant@rlf.com
       ramos@rlf.com
       romanowicz@rlf.com

*Counsel for Wayzata Opportunities Fund II, L.P.*

RLF1 9578413v.6